UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ACTBLUE LLC, ACTBLUE CIVICS, INC., ATS, INC., and ACTBLUE CHARITIES, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:26-cv-11986 |
| WARREN KENNETH PAXTON, JR., *in his official capacity as Attorney General of the State of Texas*, | ) ) ) ) | Jury Trial Demanded |
| Defendant. | ) ) ) | |

## **COMPLAINT**

Plaintiffs ActBlue LLC; ActBlue Civics, Inc.; ATS, Inc.; and ActBlue Charities, Inc. (collectively, "ActBlue"), for their Complaint for Declaratory, Injunctive, and Other Relief against Defendant Warren Kenneth Paxton, Jr. in his official capacity as Attorney General of the State of Texas, hereby allege:

## **INTRODUCTION**

1.     This case concerns Attorney General Paxton's unlawful abuse of his authority as the highest law-enforcement officer of the State of Texas, by intimidating, harassing, and targeting his political opponents in violation of the First Amendment. His latest tactic has been to take aim at ActBlue.

2.     ActBlue LLC is a non-profit political action committee ("PAC") headquartered in Massachusetts. It operates the primary online fundraising platform used by Democratic candidates and their supporters to connect, organize, and compete in local, state, and federal elections. ActBlue LLC offers its services only to Democratic and progressive causes and

1

candidates.  Since its founding in 2004, ActBlue LLC has raised nearly $19 billion for Democratic candidates and causes.  By giving donors an easy and secure way to support their preferred candidates and causes, ActBlue LLC provides Democratic candidates and committees, as well as progressive organizations and non-profits, tools to help build grassroots campaigns and movements.  In other words, ActBlue LLC engages in its own expressive and associational activity by selecting the kinds of candidates and causes that may use its tools, and it facilitates donors' participation in expressive activity (i.e., political speech) through donations, thereby connecting candidates and donors.

3.      Paxton has chosen to target ActBlue in retaliation for ActBlue's role in facilitating the funding of Democratic candidates—including the Democratic opponent in Paxton's current campaign for the U.S. Senate, James Talarico.  The day after Talarico announced raising more than $2 million in 24 hours through ActBlue, Paxton dispatched his investigators to build a case against ActBlue.  Most recently, in a round of interviews on conservative podcasts during which Paxton decried that "ActBlue has raised billions of dollars for liberal causes, liberal Democrats," he announced that he had that same day filed a civil enforcement action against ActBlue LLC. *See* Pet. & Request for Temporary & Permanent Inj., *State of Texas v. ActBlue LLC*, No. 096-376890-26 (Dist. Ct., Tarrant Cnty., Tex. filed April 20, 2026) ("TX Pet.").

4.      ActBlue brings this action for declaratory and injunctive relief to stop Paxton's retaliatory actions against ActBlue for its constitutionally protected activities.

5.      "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).  The First Amendment has its "'fullest and most urgent application'" to speech "'uttered during a campaign for political office.'"  *Id.* (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S.

214, 223 (1989)). That protection extends beyond isolated acts of expression to collective political activity in which citizens associate to advocate, organize, and compete in elections. Because "[p]olitical speech is 'indispensable to decisionmaking in a democracy," "political speech must prevail against laws that would suppress it, whether by design or inadvertence" and is protected regardless of whether "'the speech comes from a corporation rather than an individual.'" *Id.* at 340, 349 (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 777 (1978)).

6. Contributions to political campaigns both "generate essential political speech by fostering discussion of public issues and candidate qualifications," *McCutcheon v. FEC*, 572 U.S. 185, 228 (2014) (Thomas, J. concurring) (citation and quotation marks omitted), and simultaneously constitute acts of political association that link donors with candidates, committees, and causes they support. In fact, contributions *enable* much of campaigns' political speech because, in the United States, "election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *McCormick v. United States*, 500 U.S. 257, 272 (1991). Interference with those contributions therefore burdens not only speech, but the associational relationships that sustain democratic participation.

7. Paxton, the Texas Attorney General who is also currently a Republican candidate for the U.S. Senate, has repeatedly sought to chill ActBlue's exercise of its constitutional rights to free speech and association. In numerous public statements, Paxton has criticized ActBlue for "fund[ing]" what he calls "left-wing campaigns" and supporting what he calls the "radical left." Seeking to stifle his political opponents' ability to raise funds, Paxton has, for more than two years, used his authority as Attorney General to target ActBlue for its political speech and campaign fundraising activities, including by issuing numerous investigative demands under

Texas law for documents and information in ActBlue's possession and, most recently, by filing suit against ActBlue LLC in Texas state court.

8.     Paxton's latest lawsuit against ActBlue LLC is rife with false and inflammatory allegations in a blatant attempt to both retaliate against ActBlue for engaging in protected First Amendment activity—including in favor of his political opponents—and chill the candidates and campaigns that would associate with ActBlue.  His central claim is that ActBlue facilitates donor fraud by accepting gift-card and prepaid-debit-card donations.  But his lawsuit omits the fact that his investigators' clandestine attempts to use gift cards on the ActBlue platform were repeatedly rejected by the platform's automated tools and ignores powerful controls that ActBlue has instituted to prevent fraud and foreign contributions.

9.     Paxton's decision to use his government office to target ActBlue with legal sanctions as retribution for its protected speech and political association is an affront to the Constitution and must not be tolerated.  Any "[o]fficial reprisal for protected speech" violates the Constitution because it "threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  Accordingly, the "First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion ... to achieve the suppression' of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).  Paxton's use of the Texas Attorney General's Office to conduct a retaliatory investigation, issue retaliatory (and intrusive) document demands, and initiate a retaliatory state civil enforcement action against ActBlue are precisely the sort of threatened "legal sanctions," "coercion," and intimidation that the First Amendment forbids. Each action unlawfully burdens ActBlue's constitutionally protected activity and flows directly from Paxton's disapproval of how ActBlue exercises its First

Amendment rights, namely by supporting Democratic and progressive candidates and causes. This retaliatory conduct violates the Constitution.

10.     Such political harassment through abuse of legal process subjects ActBlue to multiple forms of ongoing harm, including reputational and associational harm, associational harm to donors and campaigns, diversion of time and resources, and chilling of constitutionally protected speech.

11.     To protect bedrock constitutional freedoms and to ensure robust political debate uninhibited by Paxton's use of his power to punish political opponents, this Court should declare Paxton's ongoing investigatory and litigation efforts unlawful and enjoin both Paxton's civil enforcement action against ActBlue LLC as well as any further investigatory or other acts of retaliation against ActBlue for its exercise of its First Amendment rights.

## **PARTIES**

12.     Plaintiff ActBlue LLC is a non-profit PAC registered with the Federal Election Commission ("FEC") and state electoral authorities.  Established in 2004, ActBlue LLC is a Massachusetts limited liability corporation headquartered in Boston, Massachusetts.   Its organizational mission is to help Democratic candidates and other progressive political groups build small-dollar fundraising programs through ActBlue LLC's cutting-edge online fundraising platform.  For certain non-federal activities, ActBlue LLC files with the Internal Revenue Service ("IRS") as a 527 political organization.

13.     Plaintiff ActBlue Civics, Inc. is the arm of the ActBlue organization that helps progressive non-profit social-welfare organizations that are registered as tax-exempt under section 501(c)(4) of the federal tax code build grassroots social and political movements, using ActBlue's online fundraising platform.  ActBlue Civics, Inc. is a Massachusetts non-profit corporation that files with the IRS as a 501(c)(4) organization.

14.    Plaintiff ActBlue Charities, Inc. is the arm of the ActBlue organization that helps progressive non-profit organizations that are registered as tax-exempt public charities under section 501(c)(3) of the federal tax code build grassroots social and political movements, using ActBlue's online fundraising platform.  ActBlue Charities, Inc. is a Massachusetts non-profit corporation that files with the IRS as a 501(c)(3) non-profit organization.

15.    Plaintiff f/k/a ATS, Inc. (formerly known as ActBlue Technical Services, Inc.) is a Massachusetts non-profit corporation that has, in the past, provided the technical services and engineering expertise necessary to support ActBlue's online fundraising platform.  The services are now among the vendor services that ActBlue, Inc. provides after a corporate reorganization. Plaintiff f/k/a ATS, Inc. continues to file with the IRS as a 527 organization.

