UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ACTBLUE LLC, ACTBLUE CIVICS,     )
INC., ATS, INC., and ACTBLUE     )
CHARITIES, INC.,                 )
                                 )
                                 )
          Plaintiffs,            )
                                 )
     v.                          )     Civil Action No. 1:26-cv-11986
                                 )
WARREN KENNETH PAXTON JR., *in his* )     Jury Trial Demanded
*official capacity as Attorney General of the*  )
*State of Texas*,                )
                                 )
          Defendant.             )

**MEMORANDUM OF LAW IN SUPPORT OF
EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION**

Texas Attorney General Ken Paxton is engaged in unlawful and retaliatory abuse of his Office's investigative authority to target ActBlue, a Democratic-aligned nonprofit political action committee ("PAC"), for ActBlue's exercise of its First Amendment rights to speech and association. For more than two years, Paxton has pursued ActBlue with escalating investigative demands aimed at its fundraising and campaign activities and, in recent days, has escalated his attack by filing a state court lawsuit against ActBlue that is filled with false allegations, only days after widespread reporting on the fundraising success (aided by ActBlue) of the Democratic candidate for the U.S. Senate seat sought by Paxton. By these retaliatory actions, Paxton seeks to intimidate ActBlue and divert its resources from protected political expression during a critical election period bearing directly on Paxton's own election prospects. ActBlue thus seeks emergency injunctive relief to prevent ongoing and irreparable violations of the First Amendment, including being forced to appear and expend resources to defend itself against Paxton's bogus

1

Texas state court lawsuit.

## STATEMENT OF FACTS

### A.    ActBlue Is A PAC With An Established Track Record Of Fundraising For Democratic Candidates And Causes

ActBlue is a major online fundraising platform for Democratic candidates and causes, processing nearly $19 billion in donations from millions of grassroots donors.  Gilmer Decl. ¶ 6. Unlike traditional PACs that pool, control, or redirect funds, ActBlue facilitates direct donations to the candidates and organizations donors choose to support.  Gilmer Decl. ¶ 5.  ActBlue's role is most evident during periods of heightened political engagement when millions of Americans use ActBlue to express their political opinions, connect with others, and make their voices heard. Gilmer Decl. ¶¶ 6–7.

### B.    Paxton Has A History Of Targeting Speech And Associational Activity Supportive Of His Political Adversaries

Paxton has a well-documented history as the Texas Attorney General of invoking the powers of his Office to burden, intimidate, or undermine progressive political expression.  For example, Paxton sought to revoke the nonprofit charter of the JOLT Initiative, a civic-engagement organization focused on voter registration.  Perla Decl. Ex. 1, at 1.  Paxton's efforts prompted a federal court to enjoin his actions after finding he acted in bad faith and was intimidating JOLT for engaging in constitutionally protected speech.  Perla Decl. Ex. 1, at 13–15, 22.  Paxton has similarly deployed investigative tools to pressure private companies over their speech, including opening an investigation into Twitter after criticizing its content-moderation decisions as suppressing conservative viewpoints.  Perla Decl. Ex. 2.  He has also announced investigations targeting Democratic-aligned fundraising and advocacy organizations, branding them in overtly partisan terms, such as "Beto O'Rourke's radical group" and the "Soros Slush Fund."  Perla Decl. Ex. 6, at 1; *Id.* Ex. 7, at 1.  More recently, Paxton invoked Texas consumer-protection laws to

investigate Media Matters following reporting he disfavored—an investigation that federal courts enjoined after finding evidence of bad faith and retaliation.  *See* Perla Decl. Exs. 3–5.

### C.    ActBlue Has Distributed Funds To Political Opponents Of Paxton

Paxton has decided to run for a seat in the U.S. Senate while continuing to serve as Texas Attorney General, *see* Perla Decl. Ex. 21, aligning his enforcement authority with his own electoral ambitions.    ActBlue's core function—facilitating small-dollar fundraising for Democratic candidates and causes—directly impacts that race and, in turn Paxton's electoral prospects, given ActBlue's role as the principal online fundraising platform for James Talarico, the Democratic nominee in the 2026 U.S. Senate race in Texas.  (Paxton will face Talarico in November's election if he wins the runoff against Senator John Cornyn.)  Talarico has raised significant funds using ActBlue.  Of the approximately $40 million that he raised through the first quarter of 2026, Perla Decl. Ex. 20, at 2, $36 million came through ActBlue, a significant portion of which came from individual contributors placing small-dollar donations, Gilmer Decl. ¶ 9.  In Texas alone, Talarico received more than 540,000 individual donations spanning nearly every county in Texas, with approximately 97% of the contributions totaling $100 or less, the vast majority of which were made through ActBlue.  Perla Decl. Ex. 15, at 1–2.

