# Exhibit 17

# *ActBlue May Have Misled Congress on Vetting Foreign Donations, Its Lawyers Warned*

The Democratic fund-raising group is facing investigations from the Justice Department and congressional Republicans ahead of the midterm elections.

---

▶  Listen · 16:48 min

  

**By Reid J. Epstein and Shane Goldmacher**

This article is based on internal legal memos, emails, resignation letters, Slack messages and interviews with current and former ActBlue employees.

April 2, 2026

In early 2025, a law firm working for ActBlue, the Democratic fund-raising behemoth, delivered the organization a startling warning.

The firm concluded that ActBlue's chief executive had given a potentially misleading response to congressional Republican investigators in a 2023 letter explaining how the organization vetted donations to ensure that they were not illegally coming from foreign citizens.

The letter from the chief executive, Regina Wallace-Jones, said ActBlue carried out "multilayered" screenings of contributions that helped "root out" those from overseas. In fact, the law firm found, some of the steps she had described were not always followed.

"This presents a substantial risk for ActBlue," the law firm, Covington & Burling, wrote in one of two memos expressing legal concerns. One memo raised the specter of a criminal investigation if prosecutors believed that ActBlue had tried to conceal facts about its efforts to prevent foreign contributions.

Federal election law prohibits foreign citizens or people who are not permanent residents from donating directly to federal candidates or political action committees. Lying to or obstructing Congress is a crime.

The memos instigated a meltdown at the highest levels of ActBlue, one of the Democratic Party's most vital financial organs.

A series of top officials resigned in quick succession. The New York Times revealed those departures last year, but a key cause of the tumult at ActBlue — the legal warnings about potentially misleading Congress over vetting foreign donations — is being reported here for the first time.

ActBlue is now all but declaring war on its own past lawyers, an extraordinary turn of events at a moment when President Trump has already ordered a Justice Department investigation into the organization. Democrats are nervous that any additional upheaval at ActBlue could destabilize the party's critical fund-raising apparatus ahead of the midterm elections.

All levels of Democratic candidates, from incumbent presidents to school board aspirants, use ActBlue to raise campaign money from online donors. The platform has processed nearly $19 billion in contributions since its founding in 2004, building a donor database with millions of credit card numbers that is unmatched in American politics. Nearly 23,000 candidates and groups used the site in 2025, ActBlue has said, raising almost $1.8 billion from 52 million contributions, some of which recur every month.

The Times reviewed Covington's memos, resignation letters from ActBlue officials, correspondence between Covington and ActBlue, screenshots of the fund-raising organization's internal Slack messages and a timeline of events produced by ActBlue. The Times spoke with half a dozen former ActBlue employees who participated in or were briefed on the events, all of whom were granted anonymity to describe a sensitive situation, as well as senior ActBlue officials including the chairwoman of the board.

## 'A Potential Criminal Investigation'

ActBlue is under the most intense scrutiny it has ever faced.

The Justice Department investigation that Mr. Trump ordered last April — which is in part examining the organization's systems to prevent contributions from foreign nationals — remains ongoing.

The Covington memos did not state explicitly that ActBlue broke federal law or that Ms. Wallace-Jones misled Congress, but instead explained the risks of her previous statement to Congress.

"It can be alleged that ActBlue accepted and/or facilitated the acceptance of foreign-national contributions into American elections," one memo states. "In addition, because ActBlue's staff was aware that its system was not as robust as necessary, it could be alleged that these violations were 'knowing and willful,' a standard that both increases the penalties the F.E.C. might seek and gives the Justice Department jurisdiction for a potential criminal investigation."

The memos did not identify any specific illegal contributions, and they suggested that the scope of any potential problems was unclear. Kimberly Peeler-Allen, the chairwoman of the ActBlue board of directors, said in an interview that "less than 1 percent" of contributions from the 2024 election cycle had signs that they were from foreign countries.

But within ActBlue, the memos raised serious concerns, including about Ms. Wallace-Jones's leadership. Some departing officials told the board that ActBlue was being gravely mismanaged.

In a tense video conference days after the memos were delivered, Dana Remus, a Covington lawyer who served as White House counsel in the Biden administration, warned Ms. Wallace-Jones that she was at risk of having legal liability and needed her own personal lawyer, according to two people who were on the call.

Within weeks, ActBlue and Covington parted ways.

Now, ActBlue is questioning the legal counsel provided by Covington, a major firm home to high-profile Democratic lawyers. The fund-raising organization says the firm insufficiently reviewed the 2023 letter to Congress — even as it insists that the letter was accurate.

"The statements in my 2023 letter to the House Administration Committee were accurate in the context in which they were written," Ms. Wallace-Jones said in a written statement to The Times, noting that Covington had approved the letter. Still, ActBlue later took quiet steps to strengthen its efforts to block foreign donations, and conveyed word of its new policies in an unrelated letter its current lawyers sent to Congress in mid-2025.

