**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ACTBLUE LLC; ACTBLUE CIVICS, INC., ATS, INC., AND ACTBLUE CHARITIES, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> WARREN KENNETH PAXTON, JR., in his official capacity as Attorney General of the State of Texas, <br><br> *Defendant.* | Civil Action No. 1:26-cv-11986-RGS |

## DEFENDANT'S MOTION TO DISMISS

Defendant KEN PAXTON, in his official capacity as the Attorney General of the State of Texas ("Texas Attorney General"), files this motion to dismiss. Three independent, preliminary grounds require dismissal. Even if the Court reaches the merits, the complaint fails to state a First Amendment claim. The Attorney General respectfully requests that the Court should dismiss this action.

TABLE OF CONTENTS

Table of Authorities..................................................................................................................iii

Introduction............................................................................................................................. 1

Background .............................................................................................................................. 1

Legal Standard ........................................................................................................................ 5

Argument ................................................................................................................................. 6

    I.   *Younger* abstention bars Plaintiffs' federal suit................................................... 6

        A.      The state case falls within the *Younger* taxonomy...................................7

        B.      The *Middlesex* factors support abstention................................................9

        C.      No exceptions to *Younger* abstention apply............................................10

    II.  This Court lacks personal jurisdiction over Defendant. ..................................... 13

        A.      Plaintiffs claims do not arise out of or relate to Defendant's forum-state activities. ..................................................................................................13

        B.      Defendant has not purposefully availed himself to the benefits or protections of this forum state's laws. ...............................................15

        C.      Exercise of specific jurisdiction in this forum is not reasonable. ..........18

    III. Venue is improper in this district. ...................................................................... 19

    IV. In the alternative, the complaint fails to state a claim under Rule 12(b)(6). ...... 19

Conclusion ............................................................................................................................ 20

Certificate of Service ........................................................................................................... 21

## TABLE OF AUTHORITIES

### Cases

*A Corp. v. All Am. Plumbing, Inc.*,
812 F.3d 54 (1st Cir. 2016)................................................................ 6, 13, 15, 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................... 6

*Atlantic Marine Constr. Co. v. U.S. Dist. Court*,
571 U.S. 49 (2013)................................................................................ 6, 19

*Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*,
582 U.S. 255 (2017)................................................................................. 17

*Brooks v. New Hampshire Supreme Ct.*,
80 F.3d 633 (1st Cir. 1996)........................................................................ 11

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)................................................................................. 15

*Calder v. Jones*,
465 U.S. 783 (1984)................................................................................. 15

*Copia Commc'ns, LLC v. AMResorts, L.P.*,
812 F.3d 1 (1st Cir. 2016)......................................................................... 16

*Credit Acceptance Corp. v. Healey*,
544 F. Supp. 3d 139 (D. Mass. 2021) ............................................................. 9

*D.B. ex rel. Elizabeth B. v. Esposito*,
675 F.3d 26 (1st Cir. 2012)........................................................................ 20

*Esso Standard Oil Co. v. Cotto*,
389 F.3d 212(1st Cir. 2004)........................................................................ 9

*Fanning v. FTC*,
821 F.3d 164 (1st Cir. 2016)....................................................................... 20

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949)................................................................................. 20

*Guilloty Perez v. Pierluisi*,
339 F.3d 43 (1st Cir. 2003)........................................................................ 20

*Harlow v. Children's Hosp.*,
432 F.3d 50 (1st Cir. 2005)..................................................................... 13, 17

*Hartman v. Moore*, 547 U.S. 250 (2006)............................................................ 14

*In re Justs. of Superior Ct. Dep't of Massachusetts Trial Ct.*,
218 F.3d 11 (1st Cir. 2000)......................................................................... 7

*Ins. Co. of N. Am. v. Marina Salina Cruz*,
  649 F.2d 1266 (9th Cir. 1981) ................................................................. 19

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011) .............................................................................. 17

*Kuan Chen v. U.S Sports Acad., Inc.*,
  956 F.3d 45 (1st Cir. 2020) ............................................................... 16, 17

*Leroy v. Great W. United Corp.*,
  443 U.S. 173 (1979) ............................................................................... 19

*Lewis v. City of Boston,*
  321 F.3d 207 (1st Cir.2003) ................................................................... 20

*Maymo-Melendez v. Alvarez-Ramirez*,
  364 F.3d 27 (1st Cir. 2004) ................................................................... 12

*Motus, LLC v. CarData Consultants, Inc.*,
  23 F.4th 115 (1st Cir. 2022) ............................................................. 13, 18

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) ............................................................................... 20

*Nowak v. Tak How Investments, Ltd.*,
  94 F.3d 708 (1st Cir. 1996) ................................................................... 13

*Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*,
  477 U.S. 619 (1986) ................................................................................. 7

*Platten v. HG Berm. Exempted Ltd.*,
  437 F.3d 118 (1st Cir. 2006) ................................................................... 6

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999) ................................................................................. 5

*Sawtelle v. Farrell*,
  70 F.3d 1381 (1st Cir. 1995) ................................................................. 14

*Scottsdale Cap. Advisors Corp. v. The Deal, LLC*,
  887 F.3d 17 (1st Cir. 2018) ................................................................... 13

*Sirva Relocation, LLC v. Richie*,
  794 F.3d 185 (1st Cir. 2015) ........................................................... passim

*Sprint Comm., Inc. v. Jacobs*,
  571 U.S. 69 (2013) ................................................................................... 7

*Tenet v. Doe*,
  544 U.S. 1 (2005) ..................................................................................... 6

*U.S. v. Armstrong*,
  517 U.S. 456 (1996).................................................................................................. 12

*United Books, Inc. v. Conte*,
  739 F.2d 30 (1st Cir. 1984)................................................................................... 6, 10

*Walden v. Fiore*, 571 U.S. 277, 285 (2014).................................................................... 15

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993).......................................................................................... 6

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)............................................................................................ 17, 19

*Yelp Inc. v. Paxton*,
  137 F.4th 944 (9th Cir. 2025) .................................................................................... 9

*Younger v. Harris,*
  401 U.S. 37 (1971)............................................................................................... 7, 12

**Statutes**

28 U.S.C. § 1391(b)(1) ................................................................................................... 19

28 U.S.C. § 1391(b)(2) ................................................................................................... 19

Tex. Bus. & Com. Code §§ 17.41–17.63......................................................................... 1

**Other Authorities**

Fed. R. Civ. P. 12(b)(2)................................................................................................... 13

**Constitutional Provisions**

Tex. Const. art. IV, § 22.................................................................................................. 19

**INTRODUCTION**

This case is about a single, neutral question of law: when a State Attorney General sues a foreign corporation registered in the State and actively doing business there for violations of the State's own laws in that State's courts, may the corporation drag that dispute into the courts of its home State? The answer is no—whether the sovereign is Texas, Massachusetts, or any other State.

