# Exhibit 3

**State of Texas's Amended Petition and Request for Temporary and Permanent Injunction**

096-376890-26

**CAUSE NO. 096-376890-26**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| v. | § | TARRANT COUNTY, TEXAS |
| | § | |
| ACTBLUE LLC | § | |
| | § | |
| *Defendant.* | § | 96th JUDICIAL DISTRICT |

### STATE OF TEXAS'S AMENDED PETITION AND REQUEST FOR TEMPORARY AND PERMANENT INJUNCTIONS

ActBlue LLC ("ActBlue") bills itself as "a technology platform and conduit through which funds are raised and distributed, all in strict compliance with federal and state laws and regulations,"[1] serving "to shape our democracy and fuel Democratic wins."[2] ActBlue is so well trusted by both donors and the campaigns for elective office who accept their donations that in 2025 alone, ActBlue processed $1.78 billion of small-dollar donations through its platform. But that trust is undeserved and harmful to lawful donors and campaigns alike.

In 2023, Congress and the Texas Attorney General launched investigations into whether ActBlue was facilitating illegal campaign contributions—donations made by foreign nationals, and in amounts exceeding legal limits—by accepting gift cards and prepaid debit cards, payment methods uniquely suited to concealing a donor's true identity. Faced with that scrutiny, ActBlue in 2024 told Congress and Congress publicized to the public, that ActBlue had, among other changes, revised its policies and procedures to stop accepting all gift cards and foreign prepaid debit cards. ActBlue provided further assurances to Congress and the public in 2025 that it built and strengthened its platform to protect against foreign interference in U.S. elections.

---

[1]    ActBlue Investigation: What's Really Happening and What You Need to Know, https://tinyurl.com/yc3wry24.
[2]    ActBlue, About us, https://tinyurl.com/jrprrpyk.

But ActBlue's representations to Congress were not true, and ActBlue knew they were not true. ActBlue was aware that its systems did not operate in the manner ActBlue had represented. ActBlue's own outside legal counsel informed ActBlue in private legal memorandums that have only now come to light that "[i]t can be alleged that AcBlue accepted and/or facilitated the acceptance of foreign national contributions into American elections" and "[i]n addition, because ActBlue's staff was aware that its system was not as robust as necessary, it could be alleged that these violations were 'knowing and willful'[.]"[3]

Among other misrepresentations, despite knowing—and representing to regulators—that resuming its acceptance of gift cards would open the door to election influence "from high-risk/sanctioned countries"[4] and enable foreign nationals and other ineligible persons to make unlawful contributions to federal and state candidates, ActBlue went back to accepting them. This was not an oversight. It was a continuation of ActBlue's long-standing pattern and practice of tolerating rampant donor fraud on its platform so long as the fraud stayed below the radar of regulators. Indeed, despite further knowing that domestic prepaid debit cards, like gift cards, present even a greater risk of unlawful contributions than cash, ActBlue continued to accept their use as well.

ActBlue also lied about its conducting checks of United States passports whenever payments were being made through the ActBlue platform from outside of the United States and about conducting manual reviews of contributions that indicated a foreign address—as ActBlue's

---

[3]    ActBlue May Have Misled Congress on Vetting Foreign Donations, its Lawyers Warned (Apr. 2, 2026) ("Apr. 2, 2026 NY Times Article"), https://www.nytimes.com/2026/04/02/us/politics/actblue-democrat-fundraising-foreign-donations.html.

[4]    Chairman Steil Releases Finding from Subpoena of ActBlue. United States Committee on House Administration (Dec. 10, 2024), https://tinyurl.com/3db5c3nt.

own outside counsel would later conclude. ActBlue's outside counsel told ActBlue that its representations to Congress could not only been seen as false statements, but as a cover-up to mislead. ActBlue fired its outside counsel, and then every member of ActBlue's legal and compliance staff resigned, was fired, or went on extended leave while alleging retaliation. ActBlue's legal and compliance team completely collapsed. And when ActBlue's five key personnel were deposed about it by Congress, they all declined to answer a single substantive question, collectively invoking their Fifth Amendment right 146 times—including to specific questions about whether ActBlue executives instructed them to allow more fraud on the ActBlue platform and that ActBlue had banned donations made using gift or foreign prepaid cards shortly before the 2024 election because of significant fraud occurring in their use.

Both eligible donors who give money in good faith to support their campaigns of choice in good faith and campaigns for elective office operate under and rely upon the axiom that "[f]air elections are the foundation of our democracy[.]"[5] ActBlue on the other hand lies, deceiving eligible donors and campaigns alike, when it induces them to utilize its platform by claiming it is free and safe from donor fraud—when ActBlue not only knows otherwise it actively facilitates the making of fraudulent donations. This not only perverts the electoral process, it harms lawful donors when unlawful donors are donating to rival candidates by devaluing their valid donations. And it harms campaigns who receive unlawful donations by subjecting them to potential substantial risk and exposure for violating election laws.

To protect donors and campaigns utilizing the ActBlue platform, the State of Texas files this Original Petition and Request for Temporary and Permanent Injunctions ("Petition") to

---

[5]    FBI, Election Crimes and Security, https://tinyurl.com/3ad4spc5.

immediately halt ActBlue's unlawful, deceptive, and misleading fundraising practices and to hold ActBlue accountable for the donor fraud it knowingly facilitated. In support hereof, the State shows as follows:

## I.    STATEMENT OF RELIEF

1.    Pursuant to Tex. R. Civ. P. 47(c) the State seeks monetary relief over $1,000,000 and non-monetary relief.

## II.    THE DEFENDANT

2.    Defendant, ActBlue, is a Foreign Nonprofit Corporation registered to conduct business in Texas through its registered agent, Corporate Creations Network Inc., at 2595 N. Dallas Pkwy., Ste. 350, Frisco, TX 75034.

## III.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over ActBlue because it established minimum contacts in Texas such that maintenance of this suit does not offend traditional notions of fair play and substantial justice.[6]

4.    ActBlue is subject to Texas's long-arm statute because it transacts business in Texas.[7]

5.    The Court has general jurisdiction over ActBlue because its contacts and affiliations with Texas are so continuous and systematic as to render it essentially at home in Texas.[8]

---

[6]    *See Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).
[7]    Tex. Civ. Prac. & Rem. Code §§ 17.01-.093.
[8]    *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021) (citing *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016)).

6.      Alternatively, the Court has specific jurisdiction over ActBlue because it purposefully availed itself of the privileges of conducting activities in Texas and the causes of action in this suit arise out of or relate to ActBlue contacts in Texas.[9]

7.      The Court also has jurisdiction over the ActBlue because it consented to personal jurisdiction by registering and transacting business in Texas.[10]

8.      Moreover, venue is proper in Tarrant County, Texas, because a substantial part of the events or omissions giving rise to the State's claims occurred in Tarrant County, as ActBlue has done business in Tarrant County, and because transactions occurred in Tarrant County.[11]

9.      ActBlue has accepted donations for candidates, political action committees, party committees, and nonprofits in Tarrant County, and advertises its platform in Tarrant County.

## IV.    DISCOVERY CONTROL PLAN

10.     Discovery in this case should be conducted under Level 3 pursuant to Tex. R. Civ. P. 190.4.

11.     The State claims entitlement to non-monetary relief, as well as monetary relief in an amount greater than $1,000,000 including civil penalties, reasonable attorneys' fees, litigation expenses, and costs.

---

[9]     *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412-13 (Tex. 2023).

[10]    *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023); *see also Acacia Pipeline Corp. v. Champlin Expl., Inc.*, 769 S.W.2d 719, 720 (Tex. App.—Houston [1st Dist.] 1989, no writ) ("In return for the privilege of doing business in Texas, and enjoying the same rights and privileges as a domestic corporation, Champlin has consented to *amenability* to jurisdiction for purposes of all lawsuits within the state.").

[11]    Tex. Civ. Prac. & Rem. Code § 15.002(a)(1); Tex. Bus. & Com. Code § 17.46(b).

## V.    FACTUAL BACKGROUND

12.    ActBlue is a political action committee (commonly referred to as a "PAC") and fundraising platform that has processed more than $16 billion in contributions to Democratic campaigns since its launch in 2004.[12]

13.    In 2025 alone, ActBlue processed $1.78 billion of donations through its platform—collecting a processing fee of at least 3.7% for each individual donation.[13]

14.    ActBlue publicly proclaims that its fundraising platform responsibly ferrets out donor fraud.[14]

15.    That is a lie. ActBlue consciously avoids knowing when fraud is occurring on its platform—not out of negligence, but as a deliberate strategy to evade election law requirements, prohibitions, and punishments.

16.    The evidence is unambiguous. When concerns about platform security were raised internally, ActBlue did not tighten its controls. It loosened them.

