**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ActBlue LLC; ActBlue Civics, Inc., ATS, Inc., and ActBlue Charities, Inc., <br><br>     *Plaintiffs,* <br><br> v. <br><br> Warren Kenneth Paxton, Jr., in his official capacity as Attorney General of the State of Texas, <br><br>     *Defendant.* | Civil Action No. 1:26-cv-11986-RGS |

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendant Ken Paxton, in his official capacity as the Attorney General of the State of Texas (Texas Attorney General), files this response in opposition to the emergency relief sought by Plaintiffs ActBlue LLC; ActBlue Civics, Inc., ATS, Inc. (ActBlue Technical Services), and ActBlue Charities, Inc. Plaintiffs fail to meet their burden to show entitlement to the extraordinary relief sought and the motion should, in all things, be denied.

TABLE OF CONTENTS

Table of Authorities.................................................................................................... iii

Introduction................................................................................................................ 1

Background ................................................................................................................ 1

Legal Standard .......................................................................................................... 5

Argument .................................................................................................................. 5

    I.   Younger abstention bars Plaintiffs' federal suit. .................................................. 5

    II.  This Court lacks personal jurisdiction over Defendant. ....................................... 7

    III. *First Choice* and other caselaw concerning First Amendment associational
        protections do not decide this case. ..................................................................... 8

    IV. Plaintiffs fail to show that the four preliminary injunction factors are satisfied. .............. 10

        A.  Plaintiffs have failed to show a likelihood of success on the merits of their
            claims. .................................................................................................................10

          1.   Plaintiffs were engaged in unprotected activity—failing to secure their online
              platform and lying to Congress and the public about it. ......................................... 11

          2.   Plaintiffs cannot show that they would not have been sued but-for
              Defendant's supposed "retaliatory animus." ........................................................ 12

          3.   The but-for cause of Texas's investigation and subsequent lawsuit was
              ActBlue's suspected practice of knowingly facilitating unsecure,
              anonymous, or foreign donations............................................................................ 15

        B.  Plaintiffs have failed to show likely irreparable harm in the absence of an
            injunction. .............................................................................................................17

        C.  The remaining factors weigh against a preliminary injunction. .................................18

    V.  Plaintiffs' requested injunction is too broad. ...................................................... 19

Conclusion ............................................................................................................... 20

Certificate of Service ............................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**

*A Corp. v. All Am. Plumbing, Inc.*,
812 F.3d 54 (1st Cir. 2016)........................................................................................ 7

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011)............................................................................................. 11, 12

*Asseo v. Pan Am. Grain Co.*,
805 F.2d 23 (1st Cir. 1986)........................................................................................ 5

*Buckley v. Valeo*,
424 U.S. 1 (1976).................................................................................................... 11

*Califano v. Yamasaki*,
442 U.S. 682 (1979)................................................................................................ 19

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980)................................................................................................ 11

*Centro Medico del Turabo, Inc. v. Feliciano de Melecio*,
406 F.3d 1 (1st Cir. 2005)........................................................................................ 11

*Chen v. United States Sports Acad., Inc.*,
956 F.3d 45 (1st Cir. 2020)........................................................................................ 8

*Citizens United v. FEC*,
558 U.S. 310 (2010)................................................................................................ 12

*D.B. ex rel. Elizabeth B. v. Esposito*,
675 F.3d 26 (1st Cir. 2012)................................................................................. 10, 11

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*,
445 F.3d 13 (1st Cir. 2006)........................................................................................ 5

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
489 U.S. 214 (1989)................................................................................................ 11

*F.T.C. v. Standard Oil Co.*,
449 U.S. 232 (1980)................................................................................................ 19

*Fanning v. Fed. Trade Comm'n*,
821 F.3d 164 (1st Cir. 2016)........................................................................... 11, 12, 14

*FEC v. Colorado Republican Fed. Campaign Comm.*,
533 U.S. 431 (2001)................................................................................................ 11

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026)....................................................................................... 8, 9, 20

*Gattineri v. Town of Lynnfield*,
58 F.4th 512 (1st Cir. 2023).................................................................................. 12, 14

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)............................................................................................ 11

*Gonzalez-Droz v. Gonzalez-Colon*,
    660 F.3d 1 (1st Cir. 2011)................................................................................. 10

*Gorelik v. Costin*,
    605 F.3d 118 (1st Cir. 2010).............................................................................. 11

*Guilloty Perez v. Pierluisi*,
    339 F.3d 43 (1st Cir. 2003)..................................................................... 10, 16, 17

*Harlow v. Children's Hosp.*,
    432 F.3d 50 (1st Cir. 2005)................................................................................. 7

*Hartman v. Moore*,
    547 U.S. 250 (2006)......................................................................................... 16

*In re Justs. of Superior Ct. Dep't of Mass. Trial Ct.*,
    218 F.3d 11 (1st Cir. 2000).............................................................................. 6, 8

*Jean v. Mass. State Police*,
    492 F.3d 24 (1st Cir. 2007)............................................................................. 5, 18

*Kugler v. Helfant*,
    421 U.S. 117 (1975)........................................................................................... 6

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983)........................................................................................... 19

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)........................................................................................... 5

*McCue v. Bradstreet*,
    807 F.3d 334 (1st Cir. 2015)............................................................................. 16

*Media Matters for Am. v. Paxton,*
    732 F. Supp. 3d 1 (D.D.C. 2024)....................................................................... 14

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982)........................................................................................... 6

*Motus, LLC v. CarData Consultants, Inc.*,
    23 F.4th 115 (1st Cir. 2022)................................................................................ 7

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977)................................................................................ 10, 16, 20

*N.Y. Times v. Sullivan*,
    376 U.S. 254 (1971)......................................................................................... 14

*Nieves v. Bartlett*,
    587 U.S. 391 (2019)............................................................................................. 12

*Nken v. Holder*,
    556 U.S. 418 (2009)......................................................................................... 5, 18

*Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*,
    477 U.S. 619 (1986)........................................................................................... 6, 8

*Powell v. Alexander*,
    391 F.3d 1 (1st Cir. 2004)..................................................................................... 11

