UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ACTBLUE LLC, ACTBLUE CIVICS, )
INC., ATS, INC., and ACTBLUE )
CHARITIES, INC., )
)
)
Plaintiffs, )
)                    Civil Action No. 1:26-cv-11986-RGS
)
v. )
)                    Jury Trial Demanded
)
WARREN KENNETH PAXTON JR., *in* )
*his official capacity as Attorney General of* )
*the State of Texas*, )
)
Defendant. )
)

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant Paxton, the Attorney General of Texas, has used his office to retaliate against ActBlue, a Massachusetts-based organization, through a series of intentional, forum-directed actions designed to burden ActBlue's operations and speech in Massachusetts and to punish it for its protected First Amendment activity. Paxton's efforts to avoid accountability in this Court for that unlawful conduct fail because (1) the critical bad-faith exception to abstention under *Younger v. Harris*, 401 U.S. 37, 43–44 (1971), and its progeny applies, and (2) Paxton's Massachusetts-directed conduct makes personal jurisdiction over him consistent with both the Commonwealth's long-arm statute and due process.

Paxton's conduct is not an isolated dispute. It is part of a broader, repeated pattern in which he deploys the powers of his office against out-of-state entities whose speech or associations he disfavors. Recently, one court refused to abstain under *Younger* and enjoined another retaliatory state court action Paxton brought, that one against a voting rights group. Similarly, other courts have enjoined investigations by Paxton where the indicia of his bad faith, retaliation, and

1

harassment were evident.  What cuts across all these cases is the absence of a legitimate enforcement purpose and the presence of a retaliatory objective: to deter constitutionally protected conduct by imposing burdensome investigations, escalating enforcement actions, and leveraging state authority against speakers with whom Paxton disagrees.

Here, the same tactic is on full display.  Paxton directed coercive investigative demands into Massachusetts.  He then escalated those efforts into a civil enforcement action—timed and framed in a manner that reveals its true purpose: to punish and deter ActBlue's role in facilitating political speech and association.

*Younger* abstention does not shield such conduct from federal court intervention.  The doctrine rests on principles of comity and respect for *legitimate* state proceedings, not on the abdication of federal judicial responsibility in the face of bad-faith prosecutions.  Where, as here, a state official invokes his enforcement authority as a tool of retaliation and harassment for the exercise of constitutional rights, federal courts must intervene.  Retaliatory enforcement actions fall squarely within the bad-faith exception because the prosecution itself *is* the constitutional violation.

What is more, Paxton's conduct is not confined to Texas.  Paxton directed investigative demands that required compliance at ActBlue's Massachusetts headquarters, and engaged in investigative activity resulting in a direct donation to ActBlue LLC, a Massachusetts entity.  Far from incidental effects, these Massachusetts contacts are the mechanism of the constitutional injury and reflect purposeful, targeted conduct toward the forum.

Because Paxton's conduct reflects both bad-faith retaliation against out-of-state entities and purposeful, forum-directed activity giving rise to ActBlue's claims, abstention is unwarranted,

personal jurisdiction is proper, and Paxton's motion to dismiss should be denied.[1]

## ARGUMENT

### I. *Younger* Abstention Does Not Prohibit This Court From Enjoining Paxton's Bad-Faith Civil Prosecution

#### A.    The *Middlesex* Factors Counsel Against Abstention

Paxton erroneously claims (Mot. at 9–10) that the *Middlesex* factors—(1) "there is an ongoing state proceeding (judicial in nature)," which (2) "implicates important state interests," and (3) "provides an adequate opportunity to raise federal defenses," *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 192 (1st Cir. 2015) (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982))—support abstention.  In reality, the second and third *Middlesex* factors counsel against abstention.  As for the second factor, Paxton has identified no state interest implicated by his claims about ActBlue's representations to Congress.[2]  Mot. at 3 (describing ActBlue's representations to Congress, and the characterization of these representations in a *New York Times* article).  Paxton's attempt to recast his efforts to police elections (over which he has no authority) as an issue of consumer protection is disingenuous.  His failure to providing any factual details about how Texas donors and campaigns were purportedly misled make his allegations "general to the point of rendering the *Middlesex County* test meaningless." *Harper v.*

---

[1] Paxton's motion to dismiss is also procedurally flawed.  *First*, Paxton did not confer with ActBlue's counsel as required by D. Mass. Local Rule 7.1(a)(2) before filing the motion.  *Second*, the motion was filed nearly two hours after the 6:00 PM deadline on May 27, 2026, and thus was not timely filed on the deadline set by the Court for Paxton's response.  D. Mass. L.R. 5.4(d); Order on Mot. to Expedite, Dkt. No. 18.  *Third*, Paxton's motion is not formatted in compliance with D. Mass. Local Rule 5.1(a)(2), which requires double-spacing, but instead is set in one-and-a-half line spaced text, which means Paxton in effect granted himself an expansion of the default page limit for motions.

[2] Indeed, Paxton argues that ActBlue could remove his Texas action to federal court, Mot. at 19, evincing that he knows that his suit, while purportedly brought under the Texas Deceptive Trade Practices Act, is in fact an effort to police representations to Congress and enforce federal election law—neither of which there is any Texas state interest in regulating.

