UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ACTBLUE LLC, ACTBLUE CIVICS,　　　)
INC., ATS, INC., and ACTBLUE　　　　)
CHARITIES, INC.,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　　　　)　　　Civil Action No. 1:26-cv-11986-RGS
　　　　　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　　　)　　　Jury Trial Demanded
　　　　　　　　　　　　　　　　　　)
WARREN KENNETH PAXTON JR., *in*　　)
*his official capacity as Attorney General of*　)
*the State of Texas*,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendant.　　　　　)
　　　　　　　　　　　　　　　　　　)

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION**

Paxton's Opposition to Plaintiffs' Motion for a Preliminary Injunction, Dkt. No. 39 ("Opp.") does nothing to detract from the fundamental conclusion that the factors for determining whether to grant a preliminary injunction overwhelmingly support ActBlue. Rather than rebut ActBlue's showing of likely success and irreparable harm due to Paxton's unconstitutional retaliation, the opposition largely repackages the same shifting theories and selective omissions that animated Paxton's underlying investigation and retaliatory state court lawsuit. As the record makes clear, Paxton knew before filing his initial suit that ActBlue's systems reject gift cards identified as such, yet he advanced a contrary narrative while omitting facts that undermine his claims. His effort to recast those facts—and to invoke abstention, jurisdictional objections, and post hoc justifications—does not change that this is a retaliatory enforcement action targeting protected political activity that is squarely within this Court's purview to enjoin. The opposition

1

thus confirms, rather than disproves, that ActBlue is likely to succeed on the merits and that equitable relief is warranted.

For years, Paxton has been investigating ActBlue in search of a viable theory, like a hammer in search of a nail. His allegations against ActBlue have continued to shift. His initial document demands focused on ActBlue's alleged failure to require donors to provide "CVV" codes when making donations by credit card. Perla Decl. Ex. 8, Dkt. No. 12. He next demanded documents from about six donors based on unfounded claims in social media posts, many originating from political activist Jame O'Keefe, the founder of Project Veritas. Gilmer Decl. ¶ 13, Dkt. No. 14; *id.* Ex. 8, Dkt. No. 14-8; Compl. ¶ 64.

Paxton's investigation then sat dormant for approximately one and a half years. Upon news of a significant fundraising achievement through ActBlue for James Talarico, Paxton's Democratic opponent in the U.S. Senate race in Texas, Paxton's investigators suddenly made contributions through ActBlue. Gilmer Decl. ¶ 9, Dkt. No. 14; Sharton Decl. ¶¶ 5–6, Dkt. No. 15. Five days after Talarico's FEC filings on April 15, 2026 showed strong fundraising numbers for the first quarter of 2026, Paxton toured conservative podcasts to announce a state civil action against ActBlue, conflating various issues to mask his shifting focus. Perla Decl. Exs. 15–16, Dkt. Nos. 12-15, 12-16; Perla Decl. ¶ 21(a)-(c), Dkt. No. 12. His initial suit focused on gift cards, *see* Perla Decl. Ex. 18, at 1–3, Dkt. No. 12-18, but weeks later (after ActBlue filed this suit) Paxton amended his lawsuit to assert claims about ActBlue's practices with respect to preventing foreign contributions, improperly invoking attorney-client privileged materials to advance those claims. State Of Texas's Amended Petition And Request For Temporary And Permanent Injunctions, *State of Texas v. ActBlue LLC*, No. 096-376890-26 (Dist. Ct., Tarrant Cnty., Tex.) ("Amended TX Pet."). The only thing that has remained consistent about Paxton's pursuit of ActBlue has been

his many public statements that the "radical left" uses ActBlue to fund "left-wing campaigns," including James Talarico's.  Perla Decl. ¶ 21, Dkt. No. 12.

