UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 26-11986-RGS

ACTBLUE LLC; ACTBLUE CIVICS, INC.;
ATS, INC.; and ACTBLUE CHARITIES, INC.

v.

WARREN KENNETH PAXTON, JR.,
in his official capacity as
Attorney General of the State of Texas

MEMORANDUM AND ORDER ON
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION

June 11, 2026

STEARNS, D.J.

Plaintiffs ActBlue LLC; ActBlue Civics, Inc.; ATS, Inc.; and ActBlue Charities, Inc. (collectively, ActBlue) bring this action against Warren Kenneth Paxton, Jr., in his official capacity as Attorney General of the State of Texas, based on his initiation of an allegedly sham lawsuit against ActBlue in the state court of Texas. ActBlue asserts that Paxton filed the lawsuit – which asserts claims under the Texas Deceptive Practices Act (DTPA) – not with the purpose of vindicating Texans' rights as consumers but to retaliate against ActBlue for promoting and enabling campaign contributions to Democratic candidates for political office, including James Talarico, who is

now Paxton's opponent in a race for the seat in the United States Senate presently occupied by Republican Senator John Cornyn.  Before the court is ActBlue's motion for a preliminary injunction.  On June 4, 2026, the court convened an instructive and well-presented hearing on the motion.  For the following reasons, the court will allow the substance of ActBlue's motion.[1]

## FACTUAL BACKGROUND

ActBlue is a prominent fundraising platform for Democratic candidates for public office, amassing as much as $19 billion in donations, mostly from small contributors, since its founding in 2004.  Gilmer Decl. [Dkt # 14] ¶ 6.  In December of 2023, Paxton began investigating ActBlue with the stated purpose of determining "whether ActBlue's operations are compliant with all applicable laws."  Perla Decl. [Dkt # 12], Ex. 8.  The next month, he served ActBlue with a Request to Examine (RTE) to be conducted at ActBlue's headquarters in Somerville, Massachusetts.[2]  The RTE required ActBlue to make available for inspection a myriad of documents, including

---

[1] Because the court necessarily finds a likelihood of success on the merits of ActBlue's claims in allowing ActBlue's motion for a preliminary injunction, it follows that Paxton's motion to dismiss (which raises the same arguments upon which he unsuccessfully relies here) is DENIED.

[2] Although Paxton notes that the RTE was served on ActBlue's registered agent in Austin, Texas, he does not dispute that he also served copies on ActBlue in Massachusetts or that he conducted the relevant document review at ActBlue's Massachusetts headquarters.

those "sufficient to show [ActBlue's] policies for verifying the identity of persons who make political contributions through ActBlue's website(s)." Gilmer Decl., Exs. 1, 3, 5.

Although ActBlue complied with the RTE, on July 3, 2024, Paxton served ActBlue with a civil investigation demand (CID) seeking "all Communications using the phrase 'CVV' from January 1, 2024, to January 31, 2024," as well as "[d]ocuments sufficient to show all of ActBlue's changes in policy regarding the use of CVVs for Political Contributions between December 1, 2023, and July 1, 2024." *Id.*, Ex. 7. One month later, on August 8, 2024, Paxton issued a second CID, seeking "all Transaction Records regarding Political Contributions to ActBlue" made by six specified donors. *Id.*, Ex. 8. On October 21, 2024, Paxton submitted a Petition for Rulemaking to the Federal Election Commission (FEC), detailing his investigative findings and seeking amendments to the rules regarding donor verification.

One week later, Congress subpoenaed ActBlue for documents related to donor verification. ActBlue subsequently informed Congress that it had updated its policies and no longer accepted gift card donations. The parties dispute the accuracy of this representation.

Paxton's investigation lay dormant for the following year and a half. On February 18, 2026, James Talarico announced that his fledgling Senate

campaign had raised $2.5 million in a single day ($2.2 million of which originated through ActBlue). The following day, an investigator from the Texas Attorney General's Office made a $5 donation through ActBlue using a Mastercard gift card purchased with cash at a retail outlet under a pseudonym. Six days later, on February 25, 2026, a second investigator made two $10 donations to ActBlue using a Visa e-gift card. Investigators attempted to make several additional donations between February 19, 2026, and February 26, 2026, but ActBlue's payment system recognized these donations as originating from gift cards and did not process them.

