UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ACTBLUE LLC, ACTBLUE CIVICS, INC., ATS, INC., and ACTBLUE CHARITIES, INC., | ) | |
| Plaintiffs, | ) | No. 1:26-cv-11986-RGS |
| v. | ) | |
| WARREN KENNETH PAXTON, JR., in his official capacity as Attorney General of the State of Texas, | ) | |
| Defendant. | ) | |

BEFORE THE HONORABLE RICHARD G. STEARNS
UNITED STATES DISTRICT JUDGE

Motion Hearing

June 4, 2026
11:01 a.m. - 12:27 p.m.

John Joseph Moakley United States Courthouse
Courtroom No. 21
1 Courthouse Way
Boston, Massachusetts 02210

Jennifer M. Vaillancourt, RPR, CSR #154422
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 7205
Boston, Massachusetts 02210
E-mail: Jenn.m.vaillancourt@gmail.com

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
FELICIA H. ELLSWORTH, ESQ.
TIMOTHY J. PERLA, ESQ.
AMANDA MASSELAM STRACHAN, ESQ.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617)526-6000
Felicia.ellsworth@wilmerhale.com
Timothy.perla@wilmerhale.com
Amanda.masselamstrachan@wilmerhale.com

ON BEHALF OF THE DEFENDANT:
WADE A. JOHNSON, ESQ.
BRIAN BEYUAN TUNG, ESQ.
LAUREN ELISE SAEGER, ESQ.
Texas Attorney General's Office, Special Litigation Division
PO Box 12548, Capitol Station
Ste Mc-009
Austin, Texas 78711
(512)463-4139
Wade.johnson@oag.texas.gov
Brian.tung@oag.texas.gov
Lauren.saeger@oag.texas.gov

P R O C E E D I N G S

THE CLERK: All rise.

(The Honorable Court entered.)

THE CLERK: Thank you so much. You can have a seat.

This is Civil Matter 2611986, ActBlue LLC, et al. versus Paxton.

And would counsel starting with the plaintiff please identify yourself for the record?

MS. ELLSWORTH: Good morning, Your Honor. Felicia Ellsworth for WilmerHale for ActBlue.

MS. MASSELAM STRACHAN: Good morning, Your Honor. Amanda Masselam Strachan also for ActBlue.

MR. PERLA: Good morning. Timothy Perla, WilmerHale for ActBlue.

MR. JOHNSON: Good morning, Your Honor. Wade Johnson with the Attorney General for Defendant.

MS. SAEGER: Good morning. Lauren Saeger also for Defendant.

MR. TUNG: Good morning, Your Honor. Brian Tung also for Defendant.

THE COURT: Good morning, Counsel, and welcome.

In the matter, I think, the principal discussion this morning is the motion for a preliminary injunction. I know there's -- a motion to dismiss has also been filed.

It seems to me that to the extent that is based -- and I know it's not completely based on personal jurisdiction, that, at least, is something of a nonstarter given the expansiveness of the Massachusetts long-arm statute.

Beyond that, there are other arguments. It doesn't mean that I don't want to hear you or what you have to say, but my suggestion is that the substance of the motion to dismiss is pretty much subsumed in the first leg of the preliminary injunction motion, which is the likelihood of success on the merits, so maybe we should focus there.

But, again, I don't want to preempt what I know has been long, careful preparation by counsel for the argument, and so I will hear you on whatever you think I should hear, but my focus now is on the preliminary injunction, if that is any help in terms of guidance.

Let's begin, then, with the plaintiff, which is appropriate.

MS. ELLSWORTH: Thank you, Your Honor, and, again, Felicia Ellsworth for ActBlue.

I'm going to focus on the threshold argument relating to *Younger* abstention that the attorney general has raised in opposition to the preliminary injunction motion.

And my colleague, Ms. Masselam Strachan, was going to talk about the preliminary injunction factors, but, of course, I'm happy to answer any questions that the Court has.

I wanted to just start by framing the issue in this case. This is a case about Attorney General Paxton improperly wielding the law enforcement investigatory power and the courts to target a political opponent's fundraising infrastructure in the middle of an election cycle.

ActBlue is a fundraising platform that serves as a conduit for millions of democratic and progressive donors and primarily small-dollar donors supporting public -- supporting candidates for public office.

It has processed about 19 billion dollars in donations since its founding and about 1.8 billion last year alone. This is core First Amendment protected activity, of course, facilitating political contributions.

And, importantly, ActBlue is also the primary fundraising platform for the political opponent of Defendant Paxton, James Talarico, running against Attorney General Paxton for a seat in the Senate in Texas. Through ActBlue, Talarico has raised more than 36 million dollars in just eight months, primarily, again, through small-dollar, small-donor contributions.

Now, this targeting of ActBlue that we lay out in the preliminary injunction motion is just the latest example of Attorney General Paxton targeting his political opponents.

And I'd point the Court to the amicus brief that was submitted by a group of Texas civics organizations detailing a

pattern of retaliatory activity against political opponents.

There's *Media Matters*, an investigation that was enjoined by the district of -- District Court for the District of Columbia and affirmed by the D.C. Circuit.

There were investigations into the Powered by the People pact, which was enjoined by a Texas state court, and there were investigations and an attempt to invoke -- to revoke the charter of the Jolt Initiative, which was enjoined by a federal court in Texas.

So turning to the facts that lead us here today, in December of 2023, Attorney General Paxton announced that he was starting an investigation into ActBlue.

In January of 2024, he issued four requests to examine, very wide-ranging broad requests to examine to ActBlue in Massachusetts requesting production of documents in Massachusetts.

Given the Court's comments, I won't dwell on the Massachusetts contacts, but we do think they are more than sufficiently established here.

I would also note those requests to exam were not limited to questions about Texas donors or Texas candidates. They were looking for sweeping nationwide information.

Then in July and August of 2024, Attorney General Paxton issued additional requests, civil investigative demands, seeking individual donor information.

And then in October of 2024, he transmitted his findings to the Federal Election Commission through a petition for rulemaking, and then nothing happened for 18 months.

Until on February 18th, 2026, James Talarico announced that he had raised 2.5 million dollars in a single day. The very next day, February 19th, Attorney General Paxton's office attempted to make contributions through ActBlue and continued to attempt to do so and -- and make certain successful contributions over -- through the course of February 2026.

Then on April 15th, 2026, James Talarico had an FEC filing showing strong Q1 2026 results, and five days later on April 20th, Attorney General Paxton, again, ratcheted up the -- the heat and filed a petition in Texas state court against ActBlue under the Texas Deceptive Trade Practices Act.

We filed suit in this court on May 1st. As the Court is aware, we sought a preliminary injunction on May 6th. On May 20th, Attorney General Paxton amended his complaint and also sought to seek expedited discovery of ActBlue in this Texas proceeding.

And so we come to this court with this long record, we think both the timing and the content and the nature of Attorney General Paxton's activities show the retaliatory nature of the Texas -- the Texas litigation and the reason why it should be enjoined.

I would also point out that when the April 20th

petition was filed, Attorney General Paxton went on a media tour and -- publicizing this lawsuit against ActBlue and indicating out of -- every time that ActBlue is a left-wing organization, supports Democratic candidates, is an instrument of the far left.

None of that has anything to do with the Deceptive Trade Practices Act claim in Texas. It relates entirely to the political persuasion of ActBlue and the reason why that is the target of Paxton's attention right now.

So we think this timeline, these statements, and the unrebutted evidence that was submitted in multiple declarations in connection with our preliminary injunction motions shows that this is a retaliatory prosecution and that a preliminary injunction must issue.

THE COURT: Let me ask this question: Some statements that the general made are fairly pointed. He's not the first attorney general, of course, to say things that perhaps better might have been left unsaid with respect to ongoing litigation.

To what extent can a Court rely on the public statements of a public official with respect to motive in filing a lawsuit?

MS. ELLSWORTH: So I think -- I think the Court can rely on them extensively, and I'd point the Court to other courts that have done so.

So the D.C. Circuit in *Media Matters* noted that public

statements made by an attorney general, there Paxton, were supportive of the fact that this was a bad faith prosecution and, thus, that -- that there should be -- that there should be an injunction issued.