16.    Defendant Warren Kenneth Paxton, Jr. is sued in his official capacity as Attorney General of the State of Texas.  The Attorney General's Office is headquartered in Austin, Texas. In addition to his position as Attorney General, Paxton is currently a candidate in the Texas Republican primary runoff for the U.S. Senate, scheduled for May 26, 2026.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the First and Fourteenth Amendments to the United States Constitution; under 28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that it seeks to secure equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of federal civil and constitutional rights; under 28 U.S.C. § 2201, to secure declaratory relief; under 28 U.S.C. § 2202, to secure preliminary and permanent injunctive relief; and under 42 U.S.C. § 1988, to award attorneys' fees.

18.     ActBlue has standing (a component of Article III jurisdiction) to bring its claims here.  First, ActBlue has suffered and will continue to suffer injuries-in-fact, including the harms already mentioned, *see supra* ¶ 9.  A state attorney general's compulsory demand for documents can itself impose a present injury to First Amendment associational rights sufficient to establish injury-in-fact.  *See First Choice Women's Res. Ctrs. v. Davenport*, No. 24-781, slip op. at 6 (U.S. Apr. 29, 2026).  Second, there is a sufficient causal connection between ActBlue's injuries and Paxton's actions in pursuing his investigation and civil enforcement action, including deceptive techniques by his investigators on the ActBlue platform, issuance of Requests to Examine ("RTEs") ActBlue documents and two subsequent Civil Investigative Demands ("CIDs") to ActBlue, and the civil lawsuit filed against ActBlue LLC in Texas state court on April 20, 2026.  Third, a favorable decision from this Court granting ActBlue relief will redress those injuries.  Finally, this dispute is ripe (another component of Article III jurisdiction) because ActBlue's rights are already being violated, and ActBlue will suffer further imminent invasions of those rights in the absence of relief from this Court.

19.     This Court has personal jurisdiction over Paxton in his official capacity as Attorney General of Texas.  Personal jurisdiction over an out-of-state defendant is proper where both the standards of the forum state's long-arm statute and the requirements of the Due Process Clause are satisfied.  *See Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015).  The Massachusetts long-arm statute allows courts to exercise personal jurisdiction "over a person, who acts directly or by an agent," where the suit "aris[es] from the person[] (a) transacting any business in" Massachusetts.  G.L. c. 223A, § 3.  Massachusetts courts interpret the "transacting any business in" clause of § 3(a) "expansive[ly]" for the purposes of establishing personal jurisdiction.  *Diamond Grp., Inc v. Selective Distrib. Int'l, Inc.*, 84 Mass. App. Ct. 545, 550-52

(2013). To create personal jurisdiction, "the volume of business need not be substantial but merely definite and perceptible." *Id.* at 549. Moreover, the defendant's physical presence in Massachusetts is not required to create personal jurisdiction, as "'[m]odern technology has taken us far beyond the point where two [persons] must stand in each other's physical presence to transact business.'" *Id.* at 552.

20.     The claims in this case arise from Paxton's purposeful contacts with Massachusetts, which qualify as "transacting any business in" the Commonwealth. First, Paxton caused or attempted to cause four RTEs and two subsequent CIDs to be delivered to or served on ActBlue in Somerville, Massachusetts, where its headquarters were located at the time. In those demands, moreover, Paxton sought documents from ActBlue that were overwhelmingly located in Massachusetts, and ActBlue had to undertake substantial efforts and divert organizational resources in Massachusetts to comply. Indeed, the RTEs directed that the requested documents "be produced for inspection and copying during normal business hours *at your principal office or place of business*," which for ActBlue was and is in Massachusetts. Further, Paxton's Office claimed that, as part of its investigation that led to the filing of the Texas state civil enforcement action against ActBlue LLC, it made three direct donations through the use of ActBlue LLC's website—the first using a fraudulently provided false name, and the other two each using the nickname of one of Paxton's investigators. *See* TX Pet. ¶¶ 38–41. In fact, Paxton's Office made or attempted to make additional donations beyond those identified in the Petition. A donation was made not only through ActBlue's website, but directly to ActBlue LLC (a Massachusetts entity). *See infra* ¶ 69. The ActBlue LLC treasurer, who oversees donation processing and reporting of political contributions to the FEC for all ActBlue entities, is physically located in Massachusetts. Paxton then brought the civil enforcement action against ActBlue LLC in Texas

state court on April 20, 2026, purportedly in response to (1) ActBlue's activities in Massachusetts to prevent fraud and process contributions, and (2) statements by ActBlue's CEO in a signed letter. These actions by Paxton—aimed at Massachusetts, taken with the intention of limiting ActBlue's ability to participate in future political activity there, and causing harm in this Commonwealth—demonstrate that Paxton has "transact[ed] business in" Massachusetts.

21.    Personal jurisdiction independently exists under § 3(c) of the Massachusetts long-arm statute, which creates jurisdiction where a case arises from the defendant "(c) causing tortious injury by an act or omission" in Massachusetts. G.L. c. 223A, § 3. That section is satisfied here because ActBlue alleges unlawful retaliation by Paxton in Massachusetts in violation of the First Amendment, a constitutional tort. *See Hartman*, 547 U.S. at 259-60. Paxton, through his agents, intentionally served and attempted to serve RTEs on ActBlue in Massachusetts as an act of retaliation against ActBlue for the exercise of its constitutionally protected rights, and now attempts to leverage the fruits of that in-state conduct in furtherance of his retaliatory lawsuit in Texas state court, all in violation of ActBlue's First Amendment rights. Paxton has therefore committed a tortious act in Massachusetts.

22.    This Court's exercise of personal jurisdiction over Paxton comports with due process because "he manifestly has availed himself of the privilege of conducting business" in Massachusetts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Paxton's investigative demands delivered in Massachusetts and undercover transactions with ActBlue directed at Massachusetts were undertaken for the specific purpose of retaliatory enforcement to chill ActBlue's First Amendment-protected political activity in Massachusetts. That Paxton "contemplated" that his actions would have these "consequences" in this forum confirms that he "purposefully established minimum contacts within the forum." *Id.* at 479.

23.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to ActBlue's claims occurred in Massachusetts.  Paxton caused and attempted to cause his RTEs to be served in Massachusetts; ActBlue's compliance with the RTEs occurred in full or in part in Massachusetts; the undercover transactions Paxton's investigators initiated were directed to and processed by ActBlue in Massachusetts, and the substantial chill to ActBlue has been suffered, in substantial part, in Massachusetts.

## **FACTS**

### A.  **ActBlue Is A PAC With An Established Track Record Of Fundraising For Progressive Candidates And Causes**

24.    Since its inception in 2004, ActBlue has helped progressive candidates and organizations raise nearly $19 billion through hundreds of millions of individual contributions from millions of grassroots donors.  *See* ActBlue, https://secure.actblue.com.  The average donation through ActBlue's platform is approximately $40.

25.    Unlike many other PACs, ActBlue does not collect funds to distribute to politicians or, generally, political organizations.[1]  Rather, through its online fundraising platform, ActBlue serves as a conduit for individual contributions to candidates, committees, and non-profit organizations.  Because ActBlue is a conduit, federal law treats those contributions as coming from the individual donors, not ActBlue.

---

[1] ActBlue does not make contributions with its own funds to candidates.  ActBlue does make a limited number of contributions with its own funds to PACs and national party committees (the DNC, etc.), all of which are reported in its regular FEC reporting.

26.    ActBlue charges a processing fee for each donation but does not otherwise charge for the use of its fundraising and communication tools.[2]  Funds raised go directly to the candidate or organization of the donor's choice, less the processing fee.  ActBlue also accepts donations to aid its own organizational mission from the contributors who use its platform.

27.    ActBlue makes its technology platform available to candidates for local, state, and federal office who are registered Democrats, Democratic committees, PACs working for Democratic or progressive causes, and 501(c)(4) non-profits and 501(c)(3) charities that pursue progressive social change.