### D.    Paxton Issues Investigative Demands To ActBlue

In December 2023, Paxton opened his first investigation into ActBlue.  Perla Decl. Ex. 8.  In January 2024, Paxton's Office mailed written demands to ActBlue's headquarters in Massachusetts that ActBlue make documents available for inspection by Paxton's investigators at the company's Somerville, Massachusetts office.  Gilmer Decl. ¶¶ 10-11.  Paxton stated that a "major focus" of this investigation was ActBlue's alleged "failure to require that donors provide 'CVV' codes when making donations by credit card on the ActBlue platform," Perla Decl. Ex. 8, despite ActBlue's longstanding commitment to donor security.  Paxton's investigation appears to

have been inspired by claims made in social media posts by far-right political activist James O'Keefe. Perla Decl. Ex. 23, at 2.

ActBlue has established comprehensive safeguards to detect and prevent fraudulent or unlawful donations on its platform. Sharton Decl. ¶¶ 2–4. Each donation passes through a system combining software checks and manual review to identify, block, or reject impermissible or high-risk transactions. Sharton Decl. ¶ 2. ActBlue systemically collects and verifies all required contributor information and uses automated screening tools to identify potential risks—such as fraud or prohibited or foreign contributions—for further review. Sharton Decl. ¶¶ 2–3. In recent years, the organization has voluntarily enhanced CVV restrictions. Sharton Decl. ¶ 3.

ActBlue complied with Paxton's document requests, Bonin Decl. ¶ 2, because failure to do so would result in serious civil and criminal penalties. *See* Tex. Bus. Orgs. Code §§ 12.151.–12.156. Nevertheless, on July 3, 2024, Paxton issued a Civil Investigative Demand ("CID") to ActBlue pursuant to the Texas Deceptive Trade Practices Act ("DTPA").[1] Gilmer Decl. ¶ 12; *Id.* Ex. 7. Again, ActBlue complied, producing relevant documents demonstrating its security procedures related to credit card transactions. Bonin Decl. ¶ 4. On August 8, 2024, Paxton issued a second CID to ActBlue, requesting sensitive, transactional information on six donors—as distinguished from donor information routinely reported to the FEC and other regulatory authorities. Gilmer Decl. ¶ 13; *Id.* Ex. 8. Then, on October 21, 2024, Paxton transmitted his investigative findings to the Federal Election Commission through a petition for rulemaking. Perla Decl. Ex. 22.

As the 2026 midterm election cycle intensifies, Paxton has escalated his retaliation against

---

[1] Under the Texas DTPA, the Attorney General can issue a "civil investigative demand requiring" the recipient "to produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a).

4

ActBlue.  Just one day after Talarico announced that his Senate campaign had raised $2.5 million in a single day—over $2.2 million of which was raised through ActBlue—investigators from Paxton's Office made multiple contributions to ActBlue (contributions that were processed in Massachusetts).  Gilmer Decl. ¶ 9; Sharton Decl. ¶¶ 5–6.  Three times on February 25, 2026, using different combinations of name and email, Paxton's investigators attempted to use an American Express gift card to donate $10 to a Texas Railroad Commissioner candidate.  Sharton Decl. ¶¶ 5–6.  All three donations were automatically rejected.  Sharton Decl. ¶ 6.  In April 2026, public FEC filings reflected strong fundraising for Talarico and other Democratic candidates, drawing media attention.  *See* Perla Decl. Exs. 15–16, 20.  Days later, Paxton made his next attack on ActBlue.

**E.**     **Paxton Files Texas State Court Lawsuit Against ActBlue LLC**

On April 20, 2026, Paxton filed suit against ActBlue LLC in Texas state court under the state's DTPA, seeking injunctive relief, civil penalties, and restrictions on ActBlue LLC's ability to accept donations through gift cards and prepaid debit cards.  Perla Decl. Ex. 18, at 1-3; *State of Texas v. ActBlue LLC*, No. 096-376890-26 (Dist. Ct., Tarrant Cnty., Tex.).  The suit is rife with baseless, inflammatory, and false accusations that ActBlue LLC "knowingly facilitated" donor fraud and "lied to Congress" and "the public" about fraud prevention measures.  Perla Decl. Ex. 18, at p.3, ¶ 44.  Paxton announced this lawsuit in a series of appearances on conservative podcasts that his political campaign has widely distributed.  Perla Decl. ¶ 21.  In these appearances Paxton emphasized ActBlue's connection to "liberal causes" and "liberal Democrats"—a fact that has nothing to do with consumer fraud claims but reveals Paxton's intent to engage in political retaliation.  Perla Decl. ¶ 21(c).  He also tied the suit to his own Senate campaign, explaining that current Senator Cornyn has "never been interested in this issue" and that "[w]hen in the U.S. Senate[,] [Paxton will] be all over this."  Perla Decl. ¶ 21(a).