That came after Ms. Wallace-Jones said that ActBlue had "terminated" Covington in March 2025 after "more than a year of navigating tardiness, unpreparedness, and counsel that bordered on malpractice."

A Covington spokesman, David Schaefer, said, "We have complete confidence in the legal advice our lawyers provided to ActBlue." He declined to address ActBlue's specific claims.

Dana Remus, a well-known Democratic lawyer who works at Covington & Burling, cautioned ActBlue's chief executive over the 2023 letter to Congress.   Andrew Harnik/Associated Press

## Legal Alarms Start to Blare

The remarkable turmoil at ActBlue was years in the making.

It began with the 2023 letter to Congress, which Ms. Wallace-Jones sent to Republicans on the House Administration Committee as they ramped up an investigation into the platform's efforts to prevent foreign donations.

ActBlue was lawyering up for the coming fight and brought on Covington for its expertise.

The letter from Ms. Wallace-Jones gave detailed descriptions about ActBlue's vetting. She wrote that the organization processed contributions with foreign mailing addresses only if the donor supplied a U.S. passport number.

That turned out not to be entirely accurate, Covington's 2025 memos said.

She also wrote that in some instances, ActBlue would contact donors to request their U.S. passport information in order to process donations — and that it would refund those who could not be reached.

That also did not always happen, according to Covington's memos. For example, donors who paid through third-party apps like Apple Pay, PayPal or Venmo were not asked for passport information, Covington wrote.

The Covington memos indicated that ActBlue did not have the rigor in its review of overseas donations that was required or that it had described to congressional investigators. As a result, one memo said, there was "a substantial risk that some of the funds received were impermissible contributions from foreign nationals."

The other memo — which stated that ActBlue had requested an outline of "potential legal risks associated with statements to Congress that may be alleged to be false or misleading" — explicitly explored the potential penalties.

The memo noted that the maximum penalties were five years in prison and $250,000 in fines, though it added that such a sentence would be "extremely unlikely." The Covington lawyers also wrote of the 2023 letter that "in our view, the strongest defense is that when read in context, the statements are accurate," and that the relevant paragraphs "contain qualifying language."

It outlined three potential options for ActBlue:

- Provide new information "without explicitly stating that ActBlue is correcting the record"

- "Explicitly correct the record"

- "Do not provide additional information clarifying the prior statements"

For each option, Covington presented ActBlue with advantages and risks. Some of the most severe risks came from doing nothing.

"An aggressive prosecutor may view the November 2023 letter not just as a false statement but as an effort to conceal the foreign contributions," Covington wrote.

ActBlue would eventually change its vetting practices and inform Congress, but not before an internal uproar.

## Tension Rises With a Law Firm

The Covington memos arrived at a time when ActBlue was without a general counsel.

Only months earlier, in November 2024, Ms. Wallace-Jones had "voiced concerns" to ActBlue's board about the organization's top in-house lawyer, Darrin Hurwitz, and within weeks he was terminated, according to the timeline provided by ActBlue.

Ms. Peeler-Allen said that Mr. Hurwitz had been let go because he "was not necessarily up to the job" and had committed "a series of lapses." She did not elaborate further.

Mr. Hurwitz said in a statement that Ms. Peeler-Allen's assessment was "completely false." He added, "Attorney-client privilege and legal ethics rules prevent me from discussing this matter."

Covington's conclusions landed with a thud inside ActBlue.

In ActBlue's timeline of events, the organization wrote that Ms. Wallace-Jones "was not informed that her statements could be misconstrued and taken out of context until over a year" after signing the 2023 letter.

Ms. Peeler-Allen said that after board members learned of the Covington memos, they expressed "significant alarm" at the law firm's role in reviewing the 2023 letter.

"It felt like they were trying to cover their butts," she recalled one board member saying of Covington's 2025 memos.

It is highly unusual for a former client of a major white-shoe law firm like Covington to attack it publicly, as top ActBlue officials did in statements to The Times.

Ms. Peeler-Allen said ActBlue had ultimately decided not to tell Congress that it wanted to amend its past statements.

"We saw it as we weren't going to poke the bear by issuing a correction for things that, frankly, the committee hadn't necessarily looked at more closely," she said.

Senior ActBlue officials insisted that there was nothing wrong in the 2023 letter. But at the same time, they acknowledged that the organization had stiffened its measures for vetting foreign donations after the Covington memos.

And ActBlue's new outside legal counsel included a description of those changes in a June 2025 letter to Congress, which accused Republicans of a partisan witch hunt that reached beyond the question of ActBlue's vetting of donors.

"ActBlue has recently implemented additional restrictions that will automatically reject contributions with indicators that they come from abroad, including contributions made through third-party payment processors," wrote ActBlue's new lawyers, from the law firm Dechert. The letter said the new restrictions would "represent a blanket approach to replace ActBlue's prior screening methods."