The State of Texas has brought a civil enforcement action against ActBlue in Texas state court under the Texas Deceptive Trade Practices—Tex. Bus. & Com. Code §§ 17.41–17.63 (DTPA), following a multi-year investigation by the Attorney General and Congress. Rather than defend that action in Texas or remove it to a Texas federal court, ActBlue filed this suit in Massachusetts seeking to enjoin the Attorney General from enforcing Texas law in Texas. Three independent grounds require dismissal: (1) *Younger* abstention bars a federal court from displacing an ongoing state civil enforcement proceeding of this kind; (2) the Due Process Clause bars a Massachusetts court from exercising personal jurisdiction over a Texas officer whose challenged conduct occurred entirely in Texas; and (3) the federal venue statute bars this suit, because every challenged act occurred in Texas, not Massachusetts. Even if the Court reaches the merits, the complaint fails to state a First Amendment claim and should be dismissed under Rule 12(b)(6). Dismissal does not harm ActBlue, as it may raise every argument it raises here in Texas state court. Each ground for dismissal is independently sufficient, and all are dispositive. The Court should dismiss.

**BACKGROUND**

ActBlue LLC is a political action committee and fundraising platform that processes donations to Democratic campaigns. ECF 12-18 ¶ 12. ActBlue LLC is a Massachusetts corporation that conducts business in Texas as a registered foreign corporation. *Id.* ¶ 2–7. Texas, through its Attorney General, brought a civil enforcement action against ActBlue LLC in Texas state court under the DTPA, alleging that ActBlue LLC has violated the DTPA by knowingly misrepresenting its anti-fraud practices to the public while quietly continuing to engage in conduct contrary to its public representations. *Id.* ¶¶ 33–37, 57–81.

The Texas enforcement action is the culmination of a multi-year investigation by Congress and

1

the Attorney General into ActBlue's donor-verification practices. These concerns are not new. In 2013, ActBlue told the Federal Election Commission (FEC) that "[p]repaid debit cards and gift cards do pose a unique threat of evasion of the contribution limits by a particular motivated actor. Since they are not linked to the identity of the purchasers, these cards could be utilized to make prohibited straw donor contributions." *Id.* ¶ 20. In April 2023, then-Senator Rubio wrote to the FEC requesting an investigation into ActBlue after learning that fraudulent donations connected to ActBlue were being reported to the FEC even though numerous individuals, including senior citizens, were unaware that their names and addresses were being used in connection with these donations. *Id.* A few months later, House Administration Committee Chairman Steil sent ActBlue a formal demand letter raising concerns that prepaid cards were being used to "wash" unlawful donations through the platform. *Id.* In its response, ActBlue claimed that it employed a robust security program to verify the identity of donors and prevent impermissible contributions and enumerated some of its security practices. *Id.* ¶¶ 23–25.

In December 2023, the Attorney General opened an investigation into whether ActBlue's platform was enabling donor fraud in violation of Texas law. ECF 12-18 ¶ 26. On January 10, 2024, the Attorney General mailed Requests to Examine (RTEs) to each Plaintiff's registered agent in Austin, Texas, and to each Plaintiff in Massachusetts by certified mail. *See* ECF 14-1–14-6. These RTEs informed Plaintiffs they were under investigation by the Attorney General pursuant to statutes including Texas Business and Organizations Code §§ 12.151–.156, and sought documents from Plaintiffs, including documents sufficient to show Plaintiffs' policies for verifying the identity of persons who make political contributions through ActBlue's websites to ensure compliance with campaign-finance laws. *See* ECF 14-1–14-6.

The Attorney General later issued Civil Investigative Demands (CID) concerning ActBlue's use of CVVs. On July 3, 2024, CIDs were sent to ActBlue LLC and ActBlue Technical Services by email to their Texas-based counsel, seeking documents related to discussions and policy changes concerning the use of CVVs for political contributions. ECF 14-7. On August 8, 2024, another set of CIDs were sent to ActBlue LLC and ActBlue Technical Services, again by email to

their Texas-based counsel, seeking documents reflecting A/B testing results for ActBlue's usage of CVVs. ECF 14-8. ActBlue first began collecting CVVs in 2024. ECF 1 ¶ 36.

The Congressional investigation continued in the meantime. On October 28, 2024, Chairman Steil subpoenaed ActBlue for documents related to donor verification, noting concerns that ActBlue's "failure to verify donor identity may have allowed foreign actors to fraudulently participate in the political process." ECF 12-18 ¶ 29. Just over a month later, Chairman Steil announced that ActBlue represented to Congress that it updated its policies to "automatically reject donations that use foreign prepaid/gift cards, domestic gift cards, are from highrisk/sanctioned countries, and have the highest level of risk as determined by [ActBlue's] solution provider, Sift." *Id.* ¶ 30. An April 2, 2025, joint congressional report confirmed that ActBlue eventually stopped accepting foreign prepaid debit cards in August 2024 and stopped accepting all gift-card donations in September 2024 in direct response to congressional oversight. *Id.* But things did not end there.

According to an explosive New York Times exposé, ActBlue's own legal counsel, Covington & Burling, wrote two memoranda to ActBlue in early 2025 concluding ActBlue's responses to Chairman Steil were not accurate. ECF 12-17; ECF 12-18 ¶ 33. Covington concluded that (1) ActBlue failed to consistently follow its security procedures, (2) there was "substantial risk that some of the funds received were impermissible contributions from foreign nations," and (3) ActBlue's conduct may result in *criminal* investigation. ECF 12-18 ¶¶ 33–37. Top officials at ActBlue resigned soon thereafter. *Id.* ¶ 35. Despite being privately aware of these problems, ActBlue publicly dismissed concerns about its platform as "bogus claims" and "partisan attacks trying to stifle Democratic and progressive fundraising." *Id.* ¶ 44. ActBlue then retained new legal counsel, Dechert, who claimed that Congress's investigation was "not an exercise of legitimate legislative oversight" but rather "a partisan effort to exploit legislative processes." *Id.* ¶ 36. The New York Times exposé attached as an exhibit to Plaintiffs' motion for preliminary injunction was published on April 2, 2026, and is still publicly available today. ECF 12-17.