17.    ActBlue instructed its staff to take a "more lenient approach" to fraud prevention in 2024 and "look for reasons to accept contributions."[15] It raised the threshold for donor fraud reviews to drive a higher acceptance rate. It reduced the number of manual fraud reviews. It did all of this "even though internal assessments showed that these changes would result in a measurable increase in fraudulent contributions" as ActBlue had "detected at least 22 significant fraud

---

[12]   Josh Christenson, *Contractors for DEM Fundraising Platform ActBlue Summoned to Congress Amid Fraud Probe*, House Judiciary Committee Republicans (Apr. 29, 2025), https://tinyurl.com/yc7hnkk9.

[13]   ActBlue, *Small Dollar Donors Shatter Records: Nearly $1.8 billion raised in 2025*, https://tinyurl.com/4xhzf6pj; *ActBlue Fees (Stripe)*, https://tinyurl.com/5cuur7j7.

[14]   *See* 52 U.S.C. §§ 30121, *et seq.*; Tex. Elec. Code §§ 253.003, *et seq.*; Tex. Elec. Code §§ 254.001, *et seq.*

[15]   Interim Staff Report of the H. Comm. on House Admin., Comm. on the Judiciary, and Comm. on House Oversight and Gov't Reform, 118th Cong., *Fraud on ActBlue: How the Democrats' Top Fundraising Platform Opens the Door for Illegal Election Contributions* (2025) ("*Fraud on ActBlue Congr. Rpt. I*"), at 5, https://tinyurl.com/bdfes97h.

campaigns on the platform in recent years, including several from foreign sources,"[16] and its own internal data showed that fraud was "the highest it [had] ever been and appear[ed] to be climbing further."[17]

18.    ActBlue's response to rampant fraud on its platform was to make it easier.

19.    ActBlue also leaves donors and recipients to police themselves.[18] ActBlue tells donors they "can't give over the legal limit in a single transaction"—but openly admits it "does not automatically cut donations off after someone reaches a contribution limit with multiple contributions," adding that "[i]t's up to donors and campaigns to keep track of this." [19] And for state and local candidates, ActBlue tells donors that if they believe they've exceeded a contribution limit, they can "manually request a refund."[20] In other words: go ahead and break the law, then fix it yourself later.

20.    ActBlue has long known that gift cards and prepaid debit cards can be used to commit donor fraud. Indeed, in a comment provided by ActBlue to the Federal Election Commission ("FEC") dated June 3, 2013 in response to the FEC's seeking of public comment regarding a rulemaking on technological modernization of the FEC's regulations, ActBlue acknowledged to the FEC that "[p]repaid debit cards and gift cards do pose a unique threat of evasion of the contribution limits by a particular motivated actor. Since they are not linked to

---

[16]    Interim Staff Report of the H. Comm. on House Admin., Comm. on the Judiciary, and Comm. on House Oversight and Gov't Reform, 119th Cong., *Fraud on ActBlue Part II: Illicit Foreign Donations and a Cover-Up Spur Mass Resignations and Firings on ActBlue's Legal and Compliance Team* (2026) ("*Fraud on ActBlue Congr. Rpt. II*"), at 1, https://tinyurl.com/5xwhykp7.

[17]    *Fraud on ActBlue Congr. Rpt. I*, at 5, https://tinyurl.com/bdfes97h.

[18]    *See* ActBlue, *How can I prevent a donor from exceeding their contribution limit to my campaign?*, https://tinyurl.com/yscj9vab ("If you've identified a donor who's maxed out their individual donation limit to your campaign, you can set up a Contribution Block associated with their email address to prevent further donation."); ActBlue, *What happens if I donate over the FEC limit?*, https://tinyurl.com/55y8xtz9.

[19]    *Id.*; *see* 52 U.S.C. § 30116 (Limitations on contributions and expenditures).

[20]    *Id.*

identity of the purchaser, these cards could be utilized to make prohibited straw donor contributions . . . ."[21]

21.    In April of 2023, then Senator Marco Rubio wrote a letter to the FEC regarding ActBlue, following reports of fraudulent fundraising.[22] In this letter, Senator Rubio urged the FEC "to investigate the purported presence of widespread fraudulent donations being reported to the commission by ActBlue . . . that numerous individuals, including senior citizens, have purportedly donated to ActBlue thousands of times a year [but] had no idea that their names and addresses were being used . . . ."[23]

22.    On October 31, 2023, House Administration Committee Chairman Steil sent ActBlue a formal demand letter raising concerns that prepaid cards — some potentially funded with foreign money — were being used to "wash" unlawful donations through the platform.[24]

23.    ActBlue's response was defiant. On November 27, 2023, ActBlue, through its Chief Executive Officer & President, disputed the allegations and claimed it "employs a robust security program and fraud prevention practices to verify the identity of donors, prevent fraudulent use of credit card information, and block impermissible contributions"—including "the federal prohibition on foreign national contributions."[25] ActBlue assured that "[f]or donors, our processes

---

[21]    *See* Request for Additional Comment, Technological Modernization, 87 FR 54915-01, 54916, fn. 6, ActBlue Comment at 3 (June 3, 2013), REG 2013-01, https://tinyurl.com/yhu4yptb. ActBlue argued in its 2013 comment that "[s]uch straw donor donations are rare . . . [and] in truth prepaid cards likely present less of a risk of evading the limits than cash does, since they are marginally more traceable." *Id.* These statements were materially false and misleading when they were made, and they have not aged well.

[22]    Rubio Demands Answers from FEC On Potential ActBlue Fraudulent Donations (Apr. 13, 2023), https://tinyurl.com/32a8b4t6.

[23]    *Id. See* 52 U.S.C. § 301222 (Contributions in name of another prohibited); Texas Election Code, Ch. 253, § 253.001 (Contribution or Expenditure in Another's Name Prohibited).

[24]    Letter from Bryan Steil, Chairman of the Committee on House Administration (Oct. 31, 2023), https://tinyurl.com/y9wfphb4.

[25]    Letter from Regina Wallace-Jones, CEO & President of ActBlue (Nov. 27, 2023), https://tinyurl.com/59h843pn; *see* 52 U.S.C. § 30121 (Contributions and donations by foreign nationals).

8

and procedures foster trust that ActBlue's platform for contributions is safe and secure; for candidates and committees, they promote compliance with legal obligations."[26] ActBlue represented that "[o]ur approach is multilayered, which checks and confirmations occurring throughout the donation process to verify donors and donor information", and that "[t]hese measures, which include compliance measures, technological tools, and manual reviews, help to ensure the identity of donors, roof out potential foreign contributions, and protect donors from financial fraud."[27]

24.    ActBlue further specifically assured that "ActBlue provides a variety of steps to confirm the permissibility of contributions to prevent fraudulent transactions" including:

---

[26]    *Id.*
[27]    *Id.*

1. **ActBlue provides clearly disclosed contribution rules and collects donor information that comply with federal requirements.** ActBlue provides clearly disclosed contribution rules to donors prior to making a contribution to a candidate or committee stating, among other things, that only U.S. citizens or lawfully admitted permanent residents (i.e., green card holders) may contribute and that contributions are made on a personal credit card and not with a card issued to another person. ActBlue collects and forwards donor information required by law and necessary for determining a contributor's identity and the permissibility of their contributions.

2. **Passport information is required from donors providing an address outside of the United States.** When a donor selects any country other than the United States on an ActBlue contribution form, a United States passport number field appears. Only donations with passport information are processed.

3. **Contributions are reviewed for the possibility that a donor provided a foreign address even if the donor selected the United States as their country.** Contributions that indicate a foreign country in the address information are set aside for manual review. If a contribution appears to be from a foreign address, ActBlue contacts the donor to request United States passport information. The contribution is refunded if we are unable to make contact with the donor.

4. **Contributions are checked for indications of fraud and foreign activity using an external fraud prevention tool.** ActBlue employs a leading fraud detection and management system used by major companies across a range of industries. This tool automatically assesses contributions for potential fraud and assigns a fraud score. Depending on the score, contributions are either automatically accepted, automatically rejected, or set aside for manual review. This tool uses behavioral modeling technology that has become standard in the payments industry. It evaluates over 140 behavioral signals such as the age of the card, card type, the issuer country, recent address changes, and proprietary signals at the individual cardholder level to help flag fraudulent behavior. These signals help detect whether a card is being used fraudulently, e.g., by someone other than the actual donor, and they help detect whether a card may be associated with a foreign contributor. Every day, staff at ActBlue manually review contributions that were flagged for further review by our fraud detection tool. This review looks at the totality of circumstances, including the identified risk factors, donation history and patterns, and the information provided by the donor on the contribution form. Donations are then rejected or accepted manually.

5. **ActBlue uses the industry-standard Address Verification Service (AVS) to ensure cardholder addresses match those at issuing banks.** AVS is a long-standing fraud prevention tool built and maintained by the credit card networks to ensure that a cardholder's self-reported billing address at the time a transaction is processed matches the address that the issuing bank has on file for that cardholder. ActBlue uses this service to verify transactions before processing and approving them, again ensuring that donor identities are verified.