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
    415 U.S. 1 (1974)................................................................................................ 18

*Renegotiation Bd.*, 415 U.S............................................................................................ 19

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
    397 F.3d 56 (1st Cir. 2005)................................................................................. 6, 8

*Rizzo v. Goode*,
    423 U.S. 362 (1976)............................................................................................. 19

*Sawtelle v. Farrell*,
    70 F.3d 1381 (1st Cir. 1995).................................................................................. 7

*Sirva Relocation, LLC v. Richie*,
    794 F.3d 185 (1st Cir. 2015)................................................................................... 6

*Sprint Comm., Inc. v. Jacobs*,
    571 U.S. 69 (2013)................................................................................................. 6

*Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union*,
    22 F.3d 8 (1st Cir. 1993)....................................................................................... 18

*Together Emps. v. Mass Gen. Brigham Inc.*,
    32 F.4th 82 (1st Cir. 2022)...................................................................................... 5

*United Books, Inc. v. Conte*,
    739 F.2d 30 (1st Cir. 1984)..................................................................................... 6

*United States v. Armstrong*,
    517 U.S. 456 (1996)........................................................................................ 15, 17

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981)............................................................................................. 20

*Walden v. Fiore*,
    571 U.S. 277 (2014)............................................................................................... 7

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
    481 F.3d 1 (1st Cir. 2007)..................................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................................................... 5, 6, 17

*Yelp v. Paxton*,
    137 F.4th 944 (9th Cir. 2025) ............................................................................................ 13

*Younger v. Harris*,
    401 U.S. 37 (1971) ............................................................................................................. 18

**Statutes**

Tex. Bus. & Com. Code §§ 17.41–17.63 .................................................................................. 1

Texas Bus. & Com. Code § 17.46(a) ....................................................................................... 12

**INTRODUCTION**

This motion asks the Court to do something the law does not permit: to decide, in a Massachusetts federal court, the merits of defenses that belong to a Texas state-court proceeding. ActBlue is already defending the Texas enforcement action and could raise its First Amendment arguments there. It could also remove the Texas case to a Texas federal court. Instead, ActBlue seeks to have this Court violate foundational federalism principles by requesting that it interfere with the proceedings of a separate sovereign, brought under that sovereign's law, for actions committed in that sovereign's borders, and by entities registered to do business there too. *Younger* abstention exists to prevent exactly that and requires this Court to deny Plaintiffs' motion.

Even if this Court proceeds to the merits, ActBlue cannot carry its burden on any of the four preliminary-injunction factors. It has no likelihood of success on its First Amendment retaliation claim, has not shown irreparable harm, and neither the equities nor the public interest favors halting a State's enforcement of its own laws. Furthermore, the injunction ActBlue seeks reaches far beyond any alleged injury. The motion should be denied.

**BACKGROUND**

The State of Texas brought suit against ActBlue LLC in Texas state court alleging that it violated the Texas Deceptive Trade Practices—Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41–17.63 (DTPA), by knowingly misrepresenting its anti-fraud practices to the public while quietly continuing to engage in conduct contrary to its public representations. ECF 12-18 at ¶¶ 33–37, 57–81. ActBlue LLC is a political action committee and fundraising platform that processes donations to Democratic campaigns. *Id.* at ¶ 12. ActBlue LLC is a Massachusetts corporation that conducts business in Texas as a registered foreign corporation. *Id.* at ¶ 2–7.

The Texas suit arose out of a multi-year investigation into ActBlue by Congress and the Texas Attorney General. Back in 2013, ActBlue told the Federal Election Commission that "[p]repaid debit cards and gift cards do pose a unique threat of evasion of the contribution limits by a particular motivated actor. Since they are not linked to the identity of the purchasers, these cards could be utilized to make prohibited straw donor contributions." *Id.* at ¶ 20. In April of 2023,

1

then-Senator Rubio wrote the Federal Election Commission (FEC) requesting an investigation into ActBlue following reports that fraudulent donations were being reported to the FEC, even though numerous individuals, including senior citizens, were unaware that their names and addresses were being used. *Id.* In October of 2023, the House Administration Committee Chairman Steil sent ActBlue a formal demand letter raising concerns that prepaid cards were being used to "wash" unlawful donations through the platform. *Id.* In response, ActBlue claimed that it employed a robust security program to verify the identity of donors and prevent impermissible contributions and enumerated some of its security practices. *Id.* at ¶¶ 23–25.

In December of 2023, the Texas Attorney General opened his own investigation into whether ActBlue's platform was enabling donor fraud in violation of Texas law. *Id.* at ¶ 10. On January 10, 2024, the Texas Attorney General sent a Request to Examine (RTE) to each Plaintiff's registered agent in Austin, Texas, as well as to each Plaintiff in Massachusetts, via certified mail. *See* ECF 14-1–14-6. These RTEs informed Plaintiffs they were under investigation by the Texas Attorney General pursuant to statutes including Texas Business and Organizations Code §§ 12.151–.156, and sought documents from Plaintiffs, including documents sufficient to show Plaintiffs' policies for verifying the identity of persons who make political contributions through ActBlue's websites to ensure compliance with campaign-finance laws. *See id.*

On July 3, 2024, the Attorney General sent civil investigation demands (CIDs) to ActBlue LLC and ActBlue Technical Services, via email to their Texas-based counsel, seeking documents related to their discussions and policy changes regarding use of CVVs for political contributions. ECF 14-7. On August 8, 2024, the Attorney General sent another set of CIDs to ActBlue LLC and ActBlue Technical Services, via email to their Texas-based counsel, seeking documents reflecting the A/B testing results for ActBlue's usage of CVVs. ECF 14-8. ActBlue began using CVVs in 2024. ECF 1 at ¶ 36.