*Pub. Serv. Comm'n of W. Va.*, 396 F.3d 348, 353–54 (4th Cir. 2005) ("The more difficult it is to specify the nature of the state proceedings with clarity, persuasiveness, and without attenuation, the less likely the proffered interest belongs in the zone of important state interests.").

As for the third factor, the state proceedings do not provide ActBlue an adequate opportunity to raise federal defenses because Texas law does not provide a mechanism for early dismissal of retaliatory claims. Texas's anti-SLAPP statute does not apply to enforcement actions brought by the state nor to actions under the Deceptive Trade Practices Act ("DTPA"). Tex. Civ. Prac. & Rem. Code §§ 27.010(a)(1), (7). Thus, ActBlue at best could raise its retaliation defense at the end of discovery, allowing Paxton to inflict the very injury (burdensome litigation that chills speech) that is the constitutional harm before there is any chance to seek relief from that harm.

### B.    Paxton's Lawsuit Is Retaliatory And In Bad Faith

Even were the *Middlesex* factors satisfied, "[a]bstention is inappropriate … when a state proceeding is brought in bad faith, that is, for the purpose of harassment." *Sirva Relocation*, 794 F.3d at 192. Retaliatory prosecutions are quintessential examples of bad faith conduct. Accordingly, abstention is inappropriate where a "proceeding has been brought to retaliate for or to deter constitutionally protected conduct." *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994); *Schlagler v. Phillips*, 166 F.3d 439, 442 (2d Cir. 1999); *Bishop v. State Bar of Tex.*, 736 F.2d 292, 294 (5th Cir. 1984); *Lewellen v. Raff*, 843 F.2d 1103, 1109–10 (8th Cir. 1988). Such is the case here. Mot. for Prelim. Inj., Dkt. No. 11 at 19–20.

This Court would not be the first to conclude that Paxton engaged in retaliation and bad faith prosecution of those with whom he disagrees. At least two other courts have already done so *in the last two years* on similar facts. *See Jolt Initiative, Inc. v. Paxton*, 2026 WL 297633 (W.D. Tex. Jan. 29, 2026); *Media Matters for America v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024), *aff'd* 138 F.4th 563 (D.C. Cir. 2025). When it comes to bad faith retaliation against those who exercise

First Amendment freedoms in ways with which Paxton disagrees, Paxton has proven a repeat offender. And this pattern of behavior is properly considered in evaluating Paxton's intent here. *See* Fed. R. Evid. 404(b)(2) (evidence of prior acts is admissible to prove intent).

In *Jolt*, the court refused to abstain from enjoining Paxton's state-court civil action against a voting rights group after analyzing "several indicia deemed relevant to the *Younger* bad-faith exception analysis," including the "complete lack of credible evidence of illegal activity," the "timeline of events at issue," and Paxton's "'multiplicity of prosecutions.'" *Jolt*, 2026 WL 297633 at *8 (citing *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1091–93 (5th Cir. 2023)). The *Jolt* court relied on the Fifth Circuit's ruling in *Netflix*, which examined the timeline of a state prosecution and enjoined it on the basis that it looked "like a 'mosaic' of bad faith." *Netflix*, 88 F.4th at 1096.

In *Media Matters*, the court similarly found that Paxton used his prosecutorial authority to make retaliatory investigative demands against a news outlet "in response to its protected media activities." 732 F. Supp. 3d at 28. Although the court did not address abstention because there was no pending state court proceeding to enjoin, the court enjoined Paxton's investigative demand, noting the inadequacy of state court proceedings in relieving plaintiffs who "are already suffering First Amendment harm in the form of chilled protected activities." *Id.* at 29. Because the chill to First Amendment rights "ha[d] occurred and is ongoing," plaintiffs could not "'avoid that alleged injury by challenging the document request' in Texas state court." *Id.* at 24 (quoting *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1179 (9th Cir. 2022)).

In both cases, federal courts enjoined Paxton's state-court actions based on the irreparable harm to First Amendment rights caused by Paxton's retaliatory harassment based on his political animus toward ActBlue. The "parallels are no coincidence; instead, they are part of the playbook the Attorney General has used to harass dozens of nonprofits." Brief of Amici Curiae Texas Civic and Non-Profit Organizations 12 ("Texas Civic Amici Br."), Dkt. No. 34. The evidence shows

5

that Paxton is acting with similar animus here.