Indeed, after this Court scheduled a prompt preliminary-injunction hearing and indicated a preliminary favorable view of ActBlue's retaliation claim, Paxton suddenly sought to expedite Texas proceedings—even though a month had lapsed between his initial petition and his sudden attempt to collect "urgent" discovery.  *See* ActBlue's Letter to Chambers (May 26, 2026), Dkt. No. 32.  And on May 26, 2026, he won the runoff election to be the Republican Party's nominee for the U.S. Senate seat, pitting him directly against Talarico, who, with the help of ActBlue, "hauled in $600,000—the strongest two hours of his entire campaign" after Paxton's primary win.[1] Because Paxton's opposition fails in contesting ActBlue's showing of retaliatory conduct, the Court should grant ActBlue's requested preliminary injunction.  Enjoining Paxton's continued bad-faith enforcement action is necessary to prevent further irreparable harm to ActBlue and the millions of individuals whose protected expressive and associational rights are burdened by his conduct.  Granting relief would "signal that nonprofit organizations … are not without recourse" when Paxton or other state enforcement officials target them for their exercise of their First Amendment rights.  Brief of Amici Curiae Texas Civic and Non-Profit Organizations 13 ("Texas Civic Amici Br."), Dkt. No. 34.

## ARGUMENT

### I.    Injunctive Relief Against Paxton's Retaliatory Conduct Is Warranted

ActBlue's motion showed that every relevant factor supports an injunction.  Paxton's opposition fails as to each one.  On the merits, Paxton has repeatedly made clear his intent to retaliate against organizations (including Democratic-aligned fundraising and electoral

---

[1] Jones Decl. Ex. 7, at 3–4 (noting that Paxton "will have to catch up fast: He had just $2.3 million in the bank as of the end of March" compared to Talarico's "$10 million cash on hand.").

organizations) because they electorally oppose him. *See, e.g.*, Compl. ¶ 74; Texas Civic Amici Br. 3–9. Given this history, Paxton's self-serving characterization of his actions as merely "enforc[ing] … Texas law" and protecting "Texans' interests," Opp. 13, cannot be credited. And his insistence that his suit is designed to *protect* Democratic donors, campaigns, and candidates that use ActBlue's platform, strains credulity. Amended TX Pet. 31.

Paxton's conduct is precisely the type of First Amendment retaliation that the Constitution forbids—both against ActBlue and the millions of individuals who use ActBlue to express their political opinions. Indeed, the Supreme Court recently reiterated that "demands for private donor information 'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights,'" *First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1123 (2026) (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976) (per curiam)), and "'chill' protected First Amendment associational rights even when those demands contemplate disclosure only to government officials and not 'the general public,'" *id.* at 1124 (quoting *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021)).

## A.    ActBlue Is Likely To Succeed In Establishing First Amendment Retaliation

The First Amendment does not permit government officials like Paxton to subject persons to "retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). ActBlue has established a prima facie case of First Amendment retaliation because "(1) [it] engaged in First Amendment-protected conduct, (2) [it] suffered an adverse action, and (3) [its] protected conduct played a substantial or motivating part in the adverse action." *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 118 (D. Mass. 2025) (quotation marks omitted). Paxton's contrary arguments fail.

4

*1.*     *ActBlue Engages In Protected Activity By Facilitating Democratic Fundraising*

Paxton asserts (Opp. 11–12) that ActBlue engaged in unprotected conduct by permitting certain campaign contributions and by making statements to Congress that he contends were false or misleading, and therefore outside the First Amendment's protection.  But ActBlue does not claim that Paxton is retaliating against it for its statements to Congress.  Rather, ActBlue argues that Paxton is retaliating against ActBlue for its lawful fundraising activity for Democratic candidates and organizations, including for Paxton's political opponent, James Talarico.  *See, e.g.*, Compl. ¶¶ 66–71.  And that is core First Amendment protected activity; indeed, the Supreme Court has said that the First Amendment has its "fullest and most urgent application" to political speech and expression during "campaign[s] for political office."  *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)).  ActBlue also enables donors to engage in expressive activity by facilitating their support of candidates and causes, and "generate[s] essential political speech by fostering discussion of public issues and candidate qualifications" through political fundraising.  *McCutcheon v. FEC*, 572 U.S. 185, 228 (2014) (Thomas, J., concurring in judgment) (quotation marks omitted).

Paxton responds (Opp. 11–12) that ActBlue's facilitation of political donations is not protected activity because it involves commercial speech and because it supposedly violated Texas's Deceptive Trade Practices Act ("DTPA").  Those contentions fail thrice over: ActBlue's speech was not commercial, the statements ActBlue made did not violate the DTPA—because they were not false—and Paxton's allegations about their purported falsity rely, impermissibly, on privileged material.