On April 2, 2026, the *New York Times* published an article disclosing legal advice that ActBlue had received from its then-counsel, Covington & Burling LLP. At the June 4, 2026, hearing before this court, the Attorney General's Office represented that, despite having not read the underlying memoranda referenced in the *New York Times* article, it had concluded that the article revealed significant evidence of misconduct.[3] Given ActBlue's

---

[3] The court presumes that, by representing it had not read the Covington & Burling memoranda, the Attorney General's Office sought to avoid any attorney-client privilege issue inherent in the further disclosure of legal advice that ActBlue had received from its then-counsel, and over which it seemingly had not waived the privilege. The representation, however, raises its own concerns. The Attorney General's Office effectively admits that, despite purporting to base its lawsuit heavily on the information reported by the *New York Times* (an assertion the court does not credit for

4

invocation of attorney-client privilege, the court will not delve further into the contents of the article.

On April 15, 2026, candidate Talarico made an FEC filing reporting his net fundraising results during the first quarter of 2026. Five days later, on April 20, 2026, Paxton filed suit against ActBlue in Texas state court, asserting violations of the Texas DTPA. Paxton touted the lawsuit on several conservative podcasts and in his campaign emails during the following few days, linking it to ActBlue's fundraising for liberal Democrats and to his Senate candidacy.

ActBlue filed suit in this court on May 1, 2026, alleging that Paxton had brought the state action as retaliation against ActBlue for its facilitation of political donations to Democratic candidates (specifically, Talarico).

## DISCUSSION

### I.   Personal Jurisdiction

Paxton argues that this court lacks specific personal jurisdiction over him in his official capacity because (1) he has not purposefully availed himself of Massachusetts as a forum, (2) ActBlue's claims do not arise out of any Massachusetts-based conduct, and (3) the exercise of jurisdiction is not

---

the reasons discussed below), it never fact-checked the reporting against the underlying documents.

reasonable as a matter of due process.[4] As the court intimated at the hearing, it finds no merit to these arguments. Paxton concedes that he served RTEs and CIDs on ActBlue in Massachusetts and that he conducted his review of responsive documents at ActBlue's Massachusetts headquarters. As the Texas action is undoubtedly related to these activities in Massachusetts, the exercise of jurisdiction is both reasonable and constitutional.[5]

## II.    *Younger* Abstention

"[F]ederal courts have a 'virtually unflagging obligation' to adjudicate claims within their jurisdiction." *Am. Acad. of Pediatrics v. Uthmeier*, 2026 WL 1552734, at *12 (N.D. Ill. June 2, 2026), quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). In *Younger v. Harris*, 401 U.S. 37 (1971), however, the Supreme Court held that, notwithstanding this general rule, "principles of equity and comity demand that a federal court abstain from entertaining a suit that seeks to enjoin a state criminal prosecution [or quasi-criminal proceeding] as violative of federal law so long as the state proceeding affords an adequate opportunity

---

[4] Paxton does not argue that jurisdiction is lacking under the Massachusetts Long-Arm Statute. Given the breadth of that statute, this choice is wise.

[5] For much the same reason, Paxton's venue argument is also beside the mark.

to raise the federal defense and abstention will not cause irreparable harm." *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 191-192 (1st Cir. 2015).

Paxton argues that this court should abstain from entertaining ActBlue's lawsuit, which seeks to enjoin an ongoing quasi-criminal proceeding in state court, under the auspices of *Younger*. As ActBlue notes, however, courts have consistently held that *Younger* does not apply (as *Younger* itself held) "when a state proceeding is brought in bad faith, that is, for the purpose of harassment." *Id.* at 192. And while the court recognizes that the bad faith exception to *Younger* is very narrow in scope, it agrees with ActBlue that – regardless of whether the court applies an objective or subjective test – the evidence of bad faith is sufficiently overwhelming to qualify this as one of the rare cases where the exception should apply.

First, the timing of events alone speaks volumes about Paxton's underlying motivation. The investigation against ActBlue sat dormant for more than a year and a half, until the day after Talarico announced his fundraising results, when investigators from the Attorney General's Office began making several test attempts to donate to ActBlue using gift cards. *See Netflix, Inc. v. Babin*, 88 F.4th 1080, 1092 (5th Cir. 2023) (finding bad faith where a state court case "sat idle for a year" until Netflix filed a habeas petition, at which point "there was a burst of prosecutorial alacrity"). While

7

ActBlue concedes that three of these attempts were successful,[6] Paxton waited another two months, until Talarico filed his fundraising numbers with the FEC,[7] to file a lawsuit in Texas state court.