Just recently, two days ago, we submitted just yesterday evening the Northern District of Illinois enjoined an action by the Florida attorney general and also focused on statements the Florida attorney general had made about the basis for the prosecution.

And the Fifth Circuit in the *Netflix* decision also used statements that were made by the attorney general, there a district attorney, in connection with the prosecution as evidence of intent.

And I think this all is swept into the -- not just the merits of our request for a preliminary injunction but the reason why the attorney general's invocation of *Younger* abstention doctrine does not apply because of the bad faith exception to *Younger* abstention.

THE COURT: So I assume the theory is that because the attorney general is not carrying out a ministerial act but something that can only be undertaken on his own initiative, his statements, then, do matter as opposed to simply executing a law that preordains his actions.

MS. ELLSWORTH: The statements do matter because the question is whether his action -- his state court -- his state

court civil action is, in fact, an exercise of his authority or is instead a bad faith exercise into -- at which point is not entitled to any sort of deference from this Court, again, thinking about whether it's *Younger* abstention or the merits of the preliminary injunction.

THE COURT: So you're saying the framing of the *Younger* abstention almost inherently involves motivation. It is a subjective bad faith inquiry.

MS. ELLSWORTH: The framing of the bad faith exception to *Younger* abstention, yes, is a subjective bad faith inquiry, and I would point the Court to *Netflix* as well as to the Fifth Circuit case involving New Jersey Attorney General Grewal, which is not cited in our papers but was cited in the Northern District of Illinois decision from yesterday.

Essentially -- I mean, *Younger* abstention is -- the rule is that Courts should decide cases that before them. *Younger* abstention is a -- a narrow doctrine that can be applied when various qualifying circumstances are met, but the Court should invoke it lightly and carefully.

And there are reasons why the *Younger* abstention does not apply in cases. There are narrow exceptions, and this falls into one of those exceptions, and that is when the underlying state court action was brought in bad faith and is being carried forth and brought in bad faith.

The basis for that bad faith prosecution, we would

submit, is both the timing, right, the -- the fact that this investigation lay dormant for 18 months until a political action occurred and then all of a sudden the investigation out of nowhere both restarted and was escalated in terms of its intensity by filing a civil petition as opposed to what had just, up to that point, been investigative demands.

By his own words -- and, again, the Court can take into account to determine subjective motivation the fact that in connection with publicizing this lawsuit and then also in connection with his own fundraising for his campaign using this lawsuit, Paxton has routinely characterized ActBlue as the -- part of the far left, a left-leaning fundraising arm, noted that it was based in left-leaning Cambridge, which is neither Somerville, nor Boston, which is where ActBlue is actually based, but the implication is that this is a progressive and left-leaning organization that is a political foe of Ken Paxton, and that is the reason why the Texas state court action was brought.

I would also note that -- I'd look at the -- both the *Netflix* and the *Jolt* case, which is the Western District of Texas case, both of which talk about both the timing and escalation of an attorney general's or a prosecutor's actions as being indicia of bad faith.

And in the *American Academy of Pediatrics*, that's the Northern District of Illinois decision that we sent along

yesterday, the Court found that adding -- escalating a state court proceeding by adding claims while the federal litigation is pending is additional evidence of bad faith.

We also have that here. We have an original petition filed April 20th and then an amended petition that purported to add more details and facts surrounding the allegations against ActBlue after this Court had already set a hearing on the preliminary injunction and after ActBlue had filed its motion supporting why a preliminary injunction should issue.

The other factor I would point to in support of a finding of bad faith here is selective enforcement. As we've noted in our papers, the Republican corollary to ActBlue is an entity called WinRed.

There have been complaints against WinRed for -- for fundraising challenges that -- that they have that Attorney General Paxton has received and not investigated.

The idea that -- that there is gift card donations to ActBlue and those are the subject of investigations and prosecutions, and yet the same gift card donations or alleged gift card donations to WinRed are not having any action taken against them provides further support for a finding of bad faith here given the selective enforcement, and we put some -- some material in -- in our reply brief to support that.

THE COURT: I saw that. Although -- and I do understand the argument, but selective enforcement is a

difficult doctrine to argue. It's clear that a prosecuting authority has a great deal of discretion in picking and choosing the kinds of cases he or she will bring.

But for selective enforcement, don't you have to point to something else, something beyond just simply ideological motivation?

Doesn't it have to have something to do with a protected class?

MS. ELLSWORTH: And here, I would suggest it has to do with the protected conduct that ActBlue engages in which is its political speech.

THE COURT: So you tie it directly back to --

MS. ELLSWORTH: It ties back -- it's also not -- not my only ground for bad faith. I do understand that -- that the prosecutorial discretion is broad, but it cannot be wielded in bad faith, and I do think that all comes back into the question of this bad faith exception to the *Younger* abstention doctrine.

THE COURT: But if you can show harassment, you don't really need selective enforcement, do you?

MS. ELLSWORTH: If you can show bad faith and harassment, I think what -- the First Circuit has said that, the -- the Supreme Court in the *Sprint* case, which is the most recent articulation of the *Younger* doctrine, has made clear that harassment or bad faith activity is a basis to find that -- that abstention is improper and that a federal court should

continue to act.

THE COURT: I gather you didn't spend a lot of time wrestling with this concept of commercial speech that is raised by the attorney general.

MS. ELLSWORTH: Well, I don't think there's a lot of merit to that argument. This seems to me to be core campaign speech -- core political speech protected by *Citizens United*.

THE COURT: In other words, you're saying your client has no particular commercial interests --

MS. ELLSWORTH: Well, I'm --

THE COURT: -- as opposed to political interests in what it's doing.

MS. ELLSWORTH: I'm not suggesting there's no commercial interest. Of course, it is a business. Although it is a 501(c)(3), but the speech that is being targeted here is not any sort of speech that relates to the -- to ActBlue's commercial interests.

THE COURT: Commercial speech usually means advertising, don't we, when you put that concept into --

MS. ELLSWORTH: That is -- I agree that's typically what commercial speech is. I would say that the conduct that is being targeted here or the conduct that is complained about by -- by Paxton in the state court petition relates to the processing of political donations and speech about -- you know, representations that were made about what types of donations

would be processed and what types of donations would not be processed.

It has nothing to do with how ActBlue might make money or anything along those lines. It's about what types of donors or donations will be allowed to be processed through the platform.

So I don't think there's really any purchase to the commercial speech suggestion that's made in Paxton's papers.

THE COURT: What do you say in response to the attorney general's argument that he has reams of evidence? He doesn't quite explain what these reams are other than three American Express card donations, as I understand it.

MS. ELLSWORTH: There were three donations that were -- that successfully went through. There were three donations that were rejected.

THE COURT: How do you define a ream?

MS. ELLSWORTH: I don't actually know how one defines a ream, and I would welcome the attorney general's representatives to explain the theory behind the Texas state court case.

As I understand it, it's the idea that Democratic donors and Democratic candidates, including James Talarico, were being harmed by ActBlue's representations made to Congress.

I have a hard time seeing how that falls within the

jurisdiction of the Texas Deceptive Trade Practices Act or, frankly, within the interests of the attorney general, but I'll -- I'll let his representatives speak to that.

THE COURT: Well, let's assume -- I know you wouldn't accept the proposition -- that there's a federal election violation. How does that relate to -- and this is really more for Mr. Johnson, how does that relate to Texas consumer fraud?

MS. ELLSWORTH: I -- I don't think that it does. Attorney General Paxton is not enforcing federal election law. I don't think he has the authority to enforce it, nor does he purport to be enforcing it under the state law statute that is the basis for the petition.

I would also note that the -- the -- a lot of the additional allegations and facts and some of the -- I would call hyperbole that's being used in the papers about my client relates to facts that have nothing to do with the underlying subject matter of the Texas state court petition.

That is about whether or not a statement was made about acceptance of gift cards and whether that statement was correct or incorrect and whether there was somebody who relied on that statement to their detriment and suffered some kind of harm under a Texas consumer statute.

Any representation that may have been made to Congress, all such representations which were accurate, has nothing to do with what a Texas consumer may or may not have

understood to the -- the ActBlue's platform to do.

So I too am scratching my head about the theory underlying that, and I think that is another reason why the Court can find bad faith here.