28.    Over numerous election cycles, ActBlue has become a foundational piece of campaign infrastructure for Democratic Party organizations and Democratic candidates, enabling candidates and committees to fundraise in a cost-effective way from individual donors (especially small contributors) and to sustain connections with donors across election cycles.  For instance, according to FEC data, Democratic House and Senate candidates raised 4.4 times more from individual contributors during the 2022 election cycle than they did during the 2004 election cycle, far outpacing the increase in funds from other sources such as corporate PACs.[3]

---

[2] ActBlue, Inc. has recently acquired two service providers, Impactive and Hey Victor.  *Press Release: ActBlue Acquires Impactive, Leading Democratic Organizing Platform, Expanding Power to Support Campaign Operations*, ACTBLUE (Sept. 17, 2025), https://www.actblue.com/posts/press-release-actblue-acquires-impactive-leading-democratic-organizing-platform-expanding-power-to-support-campaign-operations/; *ActBlue Acquires Hey Victor to Bring Intuitive Website Development to All Democratic Campaigns*, ACTBLUE (Jan. 21, 2026), https://www.actblue.com/press-release/actblue-acquires-hey-victor-to-bring-intuitive-website-development-to-all-democratic-campaigns/.  The communications services being offered by these new subsidiaries are fee-for-service but are not related to the allegations in Paxton's Petition.

[3] *See* Federal Election Commission*, Senate Candidate Contributions Over Time, https://www.fec.gov/data/elections/senate/*; Federal Election Commission, *House Candidate Contributions Over Time*, https://www.fec.gov/data/elections/house/.

29.     ActBlue's usage patterns confirm that individual contributors, including small-dollar donors, voice their political beliefs through contributions.  A disproportionate number of contributors donate close in time to significant political events, while a large proportion of total donations likewise occurs during those periods.  For example, that includes the death of Supreme Court Justice Ruth Bader Ginsburg in 2020, in the wake of which small-dollar donors gave more than $91 million.  Similarly, following the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), small-dollar donors contributed more than $89 million through the platform.

**B.  ActBlue Has Adopted Robust Safeguards To Protect Against Fraudulent Donations**

30.     ActBlue has long implemented strong compliance measures to prevent its platform from being exploited for unlawful purposes, and it regularly reviews and updates those measures to reflect current industry standards and emerging threats.  These measures include software and human review of contribution activity and other user conduct to prevent fraudulent transactions.  Moreover, although candidates and committees that solicit and receive contributions through conduits like ActBlue are ultimately responsible for ensuring that any contributions they receive comply with the law, ActBlue implements multiple safeguards to block political contributions that are prohibited by applicable campaign finance law.

31.     ActBlue's objective is to prevent any illegal contribution from being processed on its platform.  ActBlue seeks to achieve this objective by, for example, ensuring that its contribution forms provide donors with necessary information about eligibility for and limits on contributing to political campaigns.

32.     ActBlue's fundraising platform also collects and verifies legally required information from contributors, as well as information that is not required but may assist in compliance review.  For federal political donations, for example, ActBlue collects information

required for FEC reporting, including the donor's name, address, occupation, and contact information.

33.    ActBlue's transaction-processing technology is externally audited, and ActBlue has been certified as a Level 1 service provider under the Payment Card Industry Data Security Standard ("PCI DSS"), meaning that it has more than six million transactions annually yet maintains the highest level of compliance and payment security standards.

34.    ActBlue uses industry-standard fraud-detection software to assess each contribution made through the ActBlue fundraising platform for indications of fraud.  The software uses behavioral modeling, evaluating over 140 "signals" to assess the risk that any particular transaction is fraudulent, including the age of the credit card used, the payment type, the issuer country, recent address changes, and individual-cardholder information.  As part of this system, ActBlue's payment processor automatically blocks certain transactions that appear fraudulent.

35.    Transactions that are not automatically blocked but are flagged as high-risk are reviewed by ActBlue staff to determine if they comply with both legal requirements and ActBlue's contribution standards.  This review examines all relevant circumstances, including the risk factors identified by the fraud-detection tool, the contributor's donation history and patterns, the information the donor provided on the contribution form, and publicly available information. Donations that appear to be fraudulent or otherwise appear not to comply with applicable law are rejected.

36.    While ActBlue has historically implemented compliance systems designed to prevent fraudulent or legally non-compliant donations, it has bolstered these defenses over time. For instance, in 2024, ActBlue began collecting credit card verification values ("CVVs") for first-

time donors and returning donations from donors whose payment information had not been saved. Requiring CVVs for transactions is an optional security measure traditionally used to address fraud and limit chargebacks for stolen goods in transactions where material goods or services are provided. ActBlue implemented CVV collection as part of an update to its broader security and anti-fraud measures and to enhance donor confidence in the security of its platform.

37.    To take another example, in 2025, ActBlue implemented additional restrictions to prevent donations originating from outside the United States or its territories. These restrictions are intended to mitigate the risk that people who are neither citizens nor legal permanent residents of the United States may seek to circumvent ActBlue's policies, technology, and compliance systems to make an unlawful donation.

### C.    Paxton Has A History Of Targeting Democratic-Aligned Entities

38.    During his tenure as Texas Attorney General, Paxton has signaled an emphasis on enforcement against entities enabling voting and political speech that he perceives as aligned with the Democratic Party. He has consistently sought to suppress speech with which he disagrees and hobble his political opponents by abusing the powers of his Office.

39.    As one example, Paxton sought to revoke the nonprofit charter of the JOLT Initiative, a Texas-based Latino civic-engagement organization focused on increasing voter participation among historically underrepresented communities. JOLT and its counsel criticized the action as retaliatory and aimed at suppressing civic participation.[4] When JOLT brought suit under 42 U.S.C. § 1983 to stop Paxton's retaliation, the court issued an injunction blocking Paxton's actions and finding that Paxton had acted in bad faith, failed to present any credible or

---

[4] Ryan J. Farrick, *Texas NGO Files Lawsuit Following "Retaliatory" Attorney General Probe*, LEGAL READER (Nov. 10, 2025), https://www.legalreader.com/texas-jolt-initiative-ngo-ken-paxton-lawsuit/.

plausible evidence of wrongdoing by JOLT, and appeared to be intimidating JOLT for engaging in constitutionally protected activity. *See Jolt Initiative, Inc. v. Paxton*, No. 1:25-cv-01808-RP, Order (W.D. Tex. Jan. 29, 2026), ECF No. 44.

40.     Paxton has also repeatedly expressed an interest in using the powers of his office to address what he has characterized as ideological or political bias by social media companies against conservatives.  Since at least 2018, Paxton has criticized content-moderation decisions by Twitter and other social media platforms, accusing those companies of suppressing conservative viewpoints, and signaling that state investigative and enforcement tools could be used to address the alleged anti-conservative bias.[5]

41.     On January 13, 2021 (shortly after Twitter suspended President Donald Trump's account), Paxton issued a CID and opened an investigation into Twitter's internal content-moderation policies—actions that Twitter alleged were retaliatory and inconsistent with the First Amendment.[6]  Paxton's statements and conduct toward Twitter are another example of Paxton invoking the authority of his Office to pressure private entities whose speech-related decisions he views as ideologically opposed to his political allies.  In other words, Paxton has used his elected office to engage in viewpoint discrimination against ideological and political speech he disfavors.

---

[5] Carson McCullough, *Twitter Sues Texas AG Over His Demand for Internal Documents*, COURTHOUSE NEWS SERVICE (Mar. 8, 2021), https://www.courthousenews.com/twitter-sues-texas-ag-over-his-demand-for-internal-documents/.

[6] Press Release, Tex. Att'y Gen., *Attorney AG Paxton Issues Civil Investigative Demands to Five Leading Tech Companies Regarding Discriminatory and Biased Policies and Practices* (Jan. 13, 2021),
https://www.oag.state.tx.us/news/releases/ag-paxton-issues-civil-investigative-demands-five-leading-tech-companies-regarding-discriminatory.