Paxton's suit also extensively cites an April 2, 2026 *New York Times* article addressing ActBlue's foreign-contribution fraud prevention efforts, *see, e.g.*, Perla Decl. Ex. 18 ¶¶ 33–36— an article that does not address gift card or prepaid debit card donations, the sole conduct challenged in Paxton's lawsuit, *see generally*, Perla Decl. Ex. 17 (article); *Id.* Ex. 18 (petition). Paxton's lawsuit also ignores ActBlue's actual policies.  ActBlue does not accept gift card donations, which are automatically rejected, Sharton Decl. ¶¶ 4, 6, a fact that Paxton's own investigators confirmed before he filed his suit.  Nevertheless, Paxton's lawsuit alleges that ActBlue has "secretly resumed" accepting such donations.  Perla Decl. Ex. 18 ¶ 64.  Underscoring the retaliatory nature of his investigation, Paxton failed to comparably scrutinize WinRed, ActBlue's Republican fundraising counterpart, despite extensive public reporting in *The New York Times* regarding WinRed's suspect fundraising practices.  *See* Perla Decl. Exs. 11–12.

Paxton's lawsuit is a clear attempt to undermine his political adversaries by targeting their primary fundraising infrastructure.  Paxton himself made that aim explicit in his public press release accompanying the suit, declaring that "[t]he radical left has relied on ActBlue as a way to funnel foreign donations and dark money into their political campaigns to subvert our laws and compromise the integrity of our elections."  Perla Decl. Ex. 19, at 1.  In truth, ActBlue is a legitimate and key fundraising apparatus for Democratic candidates.  Paxton's attack on ActBlue is nothing more than the latest chapter in his ongoing effort to impair Democratic-aligned political infrastructure, apparently fearing the outcome of an electoral process that he should be defending.

## LEGAL STANDARD

The Court may enter a preliminary injunction if it finds: (1) a likelihood that ActBlue will succeed on the merits; (2) a likelihood that ActBlue will suffer irreparable harm absent injunctive relief; (3) that the balance of equities tips in ActBlue's favor; and (4) that the injunction would

6

serve the public interest.  *See Voice of the Arab World, Inc. v. MDTV Med. News Now*, *Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In First Amendment cases, the likelihood of success on the merits often proves dispositive because constitutional violations constitute *per se* irreparable harm.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'").  When defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge.  *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

## ARGUMENT

### I.    This Court Has Personal Jurisdiction Over Paxton In His Official Capacity

Specific personal jurisdiction exists over an out-of-state defendant where both the forum state's long-arm statute and the requirements of the Due Process Clause are satisfied.  *See Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015).  The Massachusetts long-arm statute allows courts to exercise personal jurisdiction "over a person, who acts directly or by an agent," where the suit "aris[es] from the person[] … transacting any business in" Massachusetts, Mass. Gen. Laws. ch. 223A, § 3(a)—which is interpreted "expansive[ly]."  *Diamond Grp., Inc v. Selective Distrib. Int'l, Inc.*, 84 Mass. App. Ct. 545, 549 (2013).  "[T]he volume of business need not be substantial but merely definite and perceptible."  *Id.*

The claims in this case arise from Paxton's purposeful contacts with Massachusetts, which qualify as "transacting any business in" the Commonwealth.  ***First***, Paxton caused or attempted to cause formal document demands to be delivered to or served on ActBlue in Massachusetts, where ActBlue is headquartered.  *See* Petersen Decl. Exs. 1–2; Gilmer Decl. Exs. 1–6.  Paxton demanded that ActBlue's documents, which are located primarily in Massachusetts, be made available for inspection and copying "during normal business hours *at your principal office or place of*

7

*business*," which is also in Massachusetts. *E.g.*, Petersen Decl. Ex. 2, at 1 (emphasis added); Gilmer Ex. 1. ActBlue undertook substantial efforts and diverted organizational resources in Massachusetts to comply. **Second**, as part of its investigation, Paxton's investigators made three direct donations through ActBlue LLC's website—the first using a fraudulently provided false name, and the other two using the nickname of one of Paxton's investigators. *See* Perla Decl. Ex. 18 ¶¶ 38–41. An additional donation was made directly to ActBlue LLC (a Massachusetts entity) by Paxton's investigators. Sharton Decl. ¶ 5. The ActBlue LLC treasurer, who is responsible for financial reporting regarding ActBlue operations to the FEC and other regulatory authorities for all ActBlue entities, is physically located in Massachusetts. Gilmer Decl. ¶¶ 1, 4. These actions by Paxton—aimed at Massachusetts, taken with the intention of limiting ActBlue's ability to participate in future political activity there, and causing harm in this Commonwealth— demonstrate that Paxton, through his agents, has "transact[ed] business in" Massachusetts.