Ms. Peeler-Allen suggested that there was no contradiction between ActBlue's position that its 2023 letter was accurate and the fact that the organization subsequently changed its vetting measures.

"We didn't do it immediately, but as we understood the gap, then we remedied the situation and answered, continued to answer truthfully to the best of our knowledge at the time," she said.

Covington & Burling is a major law firm that is home to high-profile Democratic lawyers.   Andrew Kelly/Reuters

## The ActBlue Fallout

The video call between ActBlue's leadership and Covington lawyers did not go well.

Ms. Remus warned Ms. Wallace-Jones about her own legal liability and said she should inform ActBlue's board of directors of the situation, according to the two people on the call. In an email two days later, Ms. Remus reiterated her recommendations, which she called

"necessary prerequisites for our ability to continue to assist ActBlue in these matters."

Within weeks, there was an exodus of senior ActBlue officials, and the relationship between ActBlue and Covington would be severed.

The two participants who spoke to The Times said that Ms. Wallace-Jones initially resisted Covington's recommendations, but Ms. Wallace-Jones said she "never rejected Dana's counsel." An ActBlue spokeswoman, De'Andra Roberts-LaBoo, said that Ms. Wallace-Jones had indeed obtained her own lawyer.

Two days after the video call, one of ActBlue's remaining in-house lawyers, Aaron Ting, resigned.

"I am concerned that leadership is not fully committed to transparently addressing with the Board the seriousness of our most pressing concerns: the legal compliance of ActBlue's past practices for screening political donations from abroad and its past representations to Congress regarding foreign donations and related matters," Mr. Ting wrote in his resignation letter. Ms. Roberts-LaBoo said Mr. Ting had already given notice and had only accelerated his departure.

The next day, the last remaining full-time lawyer in ActBlue's legal department, Zain Ahmad, sent the Covington memos, Mr. Ting's resignation letter and the email from Ms. Remus to Ms. Wallace-Jones to the ActBlue board of directors, ActBlue's executive leadership team and Covington's lawyers.

Within a day, Mr. Ahmad's access to some of ActBlue's computer networks was shut off. He wrote what had happened in an internal Slack message that was deleted. "Please be advised that we have Anti-Retaliation and Whistleblower Policies for a reason," Mr. Ahmad wrote.

Danielle Sell, a human resources official, wrote on an ActBlue Slack channel that Mr. Ahmad had been treated unfairly and warned that "everyone should proceed with caution."

About a half-hour later, Ms. Sell resigned.

She had also previously given notice and simply accelerated her departure, according to Ms. Roberts-LaBoo.

Mr. Ting, Mr. Ahmad and Ms. Sell declined to comment.

The board met with Covington days later for a "special meeting," according to the ActBlue timeline, then met again four days later and voted unanimously to end the organization's relationship with the law firm.

This week, Ms. Roberts-LaBoo said a former ActBlue official had previously demanded $1 million and threatened the disclosure of the organization's internal legal documents. The demand was rejected, she said.

## Republicans Increase Scrutiny

When Mr. Trump issued his unusual direct order for the Justice Department to investigate ActBlue last spring, it came with a 180-day deadline to report back the results of the inquiry.

"Hopefully ACTBLUE, the Democrats ILLEGAL SCAM used to raise money, including from not allowed 'foreign contributions,' is being looked at by authorities," Mr. Trump wrote then on his social media platform.

No such report has been made public.

Investigations by three Republican-led House committees remain ongoing. Those committees sent a letter last April accusing ActBlue of lax procedures in fraud prevention and demanding information about the raft of resignations early last year. Several former ActBlue officials were called to testify behind closed doors before Republican congressional investigators, according to people briefed on the proceedings.

The former officials all had the same lawyer, who was paid by ActBlue, and followed his guidance to invoke their Fifth Amendment right not to incriminate themselves.

ActBlue officials increasingly treated the investigations as political fishing expeditions that aimed to cripple the financial engine of the Democratic Party — while ignoring the leading processor of Republican donations, WinRed. At one point last year, the organization questioned the legitimacy of the congressional investigation.

"Let's be clear: Donald Trump and his accomplices in the Republican Party are targeting ActBlue as part of their brazen attack on democracy in America," says a fact sheet on ActBlue's website.

Ms. Peeler-Allen, the board chairwoman, said ActBlue wanted to turn the page on the drama. "This is something that we have weathered, and will continue to weather, and are stronger for it," she said.

Case 1:26-cv-11986-RGS Document 12-17 Filed 05/06/26 Page 11 of 11

Later, she sent a one-page letter on behalf of the entire ActBlue board, standing behind Ms. Wallace-Jones and praising her effusively.

"Regina," she wrote, "has demonstrated exceptional leadership across every dimension of her role."

**Reid J. Epstein** is a Times reporter covering campaigns and elections from Washington.

**Shane Goldmacher** is a Times national political correspondent.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: ActBlue Was Told It May Have Misled Congress