The Attorney General's investigation was also ongoing. After ActBlue told Congress that it stopped accepting gift cards and foreign prepaid cards, ActBlue quietly resumed accepting gift

cards without disclosure. ECF 12-18 ¶¶ 39–44. On February 19, 2026, an investigator donated five dollars to the Democratic National Committee using a physical Mastercard gift card purchased at a retail outlet, under a pseudonym. *Id.* ¶ 39; ECF 38-1. On February 25, 2026, a second investigator donated ten dollars to Jon Rosenthal, a candidate for Texas Railroad Commissioner, using a Visa e-gift card purchased online and the investigator's correct identity details. ECF 12-18 ¶ 40; ECF 37-1. That same day, the same investigator donated ten dollars to Sarah Eckhardt, a candidate for Texas Comptroller of Public Accounts, using the same Visa e-gift card and the investigator's correct identity details. ECF 12-18 ¶ 41; ECF 37-2. All three donations were made in Texas and were accepted by ActBlue. *See* ECF 12-18 ¶¶ 39–41; ECF 38-1; ECF 37-1; ECF 37-2. Plaintiffs' federal complaint alleges three American Express gift-card donations from the Attorney General's investigation were denied, ECF 1 ¶ 81, but Plaintiffs do not dispute accepting the successful donations, even though the same investigator made the Visa and American Express donations.

Texas filed its Texas state-court enforcement action on April 20, 2026, based on the New York Times exposé and the results of the congressional and the Attorney General's own investigations. ECF 12-18. Texas alleges five violations of the DTPA. *First*, ActBlue violated DTPA § 17.46(a) by falsely representing that its platform rigorously reviews and prohibits unlawful donations while secretly continuing to accept high-risk gift card donations, contrary to its public representations. *Id.* ¶¶ 57–61. *Second*, ActBlue violated DTPA § 17.46(b)(2) because "[d]onors and campaigns relied on those representations" and "ActBlue caused donors and campaigns to fundamentally misunderstand what ActBlue's platform actually does and what 'approval' of a contribution through its platform actually means." *Id.* ¶¶ 62–66. *Third*, ActBlue violated DTPA § 17.46(b)(5) because ActBlue falsely marketed its fundraising platform as secure and legally compliant even though evidence suggests that it allowed "donations that bypass identity verification, enable foreign nationals to contribute illegally, and allow donors to evade contribution limits." *Id.* ¶¶ 67–70. *Fourth*, ActBlue violated DTPA § 17.46(b)(9) because it advertised that it provided a secure and compliant fundraising platform while concealing its actual practices from users and instructed staff not to reveal policy reversals regarding gift card acceptance. *Id.* ¶¶ 71–75. And *fifth*, ActBlue

violated DTPA § 17.46(b)(24) because it knowingly failed to disclose material facts about its donation practices—namely, that it did not abide by its supposedly rigorous donation review process—in order to keep donors and campaigns using its platform. *Id.* ¶¶ 76–81. As a result, Texas seeks injunctive relief enjoining ActBlue from processing gift card and prepaid debit card donations on its platform, civil penalties available under the DTPA, and attorneys' fees. *Id.* ¶ 91.

Plaintiffs filed this federal action on May 1, 2026, seeking declaratory and injunctive relief. ECF 1. Among other relief, Plaintiffs ask this Court to enjoin the Attorney General and his officers, agents, servants, and employees from initiating any other action, continuing to litigate the Texas civil enforcement action, or further investigating ActBlue in violation of its constitutional rights, and to order dismissal of the Texas state enforcement action with prejudice. ECF 1 at 40. On May 6, 2026, Plaintiffs filed an expedited motion for preliminary injunction and a motion to expedite briefing on that motion. ECF 10; ECF 11; ECF 17. The Attorney General was served the same day. On May 7, 2026, this Court partially granted Plaintiffs' motion to expedite. ECF 18.

The state court case in Texas continues to progress. On May 18, 2026, ActBlue filed a Special Appearance, arguing that the Texas state court lacks personal jurisdiction over ActBlue. ECF 36-1. ActBlue also filed an Answer subject to its Special Appearance. ECF 36-2. Texas then filed an Amended Petition and Motion for Temporary Injunction, adding publicly available facts from a congressional report published after the Original Petition was filed. ECF 36-3. On May 22, 2026, ActBlue noticed a hearing on its special appearance to be heard on June 25. ECF 36-4. On May 26, 2026, the parties entered a Tex. R. Civ. P. 11 agreement where they agreed to exchange expedited jurisdictional discovery and respond to the same by June 10, 2026. ECF 36-5. Both parties served discovery requests the same day. ECF 36-6 and 36-7.

**LEGAL STANDARD**

The Attorney General moves to dismiss this action on three independent, threshold grounds: (1) the *Younger* abstention doctrine, (2) the absence of personal jurisdiction, and (3) improper venue. Each is a non-merits inquiry, and courts may resolve them in any order. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) (no mandatory sequencing between personal and

5

subject-matter jurisdiction); *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) (courts may address *Younger* abstention before subject-matter jurisdiction or the merits). In the alternative, the Attorney General moves to dismiss under Rule 12(b)(6) for failure to state a claim.

The First Circuit applies a three-prong approach to *Younger* abstention. *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 193 (1st Cir. 2015). Once the moving party establishes the first two prongs, the federal plaintiff bears the burden to show that one of the doctrine's "very narrowly construed" exceptions applies. *United Books, Inc. v. Conte*, 739 F.2d 30, 34 (1st Cir. 1984).

A plaintiff opposing a Rule 12(b)(2) motion bears the burden of establishing that the Court may exercise personal jurisdiction over the defendant. *See A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016). The plaintiff "may not rely on unsupported allegations in [its] pleadings" and is instead "obliged to adduce evidence of specific facts" supporting jurisdiction. *Platten v. HG Berm. Exempted Ltd.*, 437 F.3d 118, 134 (1st Cir. 2006) (internal quotations and citations omitted).