6. **Contributions processed via ActBlue's payment processor are blocked if they trigger a rules-based fraud prevention system.** At the time a donor makes a contribution, ActBlue's payment processor analyzes the payment details using a rules-based fraud prevention system. The contribution will be blocked if it does not meet the standards of those rules.

7. **ActBlue has a robust credit card security program to protect donor information.** ActBlue is an externally audited Payment Card Industry Data Security Standard (PCI DSS) certified Level 1 service provider. ActBlue's transaction processing technology stack is externally audited and is certified as PCI level 1, which is the highest level of certification possible. As part of maintaining this certification, external auditors verify that our credit card processing technology and security measures are implemented and maintained in accordance with the Payment Card Industry Data Security Standards Council.

**Figure 1**[28]

---

[28]    *Id.*

10

25.     ActBlue concluded its assurances by confirming that "[t]he donor verification and fraud prevention measures we have described meet legal requirements, address the concerns you raise, and will continue to evolve as needed in response to new security threats and technological opportunities."[29]

26.     In December 2023, Texas Attorney General Ken Paxton opened his own investigation into whether ActBlue's platform was enabling donor fraud in violation of Texas law.[30]

27.     ActBlue knew the walls were closing in. In 2024, faced with simultaneous congressional and state investigations, ActBlue twice relaxed its fraud prevention rules—even as its own internal documents showed executives and staff were well aware that fraudulent actors were actively exploiting the platform. In September and October 2024 alone, ActBlue detected 237 separate donations made from foreign IP addresses using domestic prepaid debit cards. Its response was not to stop them.[31] It was to look the other way.

28.     ActBlue also worked to hide what it was doing. When donors complained about gift card payment rejections, ActBlue instructed its staff to blame the donor's financial institution rather than disclose that ActBlue itself had changed its policies. ActBlue deliberately kept its own donors in the dark.[32]

---

[29]  *Id.*
[30]  Attorney General Ken Paxton's Ongoing Investigation into ActBlue Yields Cooperation on Donor Credit Card Identification, Texas Attorney General (Aug. 8, 2024), https://tinyurl.com/ycy8t4cx.
[31]  *Id.*
[32]  New Staff Report Details ActBlue's Unserious Approach to Fraud Prevention, United States Committee on House Administration (Apr. 2, 2025), https://tinyurl.com/3kk6aahj.

 September 14, 2024 at 7:21AM

I am still having trouble using my Amex gift card to donate an additional $50 to Kamala campaign. My card is constantly rejected. I called Amex and they say it is due to an issue on your site trying to do recurring payments. This is a $50 gift card. It can't keep donating more than it's value. Inquiry ▮▮▮▮ has been opened but nobody has responded. Please help!

▮▮

 September 18, 2024 at 9:03 PM

Hi ▮▮

Thanks for reaching out, and I'm sorry to hear about the declined contributions!

I can confirm the declined contributions were one-time and not set up to recur. The consistent decline code we received from the card issuer was "Do Not Honor."

You may want to contact the card issuer and inform them that all attempted contributions were one-time, and not set up to recur. Since it's a gift card, you may also want to try donating a lesser value than the $50 on the card, since that can improve the success rate of a charge at times.

Best,



**Figure 2**[33]

29.    On October 28, 2024, Chairman Steil subpoenaed ActBlue for documents related to donor verification, warning that ActBlue's "failure to verify donor identities may have allowed foreign actors to fraudulently participate in the political process."[34]

30.    Then ActBlue blinked. On December 10, 2024, Chairman Steil publicly announced that ActBlue had represented to Congress that it implemented updated policies to "automatically reject donations that use foreign prepaid/gift cards, domestic gift cards, are from high-

---

[33]  *Id.*

[34]  Chairman Steil Issues Subpoena to ActBlue for Documents Related to Potential Foreign Influence in Campaign Funding, United States Committee on House Administration (Oct. 30, 2024), https://tinyurl.com/yu6cs9x7 (citing Attorney General Ken Paxton's Ongoing Investigation Into ActBlue Yields Cooperation On Donor Credit Card Identification Texas Attorney General (Aug. 8, 2024), https://tinyurl.com/ycy8t4cx).

risk/sanctioned countries, and have the highest level of risk as determined by [ActBlue's] solution provider, Sift."[35]

31.     ActBlue confirmed to Congress that in August 2024, ActBlue stopped accepting foreign prepaid debit cards, and in September 2024, stopped accepting all gift card donations— changes adopted, the report noted, "in direct response to" congressional oversight.[36]

| Rule Number | Rule Name | Rule Specifics | Decision Applied | Notes |
|---|---|---|---|---|
| 1 | Internal Testing Email Whitelist | ███████████ | Automatically Accept | In place so ActBlue tech employees can run tests without getting stuck in Sift |
| 2 | Foreign Issued Prepaid Cards | ███████████ | Automatically Reject | |
| 3 | Domestic Gift Cards | ███████████ | Automatically Reject | |
| 4 | Sift Score 100 Rejection | ███████████ | Automatically Reject | The name of the rule needs to be updated, but the rule essentially says we are going to automatically reject what we consider to be the riskiest of all donations regardless of any specific signals |
| 5 | High Risk Countries (Review) | ███████████ | Manually Review | |

**Figure 3**[37]

32.     Investigators stood down. The public was told the problem was solved.

33.     It wasn't.

34.     As Congress later concluded, "[i]nternal documents produced to [Congress] by ActBlue and . . . Sift, 'reflect[ed] a fundamentally  unserious approach to fraud prevention at ActBlue . . . that [] left the door open for large-scale fraud campaigns . . . .'"[38]

---

[35]   Chairman Steil Releases Finding from Subpoena of ActBlue. United States Committee on House Administration (Dec. 10, 2024), https://tinyurl.com/3db5c3nt. Sift is a fraud prevention platform that among other services "[de]tect[s] and prevent[s] fraudulent transactions and manage[s] organizational risk, all in one place." Sift, Platform Overview, https://tinyurl.com/ywws2kef.

[36]   *Fraud on ActBlue Congr. Rpt. I*, at 5.

[37]   *Id.* at 5, fn.1, at Ex. 1.

[38]   *Fraud on ActBlue Congr. Rpt. II*, at 1 (quoting Interim Staff Report of the H. Comm. on House Admin., Comm. on the Judiciary, and Comm. on House Oversight and Gov't Reform, 118th Cong., *Fraud on ActBlue: How the Democrats' Top Fundraising Platform Opens the Door for Illegal Election Contributions* (2025), at 1, https://tinyurl.com/bdfes97h (alterations in original)).

35.    In an April 2, 2026 exposé, The New York Times reported that in early 2025, Covington & Burling, a law firm working for ActBlue, had written two private memorandums to ActBlue providing the firm's conclusions that ActBlue's chief executive officer gave a potentially misleading response to Chairman Steil in her November 27, 2023 letter explaining how the organization vetted donations to ensure that they were not illegally coming from foreign citizens. While the letter from ActBlue represented that ActBlue carried out "multilayered" screenings of contributions that helped "root out" those from overseas, in fact, the law firm found, some of the steps AcBlue listed were not always followed.[39]

36.    The New York Times reviewed two legal memoranda that the firm had provided to ActBlue which explained that "[i]t can be alleged that ActBlue accepted and/or facilitated the acceptance of foreign-national contributions into American elections" and "[i]n addition, because ActBlue's staff was aware that its system was not as robust as necessary, it could be alleged that these violations were 'knowing and willful'" of U.S. election laws.[40] The article identifies that ActBlue's chief executive's letter included that ActBlue processed contributions with foreign mailing addresses only if the donor supplied a U.S. passport number, but "[t]hat turned out to not be entirely accurate, Covington's 2025 memos said." The letter also stated that in some instances, ActBlue would contact donors to request their U.S. passport information in order to process donations and would refund those who could not be reached. "That also did not always happen, according to Covington's memos. For example, donors who paid through third-party apps like Apply Pay, PayPal, or Venmo were not asked for passport information, Covington wrote."

39    Reid J. Epstein & Shane Goldmacher, ActBlue May Have Misled Congress on Vetting Foreign Donations, Its Lawyers Warned, N.Y. TIMES (Apr. 2, 2026) ("Apr. 2, 2026 NY Times Article"), https://tinyurl.com/59j9aeas.
40    Id.

Ultimately, "[t]he Covington memos indicated that ActBlue did not have the rigor in its review of overseas donations that was required or that it had described to congressional investigators" such that "one memo said, there was 'a substantial risk that some of the funds received were impermissible contributions from foreign nationals." A second legal memorandum among other things provided options to ActBlue to potentially "correct the record[.]" The article states that "ActBlue would eventually change its vetting practices and inform Congress, but not before an internal uproar" and that ". . . ActBlue had ultimately decided not to tell Congress that it wanted to amend its past statements."