On October 28, 2024, Chairman Steil subpoenaed ActBlue for documents related to donor verification, noting that ActBlue's "failure to verify donor identities may have allowed foreign actors to fraudulently participate in the political process." ECF 12-18 at ¶ 29. Just over a month

later, Chairman Steil announced that ActBlue had represented to Congress that it had updated its policies to "automatically reject donations that use foreign prepaid/gift cards, domestic gift cards, are from highrisk/sanctioned countries, and have the highest level of risk as determined by [ActBlue's] solution provider, Sift." *Id.* at ¶ 30. An April 2, 2025 joint congressional report confirmed that ActBlue stopped accepting foreign prepaid debit cards in August 2024 and stopped accepting all gift card donations in September 2024 in direct response to congressional oversight. *Id.*

However, things did not end there. According to an explosive New York Times exposé, in early 2025, ActBlue's own legal counsel, Covington & Burling, wrote two memoranda to ActBlue concluding that ActBlue's responses to Chairman Steil were not entirely accurate. ECF 12-17; ECF 12-18 at ¶ 33. Covington concluded that ActBlue failed to consistently follow its own procedures, that there was "substantial risk that some of the funds received were impermissible contributions from foreign nations," and that ActBlue's conduct may result in criminal investigation. ECF 12-17; ECF 12-18 at ¶¶ 33–37. Top officials at ActBlue then resigned in quick succession. ECF 12-18 at ¶ 35. Despite being aware of these problems, on May 2, 2025, ActBlue publicly dismissed concerns about its platform as "bogus claims" and "partisan attacks trying to stifle Democratic and progressive fundraising." *Id.* at ¶ 44. ActBlue also retained new legal counsel, Dechert, which wrote to Congress on June 9, 2025, alleging that Congress's investigation was "not an exercise of legitimate legislative oversight" but rather "a partisan effort to exploit legislative processes." *Id.* at ¶ 36. The New York Times exposé was published on April 2, 2026, remains publicly available today, and was attached as exhibit to Plaintiffs' motion for preliminary injunction, ECF 12-18.

The Texas Attorney General's investigation was also ongoing. After ActBlue told Congress that it had stopped accepting gift cards and foreign prepaid cards, ActBlue later quietly resumed accepting gift cards without disclosure. ECF 12-18 at ¶¶ 39–44. On Feb. 19, 2026, an investigator with the Texas Attorney General donated five dollars to the Democratic National Committee through ActBlue using a physical Mastercard gift card purchased at a retail outlet with cash, under

a pseudonym. *Id.* at ¶ 39; ECF 38-1. Subsequently, on February 25, 2026, a second investigator donated ten dollars to Jon Rosenthal, a candidate for Texas Railroad Commissioner, through ActBlue using a Visa e-gift card purchased online and the investigator's correct identity information. ECF 12-18 at ¶ 40; ECF 37-1. Also on February 25, the same investigator donated ten dollars to Sarah Eckhardt, a candidate for Texas Comptroller of Public Accounts, through ActBlue using the same Visa e-gift card and the same correct identity information. ECF 12-18 at ¶ 41; ECF 37-2. All three February donations were made in Texas and accepted by ActBlue. *See* ECF 12-18 ¶¶ 39-41; ECF 38-1; ECF 37-1; ECF 37-2. Although Plaintiffs' complaint notes that three American Express gift-card donations from the Texas Attorney General's investigation were denied, ECF 1 at ¶ 81, Plaintiffs do not dispute the success of the gift-card donations described above, even though the same investigator made both the Visa and American Express donations.

The Texas Attorney General relied on the New York Times story, the Congressional investigation, and his own investigation to support the state case filed on April 20, 2026. ECF 12-18. On May 1, 2026, eleven days later, Plaintiffs filed this case, seeking declaratory and injunctive relief. ECF 1. On May 6, 2026, Plaintiffs filed an expedited motion for preliminary injunction and a motion to expedite briefing for a preliminary injunction. ECF 10; ECF 11; ECF 17.

ActBlue then filed a Special Appearance in the Texas case, arguing that the Texas State Court lacked personal jurisdiction over ActBlue. ECF 36-1. ActBlue also filed an Answer, subject to its Special Appearance. ECF 36-2. Texas then filed an Amended Petition and Motion for Temporary Injunction, adding additional facts from a congressional report published after the Original Petition was filed. ECF 36-3 at ¶¶ 38–49. On May 22, 2026, ActBlue filed a notice for argument on its Special Appearance to take place on June 25, 2026. ECF 36-4. On May 26, 2026, the parties to the state case entered a Rule 11 Discovery Agreement regarding the timing and scope of expedited discovery prior to the Special Appearance hearing. ECF 36-5. The parties exchanged discovery requests later that day. ECF 36-6; ECF 36-7.

4

**LEGAL STANDARD**

A preliminary injunction is "an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "an extraordinary and drastic remedy" that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotations and citations omitted). When considering a motion for a preliminary injunction, a district court "weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Jean v. Mass. State Police*, 492 F.3d 24, 26–27 (1st Cir. 2007).

"The first two factors are the most important." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Failure to show either likelihood of success or irreparable harm is independently fatal. *Id.* (denying the injunction because plaintiffs failed to show irreparable harm without considering the other factors); *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) ("if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity" (internal quotations and citations omitted)). The last two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co.*, 445 F.3d at 18. That burden is one of proof, not pleading. In evaluating whether Plaintiffs have met their burden of proof, this Court is not limited to the parties' briefing and may consider affidavits, declarations, exhibits, and other evidence. *See Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986).

**ARGUMENT**

**I.    Younger abstention bars Plaintiffs' federal suit.**

Plaintiffs are already defending the very claims they ask this Court to enjoin. Having been sued in Texas state court, ActBlue could have moved to dismiss there, raised its First Amendment

defenses there, or removed to a Texas federal court. Instead, it filed this separate Massachusetts action and now asks this Court to enjoin the Texas proceeding. The *Younger* abstention doctrine exists to prevent exactly this maneuver, and Attorney General's Motion to Dismiss develops this argument in full, which the Attorney General incorporates by reference. *See* ECF 35 § I.