First, there are Paxton's own words.  Even though completely irrelevant to his consumer-protection claims against ActBlue, Paxton has repeatedly emphasized that ActBlue helps Democrats.  In fact, the record suggests that Paxton's primary motivation in investigating and prosecuting ActBlue is its First Amendment-protected affiliation with Democratic Party causes and candidates.  In *Media Matters*, the court treated Paxton's initial press release and description of Media Matters as a "radical left-wing organization" as evidence of retaliatory intent.  *Media Matters*, 732 F. Supp. 3d at 28.  Here, in his official press release announcing the lawsuit against ActBlue, the first words attributed to Paxton were: "The radical left."  Perla Decl. Ex. 19, at 1, Dkt. No. 12-19.  The press release went on to note that "ActBlue funds primarily left-wing campaigns." *Id*.  If this were not enough, on Paxton's media tour announcing the lawsuit, Paxton repeatedly connected ActBlue to the Democratic Party.  Perla Decl. ¶ 21, Dkt. No. 12.  On one podcast, Paxton emphasized that donations through ActBlue go to "liberal Democrats."  Perla Decl. ¶ 21(b), Dkt. No. 12.  On another podcast, Paxton noted that "ActBlue has raised billions of dollars for liberal causes, liberal Democrats."  Perla Decl. ¶ 21(c), Dkt. No. 12.  ActBlue's political alignment has no relevance to whether it violated the DTPA.  Yet, over and over again, Paxton emphasized ActBlue's political alignment in announcing and discussing his action against ActBlue under the DTPA.  If that were not enough, Paxton's own fundraising emails for his U.S. Senate race, including one sent after ActBlue filed the instant complaint, tout his investigation of ActBlue and request "extra support from online donors to catch up" to Talarico, who "has been using the far-left's ActBlue network to raise eye-popping sums online."  Jones Decl. Ex. 5, Dkt. No. 47-7. The emails again characterize ActBlue in brazenly partisan terms—such as "the Democrats' shadowy digital fundraising network," and "based out of far-left Cambridge, Massachusetts"—and make explicit Paxton's attempt to abuse the powers of his Attorney General position solely

for political advantage in the Texas Senate race. Jones Decl. Ex. 2, Dkt. No. 47-4. This evidence alone is sufficient to establish bad faith retaliation. *See Media Matters*, 732 F. Supp. 3d at 28.

Beyond words, the timing of Paxton's investigation and litigation reveals his true intent. The same "convincing indicia of [Paxton's] bad faith" in *Jolt* and *Netflix* are present here. *Jolt*, 2026 WL 297633, at *9. Paxton first launched his investigation of ActBlue in December 2023. Perla Decl. Ex. 8, at 1, Dkt. No. 12-8. In October 2024, Paxton submitted his "findings" to the FEC. Perla Decl. Ex. 22, Dkt. No. 12-22. The investigation then laid dormant for a year and a half until Paxton's political opponent, James Talarico, announced a record-breaking single-day fundraising haul, the vast majority of which was raised through ActBlue. Gilmer Decl. ¶ 9, Dkt. No. 14; Sharton Decl. ¶ 5, Dkt. No. 15. The "inflection point"—ActBlue's "assertion of its First Amendment rights" through facilitation of Talarico's fundraising—"is difficult to overlook." *Netflix*, 88 F.4th at 1092. After Talarico's fundraising success was announced, Paxton apparently restarted his investigation: Paxton's investigators began making donations through ActBlue's website the next day. Gilmer Decl. ¶ 9, Dkt. No. 14; Sharton Decl. ¶ 5, Dkt. No. 15. Bad faith can be inferred based solely on Paxton's "burst of prosecutorial alacrity" following an "idle" period ending with ActBlue's success facilitating Talarico's fundraising. *Netflix*, 88 F.4th at 1092. This Court can "trace the abozzo of retaliation from the timeline alone." *Id.* Then, there is Paxton's escalation. In *Jolt*, Paxton "'escalat[ed] from an [Request to Examine ("RTE")] to the more severe quo warranto action' even without finding any new evidence to suggest wrongdoing." *Jolt*, 2026 WL 297633, at *9 (quoting *Netflix*, 88 F. 4th at 1093). Here, Paxton has escalated from RTEs to a civil action with a large time gap in between, while similarly pointing to no new evidence to suggest wrongdoing on the specific issues underlying his investigation and charges. Paxton's escalation on an "accelerated timeline … [is] convincing indicia of [Paxton's] bad faith." *Id.*

To justify his abrupt resumption of attention towards ActBlue, Paxton points to a *New York*

7

*Times* article about ActBlue's representations to Congress regarding its policies for screening foreign donors.  Dkt. No. 39 at 12–13; Mot. at 3–4.  ActBlue's representations to Congress, and its screening practices for foreign contributions, did not violate any law.  But more importantly, Paxton's invocation of the article is evidence of his bad faith, because the article's focus is unrelated to the focus of his investigation, and is an improper basis for any of his claims.  The claims in Paxton's petition are about the use of gift cards to make donations through ActBlue, while the article focuses on ActBlue's representations to Congress regarding prevention of foreign contributions.  It was only *after* ActBlue's motion in this Court was filed and Paxton needed to justify his actions that he amended his petition to add claims about foreign contributions.  *See* Amended Petition And Request For Temporary And Permanent Injunctions, *State of Texas v. ActBlue LLC*, No. 096-376890-26 (Tex. Dist. Ct., Tarrant Cnty.), Dkt. No. 36-3 ("Amended TX Pet.").  Paxton's shifting theories are yet another indicator of bad faith.