First, the commercial-speech cases on which Paxton relies (Opp. 11–12) do not apply here.  The Supreme Court defines commercial speech as "speech that does no more than *propose* a

commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014) (emphasis added).  None of the allegedly false statements Paxton identifies (Opp. 18) proposed a commercial transaction. Second, none of the allegedly false statements about donation-screening controls violates the DTPA because that statute applies only to "trade or commerce," meaning the sale of goods or services.  Tex. Bus. & Com. Code §§ 17.45(1)–(2), (6), 17.46(a).  None of the claims at issue here have to do with ActBlue selling goods or services to donors—rather, the claims deal with political donations with which they make their voices heard and engage in protected First Amendment association.  *See Cool Moose Party v. Rhode Island*, 183 F.3d 80, 82 (1st Cir. 1999).  In any event, Texas law is presumed not to apply extraterritorially absent clear legislative intent, s*ee Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 682 (Tex. 2006), and the statements at issue were made to Congress in Washington, D.C., not in Texas.

Paxton also argues (Opp. 11–12) that ActBlue is not engaging in political speech here because courts have imposed some limits on political fundraising speech.  That is wrong.  The fact that there are *some* limits on political-fundraising speech—as there are on many kinds of speech— does nothing to show that a particular entity is or is not engaging in political speech.  And ActBlue is assuredly involved in political speech:  Its platform provides millions of Americans with political voice, including to support Paxton's current opponent in the U.S. Senate race in Texas. *See, e.g.*, Mem. In Support of Mot for Prelim. Inj. 3, 5, 15, Dkt. No. 11 ("Mem. In Support"); Compl. ¶¶ 3, 47–52, 67–71.  Moreover, ActBlue's own choices in aligning itself with Democratic candidates and campaigns represent its own protected expressive speech.

> 2.  *ActBlue Has Suffered Adverse Action As A Result of Paxton's Retaliatory Actions*

Tellingly, Paxton does not contest that he took adverse action against ActBlue.  Paxton's investigative demands alone constitute adverse action.  The RTEs demanded sweeping categories

of sensitive documents—including ActBlue's sources of income, employee organizational structure, donor-derived revenues, and internal identity-verification policies—within just 20 days, under threat of forfeiture of ActBlue's right to do business in Texas and criminal penalties for non-compliance. Petersen Decl. Ex. 2, at 2–3, Dkt. No. 13-2; Bonin Decl. ¶ 3, Dkt. No. 16; Tex. Bus. Orgs. Code §§ 12.155–156. Paxton then issued two CIDs that reached even further, demanding (among other things) sensitive transactional records for individual donors. Gilmer Decl. Ex. 7, Dkt. No. 14-7; *id.* Ex. 8, Dkt. No. 14-8. This is precisely the kind of conduct that chills the exercise of protected First Amendment rights. *See First Choice*, 146 S. Ct. at 1124. Paxton's filing of a civil enforcement action with demands for more intrusive discovery compounds this harm. Paxton seeks over $1,000,000 in monetary relief, including civil penalties of up to $10,000 per alleged DTPA violation, and injunctive relief that would bar ActBlue from accepting donations made with certain credit cards. *See* Perla Decl. Ex. 18, at 4, 29, Dkt. No. 12-18.

Paxton's related attempt (Opp. 8–10) to distinguish *First Choice* is unpersuasive. Paxton argues (Opp. 15) that *First Choice* is not instructive here because his office does not seek donor information and expressly instructed ActBlue to redact such information. But that argument focuses on only the *current* discovery requests in the Texas litigation, ignoring the broad investigative demands that preceded them—demands for sensitive financial documents, communications, and information about ActBlue's operations, including donor information. *See, e.g.*, Petersen Decl. Ex. 2, at 7; Gilmer Decl. Ex. 8, at 7. Paxton has also sought individual donor information well beyond what is routinely disclosed to regulators. *See, e.g.*, Petersen Decl. Ex. 2, at 7 (RTE requesting documents concerning three individual donors); Gilmer Decl. Ex. 8, at 7 (CID requiring production of "Transactional Records" for six donors).