Second, the theory of harm underlying the consumer fraud claims rings hollow. When given the opportunity during the June 4 hearing, Paxton's Assistants were unable to articulate anything more concrete than the proposition that Texans, as a matter of principle, care deeply that businesses stay true to their word. *See Jolt Initiative, Inc. v. Paxton*, 821 F. Supp. 3d 706, 719 (W.D. Tex. 2026) (finding bad faith where, despite being "given multiple chances," Paxton could not identify any convincing evidence demonstrating that he had "a hope of succeeding in his quo warranto action"). This is not a compelling basis on which to premise a major lawsuit,

---

[6] ActBlue alleges that these attempts were only successful because the gift cards had been sourced through a major credit card provider and its processing vendor consequently failed to identify them as gift cards. The court expresses no opinion on the accuracy of this assertion, which appears more relevant to the question of whether ActBlue violated campaign finance laws (an issue which is not and cannot be raised in the state court proceeding) than whether it defrauded consumers. The issue of possible campaign finance violations by ActBlue (or WinRed) is not before this court.

[7] Paxton attempts to link his filing to the *New York Times* article, but the court is unconvinced. Not only is the FEC filing closer in time to the state court action, but Paxton also explicitly referenced the lawsuit in the context of his own fundraising efforts. Additionally, as the court previously discussed, *see supra* note 3, Paxton's Office concedes that it never fact-checked the *New York Times* article.

particularly given Paxton's well-known history of filing retaliatory lawsuits, *see, e.g.*, *id.*; *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025), and his failure to take any action on similar complaints filed against ActBlue's conservative analog, WinRed.

The court is also not persuaded, Paxton's remonstrations to the contrary, that the speech at issue here – which concerns the nature of the political donations that ActBlue solicits and accepts and the identities of the contributors (large and small) who use its platform – can reasonably be considered "commercial," such that it falls within the scope of the DTPA. Paxton seeks to portray ActBlue's platform as a product whose attributes have been misrepresented to consumers, but this framing does not withstand any close scrutiny. The platform does nothing more than facilitate political donations from private donors, who seek out its convenience, anonymity, and aggregation of the benefit bestowed on chosen political candidates. The facilitation of political donations reflects two types of protected speech: (1) ActBlue's own choice of which candidates or causes it will include on its platform, and (2) donors' individual choices to fund those candidates or causes with which the donor identifies. As the Supreme Court has reminded us more than once, "political speech [is] at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365

(2003); *see also Boos v. Barry*, 485 U.S. 312, 318 (1988) (noting that political speech "operates at the core of the First Amendment"). This is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).

Third, Paxton's public statements in the wake of filing the case against ActBlue reveal his true motivation. While a prosecutor is entitled to a large degree of prosecutorial discretion and has a right to make a considered public accounting of his actions, Paxton did not hesitate in drawing a connection between the lawsuit and his candidacy for Senate. *See Am. Acad. of Pediatrics*, 2026 WL 1552734, at *23 (finding evidence of bad faith where defendant made pointed statements suggesting that he "not only had personal convictions against gender-affirming care, but also that those convictions affected his enforcement decisions and his decision specifically to initiate the state lawsuit at issue here"). On a podcast appearance the day he filed the action, for example, Paxton responded to a question about whether, "as part of this lawsuit," he could "collect information [from ActBlue] that applies to the whole country" with the statement, "I love that question because I am running for U.S. Senate. When in in [sic] the U.S. Senate, I'll be all over this." Perla Decl. ¶ 21(a), quoting The Charlie Kirk

10

Show, *Building the Red Wall + Virginia's Last Chance* (published Apr. 20, 2026).  The next day, on a different podcast, he noted that ActBlue's funds "are largely going to liberal Democrats, and it's always been a mystery how they raised this much money."  Perla Decl. ¶ 21(b), quoting Salcedo Storm Podcast, *Ken Paxton Outshines Republicans By Bringing Accountability to ACT Blue* (published Apr. 21, 2026).

His fundraising emails since filing the state action have been similarly explicit.  He identifies ActBlue as "the Democrats' shadowy digital fundraising network," *see* Jones Decl. [Dkt # 51], Exs. 2 & 3, noting that it has raised billions of dollars for Democrats and, more specifically, "eye-popping sums online" for Talarico, *id.*, Ex. 5.  The truth is plain and captured in Paxton's own declarations: The lawsuit was filed in retaliation for (and in an attempt to suppress) ActBlue's efforts to fund Talarico's campaign.