If you look at the *Media Matters* case, if you look at the *Netflix* case, all of the -- the litigation that relates to these kind of bad faith exceptions to *Younger* look at the underlying merits of the case and conclude that if those merits are less than clear, that is another reason to think that there is bad faith that's motivating the prosecution.

THE COURT: I would just answer my own question. I don't think ream is a legal concept. I think, to my mind, it means 500 pages of Xerox paper in one package, but --

MS. ELLSWORTH: It's a -- it's a measurement that I don't know it's well-defined. I certainly haven't seen it defined in the papers.

THE COURT: Is the thought to have Ms. Strachan first address -- or do you want to hear from Mr. Johnson or do I want to hear from Mr. Johnson?

MS. ELLSWORTH: Whatever would be easiest for the Court, I think -- if the Court has no further questions on either *Younger* or personal jurisdiction, I'm happy to turn it over.

THE COURT: Yeah. Why don't we have Ms. Strachan, then address the remainder of the argument.

MS. MASSELAM STRACHAN: Thank you, Your Honor.

The Court here has the power to grant injunctive relief of a state court enforcement action for a reason, and that reason is here.

As Ms. Ellsworth set forth in her argument, Attorney General Paxton has a well-worn playbook of using his office to target his political rivals and silence people and causes for which he disagrees.

This lawsuit, as you know, is not filed in a vacuum. The record is replete with evidence of the defendant's real motivation here, and far from trying to hide it, he is running for office on it.

The moment is urgent, Your Honor. We ask for the preliminary injunction that is set forth in the papers. The First Amendment does not permit the silencing that General Paxton seeks, and I -- we urge this Court to grant the injunction to act as a check of his abusive power.

And I'll now run through the preliminary injunction factors, Your Honor, of which you are well aware, starting with a likelihood of success on the merits.

The merits, Your Honor, we suggest rise and fall on the First Amendment retaliation. To establish a prima facie case of First Amendment retaliation, ActBlue needs to prove, number one, that it engaged in First Amendment protected activity -- conduct, which I'll talk about; that it suffered an

adverse action; and that its conduct -- protected conduct played a substantial or motivating part in that adverse action.

So starting with the protected activity, I suggest, Your Honor, that any suggestion that ActBlue is not engaging in protected speech is meritless.

General Paxton's opposition to our preliminary injunction papers concedes that ActBlue may be election adjacent is -- is how I believe they put it, Your Honor. I think it is obviously far more than election adjacent.

ActBlue's political speech is the embodiment of what ActBlue is. Both its own speech is at issue here as well as that for the millions of voters.

THE COURT: That's the question I was going to ask, is it really ActBlue's speech or --

MS. MASSELAM STRACHAN: Your Honor --

THE COURT: -- is it those who actually are giving money?

MS. MASSELAM STRACHAN: Both, we suggest it is both, Your Honor. It is both ActBlue's -- both its -- its speech, its associational choice to align with Democratic-aligned candidates and causes. In order for ActBlue to support a candidate or a civic organization, it must align with its viewpoints and be Democratically aligned, and so it is that choice in deciding to associate with those candidates and causes, and it is also those of the donors, the millions of

donors who rely on ActBlue to express their political speech and their right of association with candidates and causes that they believe in, so we suggest, Your Honor, it is both. ActBlue --

THE COURT: Just out of curiosity --

MS. MASSELAM STRACHAN: Yes.

THE COURT: -- I'm not sure it's relevant, but who decides what ActBlue's preferred orientation is?

Is there a -- I'm not familiar with the organization. Does it have a governing board?

Who makes the decision?

MS. MASSELAM STRACHAN: It does, Your Honor, it has a -- it has a board of directors. It also has a CEO, a CFO, and typical corporate structure that you would expect, it does. It is -- that is how it's governed.

THE COURT: So if I want to be considered a beneficiary of ActBlue as a candidate, do I apply, do -- or am I chosen?

MS. MASSELAM STRACHAN: You submit --

THE COURT: Not to get into the weeds, but --

MS. MASSELAM STRACHAN: You submit a request through ActBlue, Your Honor, in order to be able to use the platform. It's reviewed by a set of folks in house at ActBlue, and then as long as it's aligned with the organization's beliefs, then they can move forward.

THE COURT: I'm not thinking of running for anything.

MS. MASSELAM STRACHAN: Good to know.

And so we suggest, Your Honor, and we urge that General Paxton is retaliating against ActBlue for its core First Amendment expressive activity. And as the Supreme Court has noted in *Citizens United*, First Amendment has its fullest and most urgent application to political speech and expression during campaigns for political office.

And so also, Your Honor, I wanted to point with respect to the donors that you ask about to the First Circuit case in *Cool Moose Party versus Rhode Island*, where the First Circuit reiterates that freedom to associate with others and the advance -- for the advancement of the political beliefs and ideas is protected by the First and Fourteenth Amendments, and the right to associate with a political party of one's choice is an integral part of this basic constitutional freedom is a quote from that case.

Your Honor, you discussed commercial speech with Ms. Ellsworth. Obviously, ActBlue contends that what is at issue and what General Paxton is trying to enforce against here is ActBlue's core political speech and its fundraising, and so I'm going to skip over that unless you have any questions.

The -- and so the -- I also wanted to point out, Your Honor, that with respect to -- I wanted to point Your Honor to *First Choice*, which Your Honor cites in your minute order,

which is an April 2026 unanimous Supreme Court decision, it feels worthy of pointing out, and we, obviously, believe that in that -- that that case is applicable here where the Supreme Court expressly unanimously rejects the argument that a protective order could somehow remedy the First Amendment injury that's caused here and would point Your Honor, as Ms. Ellsworth discussed, to the investigative demands that have been issued by General Paxton that -- that call for donor information.

Your Honor, turning to the element of causation, we suggest that there are four things that -- at least, that show that Attorney General Paxton's civil enforcement action is retaliatory and causally linked to ActBlue's protected First Amendment activity.

First, we have the timing, as Ms. Ellsworth set forth, and so I won't reiterate it here, but the -- his office's investigation of ActBlue, the timing of it, the sitting dormant for periods of -- a long period of time until James Talarico's big fundraising announcements, as well as the request for expedited discovery that came 20 days -- 19 days after we filed our complaint with this court, the discovery intensified and also added new allegations with respect to foreign donations.

And as Ms. Ellsworth pointed out and as the amicus brief very well points out, this escalation of discovery requests and the broadening of investigation is part of the

retaliatory playbook that General Paxton employs for this, so we suggest the timing is the first factor that Your Honor should be turning to.

We also -- I apologize, Your Honor. I -- I -- I got myself a little turned around. I wanted to also address the adverse action factor. I think I skipped over that.

As you know from the briefing, General Paxton doesn't contest this point. It's clear that the investigation, the civil enforcement action, the seeking of injunctive relief is all adverse action, and, again, Courts have ruled that actions like the ones that Paxton is taking here chill speech. We point the Court to *Media Matters*, of course, as well as the other cases that are cited in our briefs, Your Honor.

Causation -- now -- sorry -- let me get back to causation. We have the timing. Also, General Paxton's direct statements are evidence on the causation factor.

He's made no secret of his motivation, as we've discussed, repeatedly describing ActBlue as the liberal Democrats, the wrap to the left, et cetera, so we have his contemporaneous words.

We have his press release, Your Honor, that announces the lawsuit that trumpets the fact that ActBlue raises large amounts of money for liberal Democrats. We point the Court to *Arizona Students' Association*, the Ninth Circuit case, that explains contemporaneous statements by government officials

mentioning and criticizing protected activity is strong evidence of causation. That's in our papers, Your Honor.

He recently -- General Paxton also recently set forth his declaratory retaliatory animus in his funding e-mails, which we attached to the declaration of Matthew Jones, where General Paxton is telling his supporters, quote, lawless Democrats under investigation, end quote, and he frames ActBlue as the Democratic -- the Democrats' shadowy digital fundraising network, as we said, that was based in Cambridge, Massachusetts, and so this repeated invocation of ActBlue's political affiliation, obviously, we believe establishes causal link between his retaliatory animus and the subsequent injury.