42. Paxton has also used his elected office to target election fundraising and related activities by Democrats. On multiple prior occasions, Paxton has announced investigations targeting fundraising entities aligned with Democratic candidates, including organizations he labeled "Beto O'Rourke's radical group" and "the Soros-Slush Fund," asserting that those entities were unlawfully financing Democratic political activity.[7] In announcing one such investigation, Paxton underscored the partisan thrust of his enforcement posture by declaring that "*[a]ny Democrat* coward breaking the law by taking a Beto Bribe will be held accountable."[8] The organization labeled by Paxton in the same announcement as "Beto O'Rourke's radical group," the Powered by People PAC, raised a significant portion of its funds through small-dollar donations processed via ActBlue.[9] More generally, Paxton has frequently and publicly portrayed Democratic-aligned fundraising—but not Republican-aligned fundraising—as inherently suspect.

43. Paxton's retaliatory use of enforcement authority is well-established. Federal courts have already concluded that he has abused his enforcement authority as Texas Attorney General to retaliate against adversaries for exercising their constitutional rights. As noted above,

---

[7] Press Release, Tex. Att'y Gen., *Attorney General Ken Paxton Launches Investigation into Beto O'Rourke's Radical Group for Unlawfully Funding Runaway Democrats* (Aug. 6, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-beto-orourkes-radical-group-unlawfully-funding; Press Release, Tex. Att'y Gen., *Attorney General Ken Paxton Launches Investigation into Soros-Funded PAC for Unlawfully Funding Runaway Democrat Legislators* (Aug. 7, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-soros-funded-pac-unlawfully-funding-runaway.

[8] Press Release, Tex. Att'y Gen., *Attorney General Ken Paxton Launches Investigation into Beto O'Rourke's Radical Group for Unlawfully Funding Runaway Democrats* (Aug. 6, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-beto-orourkes-radical-group-unlawfully-funding (emphasis added).

[9] Cameron Arcand, *Texas AG investigates Beto O'Rourke PAC over support for quorum-breaking lawmakers*, FOX NEWS (Aug. 8, 2025), https://www.foxnews.com/politics/texas-ag-investigates-beto-orourke-pac-over-support-quorum-breaking-lawmakers.

a federal court enjoined Paxton's attempted revocation of JOLT's charter because Paxton appeared to be intimidating JOLT for engaging in the constitutionally protected activity of encouraging voter participation.[10]

44.    Another such instance arose from reporting by Media Matters for America ("Media Matters"), a District of Columbia-based nonprofit media watchdog.  On November 16, 2023, Media Matters published an article documenting a pattern of corporate advertisements appearing alongside extremist content on an online platform, noting that images of Adolph Hitler and white nationalist messages were being displayed next to advertisements from prominent corporations.[11]

45.    Despite the fact that the Media Matters article had no connection to Texas, Paxton stepped in.  On November 20, 2023, Paxton's Office launched an investigation into Media Matters for alleged violations of the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code Ann. § 17.41, et seq., (the same statute he has now weaponized against ActBlue), issuing a CID that compelled the production of extensive records.[12]  In public statements, including an official press release and an interview, Paxton called Media Matters a "radical anti-free speech organization," encouraging other attorneys general to investigate.[13]

46.    Media Matters and the journalist who authored the article filed suit under 42 U.S.C. § 1983 against Paxton in his official capacity, alleging that Paxton's investigation was in

---

[10] *Jolt Initiative, Inc. v. Paxton*, No. 1:25-cv-01808-RP, Order (W.D. Tex. Jan. 29, 2026), ECF No. 44.

[11] Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, MEDIA MATTERS (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

[12]. Press Release, Tex. Att'y Gen., *Attorney General Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity* (Nov. 20, 2023), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-opens-investigation-media-matters-potential-fraudulent-activity.

[13] *See id.*

furtherance of an unlawful campaign of retaliation against Media Matters for the exercise of its First Amendment rights by publishing articles with which Paxton was displeased.  *See* Compl., *Media Matters for Am. v. Paxton*, No. 1:24-cv-00147 (D.D.C. Jan. 17, 2024), ECF No. 1.  The district court agreed and, finding that it had personal jurisdiction over Paxton due to his service of the CIDs in the District of Columbia, issued a preliminary injunction barring Paxton from pursuing the investigation.  *See Media Matters for Am. v. Paxton*, No. 1:24-cv-00147, Mem. Op. (D.D.C. Apr. 12, 2024), ECF No. 37.  The D.C. Circuit affirmed, emphasizing that "the heart of [Media Matters's] claim is that the actions taken by Paxton are justiciable and warrant relief because they involve concrete and felt acts of *retaliation*." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) (emphasis in original).  The court found "uncontested evidence of Paxton's retaliatory motive in investigating Media Matters." *Id.* at 585.

### D. ActBlue Has Facilitated Donations Of Millions Of Dollars To Paxton's Democratic Opponent For U.S. Senate

47.    As noted, Paxton is currently running to serve in the U.S. Senate, challenging incumbent John Cornyn in the Republican primary.[14]  Should Paxton prevail in the May 26 runoff with Senator Cornyn, he will face James Talarico, the Democratic candidate for the seat, in the general election.

48.    ActBlue has enabled Talarico to have tremendous success in online fundraising from small-dollar donors across Texas and around the country.  Over an eight-month period, Talarico raised more than $36 million through more than one million contributions on ActBlue.

49.    Public reporting indicates, moreover, that Talarico received contributions from more than 540,000 individual donors spanning nearly every county in Texas, with approximately

---

[14] Thomas Beaumont, *Texas Republican Paxton steps up his Senate bid against GOP Sen. Cornyn ahead of early voting*, AP NEWS (Feb. 18, 2026), https://apnews.com/article/texas-senate-ken-paxton-cornyn-fe2787bbac917c5cb22918ac1e34c458.

97% of the contributions at $100 or less.[15]  The vast majority of these contributions by individual Texans were made through ActBlue.  And Republican commentators have publicly bemoaned the role of ActBlue in facilitating the small-dollar donations sustaining Talarico's campaign.[16]

50.     Multiple news outlets have reported that Talarico's fundraising advantage positions him as a serious challenger in the 2026 Senate race and that, should Paxton prevail in the May 26 primary runoff, he will face a Talarico campaign empowered by grassroots contributions through ActBlue.[17]

51.     Paxton describes himself as an "America First Warrior" and is a close ally of President Donald Trump; by contrast, ActBlue has served as an important conduit of small-dollar fundraising for Democratic opposition to the second Trump administration's policies (as it was during the first Trump administration).  During the first quarter of 2025, Democrats raised over $400 million through ActBlue.  These donations were concentrated in surges of activity following specific actions by President Trump or members of his administration, including on February 28, 2025, the date of a tense Oval Office meeting between President Trump and Ukrainian President Volodymyr Zelensky; on March 4-5, 2025, following President Trump's announcement of new

---

[15] Mack Shaw, *James Talarico breaks national fundraising record in first quarter for Senate race*, FOX 4 NEWS (Apr. 15, 2026), https://www.fox4news.com/news/james-talarico-breaks-national-fundraising-record-first-quarter-senate-race.

[16] George Caldwell, *Texas Dem Senate Candidate Posts Massive Fundraising Numbers*, DAILY SIGNAL (Apr. 15, 2026), https://www.dailysignal.com/2026/04/15/texas-dem-senate-candidate-posts-massive-fundraising-numbers/ ("'James Talarico is raising massive amounts of money through Act Blue …' said [Cornyn campaign senior adviser Matt] Mackowiak.").

[17] Gabby Birenbaum, *James Talarico Raises Record-Breaking $27 Million in First Quarter for Senate Bid*, TEX. TRIB. (Apr. 15, 2026), https://www.texastribune.org/2026/04/15/james-talarico-texas-senate-democrat-fundraising-27-million/; Mike Stunson, *Texas Democrats See Opening in Cornyn-Paxton Runoff as Party Rallies Behind Talarico*, MSN (Mar. 4, 2026), https://www.msn.com/en-us/news/politics/texas-democrats-see-opening-in-cornyn-paxton-runoff-as-party-rallies-behind-talarico/ar-AA1XxnQU.

tariffs on Canada and Mexico; and during the week of March 24, 2025, following the "Signal Gate" revelations about the Secretary of Defense and other top national security officials.

52.     Paxton's decisions to investigate ActBlue, to later escalate that investigation through public accusations and regulatory referrals, and ultimately to file a lawsuit against ActBlue therefore directly attacked an entity that had processed and distributed fundraising contributions totaling tens of millions of dollars for candidates and causes opposing Paxton politically and opposing actions of the Trump administration supported by Paxton.