Personal jurisdiction over Paxton alternatively exists because he "caus[ed] tortious injury by an act or omission" in Massachusetts. Mass. Gen. Laws ch. 223A, § 3(c). Paxton engaged in unlawful retaliation against ActBlue in Massachusetts in violation of the First Amendment, a constitutional tort. *See Hartman v. Moore*, 547 U.S. 250, 259–60 (2006). Paxton committed that tort in Massachusetts when, through his agents, he intentionally served and attempted to serve document requests in Massachusetts in retaliation against ActBlue for the exercise of its constitutionally protected rights, and now attempts to leverage the fruits of that tortious in-state conduct in furtherance of his retaliatory lawsuit in Texas state court.

This Court's exercise of personal jurisdiction over Paxton comports with due process because "he manifestly has availed himself of the privilege of conducting business" in Massachusetts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Paxton's investigative

demands and undercover transactions directed at Massachusetts were undertaken for the specific purpose of chilling ActBlue's First Amendment-protected political activity in Massachusetts. Thus, Paxton "contemplated" that his actions would have these "consequences" in this forum and "purposefully established minimum contacts within the forum." *Id.* at 479.

## II.      Emergency Injunctive Relief Is Warranted

Paxton has publicly stated his intention to punish Democratic-aligned fundraising and electoral organizations, and the adverse actions he has taken against ActBlue are rooted in animus. Paxton's actions constitute the type of retaliation the Constitution cannot abide and have caused— and will continue to cause—irreparable harm, and the balance of equities and public interest favor an injunction in this circumstance.

### A.      ActBlue Is Likely To Succeed In Establishing That Paxton Retaliated Against ActBlue's Constitutionally Protected Activities In Violation Of The First Amendment

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256. "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Id.* (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). If a government official takes adverse action against someone based on that forbidden motive, and "nonretaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may seek relief by bringing a First Amendment retaliation claim. *Id.* To establish a prima facie case of First Amendment retaliation, ActBlue must prove that "(1) [it] engaged in First Amendment-protected conduct, (2) [it] suffered an adverse action, and (3) [its] protected conduct played a substantial or motivating part in the adverse action." *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 118 (D. Mass. 2025) (internal quotation marks omitted). Here, ActBlue can prove each element and is thus likely to prevail on the merits of its claims.

9

*1. ActBlue's Political Fundraising, Support for Democratic Candidates, and Enabling of Individual Donations Are Protected First Amendment Activities.*

ActBlue's activities lie at the core of interests protected by the First Amendment. The First Amendment has its "fullest and most urgent application" to political speech and expression during "campaign[s] for political office." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). ActBlue engages in expressive and associational activity by determining which candidates and causes may use its political fundraising platform. ActBlue also enables donors to engage in expressive activity (i.e., political speech and political association) by facilitating their support of candidates and causes they value most at the local, state, and national level. *See supra* p.2. ActBlue thus "generate[s] essential political speech by fostering discussion of public issues and candidate qualifications" through political fundraising. *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 228 (2014) (Thomas, J., concurring in the judgment) (internal quotation marks omitted). Political association and expression, including collective and organizational activity that facilitates speech, lie at the core of the First Amendment. *See, e.g.*, *Cool Moose Party v. Rhode Island*, 183 F.3d 80, 82 (1st Cir. 1999) ("freedom to associate with others for the advancement of political beliefs and ideas" is "protected by the First and Fourteenth Amendments, and '[t]he right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.'" (quoting *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973))).

*2. Paxton Has Taken Numerous Actions Adverse to ActBlue.*

"Adverse action in the context of First Amendment retaliation need only be more than *de minimis*, which the First Circuit has defined simply as sufficient to chill a reasonably hardy person, or a person of ordinary firmness, from continuing to exercise their constitutional rights." *Hootstein v. Town of Shutesbury*, 2025 WL 3514337, at *6 (D. Mass. Dec. 8, 2025) (citation omitted); *see also Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011). ActBlue is *not* required to "prove that the

10

allegedly retaliatory conduct caused [it] to cease First Amendment activity altogether." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). It is sufficient to show that Paxton's retaliatory acts would chill the First Amendment activity of "a reasonably hardy individual." *Alston v. Town of Brookline*, 997 F.3d 23, 49 (1st Cir. 2021). Paxton's document demands and lawsuit against ActBlue easily satisfy this test.

*First*, it is well-settled that "a state attorney general's subpoena power" may "be abused to target viewpoints, chill speech, and silence and intimidate organizations." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025). Courts have found that Paxton's issuance of politically motivated subpoenas constitute adverse action for First Amendment purposes because of the "potential punitive consequences, as well as possible judicial intervention to enforce … CID[s]" make it "objectively reasonable" that protected speech would be deterred. *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 28 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025).