The Attorney General also moves to dismiss for improper venue under Rule 12(b)(3). Venue is governed exclusively by 28 U.S.C. § 1391(b), and a case that does not fall within one of that provision's three categories must be dismissed or transferred under § 1406(a). *See Atlantic Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 55–56 (2013).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("conclusory statements, do not suffice") (cleaned up). The Court may consider the complaint, documents central to or sufficiently referred to in the complaint, and matters of public record, including the filings in the Texas suit. *See Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993).

**ARGUMENT**

### I.    *Younger* abstention bars Plaintiffs' federal suit.

In *Younger v. Harris*, the Supreme Court held that principles of equity and comity between state and federal courts included "the basic doctrine of equity jurisprudence that courts of equity should not act . . . to restrain a criminal prosecution" in the state judicial system. *Younger v. Harris,*

401 U.S. 37, 43–44 (1971). The Supreme Court has extended the *Younger* doctrine to other types of cases over time and, in *Sprint Comm., Inc. v. Jacobs*, clarified the range of state proceedings that trigger *Younger* abstention. 571 U.S. 69, 72–73 (2013). Those proceedings are "(i) criminal prosecutions, (ii) 'civil proceedings that are akin to criminal prosecutions,' and (iii) proceedings 'that implicate a State's interest in enforcing the orders and judgements of its courts.'" *Sirva*, 794 F.3d at 192 (quoting *Sprint*, 571 U.S. at 79–80).

The Supreme Court "added a further gloss" to the *Younger* doctrine through the *Middlesex* factors. *Id*. Those factors hold that "that a federal court *must* abstain when" (1) "there is an ongoing state proceeding (judicial in nature), which" (2) "implicates important state interests and" (3) "provides an adequate opportunity to raise federal defenses." *Id.* (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)) (emphasis added).

"*Younger* abstention is *mandatory* if its conditions are met." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 68 (1st Cir. 2005) (emphasis added). Indeed, abstention is required "even where defendants claim violations of important federal rights." *In re Justs. of Superior Ct. Dep't of Massachusetts Trial Ct.*, 218 F.3d 11, 17 (1st Cir. 2000) (collecting cases); *see also, e.g., Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 628 (1986) (finding that *Younger* abstention barred the federal action to enjoin the agency proceeding on First Amendment grounds); *Sirva*, 794 F.3d at 199–200 (applying *Younger* to a state discrimination claim).

The First Circuit later "distill[ed] from *Sprint* a three-step approach to *Younger* abstention." *Sirva*, 794 F.3d at 192. First, "a federal court must ascertain whether a particular state proceeding falls within the *Younger* taxonomy." *Id.* at 193. "If so, the court must then take the second step and consider whether the *Middlesex* factors support abstention." *Id.* "And if these two steps leave the case on track for abstention, the court must take the third step and determine whether any of the isthmian exceptions to the *Younger* doctrine apply."

### A. The state case falls within the *Younger* taxonomy.

The state enforcement action is a *Sprint* civil enforcement proceeding akin to a criminal prosecution. The First Circuit describes the "hallmarks of such proceedings" as

(1) "'characteristically initiated to sanction the federal plaintiff . . . for some wrongful act,'" (2) "'a state actor is routinely a party to the state proceeding and often initiates the action,'" and (3) "an investigation is typically undertaken, culminating in a formal charge or complaint." *Sirva*, 794 F.3d at 193 (quoting *Sprint*, 571 U.S. at 79–80). All three hallmarks exist here.

*First*, the state suit was "initiated to sanction the federal plaintiff[s]." *Id*. Texas alleged ActBlue violated the DTPA in five ways. ECF 12-18 ¶¶ 19–24 (Counts I–V). The core issue in this case is that ActBlue represented to Congress, regulators, donors, and campaigns that it used anti-fraud safeguards to block unlawful donations, and that it "implemented updated policies to 'automatically reject donations that use foreign prepaid/gift cards, domestic gift cards, are from high-risk/sanctioned countries, and have the highest level of risk as determined by [ActBlue's] solution provider, Sift.'" *Id.* ¶¶ 11–12; *see id*. at 7–12. But ActBlue knew its representations were false. *Id.* ¶¶ 12–14. According to The New York Times exposé, ActBlue's then-counsel, Covington & Burling, informed ActBlue that (1) those representations were not accurate, (2) failed to consistently follow its own procedures, (3) there was "substantial risk that some of the funds received were impermissible contributions from foreign nationals," and (4) ActBlue's conduct may result in criminal investigation. ECF 12-17; 12-18 ¶ 12–14. However, after leading regulators to  believe that ActBlue remedied its misdeeds, ActBlue quietly resumed gift card donations, despite ActBlue's own admissions that "[p]repaid debit cards and gift cards do pose a unique threat of evasion" of campaign finance laws. ECF 12-18 ¶¶ 7, 15–16.

Ultimately, ActBlue violated the DTPA by knowingly misleading the public and regulators about its anti-fraud safeguards while continuing to process gift cards and prepaid debit cards. *See id.* ¶¶ 19–24. The remedy requested in the state case is, as *Younger* requires, intended "to sanction the federal plaintiff" for its violations of law: Texas requests "injunctive relief prohibiting Defendant ActBlue from permitting contributions on the ActBlue platform through the use of gift cards and prepaid debit cards," monetary civil penalties as allowed under the Texas DTPA, and attorneys' fees. *Id.* ¶ 28.

*Second*, a robust "investigation [was] undertaken, culminating in a formal charge or

complaint." *Sirva*, 794 F.3d at 193; *supra* at 1–5; Ex. 12-18 ¶¶ 12–49 (detailing multi-year investigation by Congress and the Attorney General). And *third*, the Texas Attorney General initiated the state case on behalf of the State of Texas, satisfying the state actor factor. *Sirva*, 794 F.3d at 193. Thus, the state court suit displays all three "hallmarks" of a proceeding falling within the *Younger* framework and passes the first step of *Sprint* test. *Id*. at 192–93.

### B.  The *Middlesex* factors support abstention.

The *Middlesex* factors ask whether (1) "there is an ongoing state proceeding (judicial in nature), which" (2) "implicates important state interests and" (3) "provides an adequate opportunity to raise federal defenses." *Id.* at 192 (citing *Middlesex Cnty. Ethics Comm.,* 457 U.S. at 432 (1982)). Each factor is met here.