37.    One memorandum raised the specter of a criminal investigation if prosecutors believed that AcBlue had tried to conceal facts about its efforts to prevent foreign contributions. The memorandums triggered a meltdown at the highest levels of ActBlue, with a series of top officials resigning in quick succession.[41] At the time, the departures were not publicly attributed to Covington & Burling's legal memorandums—the memorandums only became publicly known on April 2, 2026 when The New York Times reported on them.[42]

38.    As Congress would go on to conclude, "[t]his legal review also indicated that [ActBlue's CEO] previously misled Congress about ActBlue's review processes for foreign contributions. In November 2023, [she] represented [to Congress] that 'passport information is required from [ActBlue] donors providing an address outside of the United States' and that foreign donations are not processed without this 'passport information.'"[43]

---

[41]    *Id.*
[42]    *Id.*
[43]    *Fraud on ActBlue Congr. Rpt. II*, at 9 (quoting Letter from Regina Wallace-Jones, CEO & President of ActBlue (Nov. 27, 2023), https://tinyurl.com/59h843pn).

39.     "The legal review conducted by ActBlue's outside counsel . . . found that [ActBlue's CEO's November 2023 letter] claim was 'not . . . entirely accurate,' as the passport checks 'did not always happen' and were never conducted for transactions made through 'third-party apps like Apple Pay, PayPal, or Venmo.'"[44] ActBlue's CEO "also claimed that ActBlue 'contributions that indicate a foreign country in the address information are set aside for manual review.'"[45] "Documents produced to the Committees indicate that this was untrue: contributions with foreign addresses in a select set of 28 countries were automatically rejected or manually reviewed, while contributions with foreign addresses outside of these countries received no additional scrutiny."[46] "ActBlue's outside counsel wrote that [ActBlue's CEO's] November 2023 letter could be seen 'not just as a false statement but as an effort to conceal the foreign contributions'—a cover-up to mislead Congress and prevent it from discovering ActBlue's previous misconduct."[47]

40.     "The outside counsel's review concluded that 'ActBlue did not have the rigor in its review of overseas donations that was required or that it had described to congressional investigators.'"[48] "ActBlue's outside lawyers proposed that [ActBlue's CEO] 'correct the record,' noting 'risks' associated with failing to do so."[49] "Instead, [ActBlue's CEO] 'terminated' the law firm that conducted the review."[50]

---

[44]   *Id.* (quoting Apr. 2, 2026 NY Times Article).
[45]   *Id.* (quoting Letter from Regina Wallace-Jones, CEO & President of ActBlue (Nov. 27, 2023), https://tinyurl.com/59h843pn).
[46]   *Id.* (citing *Fraud on ActBlue Congr. Rpt. I* at 1, fn.2, Ex. 1).
[47]   *Id.* (quoting Apr. 2, 2026 NY Times Article (quoting memoranda)).
[48]   *Id.* (quoting Apr. 2, 2026 NY Times Article).
[49]   *Id.* (quoting Apr. 2, 2026 NY Times Article (quoting memoranda)).
[50]   *Id.* (quoting Apr. 2, 2026 NY Times Article).

41.     "The Chairwoman of ActBlue's Board of Directors . . . admitted later that up to $38 million in contributions" made through the ActBlue platform "during the 2024 election cycle 'had signs they were from foreign countries.'"[51] "Unsurprisingly," Congress subsequently concluded, "ActBlue's internal and external lawyers were concerned about the potential legal risks of ActBlue's conduct."[52]

42.     "After the 2024 election, amid an internal 'meltdown' over ActBlue's apparently deliberate failure to prevent illegal foreign political donations and subsequent misrepresentations to Congress, every member of the platform's legal and compliance staff resigned, was fired, or went on extended leave while alleging that they had faced retaliation from ActBlue staff."[53]  In the dark, ActBlue's legal and compliance team completely collapsed. "[T]his mass exodus was a direct consequence of ActBlue's failure to deter illegal foreign political donations and [ActBlue's] CEO['s] previous misstatements to Congress."[54] "Put simply: every member of ActBlue's legal and compliance team appears to have left the platform after the 2024 election because of its 'knowing and willful' acceptance of illegal foreign contributions, and the subsequent cover-up."[55]

43.     ActBlue fired its chief lawyer, its general counsel, on November 22, 2024.[56] After his "departure, ActBlue named [an] Associate General Counsel . . . the interim leader of ActBlue's legal team . . . [who] had been a fraud-prevention 'stakeholder[]' who 'provide[d] legal oversight for decisions about fraud."[57] "ActBlue offered him the job to 'head [legal and compliance]' on a

---

[51]  *Id.* (quoting Apr. 2, 2026 NY Times Article); PAC Profile: ActBlue, OPEN SECRETS, https://www.opensecrets.org/political-action-committees-pacs/actblue/C00401224/summary/2024).

[52]  *Id.*

[53]  *Id.* at 2.

[54]  *Id.*

[55]  *Id.*

[56]  *Id.* at 7

[57]  *Id.* at 10 (quoting ActBlue internal memorandum, Model Governance Committee/Trust & Safety Team Proposal, Ex. 15) (alterations in original)).

permanent basis."[58] Instead, ActBlue's new legal leader "quit" stating in his "resignation letter" that "ActBlue's past practices for screening political donations from abroad and its past representations to Congress regarding foreign donations and related matters" caused him to be "'concerned that [ActBlue's] leadership [was] not fully committed to transparently addressing with the Board the seriousness of' ActBlue's misconduct."[59]

44.    "As part of [ActBlue's] coverup, ActBlue withheld [this] resignation letter from" Congress, failing to produce it pursuant to a July 22, 2025 document subpoena that Congress served on ActBlue to which the letter was "undeniably responsive to" and to which "on October 27, 2025, ActBlue represented to [Congress] that it had produced '[a]ll non-privileged documents with responsive, relevant information.'"[60] At the same time, ". . . Actblue did produce *other* internal communications related to [the interim general counsel's] resignation" consisting of "[i]nternal messages among ActBlue employees . . . [which] stated that [he] departed because he was "really unhappy" and "fed up" with what "he[] [had] seen while being in the interim role."[61]

45.    After that, an ActBlue legal counsel "was the only remaining lawyer on ActBlue's legal and compliance team" who "[b]y default . . . became the new interim head of legal, reporting directly to [ActBlue's CEO]."[62] "On his first full day, February 25, 2025, [he] sent the memoranda from ActBlue's outside counsel detailing the platform's misconduct 'to the ActBlue board of directors [and] ActBlue's executive leadership team[.]"[63] He left the same day "on a 'leave of

---

[58]    *Id*. (quoting Internal ActBlue Employee Message (Feb. 21, 2025, 3:27 PM), Ex. 3 (alteration in original)).

[59]    *Id*. (quoting Apr. 2, 2026 NY Times Article (quoting letter) (second alteration in original)).

[60]    *Id*. at 10-11 (quoting Letter from Mr. Vincent Cohen, Counsel for ActBlue, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, Rep. James Comer, Chairman, H. Comm. on Oversight and Gov't Reform, & Rep. Bryan Steil, Chairman, Comm. on H. Admin. (Oct. 27, 2025)).

[61]    *Id*. at 11 (quoting Internal ActBlue Employee Message (Feb. 2, 2025, 3:28 PM; Ex. 3; Internal ActBlue Employee Message (Feb. 18, 2025, 5:33 PM), Ex. 5) (fifth and sixth alternation in original)).

[62]    *Id*. at 12.

[63]    *Id*. (quoting Apr. 2, 2026 NY Times Article (second and third alteration in original)).

absence' . . . processed internally as medical leave . . . [but] human resources (HR) officials who worked on the request suspected that the real reason was 'something else.'".[64] "After HR revoked [his] access to email and other internal systems, he posted a Slack message stating that 'we have Anti-Retaliation and Whistleblower Policies for a reason,' appearing to claim that he was retaliated against for blowing the whistle on ActBlue's misconduct."[65] "One of [ActBlue's CEO's] deputies swiftly 'deleted' the message."[66] ". . . ActBlue has not produced this message [to Congress pursuant to its subpoena] despite extensive evidence corroborating its existence, once again indicating deliberate stonewalling of [Congress's] investigation."[67]

46.    "ActBlue also has a 'compliance' team that works with the legal team to fulfill ActBlue's legal and regulatory obligations. This team presumably would have been expected to pick up the slack after the legal team's disintegration, especially amid allegations that ActBlue previously failed to comply with applicable federal law by accepting illegal foreign donations. Instead, on February 27, 2025—just two days after [the ActBlue legal counsel]  went on leave— [the] Director of Compliance . . . 'either quit . . . or was fired' after more than a dozen years at ActBlue."[68] "He had previously been listed as a fraud-prevention 'stakeholder[]' and was involved in the review process for changes to ActBlue's fraud-prevention policies—including their weakening in 2024."[69] "ActBlue employees attributed [his] departure to the 'unstable situation'

---

[64]    *Id.* (quoting email from ActBlue HR Employee to Regina Wallace-Jones (Feb. 26, 2025, 5:01 PM), Ex. 6; email from ActBlue HR Employee to Zain Ahmad (Feb. 25, 2025, 5:26 PM), Ex. 7) (quoting email from ActBlue HR Employee to Zain Ahmad (Feb. 25, 2025, 6:10 PM), Ex. 8; internal message from ActBlue Employee to Candace King (Feb. 25, 2025, 8:44 PM), Ex. 17)).