"*Younger* abstention is *mandatory* if its conditions are met." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 68 (1st Cir. 2005) (emphasis added). The First Circuit applies a three-step inquiry. *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 192–93 (1st Cir. 2015). *First*, the state proceeding must fall within the "*Younger* taxonomy." *Id.* at 193. It does. The Texas suit is a civil enforcement proceeding "akin to a criminal prosecution": it was initiated to sanction Plaintiffs for violations of the DTPA, the State is the moving party, and it followed a multi-year investigation culminating in a formal complaint. *See Sprint Comm., Inc. v. Jacobs*, 571 U.S. 69, 79–80 (2013); *Sirva*, 794 F.3d at 192–93. *Second*, the *Middlesex* factors must support abstention, and all three do: the Texas proceeding is ongoing and judicial, it implicates Texas's important interest in the enforcement of its consumer protection laws, and it gives Plaintiffs an adequate forum for their federal defenses. *See Sirva*, 794 F.3d at 192–93 (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)). *Third*, Plaintiffs cannot show that the "very narrowly construed" bad-faith exception applies. *United Books, Inc. v. Conte*, 739 F.2d 30, 34 (1st Cir. 1984). The Attorney General's case rests on years of investigation, the conclusions of ActBlue's own counsel, and donations investigators successfully made using gift cards ActBlue claimed to have banned, far more than the "reasonable expectation of obtaining a valid conviction" the doctrine requires. *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975).

Because abstention is mandatory, the Court need not reach the preliminary injunction factors. *Younger* abstention is required "even where defendants claim violations of important federal rights," including the First Amendment. *In re Justs. of Superior Ct. Dep't of Mass. Trial Ct.*, 218 F.3d 11, 17 (1st Cir. 2000) (collecting cases); *see Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 628 (1986). A preliminary injunction is "an extraordinary remedy never awarded as of right," *Winter*, 555 U.S. at 24, and it cannot do what *Younger* forbids.

6

## II.    This Court lacks personal jurisdiction over Defendant.

Plaintiffs ask this Court to enjoin a Texas constitutional officer from enforcing Texas law in Texas courts against Texas-registered entities for violations of Texas law that occurred in Texas. A preliminary injunction cannot issue against a defendant over whom the Court lacks personal jurisdiction. As the Attorney General's Motion to Dismiss further details, *see* ECF 35 § II, this Court lacks specific personal jurisdiction over the Texas Attorney General, and the Attorney General incorporates that argument by reference here.

Plaintiffs do not assert general jurisdiction. *See* ECF 1 at ¶¶ 17–23. Specific jurisdiction in the First Circuit requires "relatedness, purposeful availment, and reasonableness," *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 59 (1st Cir. 2016), and "the plaintiff's failure as to any one of them defenestrates its claim of specific jurisdiction," *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 122 (1st Cir. 2022). Plaintiffs fail to show each requirement. Their claims do not "arise out of, or relate[] to, the defendant's forum state activities." *A Corp.*, 812 F.3d at 59. Every act Plaintiffs complain of occurred in Texas. The Attorney General opened his investigation in Texas; served RTEs on Plaintiffs' registered agents in Texas; sent CIDs to Plaintiffs' Texas-based counsel; and filed the enforcement action in Texas state court under the DTPA. That copies of the RTEs were also mailed to Plaintiffs in Massachusetts does not change this analysis, as that receipt was only incidental to a Texas investigation, and "in-forum effects of non-forum activity, standing alone, [are] insufficient to support personal jurisdiction." *Id.* at 59–60 (discussing *Sawtelle v. Farrell*, 70 F.3d 1381, 1390–91 (1st Cir. 1995)).

Personal jurisdiction turns on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," *Walden v. Fiore*, 571 U.S. 277, 285 (2014). The Attorney General has no relevant Massachusetts contacts. Plaintiffs' decision to process donations and store documents in Massachusetts, where the "effect" of Defendant's actions may be felt, is a "unilateral activity" that cannot show Defendant is "invoking the benefits and protections" of Massachusetts' laws. *See Harlow v. Children's Hosp.*, 432 F.3d 50, 58 (1st Cir. 2005); *id.* at 63 (1st Cir. 2005) ("Jurisdiction cannot be created by and does not travel with the

7

[plaintiff] wherever she goes."). Plaintiffs must show that both the federal Due Process Clause and the Massachusetts long-arm statute are satisfied, *Chen v. United States Sports Acad., Inc.*, 956 F.3d 45, 54 (1st Cir. 2020). Neither are. Because Plaintiffs have not carried their burden to show personal jurisdiction is satisfied, this Court cannot grant the relief they seek.

III.    ***First Choice* and other caselaw concerning First Amendment associational protections do not decide this case.**

Recall, "*Younger* abstention is mandatory if its conditions are met." *Rio Grande Cmty. Health Ctr., Inc.*, 397 F.3d at 68. This Court can only consider the merits of Plaintiffs' First Amendment claims if the Court first finds that Plaintiffs met their burden to show that abstention is not required. *Younger* abstention is required even when the case implicates important federal rights, including First Amendment rights. *In re Justs. of Superior Ct. Dep't of Mass. Trial Ct.*, 218 F.3d at 17; *Ohio C.R. Comm'n*, 477 U.S. at 628. Whether the First Amendment associational protections discussed in *First Choice* apply to the present case is a merits question that should be addressed in the state case.

In *First Choice Women's Resource Centers, Inc. v. Davenport*, the Supreme Court held a state subpoena seeking donor identities provided Article III standing. 146 S. Ct. 1114, 1121 (2026). There, the New Jersey Attorney General subpoenaed First Choice, seeking "the names, phone numbers, addresses, and places of employment of all individuals who had made 'donations . . . to First Choice by any means other than though' one specific webpage." *Id.* at 1120. After receiving the subpoena, "First Choice filed suit in federal district court seeking to prevent the Attorney General from enforcing his document demands." *Id.* at 1120. The New Jersey Attorney General "responded with his own suit in state court [where] he accused First Choice of violating state law by failing to comply with his subpoena." *Id.* In its analysis, the Supreme Court noted "[t]his case presents a narrow question" and it was "not asked to decide the merits of First Choice's federal lawsuit, only whether it may proceed." *Id.* at 1121. The Court concluded First Choice possessed standing because demands "for private donor information . . . chill protected First Amendment associational rights even when those demands contemplate disclosure only to government officials

8

and not the general public." *Id.* at 1124. But this case is nothing like *First Choice* because Texas in no way seeks donor information; indeed, Texas *expressly instructed* Plaintiffs to redact any such information from documents produced in response to Texas's discovery requests.