What is more, to support the new claims in his amended filings, Paxton relies heavily on attorney-client privileged communications over which ActBlue has neither waived nor forfeited the privilege.  ActBlue's counsel alerted Paxton (and the *New York Times*) of this and demanded that Paxton and his counsel—consistent with their legal and ethical obligations—withdraw the Petition to remove claims founded on ActBlue's privileged information.  *See* Jones Decl. Ex. 1, Dkt. No. 47-3; ActBlue's Letter to Chambers (May 26, 2026), Dkt. No. 32.  Despite this request, Paxton has not withdrawn or amended the petition.  Rather, he has doubled down.  In his latest filings with this Court, Paxton repeatedly relies on ActBlue's privileged communications.  Paxton's continued disregard for ActBlue's legal rights further demonstrates bad faith.  *Accord Netflix*, 88 F. 4th at 1093 (enjoining prosecution where prosecutor's actions gave the court "reason to question the evenhandedness of his prosecutorial tactics").

And if that were still not enough, there is also Paxton's selective enforcement.  In 2021,

the *New York Times* published an exposé revealing that WinRed—ActBlue's Republican counterpart, which Paxton himself uses for fundraising—had used "dark patterns" to cause many donors to unknowingly make recurring contributions. Perla Decl. Ex. 10, at 2, Dkt. No. 12-10. Republican campaigns were forced to issue millions of dollars in refunds, Perla Decl. Exs. 10–11, Dkt. Nos. 12-10, 12-11, but Paxton never got involved. Texans have continued to beg Paxton to investigate deceptive practices by WinRed, including against elderly and cognitively impaired Texans, but he has ignored them. Jones Decl. Ex. 6, Dkt. No. 47-8 ("In the U.S. Senate race, Paxton is the only candidate who has routinely sent fundraising requests via WinRed that default to recurring donations, meaning supporters must actively opt out of monthly charges, according to fundraising links reviewed by Hearst."). The selective prosecution of ActBlue is therefore also evidence of retaliation, *see Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024), and therefore bad faith.

While Paxton has discretion to conduct investigations and bring claims, "prosecutors can exercise their discretion in good faith or bad." *Netflix*, 88 F.4th at 1093. The "whole picture" of Paxton's investigation, including the timing, public framing, shifting explanations, and substance of his claims, "does not resemble … a good-faith prosecution." *Id*. at 1096.

## C.    Paxton Does Not Establish Facts To The Contrary

Paxton offers no evidence that his retaliatory investigation and litigation is legitimate. "Notably, he has not submitted a sworn declaration that explains his reasons for opening the investigation." *Media Matters*, 732 F. Supp. 3d at 29; *Jolt*, 2026 WL 297633, at *8 ("Given multiple opportunities to assert his *good* faith … Defendant could not offer any plausible proof in either his briefing or at the hearing." (emphasis in original)). In place of evidence, Paxton's representatives offer a handful of arguments, none of which are persuasive.

*First*, Paxton argues that his lawsuit could not be in bad faith because he did not bring the suit without hope of success. This is not the test. While a showing of bad faith "generally" requires

9

that the party bringing the suit has "no reasonable expectation" of winning, "a refusal to abstain is also justified where a prosecution or proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith." *Cullen*, 18 F.3d at 103–04.  In such situations, "the expectations for success of the party bringing the action need not be relevant."  *Id.* (citing *Lewellen*, 843 F.2d at 1109–10).

Paxton cites a cursory mention of bad faith in *Brooks v. New Hampshire Supreme Court* to argue that only enforcement proceedings "without any realistic expectation of finding a violation of a rule" trigger *Younger*'s bad faith exception.  Mot. at 11.  But *Brooks* was not a case setting the bounds of this exception: *Brooks* only engaged in "extended discussion" of the pro se litigant's "allegation that the state tribunal is incompetent by reason of bias," a claim ActBlue does not make here.  *Brooks v. New Hampshire Supreme Court*, 80 F.3d 633, 639 (1996).  The *Brooks* court suggested, in "brief comments concerning two other claims that [the pro se litigant] seems to make," that bad faith prosecution constitutes enforcement without realistic expectation of a rule violation, but this passing remark does not define the full universe of "bad-faith."  *Id*. at 640–41. Indeed, the First Circuit later said that the *Younger* exception for "bad faith, harassment, or some other extraordinary circumstance" includes "those situations in which 'core constitutional values are threatened during an ongoing state proceeding and there is a showing of irreparable harm that is both great and immediate.'"  *Esso Standard Oil Co. v. López-Freytes*, 522 F.3d 136, 143 (1st Cir. 2008) (quoting *Maymó-Meléndez v. Álvarez-Ramírez,* 364 F.3d 27, 37 (1st Cir. 2004)).  And Paxton cites no other case where the contours of this exception have been subject to rigorous adversarial testing in the First Circuit, as they have been in *Jolt* and *Netflix*.