7

The Supreme Court has repeatedly explained that official "demands for private donor information 'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights.'" *First Choice*, 146 S. Ct. at 1123 (quoting *Buckley*, 424 U.S. at 65); *see e.g.*, *Bates v. City of Little Rock*, 361 U.S. 516, 524 (1960).  Paxton's actions seek confidential donor information and run afoul of Supreme Court precedent.  Indeed, courts have already concluded that similar conduct by Paxton—the issuance of politically motivated investigative demands—constituted adverse action.  *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27–28 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025).

Paxton contends (Opp. 10) that donor-privacy concerns can be addressed through a protective order.  But the Supreme Court rejected that argument in *First Choice*, explaining that, even aside from the practical risks of collecting sensitive donor information, the demand itself chills association because "[a]n official demand for private donor information is enough to discourage reasonable individuals from associating with a group."  146 S. Ct. at 1130.  "'[A]ssurances of confidentiality,'" the Court explained, "'do not eliminate' the First Amendment injury caused by a demand for private member or donor information."  *Id.* at 1131 (quoting *Americans for Prosperity*, 594 U.S. at 616).

Paxton's investigative demands *and* his Texas state lawsuit—two independent but related injuries—have forced ActBlue to divert substantial time and resources away from facilitating political participation during critical election periods.  Gilmer Decl. ¶¶ 15–16, Dkt. No. 14.  They easily satisfy the standard for adverse action in the First Amendment retaliation context, namely an action "sufficient to chill a reasonably hardy person … from continuing to exercise their constitutional rights."  *Hootstein v. Town of Shutesbury*, 2025 WL 3514337, at *6 (D. Mass. Dec. 8, 2025) (quotation marks omitted); *see also* Mem. In Support 10–14.

### 3.    *Paxton Was Motivated By Retaliatory Animus*

Next, Paxton argues (Opp. 12) that ActBlue will not likely succeed on the merits because it cannot show it would not have been sued absent Paxton's alleged retaliatory animus.  In particular, he contends (Opp. 12–13) that his RTEs, CIDs, and state-court suit would have been pursued regardless, based on congressional investigations, his office's investigation, and a *New York Times* story about ActBlue's supposed actions.  That argument—which Paxton offers without any declaration or other actual evidence—lacks merit.

The timing of key events belies Paxton's bald claim.  Paxton directed his Office to resume investigating ActBlue *one day* after his Democratic Senate opponent's campaign announced that it had raised $2.5 million in 24 hours—nearly all of it through ActBlue.  Mem. In Support 15.  Paxton also filed suit five days after the Federal Election Commission confirmed Talarico's fundraising numbers for the first quarter of the year.  And Paxton's press release announcing the lawsuit trumpeted the fact that "ActBlue raises large amounts of money for liberal Democrats." *See* Opp. 13; Perla Decl. Ex. 19, at 1 ("ActBlue funds primarily left-wing campaigns at all levels of government and has processed more than $16 billion since its founding in 2004."), Dkt. No. 12-19.  Finally, that same day, when Paxton announced the suit on a podcast, he was introduced as having "never failed from defending us from Marxists, leftists, and communists who have infiltrated the Democratic Party."  Perla Decl. ¶ 21(b).

Paxton's claim about his motivation is further refuted by his brazen declaration of his retaliatory animus in fundraising emails, where he tells supporters that he has put "Lawless Democrats Under Investigation," framing ActBlue as "the Democrats' shadowy digital fundraising network" that is "based out of far-left Cambridge, Massachusetts."  Declaration of Matthew T. Jones ("Jones Decl.") Ex. 2.  Even this lawsuit has not muted Paxton's explicit partisan animus

9

towards the "[f]ar-left," which he says "has been using … ActBlue network to raise eye-popping sums online."  Jones Decl. Ex. 5; *see also* Jones Decl. Exs, 2–4.

Paxton's repeated invocation of ActBlue's political affiliation in connection with his enforcement action establishes a causal link between his "retaliatory animus" and ActBlue's "subsequent injury."  *Hartman*, 547 U.S. at 259.  Indeed, one court of appeals has explained that contemporaneous statements by government officials mentioning and criticizing protected activity is strong evidence of causation.  *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870–71 (9th Cir. 2016).  Taken together, Paxton's own words and actions show that he targeted ActBlue, like his other political opponents before, for its protected First Amendment activity.