## III.  Preliminary Injunction

Looking past the threshold considerations, the court turns to the heart of the matter: whether to issue a preliminary injunction.  Courts consider the following factors when determining whether to do so: "(1) the movant's likelihood of success on the merits, (2) the potential for irreparable harm, (3) a balancing of the relevant equities, and (4) the effect on the public interest." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995).  "Likelihood of

success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996); *see also CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020) (Likelihood of success on the merits is the factor that "weighs most heavily in the preliminary injunction analysis."); *Ryan v. U.S. Immig. & Customs Enf't*, 974 F.3d 9, 20 (1st Cir. 2020) ("If the movant 'cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'"), quoting *New Comm Wireless Servs. Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

### a. Likelihood of Success on the Merits

"Under the First Amendment, retaliation claims proceed in two stages." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). First, the plaintiff must prove that: (1) it "engaged in constitutionally protected conduct," (2) it "was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *Id.* The burden then shifts to the defendant to prove that it "would have reached the same decision . . . even in the absence of the protected conduct." *Id.* (internal quotation marks and citations omitted).

For much the same reasons previously discussed, the court finds that ActBlue has established a likelihood of success on the merits. *See Jolt Initiative*, 821 F. Supp. 3d at 721 ("Where the allegation is that the state proceedings . . . were instituted in retaliation for or to deter the exercise of constitutionally protected rights, the question of the applicability of the *Younger* exception and that of the existence of a constitutional violation merge: to prove one is to prove the other."), quoting *Wilson v. Thompson*, 593 F.2d 1375, 1385 n.17 (5th Cir. 1979). ActBlue has engaged in protected conduct, namely, facilitating the donation of funds to political candidates on behalf of private donors. The lawsuit in Texas is undoubtedly an adverse action. And having previously found bad faith, the court agrees with ActBlue that the evidence in the record compels the conclusion that, far from protecting Texas consumers, the action was filed in retaliation for ActBlue's fundraising on behalf of Talarico, Paxton's current political rival for the Senate seat.[8]

---

[8] In his brief and at oral argument, Paxton asserts a defense under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), arguing that he can defeat a claim of adverse impact on the First Amendment rights of ActBlue by showing that the suppression of protected expression was not his primary motivation in pursuing the case and that he would have taken the same action against ActBlue even in the absence of protected speech. *See* Def.'s Resp. to Mot. for a Prelim. Injunction [Dkt # 39] at 16, citing *Mt. Healthy*, 429 U.S. at 285. This argument fails in its fundamentals. First, even under *Mt. Healthy*, it is not open to the government to impinge on

13

### b. *Remaining Factors*

The court's finding as to likelihood of success effectively resolves the remaining factors in ActBlue's favor.  Even setting aside the chilling effect the lawsuit is meant to have on private donors to the Texas campaign and the diversion of ActBlue's resources elsewhere, the suppression of speech alone constitutes irreparable harm.  *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Media Matters*, 732 F. Supp. 3d at 29 (rejecting the argument that a First Amendment injury is reparable merely because plaintiffs could bring their speech claims as an affirmative defense in the state court litigation).

---

political speech (even a "little bit," as Paxton's counsel would have it).  *Cf. Reyes-Orta v. Puerto Rico Highway & Transp. Auth.*, 811 F.3d 67, 73 n.3 (1st Cir. 2016) (noting that, in the political discrimination context, evidence of pretext may suffice to defeat a *Mt. Healthy* defense, even where the government identifies a nondiscriminatory reason for its actions).  But more to the point, *Mt. Healthy* defines the (limited) right of a government employer to prohibit speech by its employees on matters not involving issues of public concern that may interfere with its ability to efficiently perform the services it provides to the public.  *See Mt. Healthy*, 429 U.S. at 284.  The defense has nothing to do with government attempts to regulate or suppress (or retaliate against) the speech of private actors.  *Cf. Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011) (the public concern test applies only to claims brought by government employees; it does not apply to private citizens who are not part of the government workplace).

And as for the balance of hardship and public interest factors, which merge when the government is the opposing party, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), there is an inherent public interest in ensuring that state officials respect the explicit guardrails set out in the U.S. Constitution, particularly when it comes to matters of political speech, *see Media Matters*, 732 F. Supp. 3d at 30 ("And 'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation[.]'"), quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## ORDER

For the foregoing reasons, ActBlue's Motion for a Preliminary Injunction is <u>ALLOWED</u>.  Paxton and each of his agents and employees are hereby <u>ENJOINED</u> and <u>RESTRAINED</u> from continuing to litigate the Texas state civil enforcement action, *State of Texas v. ActBlue LLC*, No. 096-376890-26 (Dist. Ct., Tarrant Cnty., Tex.), or from bringing any new state civil enforcement action premised on the same conduct.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

15