Then we have, Your Honor, his shifting justifications for the retaliatory enforcement action, which show that he's making up this as he goes along. It feels like a game of Whac-A-Mole trying to keep track of the different shifting enforcement theories, whether we're talking about CVV, are we talking about gift cards, are we talking about Congress, are we talking to foreign donations, and how do any of those things tie into the Deceptive Trade Practices Act that he seeks to be enforcing?

And so we view this shifting of the theories, as we put in our reply, the hammer in search of the nail as the -- as -- as further evidence of the fact that this is not a good faith state enforcement action as -- as this inquiry that the

court in the Northern District of Illinois in *American Academy of Pediatrics* talked about, is it a good faith enforcement action, or is this evidence of retaliatory bad faith? And we suggest that it is the latter.

Not to mention, Your Honor, as Ms. Ellsworth suggested, with respect to the allegations on gift cards, which, by the way, are not forbidden; there's no federal election violation here with respect to gift cards.

The allegation that General Paxton seems to be making is that because the -- ActBlue has declared that it doesn't accept gift cards and then I think they describe it as some sort of sneaky, shadowy, behind-the-scenes decision to start accepting them again, that that is somehow a consumer protection violation against the donors to ActBlue as if a donor -- if you really go down the rabbit hole of trying to understand this, which we have, so the idea, I suppose -- and they can speak for themselves, of course -- is that a donor is somehow defrauded if ActBlue says, we don't accept gift cards; you must contribute using some other means other than a gift card, and, in fact, they do accept gift cards, according to Paxton, then, that is somehow -- that the donor is somehow defrauded.

And so I think that's the allegation with respect to gift cards. I'm not sure what else it is, but it's not that it violates some kind of federal election law because it doesn't.

It is that the donors are defrauded by what Paxton says is -- is ActBlue deciding to start using gift cards again, which we, obviously, dispute his allegations, but that is -- to sort of take it through to conclusion, I think that's what he means.

And, you know -- and we see that the *American Academy of Pediatrics* case, as the Court was evaluating the Florida attorney general's claims and says the weakness of the complaint -- the Court there said -- suggests that the attorney general is retaliating against the AAP because -- without a reasonable expectation of success rather than merely picking between viable enforcement opportunities, so that's the AAP case that we provided the Court yesterday.

So taken together, Your Honor, we believe that it's clear that the proffered reasons for bringing this case are pretextual. We think that is clear and further evidence of his retaliatory targeting of ActBlue for its First Amendment protected activity.

And then, third, Your Honor, we have the selective enforcement, which you've discussed with Ms. Ellsworth, so I won't -- I won't dwell on that, but I will point Your Honor to a case I believe is cited in our brief, *Minocqua Brewing LLC*, which is a Seventh Circuit, 2025, 160 F.4th 849, plaintiffs can establish causation through disparate treatment of similarly situated entities, and so, obviously, we point your court -- the Court to that.

There's been a lot of public reporting about Texan Republican donors who have lost thousands upon thousands of dollars through unauthorized recurring charges on WinRed's platform, and to -- as far as we're aware, the attorney general has done nothing about that.

Finally, Your Honor, on this element of causation, we point the Court to the defendant's playbook, the amicus brief lays this out very well. This is what he does simply put.

He uses his office for -- to target his political opponents and causes he disfavors for the exercise of their free speech rights. He's done it over and over, and it's why he has been stopped before, an unusual, perhaps, thing to do -- to happen in another time, but not anymore, and so we point the Court to the amicus brief.

All together, Your Honor, we believe that this is enough to show the retaliatory motive under Supreme Court precedent.

As Your Honor knows, once a plaintiff has demonstrated that the protected conduct was a substantial or motivating factor in the adverse action, the burden shifts to the defendant to show by a preponderance of the evidence that the same decision would have been reached even in the absence of protected conduct, and that is Supreme Court *Mount Healthy City School District*.

Defendant here has offered no evidence whatsoever,

Your Honor, to support the assertion that the decision to investigate and sue ActBlue would have been made absent its First Amendment activity.

Turning, Your Honor, to the harm here, it is real; it is ongoing; and it cannot be undone. Supreme Court has repeatedly made clear, as it did in *Roman Catholic Diocese of Brooklyn*, Supreme Court case, that the loss of First Amendment freedoms, even briefly, is irreparable injury.

Paxton's action here causes irreparable injury in at least three different ways. First, the investigative demands would force ActBlue to disclose private donor information, and this Court -- and as this Supreme Court has recognized and unanimously found recently in *First Choice* and in *NAACP* case on which the Supreme Court relies in that decision, these demands inevitably carry with them deterrent effect on the exercise of First Amendment rights.

ActBlue suffers an actual and ongoing injury by -- by deterring donors from associating with it, being publicly accused by a state law enforcement official of facilitating fraud has discouraged donors and campaigns from wanting to associate with ActBlue, to use the platform to express their political views. I point Your Honor to the Sharton declaration, which ActBlue filed with its papers, that lays that out in paragraph 7 and 8.

Second, Your Honor, General Paxton is forcing ActBlue

to divert resources and defend itself in litigation right now during an active election cycle. And we point the Court to *Citizens United*. It is well-known that the public begins to concentrate on elections only in the weeks immediately before they are held, and there are short time frames in which speech can have influence, and we are in that time, and we suggest that the timing here is very indicative of the real motivation behind General Paxton's actions.

These funds cannot be recovered. Paxton is immune from official capacity suits for damages, so, obviously, those funds won't be recovered.

Third and most significantly, ActBlue is irreparably harmed because it is suffering a campaign of retaliation for its exercise of First Amendment rights.

This burden is not ordinary litigation expense, Your Honor. It's constitutional injury of being forced to defend a retaliatory enforcement action designed to suppress its protected speech.

And as the Seventh Circuit noted in the *AAP* decision of-- oh, sorry -- not *AAP* -- the Seventh Circuit in *International Association of Fire Fighters*, Your Honor, which the AAP Court cites, a loss is a loss, they quote. A plaintiff need not show total deprivation to meet their irreparable harm element for a preliminary injunction.

And so ActBlue, Your Honor, will continue to suffer

irreparable harm absent injunctive relief. The ongoing discouragement of the donors and the candidates from associating with ActBlue is very real.

The equities -- Your Honor, the final elements for the preliminary injunction 3 and 4 come together because General Paxton is a public official. The -- the equities here are one-sided.

An injunction would simply require Paxton to comply with the constitution, to -- it doesn't prevent legitimate law enforcement. It would prevent enforcement that is motivated by retaliation, and Texas has no legitimate interest in enforcement actions that violate the First Amendment, so the public interest, Your Honor, is high.

This case is about protecting the rights of the individuals to participate in the democratic process without fear that the government will target them for doing so.

So, Your Honor, I'm happy to talk about the scope of the injunction or any other question you have. We point the Court, of course, to *Media Matters*.

But to conclude, Your Honor, I'd just say the Court here has the authority to enjoin the Texas action, and it has that authority for good reason. Where an organization is being targeted for exercising its constitutional rights, the Court has the ability and it must step in to stop it.

THE COURT: That leads me to my final question. In

terms of the remedy you're seeking, there's a, kind of, shifting in what you're asking for as best I can tell.

MS. MASSELAM STRACHAN: Okay.

THE COURT: At one point, I get the impression that you're asking to enjoin the attorney general forever from ever investigating ActBlue or anyone associated with it, and then a little more modestly, there's something else that's being asked for.

I don't see how a court can enjoin a future event that --

MS. MASSELAM STRACHAN: Your Honor --

THE COURT: -- is purely speculative at this point, so what in terms of framing a remedy are you really asking for in terms of its scope?

MS. MASSELAM STRACHAN: Thank you, Your Honor. It's a good question.

We are not -- and I understand your -- I understand it. In our papers, ActBlue is requesting that the Court enter an order stating that Defendant Paxton and each of his agents are enjoined from pursuing an action in violation of ActBlue's constitutional rights or in violation of the constitutional rights of third parties.

So we are not actually seeking an order that says that General Paxton is not allowed to exercise legitimate law enforcement authority going forward or that he may not pursue

ActBlue should it be a constitutional and properly founded investigation.

We also ask the Court enjoin him from continuing to litigate the Texas state court matter that's currently pending or further investigate ActBlue in violation of its -- of its rights or initiate any of their action that would be in violation of its rights.