### E.    Paxton Issues Investigative Demands to ActBlue

53.     For more than two years, Paxton has used his Office to investigate ActBlue on a variety of shifting theories.  That investigation has been marked by press releases that trumpet Paxton's actions against ActBlue.

54.     In December 2023, Paxton opened an investigation into ActBlue that his Office described as purporting "to determine whether ActBlue's operations are compliant with all applicable laws,"[18] but was in fact an act of political retaliation.  A Paxton press release stated that "[o]ne major focus of Texas's investigation" was ActBlue's alleged "failure to require that donors provide 'CVV' codes when making donations by credit card on the ActBlue platform."[19]

55.     As part of this investigation, on January 10, 2024, Paxton's Office issued four RTEs, one each to ActBlue LLC, ActBlue Civics, Inc., ActBlue Technical Services, Inc., and ActBlue Charities, Inc.

---

[18] Press Release, *Attorney General Ken Paxton's Ongoing Investigation Into ActBlue Yields Cooperation On Donor Credit Card Identification* (Aug. 8, 2024), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxtons-ongoing-investigation-actblue-yields-cooperation-donor-credit-card.
[19] *Id.*

56.    The RTEs were issued pursuant to Texas Business Organizations Code §§ 12.151-12.156 (the "Request to Examine statute"), which allows the Texas Attorney General, at his discretion, to inspect, examine, and copy any records and documents of entities doing business in the State of Texas, including out-of-state ("foreign") filing entities, and purports to require immediate compliance.  Specifically, the statute provides that, upon written request from the Attorney General, a foreign filing entity must "immediately permit" the Attorney General to "inspect, examine, and make copies of" its records, *id.* § 12.152, "without regard to whether the record is located in [Texas] or another state," *id.* § 12.155.

57.    The RTE to ActBlue LLC directed that the documents specified in the request "shall be produced for inspection and copying during normal business hours at your principal office or place of business," Tex. Atty Gen. RTE to ActBlue LLC (Jan. 10, 2024), which was in Somerville, Massachusetts.  The RTE demanded—within 20 days—production and inspection of documents regarding, among other things, ActBlue's employee organizational chart; details on ActBlue's fundraising streams, donor-derived revenues, and operational spending in Texas; ActBlue's internal policies and procedures for verifying the identity of persons who make political contributions through ActBlue; information on certain donors; and ActBlue's tax documents.

58.    Paxton's Office directed that the four RTEs to ActBlue entities be transmitted by U.S. mail to 366 Summer Street, Somerville, MA 02144.

59.    The RTE directed to ActBlue LLC was delivered at 366 Summer St., Somerville, Massachusetts, 02144 on April 8, 2024.

60.    Each of the other three RTEs was sent to the same address in Somerville, Massachusetts and processed in U.S. Postal Service facilities in Boston, Massachusetts, and then Shrewsbury, Massachusetts.

61.     ActBlue responded to Paxton's RTEs both by placing legal holds on ActBlue's records and making three productions of documents to Paxton on February 23, March 22, and April 29, 2024.  All documents placed on legal holds in response to these RTEs—and all documents ultimately produced—were located on computers stored in Massachusetts.  These documents related to, among other things, employee organizational charts, reports filed with the FEC, reports filed with the Texas Ethics Commission, IRS filings, contributor records for three donors, and information about ActBlue's practices and policies regarding fraud prevention, including fraud related to foreign donations.

62.     Unsatisfied with ActBlue's production, which complied with the RTEs, Paxton issued a CID to ActBlue on July 3, 2024, pursuant to Texas Business & Commercial Code § 17.51.  That provision is part of Texas's DTPA, which grants Paxton various powers in his capacity as Attorney General through the consumer-protection division of his Office.  This includes the power to issue a "civil investigative demand requiring" the recipient "to produce [] documentary material[s] and permit inspection and copying."  Tex. Bus. & Com. Code Ann. § 17.61(a).

63.     Paxton's CID to ActBlue demanded a broad set of documents related to the use of CVV codes for credit card transactions.  Again, ActBlue produced relevant documents, stored on computers in Massachusetts, demonstrating its security procedures related to credit card transactions.

64.     On August 8, 2024, Paxton issued a second CID to ActBlue, requesting (among other things) information on six donors.  And on August 13, 2024, Paxton sent a letter to ActBlue. Both the CID and letter referenced unfounded claims made in social media posts, many of which originated from far-right political activist and founder of Project Veritas, James O'Keefe—

22

despite the fact that O'Keefe's assertions had been repeatedly disproven.  Nevertheless, ActBlue again responded in good faith to the CID by producing more documents indicating that ActBlue had not engaged in any unlawful conduct.

65.    On October 21, 2024, Paxton released a statement, asserting that "bad actors" could exploit ActBlue to disguise political donations and evade legal requirements.[20]  He transmitted a letter to the FEC, on the same day, acknowledging that similar allegations have been raised regarding WinRed, ActBlue's Republican fundraising counterpart.[21]

66.    Despite ActBlue's good-faith responses to his investigative demands in 2024, and after a year and a half of silence, Paxton continued his efforts to target ActBlue—this time in the run-up to the 2026 election cycle, in which Paxton is personally participating.

67.    On February 18, 2026, James Talarico announced that his Senate campaign had raised $2.5 million in a single day:

---

[20] Press Release, Tex. Att'y Gen., *Investigation Into ActBlue by Attorney General Ken Paxton Uncovers Large Number of Suspicious Donations Made Through Obscured Identities and Untraceable Means; OAG Demands FEC Action* (Oct. 21, 2024), https://www.texasattorneygeneral.gov/news/releases/investigation-actblue-attorney-general-ken-paxton-uncovers-large-number-suspicious-donations-made.

[21] Office of the Tex. Att'y Gen., *Petition for Rulemaking to the Federal Election Commission Regarding ActBlue* (Oct. 21, 2024), https://www.texasattorneygeneral.gov/sites/default/files/images/press/ActBlue%20FEC%20Petition%20Redacted%20Final.pdf ("[A]lthough ActBlue has drawn the bulk of public attention on this issue, the problem does not appear to be purely partisan—WinRed has been accused of very similar issues.").



68.     Of the $2.5 million raised, donors contributed more than $2.2 million via ActBlue in the 24-hour period prior to Talarico's social media post.

69.     Just one day after Talarico's fundraising announcement, Paxton's investigators sprang into action.  Beginning on February 19, 2026, and continuing through February 26, 2026, investigators from Paxton's Office attempted to make multiple contributions through ActBlue, most of which were made under the name of Office Investigator Roscoe "Rock" Robinson.  A donation was made directly to ActBlue LLC.  Most of the contributions used an Office of the Attorney General ("OAG") email address: "rock.robinson@oag.texas.gov."  FEC data show that the donation to ActBlue LLC was made to a Massachusetts entity:

**Source information**

| | |
|---|---|
| Name | ROBINSON, ROSCOE |
| City, state and ZIP code | AUSTIN, TX 78724 |
| Occupation | INVESTIGATOR |
| Employer | OAG |
| Year to date | $10.00 |

**Receipt information**

| | |
|---|---|
| Amount | $10.00 |
| Receipt date | February 25, 2026 |
| Report year | 2026 |
| Memo | CONTRIBUTION TO ACTBLUE |
| Reported on | Form 3X on line 11AI |
| Election type | |

**Recipient information**

| | |
|---|---|
| Committee | ACTBLUE |
| Political party | |
| Type | Hybrid PAC (with Non-Contribution Account) - Nonqualified |
| State | Massachusetts |

70.     Then, in April 2026—just five days before Paxton filed his civil action against ActBlue LLC in Texas state court—FEC filings showed that Talarico and other Democratic candidates had posted strong fundraising numbers for the first quarter of 2026. A *New York Times* article the next day called Talarico a "fund-raising juggernaut" who posted "a remarkable haul that far outpaced that of any other Senate candidate"—a number that "[h]is campaign said … was the most a Senate hopeful had ever raised in the first quarter of a year."[22]

71.     Paxton's response to Talarico's surge in fundraising via ActBlue was to escalate his attack with a lawsuit against ActBlue LLC.