Similarly, Paxton has demanded that ActBlue produce sensitive financial documents, communications, and information about its operations. Bonin Decl. ¶ 3; Petersen Decl. Ex. 2; Gilmer Decl. Exs. 1, 3, 5, 7–8. Paxton's expansive document requests intrude upon sensitive information, granting Paxton unrestrained visibility into the associational choices and fundraising operations of his political rivals. Of particular note, Paxton has gone so far as to seek specific, sensitive donor information that goes far beyond the donor information routinely reported to regulatory authorities. *See, e.g.*, Petersen Decl. Ex. 2, at 7 (RTE requesting documents regarding three individual donors); Gilmer Decl. Ex. 8, at 7 (CID requiring the production of "Transactional Records" for six donors). Just last week, the Supreme Court reiterated that "demands for private donor information 'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights,'" *First Choice Women's Res. Ctrs. v. Davenport*, No. 24-781, slip op. at 9

(U.S. Apr. 29, 2026) (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976) (per curiam)), and "'chill' protected First Amendment associational rights even when those demands contemplate disclosure only to government officials and not 'the general public,'" *id.* at 10 (quoting *Americans for Prosperity Found. v. Bonta*, 594 U. S. 595, 616 (2021)).

Underscoring the chilling effect of these repeated document demands are severe civil and criminal penalties under Texas law for noncompliance, including the forfeiture of "the right of the entity to do business in [Texas]," Tex. Bus. Org. Code § 12.155, and exposure of managerial officials to criminal penalties, Tex. Bus. Org. Code § 12.156.  The breadth and force of Paxton's investigatory demands, combined with the severe penalties for non-compliance, burden and chill ActBlue's speech. *See Gericke v. Begin*, 753 F.3d 1, 6 (1st Cir. 2014) ("[I]t is obviously improper for officers to invoke criminal laws for retaliatory purposes.").[2]

Magnifying the chilling effect here, Paxton has indicated he intends to take his vendetta against ActBlue even further.  Paxton has publicly tied his ActBlue investigation and lawsuit to his U.S. Senate candidacy, saying that he—unlike current Senator Cornyn, who "has never been interested in this issue"—would take action against ActBlue.  In response to a question asking whether Paxton could, "as part of this lawsuit, as part of this investigation[,] … *collect information* [from ActBlue] *that applies to the whole country*," Paxton stated "I love that question because I'm running for U.S. Senate.  When in the U.S. Senate, I'll be all over this."  Perla Decl. ¶ 21(a).

*Second*, Paxton has now filed a civil enforcement action—premised on false and

---

[2] Indeed, Paxton himself has recognized the gravity of such unbounded requests, and their ability to chill constitutionally protected activities, in an amicus brief.  Regarding a CID issued to Exxon by the Attorney General of Massachusetts, Paxton wrote that the First Amendment "protections afforded by the Constitution . . . [are] threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air."  Brief of Amici Curiae Texas et al. in Support of Plaintiff's Motion for Preliminary Injunction at 6, *Exxon Mobil Corp. v. Healey*, No. 4:16-cv-00469-K (N.D. Tex. Sept. 8, 2016), Dkt. No. 63-2.  That logic holds true for a Massachusetts entity targeted by a Texas CID.

inflammatory allegations—against ActBlue based on its protected First Amendment political activities. *See* Perla Decl. Exs. 18–19. The Supreme Court has held that even the "threat of invoking legal sanctions" can deter protected speech, *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 67 (1963), so a government official's unfounded lawsuit targeting protected activity certainly constitutes a retaliatory action, *see Hartman*, 547 U.S. at 256 ("the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out"); *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1304 (11th Cir. 2019) (explaining that civil suits not supported by probable cause may constitute a retaliatory action under § 1983). Here, Paxton's central claim—that ActBlue facilitates donor fraud by knowingly accepting prepaid card and gift-card donations— lacks any merit. ActBlue's system is configured to automatically reject gift cards and non-reloadable prepaid cards. Sharton Decl. ¶¶ 4, 6.[3] And Paxton had reason to know this since, before filing his Texas complaint, his investigator's attempted gift card donations *were automatically rejected by ActBlue*. But Paxton nonetheless brought his baseless lawsuit in an effort to punish

---

[3] In contrast, ActBlue accepts reloadable prepaid cards, which are designed for repeated use and often linked to an identifiable account, billing address, or administering institution. Reloadable cards are subject to ActBlue's standard multilayered fraud-prevention framework and accepted only if they satisfy the same criteria as any other transaction made using a traditional debit or credit card. Sharton Decl. ¶ 4. Despite these robust fraud protections and ActBlue's compliance with all securities and election law, the injunction sought by Paxton in Texas court would bar ActBlue's lawful acceptance of donations from reloadable prepaid cards. *See* Perla Decl. Ex. 18, at 28. The First Circuit has found that similar efforts to dictate an organization's procedures for making campaign contributions violate the First Amendment. *See Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 12 (1st Cir. 2012) (enjoining Puerto Rico's campaign finance law imposing governance procedures on unions making campaign contributions). Like in *Fortuño*, Paxton's requested injunction against ActBlue would "reach[] deep into the mechanics of an organization's own self-governance and imposes numerous requirements on the organization's internal processes," thereby "seek[ing] to dictate the terms and circumstances under which they are permitted to express political opinions." *Id*.