The first *Middlesex* factor is beyond reasonable dispute. The state court proceeding, filed in Texas state court, is ongoing and judicial in nature. *See supra* at 4–5.

The second *Middlesex* factor is satisfied because the state case implicates important state interests. Like the discrimination suit in *Sirva* and the environmental suit in *Esso*, the state suit was brought by Texas (not a private party), under a statute that sanctions wrongful conduct, and follows an investigation culminating in a formal complaint. *See Sirva*, 794 F.3d at 193–95; *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 214, 218 (1st Cir. 2004). Moreover, the state suit concerns ActBlue's violations of a Texas consumer protection law, and "[t]here is no dispute that . . . the enforcement of consumer protection laws implicates an important state interest." *Credit Acceptance Corp. v. Healey*, 544 F. Supp. 3d 139, 145 (D. Mass. 2021). When, as here, "the state is in an enforcement posture in the state proceedings, the 'important state interest' requirement is easily satisfied, as the state's vital interest in carrying out its executive functions is presumptively at stake." *Yelp Inc. v. Paxton*, 137 F.4th 944, 951 (9th Cir. 2025) (affirming dismissal on *Younger* grounds).

The third *Middlesex* factor is also satisfied because nothing prevents Plaintiffs from pursuing their federal claims in the state forum. That's because "the third *Middlesex* factor is generally deemed satisfied as long as no state procedural rule bars the assertion of a federal defense and the state affords a fair opportunity to raise that defense." *Sirva*, 794 F.3d at 196–97 (citing *Moore v.*

9

*Sims,* 442 U.S. 415, 430–32 (1979)) ("Th[e] opportunity to present their federal claim is sufficient to satisfy the third *Middlesex* factor.").

### C.  No exceptions to *Younger* abstention apply.

Plaintiffs briefly argue that *Younger* does not apply because the state suit was "undertaken in bad faith." ECF 11 at 19–20. In sum, Plaintiffs argue that "Paxton's complaint is premised on the claim that ActBlue has secretly resumed acceptance of gift card donations[,] [b]ut Paxton knows this claim to be false; prior to his complaint being filed, ActBlue automatically rejected the donations Paxton's investigators attempted to make with gift cards." ECF 11 at 19 (internal quotations and citations omitted). "Additionally, Paxton's complaint is in bad faith because he selectively chose to investigate ActBlue while ignoring reports of significant compliance issues at WinRed." ECF 11 at 19–20 (citations omitted).

The bad faith exception to *Younger* is "very narrowly construed." *United Books*, 739 F.2d at 34 (collecting cases). "Plaintiffs' assertion that the state's prosecution has had a 'chilling effect' on First Amendment rights is insufficient." *Id.* at 33. Even repeated proceedings are not enough. *See id.* at 34 ("On the facts of this case—six prosecutions over a two-year period that resulted in convictions all but once—we cannot say that the *Younger* exceptions have been satisfied.").

The First Circuit defines "'bad faith' in this context [as] generally mean[ing] that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *United Books*, 739 F.2d at 34 (quoting *Kugler v. Helfant*, 421 U.S. 117, 126 n. 6 (1975)). Federal relief despite *Younger* is appropriate "'[o]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction.'" *Id*. (quoting *Perez v. Ledesma*, 401 U.S. 82, 83, 85 (1971)). While Plaintiffs' allegations may be defenses in the state case, they cannot show "proven harassment" or that Texas is "without hope" of obtaining a valid conviction.

That's because the state court case is based upon multiple years of careful investigation by the Attorney General and Congress. *See supra* at 1–5. Plaintiffs assert that the state case is "premised on the claim that ActBlue has 'secretly resumed acceptance of gift card donations," and therefore the Attorney General is acting in bad faith because he "knows this claim to be false; prior to his

10

complaint being filed, ActBlue automatically rejected the donations Paxton's investigators attempted to make with gift cards." ECF 11 at 19. But ActBlue's complaint omits the fact that, after ActBlue told Congress and the public it had stopped accepting gift cards, investigators at the Attorney General's Office successfully used gift cards to donate through ActBlue. *See supra* at 4; ECF ¶¶ 12-18; ECF 37-1; ECF 37-2; ECF 38-1. That, and the Texas suit is further supported by the facts revealed in the New York Times' exposé, which showed that ActBlue's own legal counsel, Covington & Burling, concluded ActBlue's representations to Congress were not accurate, ActBlue failed to consistently follow its own procedures, there was "substantial risk that some of the funds received were impermissible contributions from foreign nationals," and ActBlue's conduct may result in criminal investigation. ECF 12-17; ECF 12-18 ¶¶ 12–14.

These facts alone demonstrate the Attorney General has more than a reasonable expectation of obtaining a favorable judgement on Texas's claims, and the Attorney General believes discovery will further show ActBlue's wrongdoing. At minimum, these facts demonstrate the state court suit "is not an enforcement proceeding brought without any realistic expectation of finding a violation of a rule," *Brooks v. New Hampshire Supreme Ct.,* 80 F.3d 633, 641 (1st Cir. 1996). Thus, because Texas can show a reasonable expectation of obtaining a valid conviction, this factor is dispositively in Defendant's favor. *See id.* ("The [state's] investigation of [federal plaintiff] is not an enforcement proceeding brought without any realistic expectation of finding a violation of a rule; and, therefore, the investigation does not catalyze the bad-faith exception to the *Younger* doctrine.").

Plaintiffs' selective-enforcement theory fails too. Plaintiffs allege that WinRed used "pre-checked recurring donation boxes and layered defaults that led many donors to unknowingly make repeated contributions" which ultimately resulted in "an avalanche of refunds." ECF 1 at 31. The attorneys general of four States opened consumer-protection investigations into both WinRed and ActBlue, focusing on their shared use of pre-checked boxes and default recurring donation mechanisms. *Id*. But these allegations do not make WinRed similarly situated to ActBlue. After all, one may remedy these kinds of mistaken contributions with a refund.