[65]    *Id.* at 13 (quoting Apr. 2, 2026 NY Times Article (quoting message)).

[66]    *Id.* (quoting internal message from ActBlue Employee to Candace King (Feb. 26, 2025, 11:19 PM), Ex. 18).

[67]    *Id.*

[68]    *Id.* at 16 (quoting internal ActBlue employee message (Feb. 28, 2025), Ex. 11; email from ActBlue Union to ActBlue Board (Feb. 27, 2025), Ex. 14).

[69]    *Id.* (quoting ActBlue internal memorandum, Fraud Prevension Stakeholders Writeup [2023], Ex. 19; *Fraud on ActBlue Congr. Rpt. I*, Ex. 3)).

in the legal and compliance department, noting that 'the whole department [was] falling apart' following the revelations about ActBlue's potentially illegal conduct."[70]

47.    Within a week of the only remaining lawyer's having gone on leave, ActBlue's internal compliance team "collapsed."[71] "After [his] departure, 'only one person' remained on ActBlue's 'substantially weakened' compliance staff. That person—ActBlue's Legal and Compliance Operations Specialist—resigned the following week, in early March 2025.[72]

48.    Congress subpoenaed "five key ActBlue personnel" for depositions as part of its "oversight of ActBlue's weak fraud prevention practices and allegations of internal misconduct and retaliation."[73] These employees consisted of "ActBlue's Senior Workflow Specialist who manages fraud prevention on ActBlue day to day;" "Former Vice President of Customer Service . . ., the executive responsible for overseeing ActBlue's fraud-prevention team during the 2024 election cycle;" "Former General Counsel[;]" "Former Director and Associate General Counsel who 'provide[d] legal oversight for decisions about fraud' and resigned rather than participate in ActBlue's cover-up;" and "Legal Counsel . . . who appears to have been retaliated against by ActBlue executives for blowing the whistle."[74]

49.    "Across the five depositions, the current and former ActBlue employees declined to answer a single one of the Committees' substantive questions, collectively invoking their Fifth

---

[70]    *Id*. (quoting internal ActBlue Employee messages (Feb. 28, 2025, 8:38 PM, Ex. 12)).
[71]    *Id*.
[72]    *Id*.
[73]    *Id*. at 20.
[74]    *Id*. at 20-21 (quoting Letter from Rep. Bryan Steil, Chairman, Comm. on H. Admin., Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, & Rep. James Comer, Chairman, H. Comm. on Oversight and Gov't Reform, to Mr. Aaron Ting, Former Director & Associate General Counsel, Product and Privacy, ActBlue (Sep. 4, 2025) (attaching subpoena)) (citing ActBlue internal memorandum, Model Governance Committee/Trust & Safety Team Proposal; see Ex. 15; Apr. 2, 2026 NY Times Article).

Amendment right 146 times."[75] Among the questions they declined to answer included why ActBlue "took a 'more lenient' approach to fraud in 2024," "[w]hether ActBlue executives instructed them to allow more fraud on the platform," "[w]hether the practice of 'smurfing,' in which bad actors make fraudulent donations using the names and addresses of real people, is prevalent on ActBlue," "[w]hether ActBlue banned donations made using gift or foreign prepaid cards shortly before the 2024 election because of significant fraud using these mechanisms," and "[w]hether mass resignations after the 2024 election were related to fraud on ActBlue[.]"[76]

50.    The New York Times further attributed that, not wanting to "poke the bear," ActBlue ultimately decided not to inform Congress that it wanted to amend its past statements.[77] Instead, ActBlue retained new legal counsel, Dechert, to defiantly write to Chairman Steil and Congress on June 9, 2025, that Congress's "investigation is not an exercise of legitimate legislative oversight, but rather has become a partisan effort to exploit legislative processes to gather information in service of a White-House-directed Justice Department investigation."[78]

51.    ActBlue's new counsel represented to Congress in its June 9, 2025 letter that:

---

[75]  *Id*. at 21.
[76]  *Id*. at 22-24.
[77]  *Id*. at 2.
[78]  Letter from Vincent Cohen and Jonathan Streeter, Dechert (June 9 2020), https://tinyurl.com/4pbz9nfx.

ActBlue's platform incorporates anti-fraud technology, including address verification and an industry-standard fraud prevention tool that uses behavioral modeling technology to assess credit card transactions automatically for potential fraud. The tool evaluates more than 140 behavioral signals to identify potentially fraudulent activity. Transactions that are likely fraudulent are either automatically rejected or manually reviewed by ActBlue personnel. ActBlue also requires donors, subject to certain limitations, to provide a CVV when entering a new credit card number, and CVV is one of several pieces of information that are used to assess a transaction's legitimacy.

Historically, ActBlue has also taken other steps to verify that donors are U.S. citizens or lawful permanent residents. For the period identified in the Committees' request, this has included prompting donors to enter their passport number when a donor selects any country other than the United States on an ActBlue contribution form while checking out with their credit or debit card. This has also included a practice of reviewing contributions for the possibility that a donor provided a foreign address even if the donor selected the United States as their country. Despite these historical steps, ActBlue has recently implemented additional restrictions that will automatically reject contributions with indicators that they come from abroad, including contributions made through third-party payment processors. These restrictions supplement already-existing blocks for contributions from foreign-issued prepaid cards and gift cards, and represent a blanket approach to replace ActBlue's prior screening methods.

ActBlue continues to evaluate and revise its policies and procedures regularly, and to address technical limitations for implementation, in order to ensure donor security, platform integrity, and compliance with applicable law. Given ActBlue's document productions to date, it is unclear how the Committees' continued investigation of ActBlue advances your stated interest in informing legislation to address the use of CVVs, gift cards, prepaid cards, and foreign credit cards in connection with political donations.

**<u>Figure 4</u>**[79]

52.     Prior to The New York Times's exposé, investigators with the Office of the Attorney General, in checking on the veracity of ActBlue's representations, made donations from Texas to the Democratic National Committee and candidates for Texas political offices via the ActBlue platform, utilizing gift cards.

53.     Specifically, on February 19, 2026, an investigator donated five dollars ($5.00) to the Democratic National Committee, through ActBlue, from Texas using a physical Mastercard

---

[79]    *Id.*

gift card purchased at a retail outlet with cash, under a pseudonym (*i.e.*, under a falsely stated identity).[80]

54.     Subsequently, on February 25, 2026, a second investigator donated ten dollars ($10.00) to Sarah Eckhardt, a candidate for Texas Comptroller of Public Accounts, through ActBlue, from Texas using a digital Visa e-gift card purchased online, utilizing the investigator's correct identity information.[81] The investigator also left ActBlue a two dollar ($2.00) tip using the card.

55.     Also on February 25, 2026, the same second investigator donated ten dollars ($10.00) to Jon Rosenthal, a candidate for Texas Railroad Commissioner, through ActBlue, from Texas using the same digital Visa gift card purchased online, also utilizing the investigator's correct identity information.[82] The investigator also left ActBlue a two dollar ($2.00) tip using the card.

56.     Each of these donations went through without a problem.

57.     Upon information and belief, ActBlue has further accepted donations made using a gift card to candidates for elective office in Tarrant County, including potentially among others Kevin Burge, a candidate for the United States Congress (District 24), TJ Ware, a candidate for the United States Congress (District 24), Amanda Arizola, a candidate for County Commissioner (Precinct No. 2), and Jared Williams, a candidate for County Commissioner (Precinct No. 2), each of whom has received donations in the current election cycle that were made through the ActBlue platform.

---

[80]    The Consumer Protection Division's standard operating procedure is for investigators engaged in covert or undercover investigations to utilize a pseudonym. This donation was authorized to proceed under a pseudonym by the Office of the Texas Attorney General to test whether ActBlue had misrepresented that it stopped accepting all donations made using gift cards.  Upon confirmation, the use of a pseudonym was discontinued.

[81]    *See* Declaration of Rock Robinson.

[82]    *See id.*

58.    ActBlue lied to Congress and, knowing that Congress had informed the public of its change of policy, lied to the public. When the scrutiny had faded, ActBlue went right back to business as usual. All while telling its donors and the public: "[E]very contribution made through ActBlue is reviewed, and if any fail to meet our rigorous standards of compliance, they are rejected."[83] On that same page, ActBlue dismissed concerns about its platform as "bogus claims" and "partisan attacks trying to stifle Democratic and progressive fundraising."[84]

59.    Yet, ActBlue knows that on its platform when a donor's contribution is made using a gift card, the card is effectively a cash donation for which the donor can simply provide *someone's* information, *not his or her own*, to evade campaign finance regulations barring the donor's eligibility. ActBlue does not seek or obtain proof of a gift card donor's identity.