Texas alleges that ActBlue's actions and misrepresentations to the public violate the DTPA. ECF 12-18 at ¶¶ 57–81. The Texas case does not involve donor identities. The core issue in the Texas case is that ActBlue represented to Congress, regulators, donors, and campaigns that it had robust antifraud systems to block unlawful donations and that it had "implemented updated policies to 'automatically reject donations that use foreign prepaid/gift cards, domestic gift cards, are from high-risk/sanctioned countries, and have the highest level of risk as determined by [ActBlue's] solution provider, Sift.'" *Id.* at ¶ 20–30. But ActBlue knew these representations were false; after regulators backed off, ActBlue quietly resumed gift card donations. *Id.* at ¶¶ 38–44.

The Attorney General has significant evidence to support his claims that ActBlue violated the DTPA when he filed the original petition in state court. The Texas suit is based upon multiple years of careful investigation by the Attorney General and Congress. *See id.* at ¶¶ 20–49. Notably, after ActBlue told Congress and the public it had stopped accepting gift cards, investigators at the Attorney General's Office successfully used gift cards to donate through ActBlue, a fact that ActBlue does not rebut. *See id.* at ¶¶ 29–30, 38–44. Texas's suit also relies on the explosive exposé published by the New York Times on April 2, 2026. ECF 12-17; 12-18 at ¶¶ 33–37. The New York Times' investigation revealed that ActBlue's own legal counsel, Covington & Burling, concluded that ActBlue's representations to Congress were not entirely accurate, ActBlue failed to consistently follow its own procedures, that there was "substantial risk that some of the funds received were impermissible contributions from foreign nationals," and that ActBlue's conduct may result in criminal investigation. ECF 12-18 at ¶ 33–37.

As reflected in Texas's discovery requests to ActBlue, Texas *explicitly does not seek donor information* that would implicate First Choice and First Amendment associational rights. The discovery requests' instructions state:

These Requests do not seek to discover, identify, or otherwise ascertain the identity of any donor or contributor who has made a donation through your platform. If a document requested by these Requests contains both identifying information of a donor or contributor, and other discoverable information, you must produce the document in its entirety, ***but with the donor/contributor information securely redacted***. For purposes of these Requests, identifying information, when used in reference to a donor or contributor, broadly includes any information from which a donor or contributor is or may be identified, including but not limited to, the donor or contributor's name or alias, address, telephone number, email address, financial account number, or other unique markers from which the donor or contributor's identity could be discerned.

ECF 36-6 at 19 (Requests for Production, Instruction 4); ECF 36-6 at 4-5 (Interrogatories, Instruction 9 substantively identical); ECF 36-6 at 13 (Requests for Admission, Instruction 11 substantively identical).

Finally, if ActBlue still believes that the Attorney General seeks donor information protected by the First Amendment's right to association, ActBlue can seek a protective order "to prevent the Attorney General from enforcing his document demands," like the plaintiffs in First Choice. *See First Choice* at 1120. Any document demands that do not seek protected donor information would be unaffected. But any document demands that seek donor information protected by the First Amendment would be blocked. *See id.* at 1131.

IV.    **Plaintiffs fail to show that the four preliminary injunction factors are satisfied.**

A.    **Plaintiffs have failed to show a likelihood of success on the merits of their claims.**

Plaintiffs' retaliation claims fail because Defendant would have taken the alleged adverse actions even in the absence of Plaintiffs' protected conduct. "Under the First Amendment, retaliation claims proceed in two stages." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) and *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003)). To establish a prima facie case for First Amendment retaliation, a plaintiff must show that "(1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *Id.* (citing *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 16 (1st Cir. 2011); *Gorelik v. Costin*, 605 F.3d 118,

10

123 (1st Cir. 2010); *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 10 (1st Cir. 2005)). "The defendant may then avoid a finding of liability by showing that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" *Id.* (quoting *Powell v. Alexander*, 391 F.3d 1, 17 (1st Cir. 2004)) (internal citations omitted). Here, Plaintiffs fail on each element, and under the *Mt. Healthy* burden-shifting test, Defendant prevails.

   **1. Plaintiffs were engaged in unprotected activity—failing to secure their online platform and lying to Congress and the public about it.**

First Amendment protection ends where unlawful activity begins. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) ("It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now."). Likewise, engaging in false, misleading, or deceptive practices is not protected by the First Amendment. *See Fanning v. Fed. Trade Comm'n*, 821 F.3d 164, 174 (1st Cir. 2016) ("The First Amendment, however, does not protect misleading commercial speech.") (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980); *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 8 (1st Cir. 2007)).

Plaintiffs define the scope of constitutionally protected conduct here far too broadly. *See* ECF 11 at 10 ("ActBlue engages in expressive and associational activity by determining which candidates and causes may use its political fundraising platform."). While "the First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office," *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.,* 489 U.S. 214, 223 (1989)), the Supreme Court has "subjected strictures on campaign-related speech that [it has] found less onerous to a lower level of scrutiny and upheld those restrictions." *Id.* at 735. For example, the Supreme Court has "upheld government-imposed limits on contributions to candidates," *id.* (citing *Buckley v. Valeo*, 424 U.S. 1, 23–35 (1976)), "caps on coordinated party expenditures," *id.* (citing *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 437 (2001) (*Colorado II*)), and

11

"requirements that political funding sources disclose their identities," *id.* (citing *Citizens United v. FEC*, 558 U.S. 310, 369–72 (2010)).

Thus, contrary to Plaintiffs' beliefs, not everything Plaintiffs do is automatically protected and their supposedly protected activities are not beyond scrutiny merely because their commercial operations may be election-adjacent. The Texas Business & Commerce Code—the statute under which Plaintiffs have been sued in Texas state court—prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Texas Bus. & Com. Code § 17.46(a). As the First Circuit made clear, no one should interpret engaging in "false, misleading, or deceptive acts or practices" as protected First Amendment activity. *Fanning*, 821 F.3d at 174 ("The First Amendment, however, does not protect misleading commercial speech.")