Even otherwise, Paxton has no realistic expectation of proving a violation of Texas law here.  The central allegation underlying all the claims in his lawsuit—that ActBlue "quietly resumed gift card donations" after representing to Congress that it had stopped, Dkt. No. 39 at 9—

10

is demonstrably false. ActBlue continues to implement the precise mechanism it described to Congress for rejecting contributions with gift cards. Sharton Supp. Decl. ¶¶ 8–9, Dkt. No. 47-10. Because ActBlue does so, none of Paxton's Texas consumer fraud claims hold water, and his lawsuit should be enjoined.[3]

*Second*, Paxton says WinRed is not a valid comparator because the harms allegedly caused by ActBlue are supposedly harder to remedy. Paxton argues that mistaken contributions can be cured through refunds, but "[i]f ActBlue either mistakenly or knowingly allowed 'donations that bypass identity verification, enable foreign nationals to contribute illegally, and allow donors to evade contribution limits,' … these harms are likely impossible to remedy retroactively." Mot. at 11–12. But Paxton conveniently ignores his actual claims against ActBlue. Paxton is not enforcing federal election law. Rather, Paxton brings a consumer-protection action in which he alleges that ActBlue misled Democratic donors and campaigns into buying its services. *See* Amended TX Pet. at 27–35. Thus, the harm that Paxton purportedly seeks to remedy is not "impossible to remedy retroactively." Mot. at 11–12. Just like a mistaken donation, if any donor mistakenly used ActBlue's platform, they can be restored to the status quo ante through refunds.

*Third*, Paxton argues that ActBlue has not proven it will suffer irreparable injury because ActBlue can raise its federal claims in the state proceedings and because ActBlue "would face the same litigation burden regardless of whether the proceeding was brought in good faith." Mot. at 12. Paxton is wrong. As an initial matter, "a showing of retaliatory or bad faith prosecution establishes irreparable injury for the purposes of the *Younger* doctrine." *Cullen*, 18 F.3d at 104;

---

[3] It is also worth noting that the Texas DTPA applies only to deception in "trade" or "commerce," Tex. Bus. & Com. Code § 17.45(6), defined as to the sale of goods and services, *id.* § 17.45(1), (2), (6). ActBlue does not sell any goods or services to political campaign donors, and thus Paxton has no prospect of prevailing on his DTPA claim were it to proceed in state court. The state court case is instead a charade—the cost to ActBlue of defending against it being the penalty Paxton seeks to impose in bad faith.

*Bishop*, 736 F.2d at 294.  Once a plaintiff has established bad faith, he need not "independently establish[]" irreparable harm.  *Shaw v. Garrison*, 467 F.2d 113, 120 (5th Cir. 1972).  The stray sentence that Paxton cites, Mot. at 12, from *Maymó-Meléndez*, 364 F.3d at 37, is not to the contrary.  That case did not involve any allegations of bad faith.  To the extent it purports to require plaintiffs to show additional irreparable harm over and above proving bad faith, it is dicta.  But more substantively, the authority *Maymó-Meléndez* cites—*Huffman v. Pursue, Ltd.*—holds the opposite.  Rather than require bad faith *and* some other irreparable harm, the *Huffman* court held that "*Younger*, and its civil counterpart which we apply today, do *of course* allow intervention in those cases where the District Court properly finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith."  420 U.S. 592, 611 (1975) (emphasis added).

But even if a separate showing were required, Paxton's retaliatory investigation and litigation against ActBlue cause irreparable harm several times over.  ActBlue has been subjected to "a campaign of retaliation against [ActBlue] in response to [its] exercise of [its] First Amendment rights."  *Media Matters*, 138 F.4th at 585.  That itself is an irreparable injury.  *Id.*  Furthermore, Paxton has made such demands for private donor information in the investigation preceding his lawsuit.  *See, e.g.*, Petersen Decl. Ex. 2, at 7, Dkt. No. 13-2 (RTE requesting documents concerning three individual donors); Gilmer Decl. Ex. 8, at 7, Dkt. No. 14-8 (CID requiring production of "Transactional Records" for six donors).  Demands for "private donor information inevitably impose" ongoing burdens on "protected First Amendment rights," *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026), and therefore cause irreparable injury, *see Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020).  And finally, the lawsuit itself impinges on ActBlue's associational freedoms, both inducing it to "trim its protected advocacy," *First Choice*, 146 S. Ct. at 1127, by diverting substantial time and resources away from such advocacy during a critical election period, and discouraging donors and campaigns

from wanting to associate with ActBlue.  Gilmer Decl.  ¶¶ 15–16, Dkt. No. 14; Sharton Decl. ¶¶ 7–8, Dkt. No. 15.  ActBlue cannot remedy these harms by defending itself in the state-court litigation because the litigation "itself is the constitutional violation."  *Netflix*, 88 F.4th at 1085.

Paxton's argument (Mot. at 12) about litigation burden reflects a misunderstanding of the bad faith exception.  The presence or absence of bad faith is the paramount question.  The absence of bad faith—not the technicality or breadth of the litigation—is the key factor that distinguishes cases in which abstention was proper from those in which it was not.  *See Younger*, 401 U.S. at 43–47.  "*Younger* makes [this] clear."  *Shaw*, 467 F.2d at 120.