Paxton next claims (Opp. 14) that "intervening and superseding causes" triggered his enforcement decision, most notably a *New York Times* article.  But again, the calendar proves otherwise.  Paxton's investigators initiated the contributions underlying his gift-card claims *months* before the *New York Times* article.  *See* Gilmer Decl. ¶ 9 (Dkt. No. 14); Sharton Decl. ¶¶ 5–6 (Dkt. No. 15).  And he added foreign-contribution claims related to the *New York Times* article (which never mentions gift-card or prepaid-card donations) only *after* this lawsuit was filed (and hence he needed to justify his motives).  *See* ActBlue's Letter to Chambers (May 26, 2026), Dkt. No. 32.

Paxton's shifting justifications therefore appear to be pretext, masking the true motive for the enforcement action: retaliatory animus.  The article concerns foreign-donation vetting, not gift cards or fraud prevention, and he has no basis to challenge statements made to Congress during its investigation.  Moreover, Paxton has an independent obligation to ensure that allegations in an enforcement action are supported by a reasonable inquiry, not merely by references to third-party reports or articles.  *See* Tex. Civ. Prac. & Rem. Code § 10.001.  Paxton undertook no such inquiry

here.  Rather, his investigation focused on CVV usage—a practice ActBlue has required since 2024—and his February 2026 investigation subsequently confirmed that ActBlue's system automatically rejects transactions it identifies as coming from gift cards.  *See* Supplemental Declaration of Benjamin Sharton ("Supp. Sharton Supp. Decl.") ¶¶ 9, 14.  The scope of Paxton's authority under the DTPA does not extend to alleged misrepresentations *to Congress*—rather, the DTPA is designed to remedy any such statements to *consumers.*  Tex. Bus. & Com. Code §§ 17.41–.63; *see also supra* at 6 (discussing the presumption that Texas law does not apply extraterritorially).   Accordingly, those allegations cannot serve as a proper basis for his enforcement action.  In any event, those supposed causes were not "intervening and superseding causes" because they *preceded* Paxton's April 2026 admission in his enforcement press release that his action was politically motivated by the fact that ActBlue raised money for Democrats and Democratic policies.  *See* Perla Decl. Ex. 19, Dkt. No. 12-19.  Furthermore, Paxton's use of the *New York Times* article is an improper use of ActBlue's attorney-client privileged information, which ActBlue did not waive,[2] and which cannot support his enforcement action for allegedly improper gift card donations.

### 4.    *ActBlue Would Not Have Been Sued But For Its Protected Activity*

Paxton contends (Opp. 16) that even if his enforcement decision was motivated in part by impermissible animus based on ActBlue's political affiliation, it was not the sole factor, and that

---

[2] *See Dukes v. Wal-Mart Stores, Inc.*, 2013 WL 1282892, at *5 (N.D. Cal. Mar. 26, 2013) (finding that Wal-Mart retained privilege in a confidential memorandum from the law firm of Akin Gump that was leaked to the *New York Times*); *Smith v. Armour Pharm. Co.*, 838 F. Supp. 1573, 1577 (S.D. Fla. 1993) ("The fact that the contents of a privileged document have become widely known is insufficient by itself to eliminate the privilege that covers the document.").  ActBlue took reasonable precautions to protect the confidentiality of its privileged communications, did not authorize their disclosure, and promptly objected to the *New York Times*' receipt and publication of this privileged information, as well as to Paxton's improper use of this privilege material to support his claims.  *See* Jones Decl. Ex 1.

he would have sued ActBlue "regardless of any protected activity."  But under Supreme Court precedent, once a plaintiff demonstrates that protected conduct was a substantial or motivating factor in the adverse action, the burden shifts to the defendant to show "by a preponderance of the evidence" that the same decision would have been reached "even in the absence of the protected conduct."  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003).  The burden thus falls on Paxton to come forward with evidence, not mere argument, that he would have made the same enforcement decision irrespective of ActBlue's protected political activity.  He has not done so:  Indeed, he offers no evidence—no declaration from a prosecutorial decisionmaker, no contemporaneous internal memorandum, nothing—to support his bare assertion that the decision to investigate and sue ActBlue would have been made absent its First Amendment activity.