Your Honor, we point the Court to the injunction that was issued in *Media Matters*. We think that that is -- that case is highly analogous to the situation here.

The Court in *Media Matters* issued an injunction that enjoined General Paxton from, number one, enforcing a particular civil investigative demand, and, B, from issuing any additional demands or taking steps purporting to mandate any action on behalf of Plaintiffs in furtherance of the investigation of *Media Matters* announced by Defendant Paxton on November 20, 2023, so that is what was issued there.

I think if we were to translate that to what it means for -- for ActBlue and what we are seeking here, we would ask that the attorney general be enjoined from prosecuting the pending enforcement action, that he be enjoined from enforcing his outstanding discovery requests, the RTEs, the CIDs, and that he be enjoined from initiating a new enforcement action against ActBlue based on the statements currently in the amended petition, Your Honor, the things that he's set forth

that he's investigating, so we believe that, obviously, any future -- if he were to close the investigation today and initiate a new one tomorrow on the same things, obviously, we think that that should be enjoined, and, finally, enjoining Paxton from taking steps that are purporting to mandate any action from ActBlue in furtherance of his investigation into their acceptance of gift cards or vetting of foreign donations, the theories that he has put forth in his papers, so that is our suggestion here today.

THE COURT: That's a little more helpful. I mean, issuing an injunction to someone, do not violate anyone's constitutional rights, the constitution already says that --

MS. MASSELAM STRACHAN: Yes.

THE COURT: -- and so the injunction is kind of beside the point. You're --

MS. MASSELAM STRACHAN: That's --

THE COURT: -- now being a little bit more specific, so --

MS. MASSELAM STRACHAN: Great.

THE COURT: -- in other words, you want this particular enforcement action stopped.

MS. MASSELAM STRACHAN: Yes, please, Your Honor, and -- and not a further one to be initiated on the same grounds.

THE COURT: I understand.

Mr. Johnson.

MS. MASSELAM STRACHAN: Thank you, Your Honor.

THE COURT: Are you going to be the principal lawyer on this?

MR. JOHNSON: Your Honor, if it pleases the Court, we actually are going to split it up too, and Mr. Tung is going to address the *Younger*, and Ms. Saeger the preliminary injunction factors, if that's okay.

THE COURT: Yeah, as you choose.

MR. TUNG: Good morning, Your Honor. Thank you so much for having us here today. We really appreciate the opportunity to come and speak about this issue.

I wanted to start with *Younger* and address some of their arguments. We think *Younger* is very important for this case because the First Circuit's application of *Younger*, I think, is very different from how other circuits approach *Younger*.

Opposing counsel relies pretty heavily on out-of-circuit cases to support their *Younger* argument. They rely heavily on a Second Circuit case and they rely on *Netflix*, a Fifth Circuit case.

But other circuits approach *Younger* differently. They argue that -- for example, they argue -- I believe that in the Fifth Circuit, they argue that *Younger* is a subjective inquiry, but other circuits do things differently. In the Ninth

Circuit -- this is -- *Younger* is an objective inquiry, and this is *Stockton versus Brown*, 152 Federal 4th 1124 at 1139, that's a Ninth Circuit case from 2025. And the First Circuit does things even more differently.

So in the First Circuit, *Younger* is very muscular. It's mandatory if it's elements are met, and this is from *Rio Grande* First Circuit. And the standard is also different than the other circuits.

It requires in order for there to be a showing of bad faith, ActBlue must show that General Paxton has no reasonable opportunity of success. This is from the *Kugler* case at SCOTUS. This is from *Brooks* in the First Circuit and *United Books* also from the First Circuit.

And this is a very strong test. This may not be true in other circuits like the Fifth Circuit or the Second Circuit or maybe the Ninth circuit, but in the First Circuit, the First Circuit requires a very strong, muscular application of *Younger* when it's there.

Ultimately, Judge, this case is very important to us because it affects a neutral principle of law. Can a state attorney general, whether that be the Texas attorney general or the Massachusetts attorney general, if there's a foreign corporation violating our state's law affecting our citizens, can the chief law enforcement officer of our state bring a case to enforce our laws in our courts?

And this is true whether or not this is the Texas attorney general, the Massachusetts attorney general, or the New Jersey attorney general in *First Choice*.

THE COURT: Well, I certainly follow that argument, but let's go back to the question I asked earlier of the plaintiffs. What is the connection between the Texas consumer fraud statute and federal election law?

I mean, it seems that the attorney general has taken it upon himself to enforce federal election law, and I'm not sure where that authority comes from or where you locate that in the Texas state law.

MR. TUNG: Absolutely, Your Honor, and thank you so much for your questions. I really appreciate them.

So in Texas, we have a strong policy that if you are offering a service to our citizens, you have to actually do what you're saying.

Our theory from the very beginning of our first original petition, our theory of the case has always been ActBlue told us, ActBlue told Congress, ActBlue told the public that it has stopped accepting domestic gift card transactions.

And they seem to concede in their reply and response briefing that they recently filed that that's not actually their policy. It seems like there is a certain subset of domestic gift cards that they will process as a part of their policy.

And it seems they concede that they are not going to reject all gift cards, but if any gift cards that their payment processor or their vendor, Sift, if Sift says it's okay, we're going to process those too.

And that is not an adequate defense under the Texas Deceptive Trade Practices Act. I think ActBlue either needs to, one, get a better vendor and pay more for that, or, two, don't promise to do what they can't do or what they're not doing. If they can't do it, say that. And that comes with a real cost, but --

THE COURT: So you're saying it wouldn't matter whether they said we freely accept gift cards or we don't accept gift cards at all. You're saying you have to choose one or the other to satisfy of the Texas consumer.

MR. TUNG: Perhaps a more limited statement saying we will accept -- a more limited statement explaining that we will accept this certain subset of gift cards because we think that we can do an adequate job screening them, or a statement that says, we will try our best to screen for gift cards and reject them, but we will make mistakes, and to the extent of whatever mistakes are made, Congress can probe that under its own authority to investigate federal election statutes.

But as far as the harm to Texans, the harm is that in our state it is our state policy that big corporations, corporations, ActBlue facilitates a lot of money transfers, it

is our policy that if you are going to do something and offer a service in our state, you need to keep your word, and if you can't do everything and make these big promises, don't make them.

THE COURT: Well, if the service is accepting the donation, why would the consumer care who's screening it? In fact, if you had a bad purpose in making the donation, you don't want screening. You just want the donation to be accepted.

What would you say if, let's say, my organization says, we will take donations on Visa but not American Express because we don't want to pay the commission that American Express charges? Would that be discriminating against the consumer who didn't have a Visa card?

MR. TUNG: So, absolutely, Your Honor, and thank you for your question.

This matters a lot to Texas citizens and Texas consumers because there are a lot of citizens that really do care that people who are offering services in this area are keeping their word, and the Texas AG, like the Massachusetts AG, is elected by the people and responsive to the people's concerns, and this goes directly to the heart of the enforcement discretion that is key to the chief law enforcement officer of our sovereign state.

For your example, that is a hypo, I think, with

smaller stakes to the general public and to general citizens, which might be a reason to exercise enforcement discretion and not bring that suit.

But maybe I can -- I can see if this was more important and you actually -- if it really did matter that you were honest about not accepting some credit cards and accepting others, maybe someone relies on that and shows up and wants to make a transaction and can't or someone uses that information and seeks some credit cards over other credit cards and benefits one payment processer over another and maybe helps AMEX more than Visa or Visa more than AMEX.

THE COURT: Well, I didn't mean to deflect you from the argument I know you began to make, but -- and I respect your reading and attempt to read carefully First Circuit doctrine on *Younger* abstention.

But looking at the harassment, the First Circuit clearly recognizes there is a harassment bad faith exception to *Younger*. In evaluating that exception, I'll go back to the question I asked of the plaintiffs: To what extent can a Court consider the announced motive of the -- in this case, the general in bringing a civil enforcement action?

Do his words matter or not?

MR. TUNG: Thank you for your question, Your Honor. One second.

So I think, to the best of my knowledge, there isn't

such a clear rule in the First Circuit about statements that can be considered. It's possible I may have missed something. I thought that was a little unusual.