---

[22] Theodore Schleifer, *Talarico Leads a Democratic Cash Surge: 7 Takeaways From 2026 Filings*, N.Y. Times (April 16, 2026), https://www.nytimes.com/2026/04/16/us/politics/talarico-democrats-fundraising-republicans-takeaways.html.

**F. Paxton Sues ActBlue In Texas State Court**

72.    On April 20, 2026, Paxton filed a Petition in Texas state court against ActBlue LLC under Texas's DTPA, seeking injunctive relief and civil penalties and requesting an order restricting ActBlue LLC's acceptance of donations through gift cards and prepaid debit cards.

73.    The Petition is rife with inflammatory and false accusations that ActBlue LLC "knowingly facilitated" donor fraud, TX Pet. at 3 (section preceding ¶ 1), and "lied to Congress" as well as "the public" about measures taken to prevent fraud, *id.* ¶ 44.  These assertions are meritless.  But responding to Paxton's bogus lawsuit will require the expenditure of money by ActBlue and consume ActBlue personnel time in the heat of an election season, neither of which ActBlue can recover.

74.    Paxton announced his April 2026 lawsuit against ActBlue LLC in a series of appearances on conservative podcasts that his political campaign then distributed widely.  On the same day that he filed the Petition, Paxton broke the news of the lawsuit on "The Chris Salcedo Show," where Paxton was introduced as having "never failed from defending us from Marxists, leftists, and communists who have infiltrated the Democratic Party."[23]  On that show, Paxton described the lawsuit that would be filed later in the day, saying that ActBlue donations "are largely going to liberal Democrats, and it's always been a mystery how they raised this much money."[24]  Later on "The Benny Show" with Benny Johnson, the self-proclaimed "Godfather of the Conservative Internet," Paxton explained that "ActBlue has raised billions of dollars for

---

[23] Salcedo Storm Podcast, S13, Ep. 48: *Ken Paxton Outshines Republicans By Bringing Accountability To ACT Blue* (published Apr. 21, 2026), https://podcasts.apple.com/us/podcast/the-salcedo-storm-podcast/id1614095282.
[24] *Id.*

liberal causes, liberal Democrats."[25]  On "The Charlie Kirk Show," Paxton tied the lawsuit against ActBlue to his U.S. Senate candidacy, saying that—unlike current Senator Cornyn, who "has never been interested in this issue"—Paxton would take action against ActBlue.  In response to a question asking whether Paxton could, "as part of this lawsuit, as part of this investigation[,] … collect information that applies to the whole country," Paxton stated "I love that question because I'm running for U.S. Senate.  When I'm in the U.S. Senate, I'll be all over this."[26]

75.    Paxton's investigative actions and Texas state lawsuit are partisan tools designed to cripple his political adversaries by cutting off their primary fundraising infrastructure.  His Petition underscores the scale of that target, noting that ActBlue processed (as it was constitutionally entitled to) $1.78 billion in donations in 2025.  *See* TX Pet. ¶ 13.  Indeed, in the press release announcing the lawsuit, Paxton made his partisan aim explicit, emphasizing that "***ActBlue funds primarily left-wing campaigns*** at all levels of government" (emphasis added).[27]  Of course, whether or not what he calls the "radical left" has relied on ActBlue is irrelevant to whether ActBlue has violated the DTPA, but Paxton's references show the impermissible political animus underlying his Texas state lawsuit.

76.    The Petition extensively cites an April 2, 2026 *New York Times* article that alleges in early 2025, ActBlue was warned by its outside counsel that ActBlue may "ha[ve] given a

---

[25] The Benny Show, *Why Are Republicans Are About to BETRAY America On Amnesty for Millions of Illegals* (Apr. 20, 2026), https://podcasts.apple.com/us/podcast/why-are-republicans-are-about-to-betray-america-on/id1584730781?i=1000762449842.

[26] The Charlie Kirk Show (Real America's Voice, Apr. 20, 2026), https://omny.fm/shows/real-america-s-voice/the-charlie-kirk-show-april-20-2026.

[27] Press Release, Tex. Att'y Gen., *Attorney General Paxton Files Landmark Lawsuit Against ActBlue for Deceiving Americans by Lying About Its Donation Processes that Allow Fraudulent and Foreign Donations* (April 20, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-files-landmark-lawsuit-against-actblue-deceiving-americans-lying-about-its.

potentially misleading response" to Congress in a November 2023 letter.[28]  The November 2023 letter describes the wide range of actions that ActBlue takes to confirm the permissibility of donations and prevent fraud.  According to the article, after Donald Trump won the 2024 election, ActBlue's counsel prepared a memorandum for ActBlue identifying legal concerns with the 2023 letter, including, in the *Times*'s words, "the specter of a criminal investigation if prosecutors believed that ActBlue had tried to conceal facts about its effort to prevent foreign contributions."

77.     The focus of the article, however—ActBlue's fraud-prevention practices with respect to preventing foreign contributions through donor passport information and its statements about those practices to Congress in 2023—bears little relation to the conduct challenged in Paxton's lawsuit.  Each of Paxton's claims against ActBlue instead relies on ActBlue's alleged acceptance of gift-card and prepaid-debit-card donations.  The article does not once mention those alleged practices.  Paxton's citation of the article demonstrates that his Petition is a baseless effort to smear and intimidate ActBlue.

78.     More fundamentally, Paxton's Petition fails to account for ActBlue's actual policies and the distinctions ActBlue draws among prepaid instruments based on demonstrated fraud risk.[29]

79.     ActBlue does not treat gift cards and prepaid cards alike.  Its policies and controls differentiate between gift cards, non-reloadable prepaid cards, and reloadable prepaid cards,

---

[28] Reid J. Epstein & Shane Goldmacher, *ActBlue May Have Misled Congress on Vetting Foreign Donations, Its Lawyers Warned*, N.Y. TIMES (Apr. 2, 2026), https://www.nytimes.com/2026/04/02/us/politics/actblue-democrat-fundraising-foreign-donations.html.

[29] Fed. Fin. Inst. Examination Council, *BSA/AML Examination Manual: Risks Associated with Money Laundering and Terrorist Financing—Prepaid Access*, https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/0 9 (explaining that fraud risk varies by prepaid product).

reflecting the materially different risk profiles of those instruments. Gift cards are typically denominated and designed for one-time use with a particular retailer. In contrast, reloadable prepaid cards are designed for repeated use and often linked to an identifiable account, billing address, or administering institution. Contributions made using reloadable cards are subject to ActBlue's standard multilayered fraud-prevention framework and accepted only if they satisfy the same criteria as any other transaction made using a traditional debit or credit card. ActBlue's system is configured to automatically reject gift cards and non-reloadable prepaid cards.

80.    Paxton's Petition is premised on a false claim that was not supported by the facts at the time of filing. Paxton alleges that ActBlue has "secretly resumed acceptance of gift card donations." TX Pet. ¶ 64. That allegation underlies all five claims in his Petition. ActBlue's prohibition against gift card donations continues to this day. Paxton's core allegation—that ActBlue "quietly resumed accepting the very payment methods it had publicly banned, told no one, and continued to market its platform as secure and compliant," TX Pet. ¶ 79—is not grounded in fact.

81.    Before filing the Petition, Paxton's Office had firsthand information that ActBlue does not have a policy of accepting gift cards because ActBlue automatically rejected gift card donation attempts by the Office. On February 25, 2026, three times that day—using different combinations of name and email—an Office investigator attempted to use an American Express gift card to donate $10 to a candidate for Texas Railroad Commissioner. Each attempted transaction was rejected:

| Date of contribution | Contributor Name | Contributor Email | Contribution Made To | Contribution Card | Contribution Amount | Acceptance |
|---|---|---|---|---|---|---|
| February 25, 2026 | Rock Robinson | rock.robinson@oag.texas.gov | Jon Rosenthal | AMEX Gift Card | $10.00 | REJECTED |
| February 25, 2026 | Roscoe Robinson | rock.robinson@oag.texas.gov | Jon Rosenthal | AMEX Gift Card | $10.00 | REJECTED |
| February 25, 2026 | Rock Robinson | johnnydollar92@gmail.com | Jon Rosenthal | AMEX Gift Card | $10.00 | REJECTED |

These rejections demonstrated that ActBlue had not "secretly resumed acceptance of gift card donations." TX Pet. ¶ 64. Paxton nevertheless leveled that false allegation and hid evidence to the contrary from the Texas court and the public.