ActBlue for its First Amendment activities.

>    3.  *Paxton's Civil Enforcement Action Is Causally Linked to ActBlue's Protected Activity.*

Finally, ActBlue is likely to succeed in establishing a "causal connection" between Paxton's "retaliatory animus" and ActBlue's "subsequent injury." *Hartman*, 547 U.S. at 259. Paxton's own statements, the temporal proximity of adverse actions to ActBlue's fundraising success, Paxton's pattern of retaliation against those financing his political opponents, and Paxton's selective enforcement all demonstrate the causal connection.

*First*, contemporaneous statements by government officials mentioning and criticizing protected activity are strong evidence of causation. *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870–71 (9th Cir. 2016). Paxton has plainly stated that his actions are motivated by ActBlue's protected political expression and the ideological leanings of the donors who use its platform. In a press release announcing the lawsuit, Paxton said "[t]he ***radical left*** has relied on ActBlue as a way to funnel foreign donations and dark money into their political campaigns to subvert our laws and compromise the integrity of our elections." Perla Decl. Ex. 19, at 1 (emphasis added). The press release goes on to frame ActBlue by their protected associational activities: "***ActBlue funds primarily left-wing campaigns*** at all levels of government and has processed more than $16 billion since its founding in 2004." Perla Decl. Ex. 19, at 1 (emphasis added). On the same day that he filed his Texas lawsuit, Paxton broke the news of the lawsuit on the "Salcedo Storm Podcast," where Paxton was introduced as having "never failed from defending us from Marxists, leftists, and communists who have infiltrated the Democratic Party." Perla Decl. ¶ 21(b). Paxton described his lawsuit by saying that ActBlue donations "are largely going to liberal Democrats, and it's always been a mystery how they raised this much money." Perla Decl. ¶ 21(b). Later on "The Benny Show" with Benny Johnson, the self-proclaimed

14

"Godfather of the Conservative Internet," Paxton explained that "ActBlue has raised billions of dollars for liberal causes, liberal Democrats." Perla Decl. ¶ 21(c).

*Second*, the causal link between ActBlue's protected fundraising activities and Paxton's retaliatory actions is demonstrated by the temporal proximity of Paxton's investigative activity to periods of ActBlue's fundraising success for Democratic candidates. *See Smith v. Cnty. of Suffolk,* 776 F.3d 114, 118 (2d Cir. 2015) ("A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action."); *see also Ariz. Students' Ass'n*, 824 F.3d at 870. Here, after a year and a half of silence from Paxton on the investigation he initiated in 2024 (another election year), Paxton's investigators attempted to make at least ten contributions through ActBlue beginning on *the day after* James Talarico announced that his Senate campaign had raised $2.5 million in a single day, $2.2 million of which was raised via donor contributions through ActBlue. Gilmer Decl. ¶ 9; Sharton Decl. ¶ 5. Then, just five days before Paxton filed his lawsuit, FEC filings showed that Talarico and other Democratic candidates had posted exceptionally strong fundraising numbers for the first quarter of 2026. Perla Decl. Exs. 15-16, 18.

*Third*, Paxton's pattern of investigating protected expressions of financial support for his political opponents also shows causation. After a conservative commentator called for an investigation of ActBlue days after then-Vice President Kamala Harris's late July 2024 announcement that she had raised $200 million on the platform, Perla Decl. Ex. 13, at 2-3, Paxton issued a second CID, Gilmer Decl. ¶ 13; *Id.* Ex. 8, and a letter to ActBlue in August 2024, Perla Decl. Ex. 24. In 2025, after Texas Democrats traveled out of state in protest of a redistricting law, Paxton investigated PACs, including one led by former Democratic Member of the House of Representatives Beto O'Rourke, for funding the candidates. Perla Decl. Ex. 6. His press release

framed the investigation in explicitly partisan terms: "***Any Democrat*** coward breaking the law by taking a Beto Bribe ***will be held accountable***." Perla Decl. Ex. 6, at 1 (emphasis added).