But the damage wrought by ActBlue's behavior cannot be so easily remedied. If ActBlue either

11

mistakenly or knowingly allowed "donations that bypass identity verification, enable foreign nationals to contribute illegally, and allow donors to evade contribution limits,"—and its own legal counsel warned that they likely do, *supra* at 3—these harms are likely impossible to remedy retroactively. *See e.g., U.S. v. Armstrong*, 517 U.S. 456, 463–64 (1996) (selective-prosecution claims are "demanding," prosecutorial discretion receives a "presumption of regularity," and courts presume officials properly discharged their duties absent "clear evidence to the contrary").

Finally, Plaintiffs cannot prove irreparable injury—a requirement for invoking *Younger*'s bad faith exception. *See Maymo-Melendez v. Alvarez-Ramirez*, 364 F.3d 27, 37 (1st Cir. 2004) (even under the *Younger* "in bad faith" exception "irreparable injury would still be required"). This irreparable injury must be one "other than that incidental to every [] proceeding brought lawfully and in good faith." *Younger*, 401 U.S. at 47 (internal quotations and citations omitted). "*[O]nly* when it is crystal clear that the state tribunal either lacks the authority to proceed or can provide no meaningful relief can a party hope to demonstrate the degree of irreparable harm needed to justify federal-court intervention." *Sirva*, 794 F.3d at 200 (emphasis added).

Plaintiffs cannot clear this high bar for two reasons. *First*, there is no question the Texas state court adjudicating the state case has authority to proceed. The Attorney General sued ActBlue for violations of Texas consumer protection law in Texas state court, a state where ActBlue has registered agents and has subjected itself to the State's jurisdiction through conducting business there. ECF 12-18 ¶¶ 3–7. *Second*, there is no relief that Plaintiffs seek from this Court that the state court is incapable of providing. Plaintiffs could seek a dismissal or injunction in the state case and raise the same arguments. Plaintiffs also could file their federal claims as counterclaims in the state case. Plaintiffs could have also removed the state case to federal court.

In any event, Plaintiffs would face the same litigation burden regardless of whether the proceeding was brought in good faith (it was). Plaintiffs' inability to "explain how they will be irreparably harmed by allowing [the state court proceeding] . . . is important because the common thread that links the various *Younger* exception is that, in particular situations, closing the door of the federal court to a federal question will result in irreparable harm." *Sirva*, 794 F.3d at 200

(collecting cases). The "typical inconvenience that accompanies defending against charges that have been lodged" is not irreparable harm. *Id.* at 200.

## II.    This Court lacks personal jurisdiction over Defendant.

Defendant also moves to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "Specific personal jurisdiction exists over an out-of-state defendant where both the forum state's long-arm statute and the requirements of the Due Process Clause are satisfied." ECF 11 at 7 (citation omitted). Federal Due Process is satisfied if the plaintiff proves either general or specific jurisdiction over the defendant. *Harlow v. Children's Hosp.*, 432 F.3d 50, 57 (1st Cir. 2005). Plaintiffs do not claim that Defendant is subject to general jurisdiction, *see* ECF 1 at 6–10, so their claims turn on specific jurisdiction. In the First Circuit, that requires satisfying three elements: "relatedness, purposeful availment, and reasonableness." *A Corp.*, 812 F.3d at 59. "The plaintiff must carry the devoir of persuasion on all three of these elements, and the plaintiff's failure as to any one of them defenestrates its claim of specific jurisdiction." *Motus, LLC v. CarData Consultants, Inc.,* 23 F.4th 115, 122 (1st Cir. 2022).

### A.    Plaintiffs claims do not arise out of or relate to Defendant's forum-state activities.

When determining the "relatedness" prong, courts must consider "whether the claim directly arise[s] out of, or relate[s] to, the defendant's forum state activities." *A Corp.*, 812 F.3d at 59 (quotations omitted, alterations in original). The "indirect effect of out-of-state injury caused by out-of-state conduct is insufficient to fulfill the relatedness prong." *Id*. at 59–60 (citing *Sawtelle v. Farrell*, 70 F.3d 1381, 1390–91 (1st Cir. 1995) for the proposition that "in-forum effects of non-forum activity, standing alone, were insufficient to support personal jurisdiction").

When, as here, plaintiffs' claims are grounded in tort, "to assess relatedness [courts] look to whether the plaintiff has established cause in fact (*i.e.*, the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (*i.e.*, the defendant's in-state conduct gave birth to the cause of action)." *Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 21 (1st Cir. 2018) (internal quotation marks omitted); *see also Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996) (declining to adopt a solely "but for" standard and requiring a

13

showing of "proximate or legal cause"). Plaintiffs allege that Defendant committed "a constitutional tort." ECF 11 at 8 (citing *Hartman v. Moore*, 547 U.S. 250, 259–60 (2006)); *but see Hartman*, 547 U.S. at 260 (holding that an "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway.").

Plaintiffs cannot establish that "defendant's in-state conduct gave birth to the cause of action." ActBlue LLC is a foreign corporation registered to do business in Texas that may be served through its registered agent. ECF 12-18 ¶ 2. The Attorney General investigated ActBlue LLC for violations of Texas law that occurred in Texas. ECF 12-18 ¶¶ 38–49. Pursuant to Texas statute, the Attorney General sent an RTE to each Plaintiff's registered agent in Texas, as well as to each Plaintiff in Massachusetts, via certified mail. *See* ECF 14-1–14-6. CIDs were sent to ActBlue LLC and ActBlue Technical Services, via email to their Texas-based counsel. *See* ECF 14-7; ECF 14-8. Finally, the Attorney General brought the state case alleging violations of a Texas statute in Texas state court. ECF 12-18 ¶¶ 50–81.

While the "transmission of information" into a state "by way of telephone or mail is unquestionably a contact" for the personal jurisdiction analysis, *Sawtelle v. Farrell*, 70 F.3d 1381, 1390 (1st Cir. 1995) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)), the transmission of information by itself is not "sufficient to establish specific personal jurisdiction." *Id.* That's because, when a defendant's supposedly unlawful actions, like "the defendant['s] investigation," occur out-of-state, those out-of-forum actions are the "effective cause." *Id.* at 1390. This is true even if the plaintiff suffered "the 'effects'" of the defendants' allegedly unlawful activity within the forum state. *Id.* (citation omitted).