60.    Both gift cards and prepaid debit cards are actually significantly worse than in-person cash contributions. With an in-person cash contribution, the donor exposes him or herself to recognition when claiming a false identity. With a gift card or prepaid debit card, the donor does not need to present in person and is more easily able to shield his or her identity.

61.    And despite its knowledge that domestic prepaid debit cards present an even greater risk of unlawful contributions than cash, ActBlue has accepted their use, as well as gift cards.

62.    ActBlue knows exactly what is at stake. In its own words, "[f]raud, whether successful or not, can devalue the legitimate contributions made on [ActBlue's] site [and] can open up campaigns and organizations to unintended scrutiny."[85] ActBlue said those words. Indeed,

---

[83]    ActBlue Investigation: What's Really Happening and What You Need to Know (May 2, 2025), https://tinyurl.com/yc3wry24.
[84]    *Id.*
[85]    *Id.*

ActBlue said them after receiving the Covington memos, one of which warned that "[i]t can be alleged that AcBlue accepted and/or facilitated the acceptance of foreign national contributions into American elections" and "[i]n addition, because ActBlue's staff was aware that its system was not as robust as necessary, it could be alleged that these violations were 'knowing and willful' . . . ."[86] Then it chose fraud anyway.

63.    Unless stopped, ActBlue will continue to accept illegal donations made with gift and prepaid debit cards, continue to misrepresent the integrity of its platform to donors and the public, and continue to corrupt Texas federal and state elections—for as long as it remains profitable to do so.

## VI.    CIVIL PENALTIES

64.    Texas Bus. & Com. Code § 17.47(g) describes the six factors the trier of fact "shall consider" when determining the amount of civil penalties to impose: "(1) the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited act or practice; (2) the history of previous violations; (3) the amount necessary to deter future violations; (4) the economic effect on the person against whom the penalty is to be assessed; (5) knowledge of the illegality of the act or practice; and (6) any other matter that justice may require."

65.    The State is entitled under Tex. Bus. & Comm. Code § 17.47(c)(1) to recover up to $10,000 for each violation of the DTPA.

66.    Pursuant to Tex. Bus. & Com. Code § 17.47(g)(1)-(6), the facts described in ¶¶ 1-63 shall be considered by the jury when determining the civil penalties to impose.

---

[86]    ActBlue May Have Misled Congress on Vetting Foreign Donations, its Lawyers Warned (Apr. 2, 2026), https://tinyurl.com/59j9aeas.

25

67.     Tex. Bus. & Com. Code § 17.47(g)(3)-(4), (6), Defendant's current financial situation must also be considered by the jury when determining civil penalties to impose.

## VII.     DTPA CLAIMS

68.     The State incorporates the foregoing allegations as if set forth fully herein.

69.     The DTPA "plainly separates causes of action brought by consumers from those brought by the State."[87] Specifically, section 17.47(a) of the Tex. Bus. & Com. Code, authorizes the Consumer Protection Division to "bring an action in the name of the state against the person to restrain by temporary restraining order, temporary injunction, or permanent injunction the use of such method, act, or practice" "[w]henever the consumer protection division has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by [the DTPA], and that proceedings would be in the public interest[.]" This legislative grant of authority "is triggered not by a demonstration or proof . . . [i]t is instead triggered by mere *belief*" of the Consumer Protection Division.[88]

70.     Unlike private litigants, the DTPA authorizes the Consumer Protection Division, when suing in the name of the State in its sovereign capacity, as it has done here, "to protect the general public[.]"[89] "The DTPA also makes it clear that the consumer protection division of the

---

[87]   *Texas v. Colony Ridge, Inc.*, No. CV-H-24-0941, 2024 WL 4553111, at *8 (S.D. Tex. 2024) (comparing Tex. Bus. & Com. Code § 17.50 with § 17.47).

[88]   *Office of Attorney General v. PFLAG, Inc.*, 731 S.W.3d 301, 318 (Tex. 2026) (examining the Consumer Protection Division's identically worded authority to issue Civil Investigative Demands under section 17.61(a) of the DTPA) (emphasis in original). The Consumer Protection Division's decision of "[w]hether or how vigorously the Attorney General's office *should* pursue" its "broad discretion" under the DTPA "are political questions entrusted by the Legislature to the Attorney General, not to the courts" and that "[c]ourts are not well suited to second-guess the wisdom of investigatory decisions made by an elected executive officer entrusted by the law with broad discretion." *Id.* at 309 (emphasis in original).

[89]   *Avila v. State*, 252 S.W.3d 632, 647 (Tex. App-Tyler Mar. 31, 2008).

attorney general's office acts in the name of the state and does not represent persons to whom the consumer protection division requests that the court award relief."[90]

71.    Thus, "the presence of a consumer, or an injury to a consumer, is not required when the State initiates a DTPA lawsuit."[91] And accordingly, "[t]he State need not allege any injury to make its claim under the DTPA."[92] Summarily stated, "[a]nyone engaging in 'deceptive practices may be subjected to a suit by the Consumer Protection Division of the Attorney General's Office, under section 17.47.'"[93]

72.    An act is false, misleading, or deceptive under the DTPA "if it has the capacity to deceive an ignorant, unthinking, or credulous person." [94]

### Count I

### Engaging in false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.

2.    ActBlue is a "person."[95]

3.    Both donors and campaigns are "consumers" of ActBlue's goods and services.[96] A consumer is any individual, partnership, corporation, the State, or a subdivision or agency of the

---

[90]    *Id*. (citing Tex. Bus. & Com. Code § 17.47(h)). *See also* Bus. & Comm. Code § 17.47(a) & (e).
[91]    *Id*.
[92]    *Id*. (citing *Holzman v. State*, No. 13-11-00168-CV, 2013 WL 398935, at *3 (Tex. App.—Corpus Christi-Edinburg Jan. 31, 2013 (not designated for publication), pet. denied).
[93]    *Holzman*, *supra* (quoting *Riverside Nat. Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex. 1980)).
[94]    *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479–80 (Tex. 1995) (quoting *Spradling v. Williams*, 566 S.W.2d 561, 562 (Tex. 1978)); *see also Streber v. Hunter*, 221 F.3d 701, 728 (5th Cir. 2000) (same).
[95]    Tex. Bus. & Com. Code § 17.45(3) ("'Person' means an individual, partnership, corporation, association, or other group, however organized.").
[96]    *State v. Yelp, Inc.*, 725 S.W.3d 170, 184 (Tex. App. [15th Dist.] 2025); *Mother & Unborn Baby Care of N. Tex., Inc. v. State*, 749 S.W.2d 533, 538 (Tex. App.—Fort Worth 1988, writ denied).

State who seeks or acquires by purchase or lease any goods or services—or who is adversely affected by a person's unlawful act or practice under the DTPA.[97] Privity is not required.[98]

4.      ActBlue's fundraising platform — the technology through which it raises and distributes funds — constitutes "goods" or "services" and is the conduct of "trade or commerce" under the DTPA.[99]

5.      Texas Bus. & Com. Code § 17.46(a) prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

6.      ActBlue told Congress, and Congress publicized to the public, that it had stopped accepting gift card donations. Only momentarily. It resumed accepting them when regulatory scrutiny faded—without telling anyone.

7.      ActBlue simultaneously assured donors that "[e]very contribution made through ActBlue is reviewed" against "rigorous standards of compliance" and that concerns about fraud on its platform were "bogus claims" and "partisan attacks." Those representations were false. ActBlue knew they were false when it made them.

8.      Specifically, ActBlue represented to campaigns that it prohibits and ferrets out fraudulent donations, that otherwise could cause campaigns to violate State and Federal Election Laws. However, by accepting gift cards and prepaid debit cards, payment methods uniquely suited to concealing a donor's true identity, ActBlue failed to provide the service to campaigns that it promised.

---

[97]   Tex. Bus. & Com. Code § 17.45(4).
[98]   *Kennedy v. Sale*, 689 S.W.2d 890 (Tex. 1985); *see also Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex.1983).
[99]   Tex. Bus. & Com. Code §§ 17.45(1) and (2); Tex. Bus. & Com. Code § 17.46; Pricing, Act Blue (2026), https://tinyurl.com/2t4an2ry.

9.     Additionally, ActBlue knew that it did not consistently request or require passport information from donors who provided an address outside of the United States, which allowed unlawful contributions from foreign nationals to be made on its platform. For example, donors who paid through third-party apps like Apple Pay, PayPal, or Venmo were not asked for passport information.

10.     ActBlue also knew that it did not consistently automatically reject or manually review contributions from donors who provided a foreign address in a select set of 28 countries, while contributions with foreign addresses outside of these countries received no additional scrutiny, which also allowed unlawful contributions from foreign nationals to be made on its platform.

11.     ActBlue further knew that its standards of compliance were not rigorous, which allowed yet more unlawful contributions from foreign nationals to be made on its platform.

12.     ActBlue's false, misleading, and deceptive acts and practices in the conduct of trade or commerce violate Tex. Bus. & Com. Code § 17.46(a).