Here, Defendant initiated his investigation and subsequent lawsuit against Plaintiffs based on years of evidence of potential DTPA violations. Discrepancies and contradictions between what ActBlue representatives told Congress and the public and ActBlue's actual business practices as shown by the findings of the Attorney General's investigation, Congress's investigation, and the New York Times' investigation all demonstrate that Defendant had—at absolute minimum—probable grounds to believe Plaintiffs were engaged in unprotected activity alongside their protected activities. These mountains of evidence of Plaintiffs' unlawful and unprotected activity are what motivated Defendant's actions against Plaintiffs.

**2. Plaintiffs cannot show that they would not have been sued but-for Defendant's supposed "retaliatory animus."**

Plaintiffs must show that Defendant had a "retaliatory animus." *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023). To succeed, Plaintiffs must show that the "'retaliatory animus' was the 'but-for' cause of [plaintiff's] injuries, 'meaning that the adverse action against [him] would not have been taken absent the retaliatory motive." *Id.* (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019)). Neither the RTEs, CIDs, nor state court suit were motivated by retaliatory animus to ActBlue's protected activity. Instead, investigations by Congress, the

Attorney General, and the New York Times all reveal the state suit would have been brought against Plaintiffs for their well-documented violations of Texas law regardless.

Plaintiffs mistakenly attempt to magnify statements made by Paxton to show retaliatory animus. But, as in *Yelp v. Paxton*, all those statements represent are the Attorney General's "enforcement priorities and policy position," which "state Attorneys general and other state officials are entitled to have." 137 F.4th 944, 955–56 (9th Cir. 2025) (declining to hold that Defendant's public statements constituted evidence of retaliatory motive in First Amendment retaliation case and affirming dismissal of case predicated on same under *Younger* abstention). "[E]nforcement action[s] consistent with that policy direction [are not] enough to establish a retaliatory motive." *Id.* at 956. Viewed in proper context, these statements demonstrate the Attorney General's commitment to the enforcement of Texas law and the fierce protection of Texans' interests. And they illustrate the lawsuit was filed due to ActBlue's potential unlawful activity and the State's need to investigate the same. Four reasons confirm as much.

*First*, "state Attorneys General . . . are entitled to have enforcement priorities and policy positions." *Yelp Inc.*, 137 F.4th at 955–956. In each of Paxton's statements cited by Plaintiffs, Paxton communicates two main pieces of information: (1) ActBlue raises large amounts of money for liberal Democrats, and (2) evidence exists that ActBlue may be violating the law.[1] Statements expressing enforcement priorities or policy preferences are not enough to establish retaliatory motive. *See id.* And when read in context, the references to ActBlue's partisan preferences merely illustrate the potential motive behind ActBlue's potential illegal activities. Regardless, they are not the but-for cause of any adverse action.

*Media Matters* is inapposite because the constitutionally protected activity prong is more clearly in question here. The court held that the plaintiff in *Media Matters for Am. v. Paxton* was

---

[1] For example, Plaintiffs allege that Defendant's press release announcing the lawsuit "frame[s] ActBlue by their protected associational activities . . . ." ECF 11 at 14 (citing ECF 12-19 at 1). But the press release also explicitly states the reason for the lawsuit: "ActBlue lied to Congress and to the American people, and I will ensure justice is served. It has blatantly ignored state law that prohibits deceptive practices, and it must pay for its illegal conduct." ECF 12-19 at 1. Thus, rather than communicating retaliatory animus, the press release communicates that (1) ActBlue raises large amounts of money for liberal Democrats, and (2) evidence exists that ActBlue may be violating the law.

engaged in constitutionally protected activity because reporting on matters of public concern is plainly protected. 732 F. Supp. 3d 1, 27 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025) (citing *N.Y. Times v. Sullivan*, 376 U.S. 254, 269 (1971)). Here, by contrast, the relevant activity—knowingly misrepresenting that antifraud measures were in place when, in reality, they were not—is plainly unlawful and therefore devoid of a constitutional shield. *Fanning*, 821 F.3d at 174 ("The First Amendment, however, does not protect misleading commercial speech.")

And as discussed, *First Choice* does not control this case. *Supra* § III. Even if it did, however, establishing a chilling effect alone does not suffice. Plaintiffs must also show that the chilling effect came from an adverse action that would not have occurred but-for Defendant's supposed retaliatory animus. *Gattineri*, 58 F.4th at 514. They cannot do so.

*Second*, Plaintiffs' temporal proximity argument falls short because of intervening and superseding causes. Plaintiffs allege that "after a year and a half of silence from Paxton," the event that triggered further investigation into ActBlue was James Talarico's announcement that his Senate campaign had raised $2.5 million in a single day. ECF 11 at 15. That conclusory allegation is wrong. Paxton's "silence" was in reliance on ActBlue's representations to Congress and the public that it had stopped accepting foreign prepaid debit cards in August 2024 and stopped accepting all gift-card donations in September 2024 in direct response to congressional oversight. ECF 12-18 at ¶ 12. The Attorney General's own evidence that three prepaid gift card donations were accepted in February 2026 raised concerns that ActBlue was not true to its congressional testimony. But it was the April 2, 2026, New York Times exposé that served as the final push to file the state court lawsuit because, at that point, no one could deny substantial evidence demonstrated that ActBlue engaged in unlawful activity.

*Third*, none of the examples Plaintiffs cite as allegedly similar conduct towards Paxton's political opponents establish causation. Issuing a second CID in an ongoing investigation premised on evidence-based suspicion of unlawful activity is not evidence of retaliatory animus. And, as is the case here, Paxton's investigation into PACs for funding Texas Democrats who broke quorum was based on evidence of unlawful activity. ECF 12-6 at 2 ("By providing these liberal lawmakers

14

with the funds to flee the state, Powered by People *may have violated bribery laws*. Powered by People and the runaway Democrats *may have also violated other Texas laws*, including, but not limited to, those governing campaign or officeholder contributions and expenditures, coercion of a public servant, and abuse of office.") (emphasis added).