*Fourth*, Paxton's arguments call for this Court to improperly narrow the bad faith exception by raising the threshold for bad faith, Mot. at 10–13—but Paxton's conduct rises to bad faith even under a heightened standard.  Here, Paxton has "'a past history of personal conflict' or 'animus'" toward ActBlue "that would raise an inference of vindictive retaliation."  *Yelp Inc. v. Paxton*, 137 F.4th 944, 955 (9th Cir. 2025) (quoting *Cullen*, 18 F.3d at 104).  Paxton has *personal* conflict with his direct political opponents, funded through ActBlue.  In a recent fundraising email, Paxton made this conflict explicit:  "Far-left Democrat James Talarico has been using the far-left's ActBlue network to raise eye-popping sums online. … I need extra support from online donors to catch up, and Talarico is raising even more money as we speak."  Jones Decl. Ex. 5, Dkt. No. 47-7; *see also Lewellen*, 843 F.2d at 1110–11 (enjoining bad faith prosecution in part because it was brought to "thwart [state defendant's] campaign for state office against a political ally" of the county sheriff).  Further, his actions against ActBlue fall within the historic pattern of retaliation by Paxton towards his political opponents, which has been recognized by *Jolt* and *Media Matters*.  Moreover, the temporal indicia here, where a long-dormant investigation progressed to a lawsuit upon news of the fundraising success of Paxton's political opponent, further support a finding of bad faith.

If left unchecked, Paxton will continue to trample the First Amendment rights of nonprofits

he politically disfavors by running the same playbook of bad faith prosecution he has used against organizations like JOLT and ActBlue. *See* Texas Civic Amici Br. 12. Paxton's abstention arguments fail, and he presents no evidence that his prosecution was in good faith. This Court should not abstain from enjoining his bad faith state court lawsuit.

## II.    This Court Has Personal Jurisdiction Over Paxton

Paxton attempts to avoid personal jurisdiction by recasting this dispute as one involving Texas-based conduct with only incidental effects in Massachusetts. The record shows the opposite. Paxton engaged in a series of intentional, forum-directed actions aimed at a Massachusetts entity and designed to interfere with its operations in Massachusetts.[4] As Paxton concedes, "[s]pecific personal jurisdiction exists over an out-of-state defendant where both the forum state's long-arm statute and the requirements of the Due Process Clause are satisfied." Mot. at 13. Both requirements are met here.[5]

Paxton's conduct satisfies the relatedness, purposeful availment, and reasonableness requirements of due process. The Due Process Clause forbids subjecting a defendant to the binding judgment of a forum which they have no meaningful "contacts, ties, or relations." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945). This is to ensure that individuals have "fair warning

---

[4] Paxton's repeated references to *ActBlue*'s purported Texas contacts are irrelevant. *See, e.g.*, Mot. at 14, 17–18. Rather, the proper analysis focuses on *Paxton*'s contacts with Massachusetts, the forum state. *See infra* at 15–19.

[5] Paxton does not contest that the Massachusetts long-arm statute is satisfied here. Although courts have recognized that the statute extends to the limits of federal due process—and thus that the long-arm inquiry "folds into" the constitutional analysis—that does not render it superfluous. *Diomed, Inc. v. Total Vein Sols.*, 578 F. Supp. 2d 214, 215–16 (D. Mass. 2008) (citing *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 771 (1994)). Rather, it reflects Massachusetts's deliberate choice to provide broad jurisdictional reach. Here, Paxton's conduct independently satisfies the statute because he directed investigative demands and related activity into the Commonwealth, thereby "transact[ing] business" in Massachusetts, Mass. Gen. Laws ch. 223A, § 3(a), and he caused tortious injury in the Commonwealth because those same forum-directed acts were in retaliation of ActBlue's First Amendment rights, *id.* § 3(c). Accordingly, jurisdiction is also authorized by Massachusetts law.

that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Shaffer* v. *Heitner*, 433 U.S. 186, 218 (1977).  At the same time, the Due Process Clause may not be "wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  The First Circuit evaluates specific jurisdiction under three related inquiries: "relatedness, purposeful availment, and reasonableness." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir. 2008).  Each is present here.

The relatedness test is a "flexible, relaxed standard." *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994) (citing *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 207 (1st Cir. 1994)).  The inquiry asks whether Plaintiffs' claim "either arises directly out of, or [are] related to, the defendant's forum-based contacts." *Phillips*, 530 F.3d at 27.  The relevant question is thus whether Paxton's Massachusetts-directed conduct forms part of the events giving rise to ActBlue's First Amendment retaliation claim, including the retaliatory steps that imposed burdens and coercive effects in Massachusetts.  It does.  Paxton concedes that he "sent a Request to Examine (RTE) … to each plaintiff in Massachusetts, via certified mail."  Dkt. No. 39 at 2.  He does not dispute that those demands required production and inspection at ActBlue's Massachusetts headquarters, compelling performance in the Commonwealth.  Gilmer Decl. ¶¶ 10–11, Dkt. No. 14.  Nor does he dispute that his investigative activity—including test transactions—were directed at a Massachusetts-based entity.  Sharton Decl. ¶ 5, Dkt. No. 15; Mot. at 4.  Those forum contacts were not incidental—they were the operative steps through which Paxton imposed burdens on ActBlue's protected speech and associational activity.  *See Media Matters*, 138 F.4th at 577 (holding that Paxton was subject to personal jurisdiction of D.C. courts because he caused CIDs to be delivered within the District and the plaintiff's retaliation claim arose out of that conduct).