At the same time, the record evidence—Paxton's statements about ActBlue's Democratic and progressive affiliations, *see supra* at 2–3, 9–10; the temporal link between his enforcement actions and his Democratic Senate opponent's fundraising success; and Paxton's lack of interest in investigating Texans' complaints about deception by WinRed (the Republican fundraising platform that Paxton uses in his own political campaign)—all cut the other way.  And that evidence is reinforced by Paxton's prior retaliatory enforcement actions against other progressive organizations.  *See* Texas Civic Amici Br. at 3–9; *Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025); *Jolt Initiative, Inc. v. Paxton*, 2026 WL 297633 (W.D. Tex. Jan. 29, 2026).

In short, nothing in Paxton's opposition rebuts ActBlue's showing that it will likely succeed on its First Amendment retaliation claim.

**B.      ActBlue Will Face Irreparable Harm Absent Injunctive Relief**

In response to ActBlue's showing that it will likely suffer irreparable harm without a preliminary injunction, Paxton contends (Opp. 17–18) that ActBlue will suffer no harm because it

can raise its First Amendment defenses in Texas state court, and that the ordinary burdens of litigation do not amount to irreparable injury. As to the latter point, ActBlue's harm here is not the ordinary burden of litigation. It is the ongoing violation of First Amendment rights, both for ActBlue and for the donors and campaigns whose third-party First Amendment rights are harmed. *See, e.g.*, Gilmer Decl. ¶¶ 15–16, Dkt. No. 14; Sharton Decl. ¶¶ 7–8, Dkt. No. 15. The Supreme Court has made clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese v. Cuomo*, 592 U.S. 14, 19 (2020).

Paxton's actions impose irreparable injury in at least three ways. First, ActBlue is "suffering from a campaign of retaliation … in response to [ActBlue's] exercise of [its] First Amendment rights." *Media Matters*, 138 F.4th at 585. "That is … an irreparable injury." *Id.* Second, Paxton's politically motivated demands for "private donor information inevitably impose" ongoing burdens on ActBlue's "protected First Amendment rights." *First Choice*, 146 S. Ct. at 1125. And third, the lawsuit requires ActBlue to divert substantial resources away from its protected activity and towards defending itself in this litigation. This harm is irreparable because ActBlue cannot recover monetary relief against Paxton in his official capacity, even if it prevails on the merits. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989); *Edelman v. Jordan*, 415 U.S. 651, 663, 677 (1974).

As to Paxton's first argument, litigation in state court cannot provide adequate relief because Texas procedure does not provide a mechanism for early dismissal of retaliatory enforcement actions: Texas's anti-SLAPP statute enforcement actions brought by the state nor to actions under the Deceptive Trade Practices Act ("DTPA"). Tex. Civ. Prac. & Rem. Code §§ 27.010(a)(1), (7). And litigating in state court does nothing to remedy the First Amendment

13

injury that ActBlue endures by the very fact that it is subjected to a retaliatory lawsuit. *See Media Matters*, 138 F.4th at 585.

**C.    The Balance Of The Equities And Public Interest Weigh Strongly In Favor Of A Preliminary Injunction**

When the government is the opposing party, the balance-of-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Does v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). Paxton's arguments on these merged factors fail.

Paxton argues (Opp. 18) that an injunction would significantly burden Texas by preventing the sovereign state from enforcing its laws. But Texas has no legitimate interest in enforcement actions that violate the First Amendment. As the Supreme Court has said, "[a]n official action, … taken for the purpose of [violating constitutional rights] has no legitimacy at all under our Constitution." *City of Richmond v. United States*, 422 U.S. 358, 378 (1975). And an injunction would not preclude Texas from enforcing the DTPA through constitutionally *permissible* means; it would only prevent Paxton from abusing the powers of his office to target disfavored, protected political activity.