And Plaintiff -- and Plaintiffs in this case rely on Arizona -- the Arizona case from the Ninth Circuit to show that some contemporaneous statements, like, do show and can be considered.

I will say that later, the Ninth Circuit in *Yelp* found that these statements are evidence of enforcement priorities, and we think that, like you mentioned earlier, Judge, these statements are enforcement priorities and are responsive to the people that elected General Paxton.

And as far as the Court considers any of these statements, we want to note that the standard that must be met in this case is but-for causation, and I believe this is from *Nieves versus Bartlett* at SCOTUS and I think *Hartman* -- I have it written down somewhere -- but the standard to show this is really quite high.

And in the First Circuit especially in order to show this bad faith harassment, you have to show -- we believe according to First Circuit case law that there's no reasonable expectation of success in the state suit, which I think is a different requirement than the Fifth Circuit has and the Ninth Circuit has and the Second Circuit has, and that's a First Circuit court, Your Honor.

THE COURT: But at what point does an announced priority become a violation of the constitution? I'm thinking if I'm the attorney general and I were to announce that my enforcement priority is to prosecute X crime but only when African Americans are the proposed defendant, you would say, no, that's not a permissible motive.

MR. TUNG: Correct, Your Honor.

THE COURT: So then the next step is, well, what if I say I'm going to bring civil enforcement actions against persons with whom I personally disagree with their politics, you would say that is acceptable.

MR. TUNG: Your Honor, I don't think that would be acceptable if Plaintiffs can prove the but-for causation test and the no reasonable likelihood of success test that is adopted by the First Circuit, and I think that's what the First Circuit currently requires.

THE COURT: Okay. Anything more?

MR. TUNG: I also had some prepared remarks that address --

THE COURT: Go ahead.

MR. TUNG: Thank you.

They address some of the arguments made in Plaintiffs' most recent briefing.

Plaintiffs argue that they don't have an adequate opportunity to raise their defenses in federal court, and I

just wanted to talk about Texas state law a little bit.

We think they do. They say that Texas has no early dismissal mechanism, and they cite the anti-SLAPP case which has an exception for Texas AG DT -- DTPA cases.

The test is whether the federal defense can be raised, not how quickly it can be raised under *Sirva* from the First Circuit and *Pennzoil* at SCOTUS.

But also ActBlue can raise its federal defense quickly. They can seek a temporary injunction just like this preliminary injunction hearing and a permanent injunction.

And Texas does have an early dismissal statute. It can file effectively what is our version of a motion to dismiss under Texas Rules of Civil Procedure 91a, which has a mandatory order deadline -- response deadline of 45 days, so they can absolutely get quick relief in Texas court.

As far as the second Middlesex factor, this is in response to their motion to dismiss response at pages 3 to 4, the test for an important state interest is the importance of the kind of proceeding to the state and not at the level of the individual proceeding at issue, so this is from *New Orleans Public Services Incorporated* or *NOPSI* at SCOTUS 1989 at 365 -- 491 U.S. 350 at 365.

And consumer-protection-enforcement-type actions are a classic example of meeting the standard and this comes from *Credit Acceptance Corp* from the District of Massachusetts.

I'd also like to address some of opposing counsel's shifting theories argument. And we think that our theory has been very consistent and clear from the beginning.

We think our original petition alleged and showed that ActBlue said they were doing one thing and they chose to do another in violation of Texas law.

And our amended petition expands upon foreign material as the latest congressional inquiry had a lot more evidence about foreign concerns, so we put that in, but the thrust of the case and the alleged state law violations have always been consistent, and our amended complaint -- and our original complaint does address the foreign issues and our discussions of the *New York Times* and Covington memos.

I'd also like to note that to rebut ActBlue's bad faith charge we need to talk about our faith basis. It's kind of a personal charge.

And an important part of our faith basis for the suit is what was reported in the *New York Times* and the Covington memos. As -- I'd also like to make a note for the record that the type spacing in our briefs is 12 point Times New Roman and our spacing is 24 point, and I have the Word doc that we filed, and I'm happy to show opposing counsel afterwards, that it's, I believe, how our counsel -- our office has always filed briefs, and how my team has always filed briefs even before I joined.

THE COURT: The brief looked fine to me. I'm not

sure what --

MR. TUNG: Thank you. I was worried about that.

And I'd like to talk about the WinRed comparison quickly. We think that the WinRed situation is different because it's much easier to remedy a donation that you know of. You can just refund it to the donator.

But it's very different in this case when the harm and the problem is that ActBlue might not know who donated actually, and, therefore, you can't identify when a lawful donation happened and you don't know who to refund it to or the scope of the issue, and that goes to why we're asking for an injunction to prevent this or so that they're doing what they say.

I'd also like to address *First Choice* a little bit. And so, first, *First Choice* and *Media Matters* were cases about the requests for information that implicated First Amendment associational interests. *First Choice*, of course, was about Article 3 standing.

But the remedy in both of these cases was to quash or a motion for a protective order to prevent the dissemination of that specific information.

So we believe that if opposing counsel's arguments are meritorious, they can absolutely get all their -- all of their remedies in Texas state court or if they remove it to Texas federal court there.

To the extent the Court believes that the requests to examine and the CIDs requests private donor information that conflicts with *First Choice* and *Media Matters*, the Court may be able to find that the RTEs and the CIDs are not a part of the state suit. They preceded the state suit and are, therefore, not a part of it, and are, therefore, not barred by *Younger*.

And in that case, the proper remedy under *First Choice* and *Media Matters* would be to issue an injunction or a protective order prohibiting the dissemination of or an injunction that would block the request for protected information.

And to the extent the Court believes that these requests do implicate protected information, we believe that that would be the appropriate remedy in this case.

THE COURT: I follow that argument, and that would be the normal remedy, say, if we were dealing with a trade secret issue or confidential information of another kind.

But putting it in a First Amendment context and looking at it from a donor's or a prospective donor's point of view, isn't it something of the fact that the organization I'm thinking of donating to is known to be under investigation by an authority with criminal law enforcement capacity a chilling -- I have to think about? Is this organization actually going to protect me? Will they go into court? Will they try to quash the subpoena that's looking for my name and

personal information about me? Isn't the chilling effect simply from the fact of the investigation, not necessarily the information that ultimately is disclosed?

MR. TUNG: So, Your Honor, I personally am not aware of case law that finds the investigation by itself -- the fact that an investigation exists is enough to overcome the standard in the First Circuit. It may exist. I don't -- I'm not aware of it.

It's my understanding that generally the existence of an investigation is actually not -- as a question of law, not enough to overcome the standard under the principle that no one is to be free from an investigation, and it is a requirement, as a participant in our legal system, that you may be investigated for violations of law.

And, to the best of my knowledge, the remedy in these cases has been we're going to quash your requests for individual information; perhaps we're going to quash this specific ongoing state lawsuit, and in order to quash a future investigation or a future lawsuit, you have to meet the high barriers of Article 3 and the certainty that this will for sure happen again and it will be unmeritorious.

And I'm concerned that with opposing counsel's proposed relief that they might be trying -- they might effectively get an immunity from Texas law in Texas, which cannot be the answer.

If they break the law, if more evidence comes out from Congress that they've messed up, they have to be responsible for their violations of Texas law if they are doing business in Texas.

And any scope of relief offered must be tailored to the ongoing harms in this case under the restrictions of Article 3 and *Younger*.

THE COURT: I follow you on that point.

Anything else?

MR. TUNG: I think that would be all for now. Thank you so much for having us today.

THE COURT: Thank you, Mr. Tung, and we have one more presentation.

MR. TUNG: Yes, sir.

MS. SAEGER: Thank you, Your Honor.

May it please the Court, as my cocounsel explained, Plaintiffs' claims fail on several threshold issues. Plaintiffs' claims further fail on the preliminary injunction factors. This Court should deny Plaintiffs' motion.

First, likelihood of success: Plaintiffs bear the burden to establish by the a clear showing under the *Winter* case from the Supreme Court; this is two-step inquiry in the First Circuit.