82. Accordingly, Paxton's allegation that ActBlue "will continue to accept illegal donations made with gift and prepaid gift cards," TX Pet. ¶ 49, is false. The only prepaid cards permitted by ActBlue—reloadable prepaid cards—are subject to heightened fraud-prevention controls and bear no meaningful resemblance to anonymous cash contributions. Manufacturing and misrepresenting "evidence" to target a political opponent is precisely the kind of retaliatory abuse of state power that the First Amendment prohibits.

83. Paxton's Petition also relies on Paxton's "own investigation into whether ActBlue's platform was enabling donor fraud in violation of Texas law." TX Pet. ¶ 26. Specifically, Paxton claims that ActBlue made statements to Congress because it was "[f]aced with ... scrutiny" from both Congress's *and* Paxton's investigations. *Id*. at 1. Yet Paxton waited nearly two years after ActBlue's last interaction with his Office, acting only days after reports of Talarico's historic fundraising achievements—timing that further disproves the sincerity of Paxton's claimed enforcement rationale.

84. Moreover, for all the indignant rhetoric in his Petition about protecting donors and campaigns from allegedly deceptive and misleading fundraising practices, Paxton selectively

30

ignored significant and well-supported prior media coverage of campaign finance compliance issues at WinRed.  In April 2021, the same *New York Times* journalist who co-authored the April 2026 article about ActBlue published a detailed exposé about how WinRed processed donations for President Trump's 2020 campaign using pre-checked recurring donation boxes and layered defaults that led many donors to unknowingly make repeated contributions.[30]  The problems were so significant that the Trump campaign had to refund 10.7 percent of the funds it raised on WinRed in 2020, compared to a 2.2 percent refund rate for the Biden campaign on ActBlue. Subsequent reporting revealed that the same "aggressive fund-raising tactics" deployed by Trump and his committees "continued to spur an avalanche of refunds" in 2021, amounting to roughly 20 percent of the total amount he had raised online that year.[31]  Republican Senate candidates in Georgia similarly reported refunds of $4.8 million to WinRed donors in the final 2020 reporting period, which was more than triple the amount refunded by their Democratic rivals via ActBlue who raised far greater total amounts online.

85.     Further underscoring Paxton's partisan selectiveness, the *New York Times* reported in July 2021 that the attorneys general of four other states opened consumer-protection investigations into *both* WinRed and ActBlue, focusing on their shared use of pre-checked boxes and default recurring donation-mechanisms.[32]  Those attorneys general sent document requests to both platforms, treating the Republican and Democratic fundraising counterparts alike.[33]

---

[30] Shane Goldmacher, *How Trump Steered Supporters Into Unwitting Donations*, N.Y. TIMES (Apr. 3, 2021), https://www.nytimes.com/2021/04/03/us/politics/trump-donations.html.

[31] Shane Goldmacher, *Trump's Repeating Donation Tactics Led to Millions in Refunds Into 2021*, N.Y. TIMES (Aug. 7, 2021), https://www.nytimes.com/2021/08/07/us/politics/trump-recurring-donations.html.

[32] Shane Goldmacher, *Four States Start Inquiries Into Recurring Donation Tactics of Both Parties*, N.Y. Times (July 8, 2021), https://www.nytimes.com/2021/07/08/us/politics/prechecked-boxes-donations-winred-act-blue.html.

[33] *Id.*

86.     Unlike the state attorneys general who conducted investigations into both WinRed and ActBlue, Paxton, on information and belief, has never once investigated WinRed for fraud. To the contrary, he encourages and personally benefits from WinRed's fundraising efforts.  For example, Paxton's profile on X (formerly Twitter), which indicates that he is the Attorney General and features a "Ken Paxton for U.S. Senate" banner, links to his WinRed fundraising page:



87.     Paxton's alleged concern for the integrity of campaign finance laws rings hollow for yet another reason: Just last month, the FEC asked Paxton's Senate campaign to explain nearly $100,000 in donations that appear to violate federal campaign laws.[34]  That was the *third* such inquiry in less than a year; the FEC previously directed Paxton's campaign to account for roughly

---

[34] Letter from Fed. Election Comm'n to John Plishka, Treasurer, *Ken Paxton for Senate* (Mar. 25, 2026), https://docquery.fec.gov/pdf/182/202603250300343182/202603250300343182.pdf.

$125,000 in apparently illegal contributions in January 2026 and roughly $658,000 in August 2025.[35]

88.    Paxton's motive in targeting ActBlue with the numerous investigative demands and the Texas state civil enforcement lawsuit is to retaliate against ActBlue for its First Amendment activities, including fundraising for and distributing funds to liberal candidates and causes, including Paxton's potential opponent in the 2026 U.S. Senate race.  Paxton's Petition repeatedly depicts ActBlue not merely as a regulated entity, but as an illegitimate and dangerous political actor—falsely accusing it of "lying," "deceiving" donors and campaigns, "tolerating rampant donor fraud," and "corrupt[ing] Texas federal and state elections."  TX Pet. at 2-3; ¶¶ 15, 49.  He has framed ActBlue's fundraising activity in moral and ideological terms, portraying support for Democratic political causes and candidates as inherently suspect.  This vilifying rhetoric—issued in Paxton's capacity as Attorney General—goes well beyond routine allegations of statutory noncompliance and evidences a posture of hostility toward ActBlue's exercise of protected political speech and association.

89.    This weaponization of consumer-protection law against ActBlue is not an aberration, but the latest manifestation of Paxton's longstanding animus toward Democratic fundraising and political infrastructure.

90.    Paxton's actions toward ActBlue—the principal small-dollar fundraising platform for Democratic candidates and progressive causes—fit squarely within his broader pattern of

---

[35] Sanford Nowlin, *Feds Once Again Ask Ken Paxton to Explain Illegal Contributions to His Senate Campaign*, San Antonio Current (Mar. 26, 2026), https://www.sacurrent.com/news/texas-news/feds-once-again-ask-ken-paxton-to-explain-illegal-contributions-to-his-senate-campaign/.

targeting Democratic-aligned political infrastructure with investigations that far exceed the scope of Paxton's authority as Attorney General.

## CLAIMS FOR RELIEF

## COUNT I

## RETALIATION IN VIOLATION OF ACTBLUE'S RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

91.     ActBlue incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

92.     At all relevant times, Paxton acted under color of state law as Attorney General of Texas and exercised investigatory and enforcement authority over civil investigations and actions, as well as related enforcement mechanisms.

93.     "[T]he law is settled that … the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out."  *Hartman*, 547 U.S. at 256.  If an official takes adverse action against someone based on that forbidden motive, and "nonretaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim.  *Id.* (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977)).

94.     Paxton violated the First Amendment, made applicable against him through the Fourteenth Amendment, by initiating and pursuing a Texas state civil enforcement action and related investigative measures against ActBlue in retaliation for ActBlue's protected expressive and associational activity.

95.     To prevail on a claim for First Amendment retaliation, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's

34

"subsequent injury." *Hartman*, 547 U.S. at 259.  Once a plaintiff makes such a showing, "the defendant can prevail only by showing that the [conduct at issue] would have been initiated without respect to retaliation." *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019) (citation and internal quotation marks omitted).  The defendant's retaliatory animus must be a "but-for" cause of the adverse action—that is, the action would not have been taken absent the retaliatory motive. *Hartman*, 547 U.S. at 260.

96.    Impermissible retaliation likewise exists under First Circuit precedent because, as elaborated in the paragraphs that follow, (1) ActBlue "engaged in constitutionally protected conduct," (2) ActBlue "was subjected to an adverse action" by Paxton (his retaliatory civil investigative and enforcement actions), and (3) "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023) (citation and internal quotation marks omitted).