*Finally*, Paxton does not investigate "similarly situated" entities that engage in protected speech favorable to Paxton. *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) ("The existence of probable cause does not defeat a plaintiff 's claim if he produces 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" (quoting *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019))); *see Minocqua Brewing Co. LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025) ("Plaintiffs can establish causation" through "disparate treatment of similarly situated entities."). Paxton has never investigated or sued WinRed—ActBlue's Republican Party fundraising counterpart—even though the same journalist who authored the April 2026 *New York Times* article about ActBlue also reported in 2021 on WinRed using pre-checked recurring donation boxes and layered defaults that led many donors to unknowingly make repeated contributions. Perla Decl. Exs. 10–11. Such practices forced Republican candidates to refund large sums of money they had raised during 2020 and 2021 at rates several orders of magnitude higher than those of their Democratic rivals using ActBlue. Perla Decl. Ex. 12, at 1. Other state attorneys general conducted nonpartisan investigations into both WinRed and ActBlue, Perla Decl. Ex. 12, but Paxton has never joined them.

For all these reasons, ActBlue is likely to prove a causal connection between Paxton's retaliatory animus towards ActBlue's protected First Amendment activities and ActBlue's injury.

### B.    ActBlue Will Suffer Irreparable Harm Without Injunctive Relief

Paxton's actions will continue to cause ActBlue irreparable harm absent injunctive relief. ***First***, it is well settled that the violation of First Amendment rights, even for short periods of time, constitutes irreparable injury as a matter of law. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods

16

of time, unquestionably constitutes irreparable injury." (internal citation omitted)). Here, Paxton's ongoing investigation and enforcement campaign directly burden ActBlue's protected expressive and associational activities. Specifically, Paxton's investigative demands inflict irreparable harm because they force ActBlue to disclose donor, associational, and internal information—as distinguished from donor information that is regularly reported to the FEC and other regulatory authorities—that lies at the heart of First Amendment protection against compelled disclosure. *See First Choice*, slip op. 9 ("demands for private donor information 'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights'" (quoting *Buckley*, 424 U.S. at 65)); *Americans for Prosperity Found.*, 594 U.S. at 616. The demands sweep far beyond any narrowly tailored inquiry, reaching employee structures, funding sources and revenue, expenditures, and internal and external communications, all under threat of severe penalties. As elections approach, these deterrent effects operate in real time, reducing political participation during the precise window when speech and association matter most. *See Citizens United*, 558 U.S. at 334 ("It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held," and there are "short timeframes in which speech can have influence.").

**Second**, Paxton's decision to file a civil enforcement action in Texas state court on April 20, 2026, marks a decisive escalation by converting an already coercive investigation into an unfounded enforcement proceeding. Following months of repeated investigative demands, Paxton initiated suit seeking injunctive relief and civil penalties—including restrictions on ActBlue's ability to accept certain forms of political donations. *See generally* Perla Decl. Ex. 18. Absent injunctive relief, ActBlue will be forced to expend substantial and increasing resources (including staff time, operational capacity, and outside legal support) to respond to Paxton's retaliatory lawsuit that is directly burdening First Amendment activities. Gilmer Decl. ¶¶ 15–16. These

17

harms are irreparable because ActBlue cannot recover damages against Paxton in his official capacity given Paxton's sovereign immunity as Attorney General. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989); *Edelman v. Jordan*, 415 U.S. 651, 677 (1974). Thus, the substantial resources ActBlue is being compelled to expend now—responding to enforcement litigation, complying with coercive process, and diverting capacity away from protected expressive activity—are permanently lost, even if ActBlue ultimately prevails in the Texas litigation.

### C.      The Balance of Equities And The Public Interest Favor Emergency Relief

In evaluating the third and fourth factors, courts weigh the relative hardships to the parties and assess whether an injunction would serve the public interest. See *Dunkin' Donuts Franchised Rests. LLC v. Wometco Donas Inc.*, 53 F. Supp. 3d 221, 231–32 (S.D.N.Y. 2014).

The balance of equities decidedly favors ActBlue. Absent injunctive relief, ActBlue will continue to suffer ongoing constitutional harm, including chilled political participation, compelled disclosure of protected donor and associational information, reputational injury from public accusations, and the diversion of substantial resources to resist escalating investigative demands and defend against active enforcement litigation. By contrast, narrowly tailored injunctive relief would impose no comparable hardship on Paxton. The requested relief would not preclude Texas from enforcing its laws through constitutionally permissible means; it would only prevent Paxton from using enforcement powers in ways that exceed constitutional limits and target protected political activity. Paxton has no legitimate interest in continuing conduct that violates the First Amendment, and an injunction ensures that ActBlue and its users may continue to participate in the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957).

An injunction affirmatively serves the public interest. As the First Circuit has emphasized, "the suppression of political speech harms not only the speaker, but also the public to whom the

18

speech would be directed." *Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012) (citing *Citizens United*, 558 U.S. at 339–40). That concern is especially acute here, as the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339. An injunction would halt ongoing constitutional injury, impose minimal countervailing burden, and protect the public's interest in political participation and free expression. Accordingly, both the balance of equities and the public interest favor injunctive relief.