Merely mailing RTEs to Plaintiffs in Massachusetts and to their registered agents in Texas does not satisfy the "relatedness" prong. The RTE's arrival in Massachusetts was merely incidental to the Attorney General's investigation of a Texas-registered entity under Texas law concerning conduct that occurred in Texas. Plaintiffs' alleged constitutional injury would have arisen regardless of where the RTEs were sent. Accepting Plaintiffs' argument would mean state attorneys general could not investigate registered foreign corporations without being automatically subjected

14

to the personal jurisdiction of said corporations' home state. That is not the law.

When determining "purposeful availment," courts must consider "whether the defendant's in-state contacts 'represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *A Corp.*, 812 F.3d at 59 (citation modified). In *A Corp.*, plaintiff argued that defendant "purposefully availed itself of the forum because its alleged infringement targeted a Massachusetts company." *Id*. at 60. The First Circuit rejected this argument, holding "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a *meaningful* way." *Id*. (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)) (emphasis added).

Where, as here, the defendant's conduct takes place outside the forum, it may constitute purposeful availment if the conduct has effects inside the forum—the "effects" test from *Calder v. Jones*, 465 U.S. 783 (1984). But even under this test, the inquiry turns on "the defendant's contacts with the forum State itself, *not the defendant's contacts with persons who reside there*." *Walden*, 571 U.S. at 285 (emphasis added). Put otherwise, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* Ultimately, the question is whether a defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," or whether the relationship to the forum is being driven by the plaintiff instead. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

### B. Defendant has not purposefully availed himself to the benefits or protections of this forum state's laws.

When determining "purposeful availment," courts must consider "whether the defendant's in-state contacts 'represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *A Corp.*, 812 F.3d at 59

15

(citation modified). In *A Corp.*, plaintiff argued that defendant "purposefully availed itself of the forum because its alleged infringement targeted a Massachusetts company." *Id.* at 60. The First Circuit rejected this argument, holding "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a *meaningful* way." *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)) (emphasis added).

Where, as here, the defendant's conduct takes place outside the forum, it may constitute purposeful availment if the conduct has effects inside the forum—the "effects" test from *Calder v. Jones*, 465 U.S. 783 (1984). But even under this test, the inquiry turns on "the defendant's contacts with the forum State itself, *not the defendant's contacts with persons who reside there*." *Walden*, 571 U.S. at 285 (emphasis added). Put otherwise, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* Ultimately, the question is whether a defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," or whether the relationship to the forum is being driven by the plaintiff instead. *Burger King*, 471 U.S. at 475.

Consider the following examples. In the First Circuit, an out-of-state buyer does not automatically "purposefully avail" itself of the forum state by merely buying goods or services from a company domiciled in the forum state. Even if the buyer receives good or services originating from the forum state, the First Circuit "view[s] the origins of such shipments, instead, as resulting from [the provider's] own 'unilateral activity.'" *Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 5 (1st Cir. 2016). In these situations, the buyer has "no relevant contact with Massachusetts beyond the insubstantial contacts that anyone would have when buying goods and services from a company that itself happens to be in Massachusetts." *Id.* at 6.

Similarly, personal jurisdiction does not arise simply because a party pursues discovery, documents, or other litigation-related activity in a different state. "Simply put, jurisdiction cannot be carted from state to state, enabling a plaintiff to sue in any state to which he chooses to roam." *Kuan Chen v. U.S Sports Acad., Inc.,* 956 F.3d 45, 62 (1st Cir. 2020). "Jurisdiction cannot be

16

created by and does not travel with the [plaintiff] wherever she goes." *Harlow*, 432 F.3d at 63. Here, Plaintiffs' decision to process donations and store documents in Massachusetts—where the "effect" of Defendant's actions may be felt—is a "unilateral activity" that does not show Defendant is "invoking the benefits and protections" of Massachusetts' laws. *See id.* at 58. Were it otherwise, Plaintiffs could simply shift the state where donations are processed, or documents are stored to enable Plaintiffs to "sue in any state to which he chooses to roam." *Chen*, 956 F.3d at 62. This interpretation is inconsistent with the fact that it is the defendant's choice to invoke the benefits and protections of the forum state that creates personal jurisdiction, not the plaintiffs' choice to associate with the forum state.

This rule applies with special force where a private litigant tries to drag a sovereign across state lines. *See Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 582 U.S. 255, 256 (2017) (establishing personal jurisdiction submits defendants "to the coercive power of a State," "restrictions on personal jurisdiction . . . are a consequence of territorial limitations on the power of the respective States," and "this federalism interest may be decisive" (internal quotes omitted)); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (limitations on personal jurisdiction protects states' "status as coequal sovereigns in a federal system").

Here, Defendant never "invoke[ed] the benefits and protections of [Massachusetts'] laws." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011). The Attorney General did not purposefully avail himself of Massachusetts law by investigating a Texas-registered foreign corporation for violations of Texas law committed in Texas, sending investigative demands to registered agents and counsel based in Texas, and filing a Texas enforcement action in Texas state court. Plaintiffs' Massachusetts domicile, document storage, or donation-processing infrastructure cannot serve as the Attorney General's forum contacts. To hold otherwise would mean that state attorneys general cannot investigate a foreign corporation registered in their own state without being subject to the personal jurisdiction of foreign states.

Finally, note that Plaintiffs requested relief seeks to prevent Defendant from taking actions *in Texas*, not just Massachusetts. Plaintiffs seek to "[p]ermanently and preliminary enjoin Paxton and

17

his officers, agents, servants, and employees from *initiating any other action*, *continuing to litigate* the civil enforcement action, or *further investigating* ActBlue in violation of its constitutional rights, and order that Paxton and his officers, agents, servants, and employees *dismiss the Texas state civil enforcement action* with prejudice." ECF 1 at 40 (emphasis added). This extraordinary request would preclude further investigation or enforcement of Texas statutes against ActBlue, even if further public evidence continues to show that ActBlue engaged in violations of Texas law harming Texas citizens in Texas. And Plaintiffs seek this extraordinary relief not by removing the Texas case to federal court, but rather by filing a lawsuit in Massachusetts. While Plaintiffs have chosen to seek the benefits and protections of Massachusetts state law, the Attorney General has not. This case belongs in a Texas state or federal court.