### Count II

### Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

13.     Texas Bus. & Com. Code § 17.46(b)(2) provides that "false, misleading, or deceptive acts or practices" includes "causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services."[100]

---

[100]     *See Webster College v. Speier*, 605 S.W.2d 712 (Tex. Civ. App.—Eastland 1980, *judgment aff'd in part, rev'd in part*, 616 S.W.2d 617 (Tex. 1981)) (school's solicitations falsely represented that its "master of arts individualized program was fully accredited and that it was recognized by the State of Texas and hours acquired were transferable to other graduate schools."); *see also Scholtz v. Sigel*, 601 S.W.2d 516 (Tex. Civ. App.—Dallas 1980) (misrepresentation that a horse had attained the highest ranking by the American Quarterhorse Association).

14.    ActBlue told the world its platform operates under robust security and fraud prevention measures that ensure contributions comply with federal and state election law. Donors and campaigns relied on those representations—reasonably believing that contributions processed through ActBlue's platform had been screened, verified, and certified as lawful.[101]

15.    That belief was false, and ActBlue made it so.

16.    ActBlue secretly resumed acceptance of gift card donations—the very payment method it publicly swore off. Because ActBlue represented to campaigns that it restricts fraudulent donations, that otherwise could cause campaigns to violate State and Federal Election Laws, but continued accepting gift cards and domestic prepaid debit cards, payment methods uniquely suited to concealing a donor's true identity, ActBlue caused confusion about the safety of its platform.

17.    ActBlue did not consistently request or require passport information from donors who provided an address outside of the United States, and hid this fact. For example, donors who paid through third-party apps like Apple Pay, PayPal, or Venmo were not asked for passport information.

18.    ActBlue further did not consistently automatically reject or manually review contributions from donors who provided a foreign address in a select set of 28 countries, while contributions with foreign addresses outside of these countries received no additional scrutiny, and hid this fact.

---

[101]    *See* CERTIFICATION, Black's Law Dictionary (12th ed. 2024) ("The act of attesting; esp., the process of giving someone or something an official document stating that a specified standard or qualification has been met."); *e.g., Lone Star Ford, Inc. v. McGlashan*, 681 S.W.2d 720, 722 (Tex. App.—Houston [1st Dist.] 1984) (used-car seller said it would transfer clear title on payment but did not); *Potere, Inc. v. National Rlty. Serv.*, 667 S.W.2d 252, 257 (Tex. App.—Houston [14th Dist.] 1984) (realtor made misleading statements about who would make purchase decision in guaranteed sale of franchise).

19.    And ActBlue knew that its system was not as robust as necessary—and hid that fact as well.

20.    ActBlue caused donors and campaigns to fundamentally misunderstand what ActBlue's platform actually does and what "approval" of a contribution through its platform actually means.[102]

21.    ActBlue's conduct violates Tex. Bus. & Com. Code § 17.46(b)(2).

## Count III

**Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not.**

22.    Texas Bus. & Com. Code § 17.46(b)(5) provides that "false, misleading, or deceptive acts or practices" includes "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not."[103]

23.    ActBlue markets itself as a secure, compliant fundraising platform that protects donors, campaigns, and the democratic process. It is not. ActBlue's platform accepts anonymous gift card and prepaid debit card donations that bypass identity verification, enable foreign nationals

---

[102]    *Fort Worth Mortg. Corp. v. Abercrombie*, 835 S.W.2d 262, 265–266 (Tex. App.—Houston [14th Dist.] 1992) (switching of policies without notice certainly sufficient to cause confusion or misunderstanding as to the source of the insurance coverage).

[103]    *See Dal-Chrome Co. v. Brenntag Sw., Inc.*, 183 S.W.3d 133, 138–39 (Tex. App.—Dallas, 2006) (affirming a jury verdict finding that a chemical supplier delivered acid contaminated with foreign substances after promising to meet manufacturer's specifications for acid quality and that the supplier would perform quality control measures to ensure the acid met same); *see also 2 Fat Guys Inv. v. Klaver*, 928 S.W.2d 268, 271–72 (Tex. App.—San Antonio 1996) (affirming a jury verdict finding against an automobile service and repair shop that represented a vehicle's oil had been changed properly when it had not).

to contribute illegally, and allow donors to evade contribution limits—all while ActBlue tells the public the opposite is true.[104]

24.     ActBlue represented to Congress, to regulators, and to the public that its services include (a) automatic rejection of all gift cards and all donations made from high-risk or sanctioned countries, including in its representations to donors and campaigns; (b) requiring passport information from donors who provide an address outside of the United States; (c) automatically reject or perform a manual review contributions from donors who provide a foreign address in a select set of 28 countries; and (d) scrutinize contributions with foreign addresses outside of these countries. These representations were false, exposing campaigns to violations of State and Federal Election laws. ActBlue's services do not have the characteristics, benefits, or compliance safeguards it claims they do.

25.     ActBlue's conduct violates Tex. Bus. & Com. Code § 17.46(b)(5).

## Count IV

### Advertising goods or services with intent not to sell them as advertised.

26.     Texas Bus. & Com. Code § 17.46(b)(9) provides that "false, misleading, or deceptive acts or practices" includes "advertising goods or services with intent not to sell them as advertised."

---

[104]    *See Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 729 (Tex. 1982) (ruling that a statement by a seller in advertisements is actionable if there was a promise to perform specific acts).

27.    ActBlue did not merely make an honest mistake about its own policies. It advertised a compliant, secure fundraising platform—and then deliberately delivered something different, knowing consumers would rely on those advertisements in choosing to use its services.[105]

28.    ActBlue knew that donors and campaigns would not use its platform if they understood that it was processing anonymous gift card and prepaid debit card donations that circumvent election law. So ActBlue hid it. When donors asked why gift card payments were being rejected, ActBlue instructed its staff to blame the donor's bank—not to disclose its own policy changes.

29.    By (a) accepting gift cards and domestic prepaid debit cards; (b) not consistently requiring passport information from donors who provide an address outside of the United States; (c) automatically rejecting or performing a manual review of contributions from donors who provide a foreign address in a select set of 28 countries; and (d) scrutinizing contributions with a foreign addresses outside of these countries, ActBlue sold consumers, importantly campaigns, a product or service it never intended to deliver, that exposed them to violations of State and Federal Election laws.

30.    ActBlue's conduct violates Tex. Bus. & Com. Code § 17.46(b)(9).

---

[105]    *See, e.g.*, *Innovative Office Sys. v. Johnson*, 906 S.W.2d 940, 947 (Tex. App.—Tyler 1995, writ granted w.r.m.) (seller advertised new copy system at trade show with intent not to sell components of system as demonstrated or advertised).

**Count V**

**Failing to disclose information concerning goods or services which was known
at the time of the transaction if such failure to disclose such information was intended
to induce the consumer into a transaction into which the consumer would not
have entered had the information been disclosed.**

31.    Texas Bus. & Com. Code § 17.46(b)(24) provides that "false, misleading, or deceptive acts or practices" includes "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."

32.    ActBlue knew that gift card and prepaid debit card donations are a primary vehicle for donor fraud—enabling contributors to conceal their identities, evade contribution limits, and bypass the foreign national prohibition. ActBlue knew this, documented it internally, and said so publicly.

33.    ActBlew also knew that contributions made from overseas locations are particularly susceptible to foreign nationals making unlawful contributions to federal and state candidates. ActBlue knew this, documented it internally, and said so publicly.

34.    ActBlue also knew that donors and campaigns would be less likely to use its platform—and less likely to accept contributions processed through it—if they understood that anonymous, potentially illegal donations were flowing through it unchecked.

35.    Armed with that knowledge, ActBlue said nothing. The omission was not accidental. It was the point.

36.    Had ActBlue disclosed that it had resumed accepting gift card donations, many donors and campaigns would not have used its platform, including campaigns that would otherwise be exposed to violations of State and Federal Election laws.

37.    Had ActBlue disclosed that ActBlue did not consistently request or require passport information from donors who provided an address outside of the United States, and that, for example, donors who paid through third-party apps like Apple Pay, PayPal, or Venmo were not asked for passport information, many donors and campaigns would not have used its platform, including campaigns that would otherwise be exposed to violations of State and Federal Election laws.

38.    Had ActBlue disclosed that it did not consistently automatically reject or manually review contributions from donors who provided a foreign address in a select set of 28 countries, while contributions with foreign addresses outside of these countries received no additional scrutiny, many donors and campaigns would not have used its platform, including campaigns that would otherwise be exposed to violations of State and Federal Election laws.

39.    And ActBlue not hid that its system was not as robust as necessary, many donors and campaigns would not have used its platform, including campaigns that would otherwise be exposed to violations of State and Federal Election laws.