*Finally*, as discussed in Defendant's Motion to Dismiss, declining to investigate ActBlue's Republican counterpart, WinRed, does not establish retaliatory animus. Plaintiffs allege that WinRed used "pre-checked recurring donation boxes and layered defaults that led many donors to unknowingly make repeated contributions" which ultimately resulted in "an avalanche of refunds." ECF 1 at ¶ 84. The attorneys general of four states opened consumer-protection investigations into both WinRed and ActBlue, focusing on their shared use of pre-checked boxes and default recurring donation mechanisms. *Id.* But these allegations do not make WinRed similarly situated to ActBlue. After all, it is possible to remedy mistaken contributions with a refund.

The same cannot be said of what's at issue here. If ActBlue either mistakenly or knowingly allows "donations that bypass identity verification, enable foreign nationals to contribute illegally, and allow donors to evade contribution limits," ECF 12-18 at ¶¶ 67–70, these harms may be impossible to remedy retroactively. *See also United States v. Armstrong*, 517 U.S. 456, 463–64 (1996) (selective-prosecution claims are "demanding," prosecutorial discretion receives a "presumption of regularity," and courts presume officials properly discharged their duties absent "clear evidence to the contrary").

3. **The but-for cause of Texas's investigation and subsequent lawsuit was ActBlue's suspected practice of knowingly facilitating unsecure, anonymous, or foreign donations.**

Texas's lawsuit against ActBlue is supported by real, substantial evidence. Thus, the but-for cause of Texas's investigation and lawsuit is not the fact that ActBlue participates in *some* protected activities, but rather that the Attorney General had ample reason to believe that ActBlue is violating Texas consumer protection law.

If the plaintiff establishes retaliatory animus as a motivating factor, the defendant may avoid liability by showing "by a preponderance of the evidence," *Lewis v. City of Boston,* 321 F.3d 207, 219 (1st Cir. 2003), that the alleged adverse actions would have been taken "even in the absence of the protected conduct." *Guilloty Perez*, 339 F.3d at 56 (quoting *Mt. Healthy*, 429 U.S. at 287); *see also McCue v. Bradstreet*, 807 F.3d 334, 338–39, 339 n.2 (1st Cir. 2015) (noting that *Mt. Healthy* "two-step framework" applied outside "the context of public employment, where it originated").

But a constitutional violation is not automatically established even when protected conduct played a "substantial part" in an alleged adverse action. *Mt. Healthy*, 429 U.S. at 285. This burden-shifting framework allows courts to "root out those cases in which retaliation may have been one factor, but was not the only justification for the [alleged adverse] action." *Guilloty Perez*, 339 F.3d at 58. Likewise, it ensures that a plaintiff is not put "in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Mt. Healthy*, 429 U.S. at 285; *cf. Hartman v. Moore*, 547 U.S. 250, 265–66 (2006) (plaintiffs must also plead and prove absence of probable cause for First Amendment retaliatory prosecution claims).

Plaintiffs failed to show retaliatory animus as the driving force behind the alleged adverse actions for all the reasons discussed above. Even if they did, Defendant would nevertheless have investigated Plaintiffs and sued regardless of any protected activity because Congressional investigations, the Attorney General's investigations, and even an investigation by the New York Times all revealed that ActBlue engaged in fraudulent behavior.

If the Attorney General had no evidence of ActBlue's potential illegal donor fraud activity, he would not have brought the state lawsuit. To the contrary, Texas's Original Petition lays out in granular detail the evidence Texas has against ActBlue. *See* ECF 12-18. When ActBlue's activity raised congressional eyebrows, ActBlue representatives told Congress and the public that its "donor verification and fraud prevention measures . . . meet legal requirements, address the concerns you raise, and will continue to evolve as needed in response to new security threats and technological opportunities." *Id.* at ¶ 25. The April 2025 joint congressional report "told the public

16

the problem was solved" when it never truly was. *Id.* at ¶¶ 30–31. Texas investigators themselves confirmed that ActBlue had mislead both Congress and the public in that report because, contrary to its statement that ActBlue had stopped accepting all gift card donations as of September 2024, Texas investigators were not prevented from making three gift card donations on the platform in February 2026. *Id.* at ¶¶ 30–31, 39–42. This behavior plainly violates the DTPA, and the Attorney General has a lawful justification for the state lawsuit. *Cf. United States v. Armstrong,* 517 U.S. at 464 (recognizing that "courts presume that [Attorneys General] have properly discharged their official duties" in their decisions to bring enforcement actions). Thus, reams of evidence unearthed in the investigations—not just a mere "preponderance"—demonstrate that the alleged adverse actions would have been taken "even in the absence of the protected conduct." *Guilloty Perez*, 339 F.3d at 56.

Thus, ActBlue's First Amendment retaliation claim cannot succeed because any supposed retaliatory animus for ActBlue's protected activities is not the but-for cause for the state court suit. Instead, the evidence unearthed by Congress, the Attorney General, and the New York Times confirms that ActBlue would have been sued for violating the DTPA regardless of any supposed animus. This Court should therefore deny the motion for preliminary injunction.

**B. Plaintiffs have failed to show likely irreparable harm in the absence of an injunction.**

Plaintiffs must also show they are "likely to suffer irreparable harm in the absence of preliminary relief, . . . a possibility of irreparable harm" is insufficient. *Winter,* 555 U.S. at 20, 22. ActBlue suffers no cognizable harm if they do not receive their requested injunction. As explained above and further detailed in Defendant's motion to dismiss, ActBlue's requested relief is impermissible and runs afoul of *Younger*. *See supra* § I; ECF 35 § I. Indeed, ActBlue will be more than capable of raising their First Amendment defenses before the state court—the only appropriate forum for this dispute, ECF 35 § I; *see supra* at § I—which will dismiss the state case and can award other equitable relief if ActBlue's First Amendment arguments are meritorious.

To the extent ActBlue seeks injunctive relief to shield it from the ordinary aspects of participating in litigation, the "time and expense of litigation" is not considered "substantial and

irreparable injury warranting an injunction." *Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union*, 22 F.3d 8, 14 (1st Cir. 1993); *see also Renegotiation Bd. v. Bannercraft Clothing Co.,* 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."); *Younger v. Harris*, 401 U.S. 37, 46 (1971) ("the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term").