Paxton's attempt to minimize his contacts as "mere" mailings misstates the facts.  Mot. at 14.  The principle on which he relies—that "the transmission of information by itself is not

15

'sufficient'" where the defendant's underlying conduct occurs entirely out of state—has no application here. *Id.* (citing *Sawtelle v. Farrell*, 70 F.3d 1381 (1st Cir. 1995)). Paxton's Massachusetts-directed conduct was not limited to transmitting information. The RTEs were coercive investigative demands directed into Massachusetts. They required document production and inspection at Plaintiffs' Massachusetts headquarters. *See* Petersen Decl. Exs. 1–2, Dkt. No. 13; Gilmer Decl. Exs. 1–6, Dkt. No. 14. Paxton also directed investigative activity into Massachusetts through test transactions that included a donation to ActBlue LLC, a Massachusetts entity. *See* Sharton Decl. ¶ 5, Dkt. No. 15. These actions are not the type of incidental, downstream effects described in *Sawtelle*; they are the very conduct through which the injury (i.e., the cost of and burden of responding to the RTEs) was imposed. And Paxton concedes that his investigation led to the state court enforcement action. Mot. at 4.

The same conduct satisfies purposeful availment. The requirement ensures that personal jurisdiction is not premised on "random, isolated, or fortuitous" contacts with the forum state. *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). The First Circuit holds that the two cornerstones of this inquiry are "foreseeability" and "voluntariness," and further that "when the source takes the initiative and causes foreseeable injury, jurisdiction may lie." *Ticketmaster-New York*, 26 F.3d at 207–08. Both are met here. Foreseeability is satisfied because Paxton's conduct and connection to Massachusetts were such that he should "reasonably anticipate being haled into court there." *Burger King Corp.*, 471 U.S. at 474. He not only directed investigative demands at a Massachusetts-based entity—requiring performance, production, and inspection in Massachusetts—but went further and affirmatively engaged with a Massachusetts-based platform as part of carrying out his investigation. In doing so, his agents made test transactions through ActBlue's platform, which conditions use on an agreement to Terms of Service containing a Massachusetts forum-selection clause. Sharton Supp. Decl. ¶ 6, Dkt. No. 47-10. And the Terms

16

of Service further state that "[i]f you are using our Services on behalf of an organization or entity, you represent that you have authority to bind that organization or entity to these Terms." *Id.* Ex. 1, § 4(a). The deliberate invocation of Massachusetts-governed system—alongside his demands for performance of document production in Massachusetts—provided clear notice that litigation here was a foreseeable consequence of his actions. Voluntariness is likewise satisfied because Paxton's contacts with the forum "proximately result[ed] from [his own] actions." *Phillips*, 530 F.3d at 28. He chose to send the relevant demands, to require conduct in Massachusetts, and to avail himself of Massachusetts-based systems. Those deliberate choices foreclose any argument that his contacts with the forum were incidental or compelled.

The authorities Paxton invokes do not suggest otherwise. The "example" Paxton uses, *Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1 (1st Cir. 2016), addresses materially different circumstances—there, the relevant contacts arose from ordinary commercial relationships, "buying goods and services," and the court emphasized that any connection to the forum resulted from the plaintiff's own unilateral activity rather than the defendant's forum-directed conduct. *Id.* at 5–6. That framework has no application here, where Paxton himself invoked state authority to compel performance in Massachusetts and to direct investigative activity into the forum. Personal jurisdiction in this case does not result from Plaintiffs' own unilateral activity but from Paxton's deliberate choice to operate within the forum as part of his enforcement strategy.

The same is true of the cases Paxton cites for the proposition that jurisdiction cannot be "carted from state to state." *See* Mot. at 16 (quoting *Kuan Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 62 (1st Cir. 2020)). Those decisions reject attempts by plaintiffs to manufacture jurisdiction based solely on their own movements or preferences. They do not involve a defendant who affirmatively directs coercive legal process into a forum and compels conduct there. Here, it

17

was Paxton—not ActBlue—who chose to project his authority into Massachusetts, requiring compliance in the Commonwealth and donating directly to entities located here. Having done so, Paxton cannot now recast himself as a passive actor.

Finally, Paxton attempts to argue that this case is a sweeping attack on routine, lawful investigative authority—a characterization that does not withstand scrutiny. Plaintiffs do not challenge the existence of investigative power; they invoke the personal jurisdiction of this Court over Paxton's efforts to extend his investigatory power outside his state's borders by directing demands into Massachusetts in a retaliatory manner designed to impose costs and disrupt ActBlue operations during a pivotal election cycle. That is not ordinary law enforcement. It is forum-directed conduct undertaken for an improper purpose—and it is that conduct, not ActBlue's Massachusetts presence, that supports personal jurisdiction over Paxton here.

Finally, the exercise of jurisdiction here is plainly reasonable. None of the "Gestalt" factors, which are "intended to aid the court in achieving substantial justice," *Adelson v. Hananel*, 510 F.3d 43, 51 (1st Cir. 2007), supports insulating an out-of-state official from suit in a forum he deliberately targeted with coercive investigative activity. Massachusetts has a substantial interest in adjudicating claims that a state official directed coercive investigative demands into the Commonwealth to burden a Massachusetts entity's speech and operations within the state. *See Keeton*, 465 U.S. at 776. The First Circuit has likewise recognized the Commonwealth's "stake in being able to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors." *Adelson*, 510 F.3d at 51. Paxton shifts between framing this case as a generalized constitutional challenge untethered to any forum and as a Texas-law dispute requiring resolution in Texas courts. It is neither. ActBlue's claims turn on federal constitutional limits applied to conduct Paxton directed into Massachusetts, which Massachusetts courts are fully competent and

18

better equipped to adjudicate.  Requiring Paxton to litigate in this forum is neither unfair nor unreasonable.