These same points answer Paxton's argument (Opp. 19) that the relief ActBlue seeks is not properly tailored to the alleged First Amendment injury because the relief would supposedly bar future investigations and enforcement actions regardless of new evidence, new conduct, or independent lawful grounds for state action. Again, an injunction would not preclude Texas from enforcing its laws via constitutionally permissible means; it would only prevent Paxton from using enforcement powers in ways that exceed constitutional limits, including targeting protected speech. An injunction would thus be narrowly tailored—and in the public interest—because "the suppression of political speech harms not only the speaker, but also the public to whom the speech

14

would be directed." *Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012) (citing *Citizens United*, 558 U.S. at 339–40).

Finally, Paxton's assertion (Opp. 18–19) that defending a lawsuit is not "overly burdensome" misses the point entirely. As discussed, *see supra* § I.B, the burden here is not ordinary litigation expense—it is the constitutional injury of being forced to defend a retaliatory enforcement action designed to suppress protected political speech. The public interest in halting that constitutional violation is self-evident, as the First Amendment "'has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Citizens United*, 558 U.S. at 339 (quoting *Eu*, 489 U.S. at 223).

## II.    Abstention Is Not Required

Contrary to Paxton's claim that "abstention is mandatory," Opp. 6, the First Circuit has explained that abstention under *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny is "inappropriate … when a state proceeding is brought in bad faith, that is, for the purpose of harassment." *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 192 (1st Cir. 2015). Paxton's retaliatory harassment triggers the bad-faith exception.

Multiple courts have found that Paxton's investigative activity and litigation against political opponents constitute retaliation and bear "several indicia" relevant to "the *Younger* bad-faith exception analysis." *Jolt*, 2026 WL 297633 at *8; *see also Media Matters*, 732 F. Supp. 3d at 28–29 (finding Paxton retaliated against news outlet "in response to its protected media activities"). Paxton's investigation into ActBlue and associated lawsuit fit this retaliatory pattern. *Younger* provides no bar to enjoining such bad faith retaliatory conduct, particularly because Paxton has a "a past history of personal conflict" or "animus" toward ActBlue due to ActBlue's facilitation of fundraising for his political opponents. *Cullen v. Fliegner,* 18 F.3d 96, 104 (2d Cir. 1994) (quotation marks omitted).

15

Indeed, a review of Paxton's allegations leaves no doubt that they were brought in bad faith. Paxton's central allegation—that ActBlue "secretly resumed acceptance of gift card donations" after representing to Congress that it had stopped, Opp. 9—is demonstrably false. ActBlue submitted a document to Congress in 2024 describing the specific rule it had implemented to automatically reject domestic gift cards. Amended TX Pet. 10, 37. That rule remains in place today. Sharton Supp. Decl. ¶¶ 8–9. Paxton had no sound basis to allege otherwise. Indeed, Paxton either knew or should have known that his allegation was false, because his investigators repeatedly had their attempted gift card donations *rejected*. *See* Mem. In Support 5; Sharton Supp. Decl. ¶ 14. Paxton's opposition even notes this. Opp. 4. Those rejected transactions—never mentioned in Paxton's state-court petition—confirm the reality: that ActBlue's "system has been designed to automatically reject gift cards and non-reloadable prepaid cards identified by ActBlue's third-party anti-fraud vendor." Sharton Supp. Decl. ¶ 8.

Paxton notes that three *other* transactions started by his investigators using two specific cards were processed by ActBlue. Opp. at 3–4. But that does nothing to undermine Paxton's bad faith. For starters, the transactions were processed only because ActBlue's third-party anti-fraud vendor did not identify those cards to ActBlue as gift cards: one was identified as a Wells Fargo business debit card and one as a reloadable prepaid Mastercard. Sharton Supp. Decl. ¶ 10–12. As a result, despite ActBlue's ongoing execution of the precise rule rejecting gift cards that Paxton cites in his Petition, the transactions were processed. Sharton Supp. Decl. ¶ 10–12. And a bare minimum of diligence by Paxton—which a person not acting in bad faith assuredly would have undertaken—would have revealed that because of how these credit cards are classified, *see* Sharton Supp. Decl. ¶ 9, these cards would not be identified as gift cards when processed by ActBlue's third-party vendor.

16

Paxton cites two cases (Opp. 6) in support of the claim that abstention is required even when defendants claim a violation of First Amendment rights.  But ActBlue is not arguing that *Younger* is inapplicable because this case involves the First Amendment.  ActBlue is arguing that *Younger* does not apply under its well-established bad-faith exception.  Paxton's cited cases do nothing to refute that point.