First, the prima facie case, which requires Plaintiffs to establish a showing of three elements, that they were

engaging in protected activity; that they were subjected to an adverse action by an defendant; and that the protected conduct was a substantial or motivating factor in the adverse action, and then, second, the burden shifts to the defendant to give him an opportunity to rebut by showing that he would have reached the same decision even in the absence of protected conduct. It's this shifting burden, this second step that this Court should base its ruling on today, Your Honor.

First, Plaintiffs were not engaged in constitutionally protected conduct. I'd like to address Your Honor's question to opposing counsel about commercial speech.

Looking to the Supreme Court's case of *Bolger versus Youngs Drug Products Corporation*, commercial speech is defined as speech which does no more than propose a commercial transaction, and then the Court went on to address three factors which it said on their own do not establish commercial speech but taken together or even two of them could establish commercial speech.

So here, we see two in play. The three factors are advertisement, that it references a specific product, and that the speaker has an economic motivation.

The speech at issue here is ActBlue's statements to Congress and to the public, including Texas consumers, that its fundraising platform employs robust anti-fraud measures to prevent -- to prevent fraud such as foreign donations or

individuals violating federal election laws by donating over the threshold limit.

This is both -- while not necessarily an advertisement of their product, this is referencing a specific product. Their anti -- their fundraising platform, and the speaker certainly has an economic motivation, soliciting donations or soliciting individuals to use their fundraising platform to support candidacies.

And then if we look to Texas's amended petition paragraph 4 of Count 1, Texas pleads that ActBlue's fundraising platform itself is the good or service and is the conduct of trade or commerce under the DTPA, so this does relate, in fact, to Texas consumer protection law.

Second, Plaintiffs bear the burden of showing that Defendant was motivated by retaliatory animus and that Plaintiffs would not have been sued but for Defendant's retaliatory animus. Here, Your Honor, Plaintiffs have not shown this causation.

Plaintiffs mistakenly attempt to magnify statements made by General Paxton to show this retaliatory animus. We would point the Court to *Yelp versus Paxton*, the Ninth Circuit case, which noted that state attorneys general are entitled to have enforcement priorities and policy positions, as my cocounsel spoke about, and that enforcement actions consistent with that policy direction are not enough to establish a

retaliatory motive.

Here, Your Honor, I'd like to point you back to your question earlier posing a hypothetical. If the attorney general were to state that his policy position was to go after individuals based on a protected class such as race, Your Honor, I believe a -- the policy preference such as that would itself be a constitutional violation and any action thereof would be violating many laws, state and federal. It wouldn't just be a First Amendment retaliatory action.

Here, we have statements made by the attorney general that -- that convey two pieces of information. First, that ActBlue raising large amounts of money for liberal Democrats. There is a true statement, Your Honor.

Second, evidence exists that ActBlue may be violating the law; also a true statement, and whether there be rhetorical flourishes in addition to these statements or a connotation that the attorney general is going after them because they raise money for liberal Democrats, that should not matter because the fact is, Your Honor, there is evidence -- we have evidence of ActBlue's potential violations of the law.

THE COURT: I follow that argument. You're not trying to argue that viewpoint discrimination is constitutionally permitted.

MS. SAEGER: No, Your Honor.

THE COURT: Why didn't the attorney general ever make

that clear in a statement that he made that he was pursuing this not because it was crazy left wing in its orientation, but his interest was simply in protecting -- again, I'm trying to understand what the interest is from a -- you're saying from a donor's point of view we're more comfortable donating to an organization that we can be assured is not involved in any kind of corrupt activity and is complying with all federal election laws. I think that's the argument you're trying to make.

MS. SAEGER: Yes, Your Honor. That's accurate.

THE COURT: But then you wouldn't then go on to say that viewpoint discrimination is okay also, so it's just simply that argument, your second argument which you're relying on.

MS. SAEGER: He doesn't have to clarify that his statement is not -- he doesn't have to clarify or make a statement against viewpoint discrimination because under the *Mount Healthy* standard, Your Honor, even if there is some evidence that the attorney general is in part motivated or even if -- *Mount Healthy*, I think, said if it plays a substantial part by this political disagreement if the attorney general, which he can, can show that there is another reason and a more substantial reason, which is the violations of the law, then that takes over, and can fully rebut the prima facie case that Plaintiffs could have made, so it doesn't necessarily matter if there is a mixed motive as long as there is credible evidence in the state court suit, which we would argue there is.

Next, Plaintiffs' temporal proximity argument obscures the timeline completely and ignores intervening and superseding causes.

There are two in particular. First, is the congressional investigation. Plaintiffs neglected to mention that there was an ongoing congressional investigation, which is -- which preceded the Texas attorney general's investigation by a few months in 2023, and the congressional investigation continues with, I think, upcoming deadlines for disclosure and for testimony.

The fact that this was ongoing and is part of the evidence that the attorney general relied upon to provide a good faith basis for his investigations and civil enforcement action is enough to show that the temporal proximity was not indicative of retaliatory animus.

THE COURT: I follow your point, but, again, as I understand the congressional investigation, its focus is on federal election law violations.

What -- I can understand as a citizen or even as a public official the attorney general may have an interest in federal election law, but how does that fit into an enforcement scheme involving a consumer protection statute?

MS. SAEGER: It fits in, Your Honor, because by accepting -- first, by telling Congress and the public -- by telling Congress and telling the public at the same time and by

posting it all over their website that they employ robust anti-fraud detection measures they -- and specifically with regard to their gift card acceptance or nonacceptance policy, ActBlue has represented that it is not accepting gift cards or certain types of gift cards as a -- an anti-fraud measure to check against certain frauds happening, such as foreign donations.

And this is -- this is the nexus, Your Honor, to the congressional investigation, which is based off of federal law which Texas attorney general has no authority to prosecute claims over.

But consumers deserve to have -- and Texas law allows the Consumer Protection Division of the attorney general's office to bring a civil enforcement action on this basis -- consumers to have assurances that the -- that the products that they are purchasing, supporting are secure, and particularly Texans care a lot about secure elections.

And so if there are -- certainly, Texans are aware of the congressional investigation, the myriad claims against ActBlue, and the evidence that has been unveiled through Congress's investigation, the *New York Times*' investigation, and Texas's own investigation, Texans are aware of this. They're concerned about it, and so that does give the attorney general, through the Consumer Protection Division, the full authority under the DTPA to investigate and to bring a civil

enforcement action.

I'd like to briefly address the gift card donations that were successful in February of this year. Plaintiffs' counsel obscures this point arguing, first, that the -- several I think it's AMEX -- I get confused by the card -- but I think the AMEX donations did not go through. While three donations did go through, one Visa and two Mastercards.

And Plaintiffs' counsel argues that this is because their anti-fraud measure did not pick up on those cards as against their policy or as potentially dangerous donations.

That's an issue, Your Honor, and that's an issue that Texas consumers care about, so, therefore, it's an issue that the Texas Consumer Protection Division and the attorney general can -- can seek a civil enforcement action from.

THE COURT: Again, on that -- going back to the talk about a ream --

MS. SAEGER: Sure.

THE COURT: It's only those three examples you have; is that right?

MS. SAEGER: I'm sorry?

THE COURT: It's only those three examples that you have.

MS. SAEGER: Those three examples combined with the congressional investigation and the evidence from the *New York Times*' investigation through their expose in early April of

this year, Your Honor.

THE COURT: Well, that's an interesting question. Let's -- I don't want to get you too far out on a limb --

MS. SAEGER: Sure.

THE COURT: -- but Plaintiffs are saying, wait a minute, this is an attorney-client privilege issue; we haven't waived it, so are you really relying on the *New York Times* or statements attributed to their counsel, at least their counsel at the time?

MS. SAEGER: We are relying on the *New York Times* article and the statements therein. However, we're not relying on -- the Consumer Protection Division certainly did not rely upon the memos themselves.

Now, in a letter in response to opposing counsel in the state enforcement action, counsel for Texas argued -- stated that Texas has never had the Covington Burling memos. We have never seen them. We will not seen them. We have only relied upon the statements that have been publicly broadcasted through the *New York Times* article.

And, Your Honor, in -- opposing counsel for the state -- the state action, in their letter to state counsel, they argued -- they did not state -- they argued that they had asked the *New York Times* to take these -- take this article down, to remove the supposedly privileged information. However, they did not make any showing on that point.