97.    *First*, ActBlue's activities—facilitating political donations, enabling political association, and supporting political expression by candidates, donors, and organizations—are legally protected under the First Amendment.  Political association and expression, including collective and organizational activity that facilitates speech, lie at the core of the First Amendment. *See Figueroa-Serrano v. Ramos-Alverio*, 221 F.3d 1, 7 (1st Cir. 2000) (citing *Elrod v. Burns*, 427 U.S. 347, 356 (1976))); *see also Galloza v. Foy*, 389 F.3d 26, 28 (1st Cir. 2004) ("The First Amendment protects associational rights.  Incorporated within this prophylaxis is the right to be free from discrimination on account of one's political opinions or beliefs." (citing *LaRou v. Ridlon*, 98 F.3d 659, 661 (1st Cir. 1996))).

98.    *Second*, Paxton has taken action adverse to ActBlue's protected activity.  Paxton's retaliatory conduct "would deter a reasonably hardy individual from exercising his constitutional

rights." *Alston v. Town of Brookline*, 997 F.3d 23, 49 (1st Cir. 2021) (citation and quotation marks omitted).

99.    *Third*, Paxton's investigation and civil enforcement action—i.e., the injury suffered by ActBlue—is causally linked to ActBlue's protected activity.  Paxton's statements in both the Petition and the accompanying press release indicate that the lawsuit and the preceding investigation were motivated by Paxton's retaliatory animus against ActBlue's First Amendment activities of facilitating contributions for, and distributing funds to, Democratic and liberal candidates in Texas and nationwide.  Paxton's retaliatory motive is further established by temporal proximity, Paxton's public statements evidencing hostility toward the political causes ActBlue supports, ActBlue's distributions to Paxton's political opponent, James Talarico, and the selective nature of the enforcement action.

100.    Paxton's retaliatory campaign against ActBlue has injured ActBlue and will continue to do so absent relief from this Court.  Among other things, ActBlue has been forced to expend time and resources to respond to invasive and overbroad demands for documents from Paxton and, in light of Paxton's latest escalation, must either subject itself to the jurisdiction of the Texas state courts to respond to Paxton's inflammatory civil enforcement action or face sanctions.  Such actions chill ActBlue's exercise of its rights to distribute funds to progressive candidates and causes because it may reasonably fear that doing so may subject it to further retaliatory actions by Paxton.

101.    This harm will be redressed by an order declaring Paxton's conduct to be unlawful and enjoining him from pursuing retaliatory investigations or enforcement actions predicated on ActBlue's protected activity.  Such relief is appropriate under 42 U.S.C. § 1983.

## COUNT II

### RETALIATION IN VIOLATION OF THE RIGHTS OF DONORS, DEMOCRATIC CANDIDATES, AND PROGRESSIVE ORGANIZATIONS FOR PROTECTED EXPRESSION UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

102. ActBlue incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

103. Paxton's conduct described above constitutes retaliation against Democratic candidates, progressive organizations, and the donors who support those candidates and organizations.

104. ActBlue has third-party standing to assert claims on behalf of the candidates and organizations that fundraise through ActBlue, and on behalf of U.S. citizens who lawfully use ActBlue to exercise their right to participate in the democratic process.

105. Third-party standing is permitted when: (1) the plaintiff has suffered a concrete injury, though not necessarily to its own legal interest; (2) the plaintiff has a sufficiently close relationship with the third party; and (3) the third party faces a hindrance to asserting its own rights. *See Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see also Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 37-39 (1st Cir. 1990).

106. ActBlue satisfies all three requirements: (1) Paxton's conduct described above discourages users from continuing to use the platform, harming ActBlue's revenues and reputation; (2) progressive causes and candidates rely on ActBlue to mobilize small donors, and small donors depend on ActBlue to aggregate their political power; and (3) both recipients and donors may be deterred from suing in their own name out of fear of further retribution by Paxton (and others).

107. ActBlue's third-party standing is particularly clear given that the relevant factors are less demanding "when there is a danger of chilling free speech." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). That is assuredly the situation here.

108. Democratic candidates engage in quintessential First Amendment-protected activity in campaigning for public office, and ActBlue is a significant means by which donations to these campaigns are processed. Progressive organizations likewise engage in political speech and embody their members' exercise of their right to free association. And donors who give money to these candidates and causes through ActBlue exercise their rights of free speech and association by doing so. *See*, *e.g.*, *McCutcheon*, 572 U.S. at 203.

109. Paxton's false statements about ActBlue and its users, his retaliatory investigation of ActBlue and its users, and the adverse actions taken by him against ActBlue constitute adverse actions against the candidates, causes, and donors that use ActBlue to enable their participation in the democratic process.

   a. These sanctions constitute adverse actions against candidates and causes because ActBlue is a significant source of fundraising for these candidates and causes, and a critical tool that facilitates their communications with supporters. Incapacitation of ActBlue thus harms candidates' electoral chances and charitable organizations' ability to meet their organizational goals.

   b. Likewise, sanctioning ActBlue harms small donors to Democratic candidates because small donors rely on ActBlue to process their contributions to candidates and causes that they support. The abusive use of a Texas civil enforcement action impedes ActBlue's ability to connect donors and candidates and harms small donors' ability to participate in the democratic process.

38

c. Donors, candidates, and organizations of ordinary firmness will be deterred by Paxton's actions from exercising their rights to associate with ActBlue and to give money to progressive candidates and causes because they may reasonably fear that doing so may subject them to investigation by the government or lead to their public exposure as supporters of progressive causes that Paxton dislikes.

110. As discussed, Paxton's actions against ActBlue and the candidates and donors who rely on it to engage in the U.S. electoral process were motivated by a retaliatory animus toward Democratic candidates, progressive causes, and the U.S. citizens who financially support them.

111. Paxton's First Amendment violations have caused ActBlue, as well as the donors, candidates, and organizations that use ActBlue, ongoing and irreparable harm.

## **PRAYER FOR RELIEF**

WHEREFORE, ActBlue seeks judgment in its favor and an order against Paxton that grants the following relief:

A. Declare that Paxton's continued investigation and investigatory demands, as well as the Texas state civil enforcement action, constitute First Amendment retaliatory actions in violation of ActBlue's rights under the First and Fourteenth Amendments to the U.S. Constitution.

B. Declare that Paxton's continued investigation and investigatory demands, as well as the Texas state civil enforcement action, violate ActBlue's rights under the First and Fourteenth Amendments to the U.S. Constitution.

C. Declare that Paxton's continued investigation and investigatory demands, as well as the Texas state civil enforcement action, constitute First Amendment retaliatory actions in violation of the rights of third parties under the First and Fourteenth Amendments to the U.S. Constitution.

39

D.     Declare that Paxton's continued investigation and investigatory demands, as well as the Texas state civil enforcement action, violate the rights of third parties under the First and Fourteenth Amendments to the U.S. Constitution.

E.     Temporarily enjoin Paxton and his officers, agents, servants, and employees from further pursuing any action in violation of ActBlue's exercise of its constitutional rights or in violation of the constitutional rights of third parties.

F.     Permanently and preliminarily enjoin Paxton and his officers, agents, servants, and employees from initiating any other action, continuing to litigate the civil enforcement action, or further investigating ActBlue in violation of its constitutional rights, and order that Paxton and his officers, agents, servants, and employees dismiss the Texas state civil enforcement action with prejudice.

G.     Award ActBlue its costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

H.     Grant ActBlue any and all other relief as the Court deems just and proper.

## JURY DEMAND

ActBlue demands a trial by jury on all issues so triable.

Dated: May 1, 2026

Respectfully submitted,

By: */s/ Timothy J. Perla*

WILMER CUTLER PICKERING HALE AND DORR LLP
Timothy J. Perla  (BBO No. 660447)
   timothy.perla@wilmerhale.com
Felicia H. Ellsworth
   felicia.ellsworth@wilmerhale.com (BBO No. 665232)
Amanda Masselam Strachan (BBO No. 641108)
   amanda.masselamstrachan@wilmerhale.com
60 State Street

40

Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Ronald C. Machen (*pro hac vice forthcoming*)
   ronald.machen@wilmerhale.com
Matthew T. Jones (*pro hac vice forthcoming*)
   matthew.jones@wilmerhale.com
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiffs ActBlue LLC, ActBlue Civics, Inc., ATS, Inc., and ActBlue Charities, Inc.*