### III.   This Court Can Enjoin Paxton From Continuing to Litigate His Bad-Faith Lawsuit

ActBlue is seeking injunctive relief against not only Paxton's retaliatory continued investigatory activities but also the Texas state civil enforcement action he filed against ActBlue. That lawsuit, which is premised on false allegations and intentionally omits key material information, was undertaken in bad faith, and Paxton should be enjoined from further litigating it.

*Younger v. Harris*, 401 U.S. 37 (1971), which prevents federal courts from enjoining state court proceedings, *see Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013), is inapplicable here.[4] It is a recognized exception to the *Younger* doctrine that "[a]bstention is inappropriate … when a state proceeding is brought in bad faith, that is, for the purpose of harassment." *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 192 (1st Cir. 2015) (citing *Younger*, 401 U.S. at 53–54). Here, bad faith is present. Paxton's complaint is premised on the claim that ActBlue has "secretly resumed acceptance of gift card donations." Perla Decl. Ex. 18 ¶ 64. But Paxton knows this claim to be false; prior to his complaint being filed, ActBlue automatically rejected the donations Paxton's investigators attempted to make with gift cards. Sharton Decl. ¶ 6. Additionally,

---

[4] The Anti-Injunction act does not apply here because 42 U.S.C. § 1983 is an "express authorization from Congress permitting federal courts to enjoin state proceedings in order to protect federal rights." *Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972). This court may accordingly enjoin a pending proceeding in state court. *Id.*

19

Paxton's complaint is in bad faith because he selectively chose to investigate ActBlue while ignoring reports of significant compliance issues at WinRed. *See* Perla Decl. Exs. 10–11.

Indeed, Paxton's actions here contain "several indicia deemed relevant to the *Younger* bad-faith exception analysis" that another court recently considered when enjoining, on First Amendment grounds, Paxton's attempt to enforce a document demand against a nonprofit voter registration organization, namely "the complete lack of credible evidence of illegal activity conducted by Plaintiff, suggesting that Defendant has 'no hope of obtaining a valid' outcome in his favor, and also the timeline of events at issue and Defendant's 'multiplicity of prosecutions,' or as the Fifth Circuit described it, 'upping the ante.'" *Jolt Initiative, Inc. v. Paxton*, 2026 WL 297633, at *8 (W.D. Tex. Jan. 29, 2026) (citing *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1091–93 (5th Cir. 2023)). Paxton has upped the ante in this case by restarting his investigation of ActBlue and filing a lawsuit once a political opponent started to receive significant donations through ActBlue. In *Jolt Initiative*, Paxton "us[ed] a multiplicity of enforcement tools on an accelerated timeline—'escalating from [a document request] to the more severe quo warranto action' even without finding any new evidence to suggest wrongdoing by Plaintiff." *Id.* at *9. Here, after a year and a half of silence and only days after ActBlue's widely reported role in supporting the successful fundraising of his political opponent, Paxton escalated to an unfounded lawsuit.

Paxton's lawsuit, which he characterized as taking on "[t]he ***radical left***" and "left-wing campaigns," *see supra* p.14, is the very type of meritless, politically motivated lawsuit that falls into the bad-faith exception to *Younger* abstention. The Court should thus enjoin Paxton from continuing to litigate it.

## CONCLUSION

For the foregoing reasons, ActBlue respectfully requests that the Court grant ActBlue's motion for an expedited preliminary injunction.

20

Dated: May 6, 2026

Respectfully submitted,

By: */s/ Timothy J. Perla*

WILMER CUTLER PICKERING HALE AND
DORR LLP
Timothy J. Perla, BBO No. 660447
   timothy.perla@wilmerhale.com
Felicia H. Ellsworth, BBO No. 665232
   felicia.ellsworth@wilmerhale.com
Amanda Masselam Strachan, BBO No. 641108
   amanda.masselamstrachan@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Ronald C. Machen (*pro hac vice*)
   ronald.machen@wilmerhale.com
Matthew T. Jones (*pro hac vice*)
   matthew.jones@wilmerhale.com
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiffs ActBlue LLC, ActBlue Civics, Inc., ATS, Inc., and ActBlue Charities, Inc.*

21

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document and all supporting papers filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be delivered by process server to those indicated as non-registered participants on May 6, 2026 or as soon as practicable thereafter.  Courtesy copies will also be transmitted by electronic mail to the non-registered participants listed below on May 6, 2026.

Warren Kenneth Paxton, Jr.
Attorney General
Office of the Attorney General of the State of Texas
kenneth.paxton@oag.texas.gov

David Bizar
Assistant Attorney General
Office of the Attorney General of the State of Texas
david.bizar@oag.texas.gov

Dated: May 6, 2026

/s/ Timothy J. Perla
Timothy J. Perla, BBO No. 660447
*Counsel for Plaintiffs*