### C. Exercise of specific jurisdiction in this forum is not reasonable.

Finally, Plaintiffs must show that "the exercise of specific jurisdiction in the forum must be reasonable under the circumstances." *Motus*, 23 F.4th at 122 (quoting *Chen*, 956 F.3d at 59); *A Corp.*, 812 F.3d at 61. When assessing reasonableness, courts generally consider: "(1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *A Corp.*, 812 F.3d at 61 (internal quotations omitted and alteration in original).

Massachusetts' interest in this case is minimal. This case concerns enforcement of a Texas statute for acts taken in Texas. ECF 12-18 ¶¶ 50–81. Plaintiffs' claims are based on the federal Constitution, which applies nationally, not the Massachusetts Constitution. And Plaintiffs voluntarily chose to be subject to Texas law by conducting business and registering as a foreign corporation in Texas, and thus subject to suit in Texas. *Id.* ¶¶ 2–7.

Furthermore, resolving this dispute in Texas promotes judicial efficiency. Plaintiffs' claims require consideration of the DTPA, and "federal judges sitting in [Texas] are better qualified to construe [Texas] law, and to assess the character of [Texas's] probable enforcement of that law,

18

than are judges sitting elsewhere." *Leroy v. Great W. United Corp.*, 443 U.S. 173, 186 (1979).

That, and Plaintiffs can "obtain[] convenient and effective relief" in Texas. *World-Wide Volkswagen*, 444 U.S. at 292. Litigating jurisdiction and venue in Massachusetts (including potential appeals) make this case less effective than litigating in Texas state court, or removal to Texas federal court. *See Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1273 (9th Cir. 1981) (objection to litigating in one forum renders it less "effective" for plaintiff).

Finally, the Attorney General, as a constitutional officer exercising the sovereignty of the State of Texas, Tex. Const. art. IV, § 22, has a substantial interest in being able to investigate violations of Texas statutes in Texas, enforce Texas statutes in Texas, and bring suits in Texas courts. It is the policy—and in the substantial interest—of all sovereigns to enforce and investigate violations of their own laws within their own borders. *See Sprint Commc'ns*, 571 U.S. at 79.

## III.    Venue is improper in this district.

The facts that defeat personal jurisdiction also defeat venue, and the Attorney General objects to venue under Rule 12(b)(3). Venue is proper only where the case "falls within one of the three categories set out in § 1391(b)," and otherwise "venue is improper, and the case must be dismissed or transferred under § 1406(a)." *Atlantic Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 56 (2013). None apply. The sole defendant, the Texas Attorney General, does not reside in Massachusetts. *See* 28 U.S.C. § 1391(b)(1). No "substantial part of the events or omissions giving rise to the claim" occurred in Massachusetts, *see id.* at § 1391(b)(2), as every challenged act occurred in Texas*, see supra* at § II. And § 1391(b)(3) is unavailable because venue lies in Texas and this Court does not have personal jurisdiction over the Attorney General.

## IV.    In the alternative, the complaint fails to state a claim under Rule 12(b)(6).

*Younger* abstention, the absence of personal jurisdiction, and improper venue each require dismissal without reaching the merits. If the Court nevertheless does so, the complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The Attorney General's Opposition to Plaintiffs' Motion for a Preliminary Injunction explains these arguments in detail and is incorporated by reference. *See* ECF 36 at § IV.A.

19

Plaintiffs' sole federal claim is First Amendment retaliation, the first element of which is that the plaintiff engaged in constitutionally protected conduct. *See D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). First Amendment protection ends where unlawful activity begins, *see Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949), and "does not protect misleading commercial speech," *Fanning v. FTC*, 821 F.3d 164, 174 (1st Cir. 2016). Texas's claims concern misrepresentations about ActBlue's anti-fraud safeguards under the DTPA—deceptive practices, not protected expression. The fact that ActBlue also engages in protected fundraising activity does not immunize its deception.

The complaint also fails to plead causation. Retaliatory animus must be the but-for cause of the challenged action. *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019); *cf. Hartman*, 547 U.S. at 260 (absence of probable cause for a retaliatory enforcement proceeding "must be pleaded and proven"). If the plaintiff establishes retaliatory animus as a motivating factor, the defendant may avoid liability by showing "by a preponderance of the evidence," *Lewis v. City of Boston,* 321 F.3d 207, 219 (1st Cir.2003), that the alleged adverse actions would have been taken "even in the absence of the protected conduct." *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003). Plaintiffs' own complaint describes facts establishing an independent, lawful basis for the enforcement action: the multi-year congressional and state investigations, ActBlue's representations regarding its donor-verification practices, and the reporting on its outside counsel's conclusions. Plaintiffs fail to show that protected activity, rather than the statutory violations the complaint itself describes, was the but-for cause of the State's action.

## CONCLUSION

For the foregoing reasons, the Attorney General respectfully requests that the Court dismiss this action. ActBlue's is perfectly capable of presenting its arguments in the Texas state court proceeding. *Younger* abstention—which applies equally to every state's attorney general—requires that this dispute be resolved in the courts of Texas, and the Court should dismiss accordingly.

20

Date: May 27, 2026

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
*Admitted Pro Hac Vice

Respectfully submitted.

/s/ Wade Johnson
WADE JOHNSON*
Special Counsel
Texas State Bar No. 24062197
wade.johnson@oag.texas.gov

BRIAN B. TUNG*
Assistant Attorney General
Texas State Bar No. 24145179
Brian.Tung@oag.texas.gov

LAUREN E. SAEGER*
Assistant Attorney General
Texas State Bar No. 24149365
Lauren.Saeger@oag.texas.gov

DAVID M. BIZAR
Assistant Attorney General
Texas State Bar No. 24110737
david.bizar@oag.texas.gov

COUNSEL FOR DEFENDANT KEN PAXTON

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on May 27, 2026, a true and correct copy of the above and foregoing document has been served using the CM/ECF system to all counsel and parties of record.

TIMOTHY J. PERLA
BBO No. 660447
timothy.perla@wilmerhale.com

FELICIA H. ELLSWORTH
BBO No. 665232
felicia.ellsworth@wilmerhale.com

AMANDA MASSELAM STRACHAN
BBO No. 641108
amanda.masselamstrachan@wilmerhale.com

WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

RONALD C. MACHEN*
ronald.machen@wilmerhale.com

MATTHEW T. JONES*
matthew.jones@wilmerhale.com

2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*pro hac vice

COUNSEL FOR PLAINTIFFS

/s/ Wade Johnson
WADE JOHNSON