40.    ActBlue's silence was designed to prevent exactly that outcome — and to keep the money flowing.

41.    ActBlue's conduct violates Tex. Bus. & Com. Code § 17.46(b)(24).

## VIII.  DTPA TEMPORARY
## AND PERMANENT INJUNCTIONS

42.    The State incorporates the foregoing allegations as set forth fully herein.

35

43.     Generally, an applicant for a temporary injunction must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.[106]

44.     But when the State seeks injunctive relief under a statute, those common law requirements give way. The Texas Supreme Court has held that "when it is determined that [a] statute is being violated, it is within the province of the district court to restrain it"—and that "[t]he doctrine of balancing the equities has no application to this statutorily authorized injunctive relief."[107] A statute's express authorization for injunctive relief supersedes the common law elements of imminent harm, irreparable injury, and lack of adequate remedy at law.[108]

45.     In any event, the State's inability to enforce its own duly enacted laws "clearly inflicts irreparable harm on the State."[109]

46.     A temporary injunction requires notice.[110] Whether to grant either a TI rests within the trial court's sound discretion.[111]

---

[106]   *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Polston v. State*, No. 03-20-00130-CV, 2022 WL 91974, at *3 (Tex. App.—Austin Jan. 6, 2022, no pet.); *Trove v. Scott*, No. 03-99-00118-CV, 1999 WL 546997, at *1 (Tex. App.—Austin July 29, 1999, no pet.) (not designated for publication); Tex. R. Civ. P. 680.

[107]   *State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 805 (Tex. 1979).

[108]   *West v. State*, 212 S.W.3d 513, 519 (Tex. App.—Austin 2006, no pet.); *see White Lion Holdings, L.L.C. v. State*, No. 01-14-00104-CV, 2015 WL 5626564, at *9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2015, pet. denied) (mem. op.).

[109]   *Texas Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet. denied) (quoting *Abbott v. Perez*, 585 U.S. 579, 602 (2018)); *see Washington v. Associated Builders & Contractors of S. Tex. Inc.*, 621 S.W.3d 305, 319 (Tex. App.—San Antonio 2021, no pet.) ("Like the trial court, our sister court, and the Supreme Court, we agree that the 'inability [of a state] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State.'" (quoting *Abbott*, 585 U.S. at 602 n.17, and *Texas Ass'n of Bus.*, 565 S.W.3d at 441)).

[110]   *See* Tex. R. Civ. P. 680–81.

[111]   *In re MetroPCS Communications, Inc.*, 391 S.W.3d 329, 336 (Tex. App.—Dallas 2013, no pet.); *Butnaru*, 84 S.W.3d at 204.

47.     The purpose of a temporary injunction is to maintain the status quo pending a full hearing on the merits—not to grant complete final relief.[112]

48.     Under the DTPA, the Attorney General is authorized to seek a temporary and permanent injunction to prevent and enjoin violations of section 17.46(a)–(b). The State need only establish: (1) that the Attorney General has reason to believe ActBlue is engaging in, has engaged in, or is about to engage in any act or practice declared unlawful by the DTPA; and (2) that the proceedings would be in the public interest.[113] The list of deceptive acts under section 17.46(b) is non-exhaustive.[114]

49.     The fact that ActBlue has ceased—or claims to have ceased—its unlawful conduct does not defeat the State's entitlement to injunctive relief.[115] The DTPA creates a conclusive presumption that potentially violative conduct coupled with a public need presents a sufficient risk of harm to warrant relief.

50.     Both elements are satisfied here. The Attorney General has reason to believe that ActBlue is engaging in, has engaged in, and is about to continue engaging in acts and practices declared unlawful by the DTPA. The evidence is not subtle: ActBlue promised regulators it had stopped accepting all gift card donations, then quietly resumed accepting them the moment oversight faded. Texas investigators confirmed that on February 19 and 25, 2026, ActBlue processed donations made with gift cards—the exact payment method ActBlue swore to Congress it had banned. And as ActBlue has acknowledged, pre-paid debit cards also are not linked to the

---

[112]  *In re Triantaphyllis*, 68 S.W.3d 861, 869 n.7 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (citation omitted); *Intercont'l Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 891 (Tex. App.—Houston [1st Dist.] 2011, no pet.).
[113]  *West*, 212 S.W.3d at 518–19; *see also* Tex. Bus. & Com. Code § 17.47(a).
[114]  Tex. Bus. & Com. Code § 17.46(a).
[115]  *West*, 212 S.W.3d at 518-19.

identity of the purchaser, so they too can be utilized to make prohibited straw donor contributions. The public interest in stopping this conduct is self-evident. Fair elections depend on it.

51.    This Court should immediately enter a temporary injunction and ultimately a permanent injunction—barring ActBlue, its officers, agents, employees, and all persons acting in concert with it from accepting contributions made with gift cards or prepaid debit cards. ActBlue has already proven it cannot be trusted to police itself. Only this Court can stop it.

52.    ActBlue cannot hide behind the status quo. The continuation of illegal conduct—including violations of the DTPA—"cannot be justified as preservation of the status quo."[116] That is precisely what this Petition seeks to prevent: not the disruption of legitimate business, but the continuation of fraud that ActBlue has been caught committing twice.

---

[116]    *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004); *State ex rel. Office of Attorney Gen. of Tex. v. City of San Marcos*, 714 S.W.3d 224, 245 (Tex. App. [15th Dist.] 2025); *see also Pierce v. State*, 184 S.W.3d 303, 308 (Tex. App.—Dallas 2005, no pet.) (holding that an injunction stopping ongoing illegal conduct does not disturb the status quo—it restores it).

## PRAYER FOR RELIEF

The State incorporates by reference the preceding paragraphs as if fully set forth herein. As explained above, ActBlue has engaged in unlawful conduct and deceptive trade practices in violation of state law.

NOW THEREFORE, the State respectfully prays that the Court enter judgment in its favor and order the following:

a.  Temporary and Permanent injunctive relief prohibiting Defendant ActBlue from permitting contributions on the ActBlue platform through the use of gift cards and prepaid debit cards;

b.  Civil penalties in favor of the State in an amount of not more than $10,000 per DTPA violation;

c.  Attorneys' fees and all costs and expenses; and

d.  Any and all further relief to which the State may be entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

JOHNATHAN STONE
Chief, Consumer Protection Division

*/s/ David Bizar*
DAVID BIZAR
Assistant Attorney General
State Bar No. 24110737

39

Office of the Attorney General
Consumer Protection Division
P. O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 463-2185
Facsimile: (512) 473-8301

David.Bizar@oag.texas.gov
Johnathan.Stone@oag.texas.gov

**ATTORNEYS FOR THE STATE OF TEXAS**

## DECLARATION OF ROCK ROBINSON

Pursuant to Tex. Civ. Rem. & Prac. Code § 132.001(f), I, Rock Robinson submit this unsworn declaration in lieu of a written sworn declaration, verification, certification, oath, or affidavit.

1.    My name is Rock Robinson. I am over 18 years of age, of sound mind, and capable of making this declaration.

2.    The facts stated within this declaration are within my personal knowledge and are true and correct.

3.    I work as an investigator in the Office of the Texas Attorney General. In my capacity as an investigator, I have read the foregoing document titled "State of Texas's Amended Petition and Request for Temporary and Permanent Injunctions," and the factual allegations stated therein are true and correct.

4.    My name is Rock Robinson, and I am an employee of the following governmental agency: Texas Office of the Attorney General. I am executing this declaration as part of my assigned duties and responsibilities. I declare under penalty of perjury that the factual statements in the foregoing are true and correct.

Executed in Travis County, State of Texas, on the 20th day of May 2026.


*/s/ Rock Robinson*
Rock Robinson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of May 2026, a copy of the foregoing document was served to all counsel of record in accordance with the Texas Rules of Civil Procedure.

*/s/ David Bizar*
DAVID BIZAR
Assistant Attorney General

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Zeilic Contreras on behalf of David Bizar
Bar No. 24110737
zeilic.contreras@oag.texas.gov
Envelope ID: 115173680
Filing Code Description: Amended Filing
Filing Description: States Amended Petition and Request for Temporary and Permanent Injunctions
Status as of 5/21/2026 8:46 AM CST

Associated Case Party: THEACTBLUE LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michael P.Lynn | | mlynn@lynnllp.com | 5/20/2026 7:18:31 PM | SENT |
| Yaman Desai | | ydesai@lynnllp.com | 5/20/2026 7:18:31 PM | SENT |
| Lisa Mewbourn | | lmewbourn@lynnllp.com | 5/20/2026 7:18:31 PM | SENT |
| Ronni AdeleBracken | | rbracken@lynnllp.com | 5/20/2026 7:18:31 PM | SENT |
| Kerri Jones | | kjones@lynnllp.com | 5/20/2026 7:18:31 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 5/20/2026 7:18:31 PM | SENT |
| Zeilic Contreras | | Zeilic.Contreras@oag.texas.gov | 5/20/2026 7:18:31 PM | SENT |
| Johnathan Stone | | johnathan.stone@oag.texas.gov | 5/20/2026 7:18:31 PM | SENT |
| David Bizar | | david.bizar@oag.texas.gov | 5/20/2026 7:18:31 PM | SENT |