## C. The remaining factors weigh against a preliminary injunction.

Next, courts must consider "(3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Jean*, 492 F.3d at 26–27. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

Issuing Plaintiffs' requested injunction will significantly burden the State of Texas. The injunctive relief requested by Plaintiffs is unprecedented and extraordinarily broad. Plaintiffs— foreign corporations registered to do business in Texas—seek to prevent Texas, a sovereign state, from exercising its right to investigate them for potential violations of Texas consumer protection law that occurred in Texas and harmed Texas citizens, and to enforce Texas law against them in Texas courts if violations are found. *See* ECF 1 at 40 (scope of permanent and preliminary injunctive relief requested includes enjoining "any other action" or "further investigating ActBlue" by "Paxton and his officers, agents, servants, and employees"). This broad injunctive relief is inappropriate. What if more evidence becomes public, showing additional unlawful activity from ActBlue? What if ActBlue starts engaging in new violations of law? Injunctive relief that prohibits the Attorney General, the chief law enforcement officer of Texas, from investigating or enforcing violations of Texas law significantly burdens the State, including by violating the federalism concerns at the heart of the *Younger* abstention doctrine, and effectively immunizes ActBlue from being held accountable even for future acts. *See supra* § III; ECF 35 § I.

On the other hand, denying the injunction will not significantly burden Plaintiffs. Defending a case is not overly burdensome, certainly no more burdensome than litigating a parallel

lawsuit here. Indeed, it does not even constitute a cognizable harm for preliminary injunction purposes. *Renegotiation Bd.*, 415 U.S. at 24 ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."). Instead, "the expense and annoyance of litigation is part of the social burden of living under government." *F.T.C. v. Standard Oil Co.*, 449 U.S. 232, 244 (1980) (internal quotes and citations omitted). Nor does the state case involve donor information or other First Amendment protected information. *See supra* § III.

## V.   Plaintiffs' requested injunction is too broad.

Even apart from *Younger*, personal jurisdiction, and the merits defects in Plaintiffs' retaliation theory, the preliminary injunction Plaintiffs seek is far too broad. Plaintiffs ask this Court to enjoin the Attorney General and his officers, agents, servants, and employees from "initiating any other action, continuing to litigate the civil enforcement action, or further investigating ActBlue," and to order dismissal of the Texas enforcement action with prejudice. ECF 1 at 40. That request is not properly tailored to Plaintiffs' alleged First Amendment injury. It would bar future investigations and future enforcement actions without regard to new evidence, new conduct, or independent lawful grounds for state action.

Federal equity does not authorize that relief. "Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction may not sweep beyond the Art. III injury shown. "[T]he nature of the violation determines the scope of the remedy," *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (internal citations and quotations omitted), and a remedy must be tied to the plaintiff's concrete injury, not to speculative future disputes. *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (future injury must be "real and immediate," not a "conjectural" or "hypothetical" possibility). Furthermore, courts must be especially careful when "the exercise of authority by state officials is attacked," and must weigh the "special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo*, 423 U.S. at 378.

Plaintiffs' request also conflicts with First Amendment retaliation doctrine. *Mt. Healthy* prevents a plaintiff from being placed "in a better position as a result of the exercise of

19

constitutionally protected conduct than he would have occupied had he done nothing." 429 U.S. at 285. Yet Plaintiffs' proposed injunction would do just that, as it would restrain future investigations and enforcement actions even when the Attorney General has independent grounds to proceed. The First Amendment does not disable Texas from enforcing generally applicable law against ActBlue for reasons unrelated to any protected activity.

Nor can Plaintiffs obtain, at the preliminary-injunction stage, an order requiring dismissal of the Texas action with prejudice. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," not to grant final judgment before trial. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). If Plaintiffs identify a particular demand or disclosure that violates associational rights, the proper remedy would be a narrow order directed to that specific demand or disclosure. *See First Choice*, 146 S. Ct. at 1120 (seeking to prevent the New Jersey Attorney General from enforcing specific document demands). It would not be a blanket prohibition on future state investigations or enforcement. And if this Court ultimately determines that relief is appropriate, the relief must be no more burdensome to the Defendant than necessary to remedy any Art. III injury.

CONCLUSION

The Attorney General respectfully requests that the Court deny the motion for a preliminary injunction. Plaintiffs are free to raise every argument in their motion in the Texas enforcement action it is already defending. What Plaintiffs may not do is use this Court to escape that proceeding. *Younger* abstention, the absence of personal jurisdiction, Plaintiffs' failure to satisfy the preliminary-injunction factors, and the extraordinarily broad scope of Plaintiffs' requested relief each independently require denial.

Date: May 27, 2026,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

Respectfully submitted.

/s/ Wade Johnson
WADE JOHNSON*
Special Counsel
Texas State Bar No. 24062197
wade.johnson@oag.texas.gov

BRIAN B. TUNG*
Assistant Attorney General
Texas State Bar No. 24145179
Brian.Tung@oag.texas.gov

LAUREN E. SAEGER*
Assistant Attorney General
Texas State Bar No. 24149365
Lauren.Saeger@oag.texas.gov

DAVID M. BIZAR
Assistant Attorney General
Texas State Bar No. 24110737
david.bizar@oag.texas.gov
*Admitted Pro Hac Vice

COUNSEL FOR DEFENDANT KEN PAXTON

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on May 27, 2026,May 27, 2026, a true and correct copy of the above and foregoing document has been served using the CM/ECF system to all counsel and parties of record.

TIMOTHY J. PERLA
BBO No. 660447
timothy.perla@wilmerhale.com

FELICIA H. ELLSWORTH
BBO No. 665232
felicia.ellsworth@wilmerhale.com

AMANDA MASSELAM STRACHAN
BBO No. 641108
amanda.masselamstrachan@wilmerhale.com

WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

RONALD C. MACHEN*
ronald.machen@wilmerhale.com

MATTHEW T. JONES*
matthew.jones@wilmerhale.com

2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*pro hac vice

COUNSEL FOR PLAINTIFFS

/s/ Wade Johnson
WADE JOHNSON

21