### III.    Venue Is Proper In This District

Contrary to Paxton's cursory assertion (Mot. at 19), venue is proper here because a "substantial part of the events or omissions giving rise to the claim occurred" in the District of Massachusetts.  28 U.S.C. § 1391(b)(2).  As multiple courts have found against this same defendant, delivery of document demands and the "chilling effect that ensued" comprise a substantial part of ActBlue's claims against Paxton.  *Media Matters*, 732 F. Supp. 3d at 27; *see also Twitter, Inc. v. Paxton*, 2021 WL 1893140, at *2 (N.D. Cal. May 11, 2021) (same), *aff'd*, 26 F.4th 1119 (9th Cir. 2022), and *aff'd*, 56 F.4th 1170 (9th Cir. 2022).  Paxton directed that four formal document demands be delivered, or attempted to be delivered, to ActBlue's headquarters in Massachusetts.  *See* Petersen Decl. Exs. 1–2, Dkt. No. 13; Gilmer Decl. Exs. 1–6, Dkt. No. 14. And the chilling effect of Paxton's conduct was similarly felt in Massachusetts.  Paxton's "half-hearted argument that venue is not proper" in Massachusetts should thus be rejected.  *Media Matters*, 732 F. Supp. 3d at 27.

### IV.    ActBlue States A Claim For First Amendment Retaliation

Paxton makes two last-ditch arguments that the complaint fails to state a claim, each of which is unavailing.  *First*, he argues that ActBlue has not "engaged in constitutionally protected conduct" because it engaged in "deceptive practices, not protected expression."  Mot. at 20.  The protected speech at issue in ActBlue's retaliation claim is not speech regarding ActBlue's anti-fraud practices.  Rather, ActBlue's claim is that its protected activities—"facilitating political donations, enabling political association, and supporting political expression by candidates, donors, and organizations," Compl. ¶ 97—were the motivating factors underlying Paxton's decision to bring a retaliatory DTPA claim.  In his motion to dismiss, Paxton conflates the speech

at issue in his DTPA claim with the constitutionally protected conduct at issue in ActBlue's retaliation claim.  Furthermore, ActBlue's communications about its anti-fraud safeguards were accurate and not "deceptive."  For the purpose of a motion to dismiss, ActBlue's factual claims about its fraud prevention practices, Compl. ¶¶ 78–82, which are contrary to Paxton's characterizations of them as deceptive, must be taken to be true in ruling on a motion to dismiss. *See Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011).

*Second*, Paxton argues that the complaint "fails to plead causation," because there is "an independent, lawful basis for the enforcement action."  Mot. at 20.  The "independent, lawful" basis for Paxton's enforcement action is no more than pretext.  ActBlue has in place specific rules for automatically rejecting gift cards.  Sharton Decl. ¶ 4, Dkt. No. 15; Sharton Supp. Decl. ¶¶ 8–9, Dkt. No. 47-10.  The congressional investigation of ActBlue and associated reporting on ActBlue's representations of its foreign donor-verification practices could not have formed the basis for Paxton's lawsuit because he only added claims regarding foreign contributions *after* ActBlue filed this lawsuit.  *See* Amended TX Pet.  Paxton fails to address the numerous indicia of causation in ActBlue's pleadings, including "temporal proximity, Paxton's public statements evidencing hostility toward the political causes ActBlue supports, ActBlue's distributions to Paxton's political opponent, James Talarico, and the selective nature of the enforcement action." Compl. ¶ 99.

Thus, as described here and in its reply in support of its motion for preliminary injunction, Dkt. No. 47-1, ActBlue has not only pleaded a viable First Amendment retaliation claim, but also it has established that it is likely to succeed on the merits.

## CONCLUSION

For these reasons, the Court should deny Paxton's motion to dismiss in full.

Dated: June 2, 2026

Respectfully submitted,

By: */s/ Felicia H. Ellsworth*

WILMER CUTLER PICKERING HALE AND
DORR LLP
Felicia H. Ellsworth, BBO No. 665232
   felicia.ellsworth@wilmerhale.com
Timothy J. Perla, BBO No. 660447
   timothy.perla@wilmerhale.com
Amanda Masselam Strachan, BBO No. 641108
  amanda.masselamstrachan@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Ronald C. Machen (*pro hac vice*)
   ronald.machen@wilmerhale.com
Matthew T. Jones (*pro hac vice*)
   matthew.jones@wilmerhale.com
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiffs ActBlue LLC, ActBlue Civics, Inc., ATS, Inc., and ActBlue Charities, Inc.*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document and all supporting papers filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: June 2, 2026

/s/  *Felicia H. Ellsworth*
Felicia H. Ellsworth, BBO No. 665232
*Counsel for Plaintiffs*