In short, Paxton's demonstrably baseless allegations against ActBlue leave no doubt that his state-court lawsuit was brought in bad faith, meaning that *Younger* is not a bar to a federal-court injunction of that lawsuit.

## III.    This Court Has Personal Jurisdiction Over Paxton In His Official Capacity

Paxton attempts (Opp. 7–8) to recast this dispute as Texas-based, with only incidental Massachusetts effects.  But the record shows intentional, forum-directed conduct toward a Massachusetts entity.  In fact, Paxton was well-aware that he was targeting conduct towards Massachusetts, as his own fundraising email refers to ActBlue as "based out of far-left Cambridge, Massachusetts." Jones Decl. Ex. 2.[3]  As discussed more fully in ActBlue's opposition to Paxton's motion to dismiss, because that conduct satisfies the minimum contacts demanded by both due process and Massachusetts' long-arm statute (Mass Gen. Laws ch. 223, § 3(a)), the Court has specific personal jurisdiction over Paxton.  *See* Plaintiffs' Opposition to Defendant's Motion to Dismiss at 16–21.

Due process is satisfied because Paxton's Massachusetts-directed conduct: (1) gives rise to Plaintiffs' claims, (2) reflects his voluntary and purposeful engagement with the forum, and (3) makes the exercise of jurisdiction reasonable. *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir. 2008).  First, Plaintiffs' retaliation and other claims "arise[] directly out of" Paxton's conduct

---

[3] ActBlue is headquartered in Boston, Massachusetts, and was previously headquartered in Somerville, Massachusetts.  Gilmer Decl. ¶¶ 2, 10, Dkt. No. 14.

in Massachusetts, *id.*, including his issuance of coercive investigative demands into the Commonwealth, his requirement that compliance occur at ActBlue's Massachusetts headquarters and his investigative activity processed through Massachusetts-based systems. Second, Paxton "purposefully availed" himself of the forum by deliberately directing those demands and related investigative activity at Massachusetts, and by requiring performance there. Given these intentional contacts with the Commonwealth, Paxton could "reasonably anticipate being haled into court there," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Third, exercising jurisdiction is reasonable: Massachusetts has a substantial interest in adjudicating claims that an out-of-state official used coercive investigative tools to burden a Massachusetts entity's speech and operations, and Paxton cannot claim unfairness after choosing to project his authority into the forum. *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776 (1984).

Personal jurisdiction is also authorized by Massachusetts's long-arm statute. Paxton "transact[ed] business" in the Commonwealth by sending formal investigative demands into Massachusetts, requiring the production and inspection of documents located in Massachusetts, and directing investigative activity—such as test transactions—at a Massachusetts entity, all of which required the expenditure of time and resources within the state. Mass Gen. Laws ch. 223, § 3(a). Those same acts also caused tortious injury in Massachusetts, via Paxton's retaliation against ActBlue in Massachusetts in violation of the First Amendment. *Id*. § 3(c). The statute is interpreted broadly, and Paxton's conduct falls well within its scope.

## CONCLUSION

The Court should enter a preliminary injunction.

18

Dated: June 2, 2026

Respectfully submitted,

By: */s/  Felicia H. Ellsworth*

WILMER CUTLER PICKERING HALE AND DORR LLP
Felicia H. Ellsworth, BBO No. 665232
    felicia.ellsworth@wilmerhale.com
Amanda Masselam Strachan, BBO No. 641108
    amanda.masselamstrachan@wilmerhale.com
Timothy J. Perla, BBO No. 660447
    timothy.perla@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Ronald C. Machen (*pro hac vice*)
    ronald.machen@wilmerhale.com
Matthew T. Jones (*pro hac vice*)
    matthew.jones@wilmerhale.com
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiffs ActBlue LLC, ActBlue Civics, Inc., ATS, Inc., and ActBlue Charities, Inc.*

19

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document and all supporting papers filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: June 2, 2026

/s/  Felicia H. Ellsworth
Felicia H. Ellsworth, BBO No. 665232
*Counsel for Plaintiffs*