There is no evidence, absolutely none, that ActBlue has asked and failed to get these statements taken down from the *New York Times*, but even if they had, they have waived this privilege over and over again, Your Honor.

And the most recently and most relevant to this court's proceeding is the fact that they have used -- ActBlue has used both our original petition and the *New York Times* article itself as affirmative evidence to support their preliminary injunction motion.

They cannot use these statements as a sword and then a shield to prevent Texas from using them as well. Your Honor, they're out for the public to see them, and so the privilege has been waived many times over.

I'd also like to briefly address opposing counsel's charge that there have been shifting justifications. This is a point that I'd like to correct the record on.

Texas's original petition cited extensively to the *New York Times* article in the allegations therein. It -- it referenced suspicion of foreign donations through the congressional investigation.

The reason the petition was then amended in May of this year was because a congressional report came out after the original petition was filed with new evidence or elaboration be on the same evidence.

It is not, as opposing counsel states, an effort to

pack in further justification or try to explain away any retaliatory animus. It was simply a matter of timing, Your Honor.

The justification for this lawsuit has always been the same, that there have been suspected and there's evidence of violations of the DTPA and the attorney general has authority to prosecute.

But getting back to -- getting back to causation and then moving onto the -- when the burden shifts to the defendant, then, under the *Mount Healthy* standard. This is, again, what the Court should base its ruling on today, that, again, even if -- even if -- even if Plaintiffs could prove causation, Defendant prevails under *Mount Healthy* because the but-for cause of Texas's investigation and civil enforcement action was ActBlue's suspected practice of knowingly facilitating unsecure, anonymous, or foreign donations and also misrepresenting to Congress and to the public about their use of gift cards.

This means -- this standard means that the Court should take away the allegedly retaliatory motive and ask whether there is any evidence, and there is.

Under *Mount Healthy*, again, a constitutional violation is not automatically established even when protected conduct played a substantial part in an alleged adverse action. This burden-shifting framework, the Supreme Court said, allows

courts to root out those cases in which retaliation may have been one factor but not the only justification for the alleged adverse actions.

Your Honor, just read Texas's original or now amended petition. The evidence is in there. Taken together, the investigations by Congress, the attorney general, and the *New York Times* provide -- provide much evidence that ActBlue would be in the same position facing a lawsuit in Tarrant County regardless of ActBlue's political leanings and protected activity.

To the next factor of the preliminary injunction test, irreparable harm, the First Circuit weighs this heavily, Your Honor. ActBlue suffers no cognizable harm if they do not receive the requested injunction.

ActBlue can adequately raise its First Amendment defenses before the state court, which is the only proper forum for this dispute, and which has the power to dismiss the state case and award equitable relief if ActBlue's First Amendment defenses prevail.

I'd like to address a point that you raised to opposing counsel as well as my cocounsel, which is chilling effect.

And, Your Honor, the Supreme Court has -- and other courts have said that there is a chilling effect when First Amendment rights are taken away even for a moment.

Here, we would argue that the -- that that analysis depends on this Court first finding that there is retaliation, which we would dispute. So even -- even if there is a chilling effect here, it's not necessarily actionable or a constitutional violation because there is this *Mount Healthy* standard alternative -- alternative explanation, which is the evidence that the Texas state case has and that the attorney general had a neutral reason just to enforce the law against ActBlue.

THE COURT: Are you sure there's a connection between chilling effect and *Mount Healthy*?

I mean, if -- does it depend on the quantity or the quantum of chilling that flows from the motivation of the enforcement action?

In other words, do you have to get past the *Mount Healthy* issue before you can even get to the chilling effect, or does the First Amendment trump --

MS. SAEGER: I think maybe --

THE COURT: -- *Mount Healthy* in that respect?

MS. SAEGER: I think maybe I said it unclearly.

There may be a chilling effect, but because of the *Mount Healthy* standard, this is, like, the -- the balancing test under *Mount Healthy*, so Plaintiffs can establish a prima facie case, but then it -- the burden shifts to the defendant to rebut that with his *Mount Healthy* same decision defense,

and --

THE COURT: So a little bit of chilling is okay but not a lot.

MS. SAEGER: I don't think there's a quantifiable amount, and I'm not asking this Court to make a --

THE COURT: Understood.

MS. SAEGER: -- some sort of decision on that. I'm just saying that even if there is some incidental chilling, like Your Honor said, with a criminal prosecution or allegations that a company is doing something unlawful, somebody's potentially not going to want to donate to that company because there's this bad reputation, that happens in both meritless criminal prosecutions or civil actions and those that hold merit.

So what I'm saying is that this case holds merit, so this Court should not necessarily take the fact that there might be some chilling to overpower and find for the plaintiffs.

And, finally, on that point, the burden of litigation and its associated expenses are not irreparable injury under *Renegotiation Board versus Bannercraft Clothing Company.*

Third -- the third factor or the last two factors merge with when the government is a party. Issuing Plaintiffs' requested injunction will significantly burden the State of Texas and -- and so these factors weigh against enjoining a

sovereign's enforcement of its own laws.

And then briefly, overbroad remedy, Your Honor, the remedy that Plaintiffs are asking for is unprecedented and extraordinarily broad.

Essentially, it is this: Plaintiffs, a foreign corporation, registered to do business in Texas seek to prevent Texas, a sovereign state, from exercising its right to investigate them for potential violations of Texas consumer protection law that occurred in Texas and harmed Texas citizens and to enforce Texas law against them in Texas courts if violations are found.

And as Your Honor acknowledged and questioned opposing counsel, their requested relief is confusing to say the least. Even with her clarification, I believe opposing counsel is still asking for something that is completely overly broad and this Court should at least exercise much caution before deciding to grant, and that is because opposing counsel stated, in response to your question, that they are asking for this Court to enjoin any initiation of any other action that would be in violation of ActBlue's rights and also enjoining from initiating a new action on the same grounds.

This, Your Honor, as you aptly stated to opposing counsel in your question, is that the Court can't enjoin future action even if it's based upon the same grounds as this action.

All the Court is authorized -- has jurisdiction to do

is -- is stop what is happening now potentially, but even with that, the Supreme Court has recognized in *Califano versus Yamasaki* that federal principles of equity require that equitable relief be, quote, no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs, end quote.

If this Court were to determine that plaintiffs have made a sufficient showing on the four preliminary injunction factors, complete relief would look -- would be enjoining this investigation.

Any injunction issued by this Court should have no effect on future investigations based on new evidence of the same DTPA violations or on other violations.

The Supreme Court said in *Rizzo versus Goode* that Courts must be especially careful when the exercise of authority by state officials is attacked and must weigh the special delicacy of the adjustment to be preserved between federal equitable power and state administration of its own law, and *Mount Healthy* forbids Courts from placing plaintiffs in a better position because of the exercise of constitutionally protected activity.

Plaintiffs' requested injunction here would do just that. They would be effectively shielded from future investigations by Texas if there is even a hint of political opposition. That cannot be the law, Your Honor.

This Court must remember that the First Amendment doesn't disable Texas from enforcing generally applicable law against ActBlue for reasons unrelated to any protected activity.

Plaintiffs also cannot obtain an order requiring dismissal of the Texas action with prejudice at the preliminary injunction stage.

Under *University of Texas versus Camenisch*, the Supreme Court held that the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, not to grant final judgment before trial.

For all these reasons, Your Honor, we respectfully request this Court deny Plaintiffs' expedited motion for preliminary injunction and grant our motion to dismiss. Thank you.

THE COURT: Thank you. Your argument was very well framed. I applaud you.

I'm going to take the matter under advertisement. I know you both have an investment in a prompt decision, and I'm actually pretty good at prompt decisions, so I promise you a prompt decision, but not today.

Again, thank you for your attendance and you've given me a lot to think about.

MS. ELLSWORTH: Thank you, Your Honor.

THE CLERK: All rise.

(The Honorable Court exited.)

(Adjourned at 12:27 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

I, Jennifer M. Vaillancourt, do hereby certify that the foregoing is a correct transcript from the record of proceedings taken on June 4, 2026, in the above-entitled matter to the best of my knowledge, skill, and ability.

/s/ Jennifer M. Vaillancourt_ June 23, 2026

Jennifer M. Vaillancourt, RPR, CSR Date
Official Court Reporter